UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-25 (LMP/DLM)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | JOINT PETITION TO DISCLOSE |
| v. ) | GRAND JURY MATERIAL |
| ) | |
| NEKIMA LEVY ARMSTRONG, et al., ) | |
| ) | |
| Defendants. ) | |

## I.    INTRODUCTION

Numerous irregularities in this case, many of which have already been noted by the Chief Judge of this court, raise concrete, non-speculative concerns that prosecutors engaged in conduct in the grand jury that undermined that body's historic and constitutional function of protecting against prosecutorial overreach.  Specifically, the record raises significant concern that the government provided the grand jury with profoundly misleading legal instruction; failed to ensure that the grand jury engaged in an individualized, defendant-by-defendant assessment of probable cause; engaged in inflammatory legal argument or commentary; and improperly rushed the deliberation due to the government's dubious claim of a national-security emergency.  Any of these improper actions, singularly or in combination, would provide the defendants grounds for a motion to dismiss.

Accordingly, the undersigned defendants respectfully ask this Court to grant them access to a narrow subset of grand jury material—specifically, (a) a transcript of direct interactions between the prosecution and the grand jury (such as introductory remarks, legal advice, instruction, or colloquy); (b) the testimony of any federal law enforcement officer(s) who appeared in the grand jury; and (c) any exhibits presented to the grand jury.

Federal Rule of Criminal Procedure 6(e) requires that matters occurring before a grand

jury generally remain secret.  Fed. R. Crim. P. 6(e)(2).  However, that secrecy is not absolute; in fact, Congress "has recognized that in some situations justice may *demand* that discrete portions of grand jury proceedings be made available." *In re Grand Jury Proc. Relative to Perl*, 838 F.2d 304, 306 (8th Cir. 1988) (emphasis added); *see also Murdick v. United States*, 15 F.2d 965, 968 (8th Cir. 1926) ("There is inherent power in the court to prevent abuse in grand jury proceedings. There is no divinity surrounding its action, and the court has the right to go behind the secrecy imposed upon a grand jury as to its proceedings, where the interests of justice demand.").[1]  This is one of those times where justice demands release.

Rule 6(e)'s enumerated exceptions expressly include disclosure made "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii); *United States v. Williams*, No. 20-CR-282 (3) (PJS/ECW), 2023 WL 4373905, at *1 (D. Minn. July 6, 2023) (quoting the rule). To obtain these grand jury materials, the party seeking disclosure must also make a strong showing of particularized need. *United States v. Sells Eng'g, Inc.,* 463 U.S. 418, 434 (1983); *United States v. McDougal*, 559 F.3d 837, 841 (8th Cir. 2009) (citing standard for "particularized need"); *United States v. Broyles*, 37 F.3d 1314, 1318 (8th Cir. 1994); *In re Grand Jury Proc. Relative to Perl*, 838 F.2d 304, 306 (8th Cir. 1988).

As explained more fully below, the defendants have more than adequately demonstrated that grounds may (and likely do) exist to dismiss the superseding indictment based upon improper conduct and that their need for the limited information they are requesting far outweighs any need for continued secrecy.  Their access to the requested information is

---

[1] An appellate court relied on this 1926 case as recently as 2022.  *In re Petition for Ord. Directing Release of Recs.*, 27 F.4th 84, 91 (1st Cir. 2022).

necessary to avoid an injustice of constitutional magnitude, and they have crafted a narrowly tailored request limited to only that information that does not intrude upon any of the concerns underpinning the historic need for grand jury secrecy.

For these reasons, the defendants respectfully ask this Court to grant their request.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. The Alleged Offense

This case stems from a nonviolent protest that allegedly disrupted a church service. Based on that protest—carried out on the Martin Luther King holiday weekend in honor of the late civil rights activist who championed nonviolent resistance— the government charged 39 defendants with multiple federal felonies.

The political protest took place at Cities Church in St. Paul on January 18, 2026, 11 days after an Immigration and Customs Enforcement ("ICE") agent shot Renee Good in the face, killing her, during an immigration enforcement action in the Twin Cities known as Operation Metro Surge. Prior to the protest, some of the demonstrators had learned that one of the pastors at the church was also the director of the ICE field office in St. Paul. Doc. No. 23-1 at ¶¶ 28-29 (Nakima Levy: "That's why we're here. We're demanding justice for Renee Good and letting them know that this will not stand.").

*The video.* Don Lemon, an independent journalist, livestreamed the protest that led to the current charges. The government relied on the livestream video as the basis for many of the allegations in the initial complaint affidavit and ultimate superseding indictment. *See* Doc. 23-1 at ¶¶ 7-33. A clip of the video, depicting the protest, is attached as **Exhibit A**. The video shows Mr. Lemon entering the church without his cameraman and broadcasting audio from inside. Ex. A at 00:05. Shortly after he enters the church, a woman can be heard interrupting the pastor and asking about another pastor employed by ICE. 01:54. The protesters then begin chanting,

"Justice for . . . Renee Good" and then, "Hands up . . . Don't shoot," as Mr. Lemon narrates the activity. 02:15-02:33.

Once the cameraman enters the building, the video shows a number of protesters chanting and milling around the gallery of the church. 03:00. Many are filming with their cellphones. They are chanting "ICE out." 03:15. The pastor can be seen at the pulpit, calmly consulting with several congregants. 03:20. Many of the congregants leave the building, while others appear to pray over the protesters. 04:02, 04:36. One of the protesters says, "This ain't God's house. The house of the devil." 04:42. Multiple doors—at the main entrance in the back of the church and on the side—are wide open and unobstructed. *E.g.,* 04:44, 06:36.

At one point, the pastor comes down from the altar and continues to converse with his congregants. 04:57, 06:23. Mr. Lemon describes the scene to his viewers as "kind of mayhem in here." 06:28. Mr. Lemon seeks out the pastor, who states, "Our church had gathered for worship, which we do every Sunday, and we were interrupted by this group of protesters." 12:39. He then says, "I have to take care of my church and my family," and asks Mr. Lemon to leave. 13:38. The pastor then leaves the civil conversation without obstruction.

Mr. Lemon continues to move through the church and interview other congregants. One congregant comments that "it's good to speak up, it's good to protest, but it's better to do it in a peaceful way." 17:40. When Lemon asks him whether this protest is peaceful, the man says, "it's trespassing." 17:46. At the end of their civil conversation, Mr. Lemon and the man shake hands. 19:47.

As the protest continues, a group of congregants standing near the unobstructed main entrance hold their arms up in prayer. 16:25. Congregants can be seen putting on their coats and leaving the church, unobstructed, 04:45, or filming with their phones, 03:30, or praying. Others simply remain in their chairs, quietly observing. 06:50. One congregant yells angrily at some of

the protesters. 08:09. Another congregant puts a hand on the first congregant's shoulder to calm him down. 08:15. The pastor can be seen speaking to a young congregant. 16:57.

In short order, most of the congregants have left the church, and there seem to be more protesters than churchgoers. The church doors remain wide open, as congregants leave without issue. 19:40. Don Lemon also leaves the church, seven minutes after being asked to do so. 20:16. He walks around the building to another entrance and points out the pastor hugging the congregants as they leave the church, unobstructed. 21:08. (The pastor has, by this point, moved from the front of the church to the back, without impediment. 20:04)

After interviewing another congregant leaving the church, Lemon goes back inside. The protesters are still chanting about Renee Good, but the size of the crowd has diminished substantially. Another congregant leaving the church tells Lemon that the protesters have lost because they "emptied a house of worship [and] everybody's gone home." 24:02. He says that the protesters have caused "derision and upset," and that he feels "violated, interrupted, and angry." 24:21.

As Lemon's conversation with the congregant continues, Ms. Levy Armstrong and the other protesters can be seen exiting the church past them, while chanting, "We have nothing to lose but our chains." 25:11. This occurs approximately 23 minutes after the protest began.

There are rows of chairs in the gallery of the church, not affixed to the floor. At the end of the protest, they remain in neat rows just as they were before the protest began. Not a single chair has been overturned by the disturbance or pushed out of line. 23:25.

### B.    The Government's Rocky Road to Indictment

Almost immediately after this protest, the government began a public and hurried effort to charge every nonviolent demonstrator from Cities Church with multiple felonies.  This extraordinary path to the superseding indictment is detailed in Doc. 125, Lemon Motion for

Release of Grand Jury Material (Lemon Motion), which undersigned defendants hereby adopt in its entirety, as well as incorporating herein the material at pp. 3-5, which is relevant to this section. A short summary of the most relevant events follows:

On January 20, 2026, two days after the church protest, the government presented this Court with a probable cause affidavit and a criminal complaint seeking to charge eight protestors with two crimes: a violation of 18 U.S.C. § 241, the federal criminal civil rights conspiracy statute; and a violation of 18 U.S.C. § 248(a)(2) (the FACE Act). After reviewing the affidavit, this Court informed the government that it lacked probable cause for all eight of the defendants on the FACE Act charge and for five of the eight defendants on the conspiracy charge. *See In re United States of America,* No. 26-01135, Emergency Pet. for Writ of Mandamus *("Pet.")* at 3 (8th Cir. Jan. 22, 2026).

Rather than marshaling sufficient probable cause to satisfy the Court's concerns, the government took a step "unheard of" in the history of the District of Minnesota, seeking district court review of the no-probable-cause determination. Letter from Chief Judge Schiltz to Eighth Circuit, No. 26-01135 at 2 (Jan. 23, 2026) ("First Letter") ("It is important to emphasize that … [the government's request for review] is unheard of in our district or, as best as I can tell, any other district in the Eighth Circuit. I have surveyed all of our judges—some of whom have been judges in our District for over 40 years—and no one can remember the government asking a district judge to review a magistrate judge's denial of an arrest warrant."); s*ee also Pet.* at 4. When the district court did not immediately act upon the government's demand for review, the government filed an emergency petition for a writ of mandamus to the Eighth Circuit, claiming a "national-security emergency" and demanding that the court issue a writ by the next day ordering the district court to issue arrest warrants, or, alternatively, that the Eighth Circuit issue the arrest warrants itself. Pet. at 2; First Letter at 3. On January 23, 2026, the Eighth Circuit denied the

government's emergency petition. *See* Judgment (Jan. 23, 2026).

Still, the government did not amend the complaint affidavit, as it would presumably have done if it had possessed additional evidence to support probable cause. Rather, it turned to the grand jury, which on January 29, 2026, returned a true bill against defendants 1-9, apparently on the same evidence that this Court had found inadequate. *See* Doc. No. 39. On February 26, 2026, the government obtained a superseding indictment, adding 30 defendants charged with the same two violations contained in the initial indictment. Doc. No. 144. [2]

Three weeks later, the government quietly moved to dismiss the charges against one of the 39 defendants, a woman who apparently had nothing to do with the protest and never entered the church. Doc. Nos. 412, 413.[3] Given that this woman had nothing to do with the demonstration at the church, it is factually impossible that the government possessed—let alone presented to the grand jury—reliable evidence of her complicity. Nevertheless, the grand jury indicted her.[4]

---

[2] Although it is possible that the government presented to the grand jury additional evidence that was not previously presented to this Court, Chief Judge Schiltz, or the Eighth Circuit, the timeline of this prosecution suggests that it did not. Three days after the mandamus petition was denied by the Eighth Circuit, the grand jury returned the first indictment.

[3] *See* "Charges Dropped Against Woman Mistaken for Protestor in Minnesota Church Case," New York Times (March 21, 2026) (available at https://www.nytimes.com/2026/03/21/us/chargesdropped-against-woman-mistaken-for-protester-in-minnesota-churchcase.html?smid=nytcore-ios-share).

[4] Assuming this was an honest error, and even assuming that the government had arguable probable cause to believe that this woman was present at the church, this episode offers support for two key pillars of this motion for grand jury minutes: (1) it supports the strong inference, set out below, that the government, contrary to law, *see infra* at 19-20**,** treats mere presence at the church during this protest as sufficient to establish probable cause that a person committed a conspiracy and a FACE Act violation (and therefore supports the inference that the government misled the grand jury on this key legal principle); and (2) it reflects an apparent failure on the part of the government to conduct a careful, individualized assessment of its evidence (and therefore supports the strong inference, set out below, that the government failed to instruct the grand jury on this important constitutional requirement).

C.      **Statements of Government Officials Magnifying Concerns of Faulty Instructions**

As these atypical efforts were ongoing, high-ranking Department of Justice (DOJ) officials were making inflammatory public statements, as outlined in Doc. 125 at pp. 5-9 (Lemon Motion), adopted and incorporated herein.  Officials made these statements in violation of federal regulations, the Justice Manual, and the rules of professional responsibility.  *See* 28 C.F.R. § 50.2(b)(2) (prohibiting any public statement that could "reasonably be expected to influence the outcome of a pending or future trial."); Justice Manual 1-7.600 ("DOJ personnel shall not make any statement . . .  that reasonably could have a substantial likelihood of materially prejudicing an adjudicative proceeding."); ABA Model Rules of Professional Conduct, § 3.6(a) (prohibiting attorneys from making public communications that "have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.").

D.      **The Resulting Charges as Set Forth in the Superseding Indictment**

The superseding indictment, returned on February 26, 2026, charged 39 defendants [now down to 38] with two felony offenses. Count One charges a violation of 18 U.S.C. § 241, the federal criminal civil rights conspiracy statute, and Count Two charges a violation of 18 U.S.C. § 248(a)(2), commonly referred to as the FACE Act. The 19-page speaking indictment, which describes the protesters' conduct in copious detail, contains no allegation of conduct that involves force, a threat of bodily injury, or any act of obstruction as defined in the statute.  Yet the document asserts, in conclusory fashion, that the protestors "engaged in acts of oppression, intimidation, threats, interference, and physical obstruction." (Doc. 144 at ¶ 3).

### III.     LAW AND ARGUMENT

As demonstrated below, there are numerous concrete, non-speculative reasons to believe that the government provided the grand jury with profoundly misleading legal instruction; failed

to ensure that the grand jury engaged in an individualized, defendant-by-defendant assessment of probable cause; engaged in improper, inflammatory commentary; and improperly rushed the grand jury's deliberation due to the government's hyperbolic claim of national emergency. Any of these grand jury abuses, separately or combined, risks an indictment so obviously obtained through infringement on the grand jury's independence that it violates the Fifth Amendment and can provide grounds for dismissal. *See, e.g., Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (explaining that dismissal is appropriate if a defendant establishes that misconduct before the grand jury "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations.") (internal quotations and citations omitted); *United States v. Hogan*, 712 F.2d 757, 762 (2d Cir. 1983) ("Taking advantage of his special position of trust, the AUSA impaired the grand jury's integrity as an independent body"); *see also United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1245 (10th Cir. 1996) (holding that although technical errors affecting probable cause are insufficient to dismiss an indictment, errors grave enough to "essentially threaten[] the defendant's rights to fundamental fairness" may serve as a basis for dismissal).

A. **There Is Reason to Believe the Government Provided the Grand Jury with Fundamentally Flawed Legal Instruction**

The government has charged two narrow, complex statutes. However, the language in the superseding indictment itself (underscored by public comments made by DOJ officials) reveals that the government did not understand (or did not respect) the limited legal reach of these statutes. The government's ignorance of (or disregard for) the elements of the offenses it charged makes it extremely likely that prosecutors, relying on their incorrect view of the law, provided fundamentally inaccurate legal instruction to the grand jury. Although courts rarely concern themselves with minor instructional errors in the grand jury—because it is rare for such errors to

affect probable cause, much less fundamental fairness—significant, improper instruction, such as appears to have been given here, infringes on the grand jury's independence and provides grounds for dismissal.

A district court in the Eastern District of Virginia recently provided a defendant access to grand jury material based, in part, on two comments the prosecutor made to the grand jury that, on their face, appeared to be "fundamental misstatements of the law that could compromise the integrity of the grand jury process." *United States v. Comey*, 809 F. Supp. 3d 396, 409 (E.D. Va. 2025). Other courts have similarly recognized that errors in instructions can be so grave as to require dismissal of an indictment. *United States v. Peralta,* 763 F. Supp. 14, 21 (S.D.N.Y.1991) ("We find that defendants were seriously prejudiced by the cumulative effect of the government's misleading statements of law and its use of inaccurate hearsay testimony. These defects in the grand jury presentation leave us with 'grave doubt that the decision to indict was free from the substantial influence' of the errors.") (*citing Bank of Nova Scotia*, 487 U.S. at 256); *see also United States v. Gas Pipe, Inc.*, No. 3:14-CR-00298-M, 2018 WL 5046412, at *7 (N.D. Tex. Aug. 7, 2018) (declining to dismiss but recognizing that "[a] legal instruction to the grand jury that 'seriously misstates the applicable law renders the indictment subject to dismissal if the misstatement casts grave doubt that the decision to indict was free from substantial influence of the erroneous instruction."); *United States v. Steven*s, 771 F. Supp. 2d 556, 567 (D. Md. 2011) (dismissing indictment due to instructional error that raised "grave doubt that the decision to indict was free from the substantial influence" of the erroneous instruction).

Without the transcript of the legal instruction and colloquy, neither the defendants nor the Court can determine the extent of any instructional error.  The defendants need not, at this stage, prove that they would *certainly* prevail in a motion to dismiss—only that grounds "*may exist*" to challenge the indictment based on the suspected error.  The irregularities identified below are so

numerous and significant that justice demands that the defendants be allowed to pierce the veil of grand jury secrecy to determine whether the feared errors in fact occurred.

To assist this Court in evaluating why the available evidence indicates a high risk of fundamental instructional error, the defendants first explain the federal prosecutor's role as the legal advisor to the grand jury; next explain elements and legal limits of the charged statutes; and then demonstrate how the detailed factual allegations in the indictment and official statements from DOJ officials directly conflict with those elements and suggest a profound misunderstanding of the law that was likely shared with the grand jury.

### 1.    The Role of the Prosecutor as Legal Advisor to the Grand Jury

The role of the grand jury, of course, is to determine if there is probable cause for each defendant on each element of each offense.  Through the exercise of this duty, the grand jury serves historic functions that pre-date even the Fifth Amendment, including "both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions." *United States v. Calandra*, 414 U.S. 338, 343 (1974); *United States v. Allen*, 406 F.3d 940, 946 (8th Cir. 2005).  Thus, the grand jury is both the body that indicts a criminal defendant, and the body that protects him or her from unfounded or unwarranted prosecution.  It serves a "vital" role as "a check on prosecutorial power." *United States v. Cotton*, 535 U.S. 625, 634 (2002).  But the grand jury cannot fulfill its duty if it is misled or misinformed.

The task of making sure the grand jury is not misled or misinformed falls to the prosecutor, who serves as the legal advisor to the grand jury.  *See United States v. Navarro-Vargas*, 408 F.3d 1184, 1207 (9th Cir. 2005) (citing authorities explaining that a government attorney is "by law … the only legal advisor to the grand jury"); *United States v. Ciambrone,* 601 F.2d 616, 622 (2d Cir. 1979) (noting that grand jurors "must lean heavily upon the United States

Attorney as its investigator and legal advisor to present to it such evidence as it needs for its performance of its function and to furnish it with controlling legal principles.").

The grand jury, with no special legal training, must rely on the prosecutor to tell it what the law is and explain how the law applies, *or does not apply*, to the facts. *United States v. Filer*, 762 F. Supp. 3d 730, 756 (N.D. Ill. 2025) ("[P]rosecutors are the legal advisors to the grand jury. And as the legal advisors, the prosecutors 'inform[ ] the jurors about the relevant law and explain[ ] how it applies – or does not apply – to the available evidence.') (quoting 1 Susan W. Brenner & Lori E. Shaw, Federal Grand Jury: A Guide to Law and Practice § 6:2 (2d ed. 2006)), *appeal dismissed*, No. 25-1079, 2025 WL 1952087 (7th Cir. Jan. 19, 2025); *see also United States v. Briggs*, 514 F.2d 794, 803 (5th Cir. 1975) ("Failure of the grand jury to perform its shielding function where appropriate may be explained by the tendency of the body, with its members not learned in the law, to follow the lead of the prosecutor, who is its legal advisor."); *United States v. Wahib*, 578 F. Supp. 3d 951, 957 (N.D. Ohio 2022) ("As a legal advisor to the grand jury, the prosecutor must give the grand jury sufficient information concerning the relevant law to enable it intelligently to decide whether a crime has been committed.") (internal quotation and citation omitted); *United States v. Twersky*, No. S2 92 CR. 1082 (SWK), 1994 WL 319367, at *4 (S.D.N.Y. June 29, 1994) (same).

Of course, if the prosecutor fundamentally misrepresents or distorts the law—either out of ignorance of the law, or with intent to obtain an indictment based on what that prosecutor *wants* the law to be, rather than what it *is*—he or she wholly undermines the independence of the grand jury that is the fundamental promise of the Fifth Amendment. *See United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979) ("[A] line must be drawn beyond which a prosecutor's control over a cooperative grand jury may not extend … [P]rosecutorial behavior, even if unintentional, can also cause improper influence and usurpation of the grand jury's

role."); *United States v. Heffington*, 682 F.2d 1075, 1080 (5th Cir. 1982) ("The role of a prosecutor is to direct the grand jury in its investigation, but to avoid taking control of such inquiry."); American Bar Association, Criminal Justice Standards for the Prosecution Function (4th Ed. 2017) at 3-4.5 (noting that, "[w]here the prosecutor is authorized to act as a legal advisor to the grand jury, the prosecutor should appropriately explain the law").

2.     <u>The Elements of the Charged Statutes</u>

In this case, the job of explaining the law required the prosecutors to explain complicated statutes, due to specialized definitions and statutory cross-references. Count One alleges that the defendants conspired to injure, oppress, threaten, and intimidate members of the Cities Church in the exercise of a federally protected right, described in the superseding indictment as "the First Amendment right of religious freedom at a place of religious worship, as secured by Title 18, United States Code, Section 248(c)." The second count alleges that the defendants violated 18 U.S.C. § 248(a)(2), with [unspecified] resulting bodily injury to a congregant. Because the conspiracy charge involves conduct described in § 248, the defendants describe the elements of § 248 (Count Two) before describing the elements of § 241 (Count One).

a.     *18 U.S.C. § 248(a)(2), the FACE Act*

The applicable section of § 248 makes it a crime to use force, threat of force, or physical obstruction to intentionally injure, intimidate, or interfere with "any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." *See* 18 U.S.C. § 248(a)(2). The elements of the charged violation of § 248(a)(2) are (1) that the defendant used force, the threat of force, or physical obstruction (as that term is narrowly defined in the statute), (2) that the defendant acted with intent to injure, intimidate, or interfere with another person; (3) that the other person was lawfully exercising religious freedom

13

at a place of worship; and (4) that the offense resulted in bodily injury to another person.[5]  18

U.S.C. § 248(a)(2); s*ee also United States v. Dinwiddie*, 76 F.3d 913, 917 (8th Cir. 1996)

(generally discussing statutory language of § 248(a)(1)); *United States v. Harlow*, No. CR 22-

096-4 (CKK), 2023 WL 7880183, at *5 (D.D.C. Nov. 16, 2023)(unpublished) (reciting elements

of § 248(a)) and citing (*Terry v. Reno*, 101 F.3d 1412, 1414 (D.C. Cir. 1996)).

Subsection (e) of § 248 specifically defines "intimidate" ("to place a person in reasonable

apprehension of bodily harm to him"), "interfere with" ("to restrict a person's freedom of

movement"), and "physical obstruction" ("rendering impassable ingress to or egress from … a

place of religious worship, or rendering passage to or from such … place of religious worship

unreasonably difficult or hazardous").  Although the term "threat" is not defined in the statute,

the Supreme Court has recognized that to form the basis of a criminal charge, a threat must be a

"true threat," that is, a statement "where the speaker *means* to communicate a serious expression

of an *intent to commit an act of unlawful violence* to a particular individual or group of

individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (emphasis added). Moreover, the

Eighth Circuit, upholding the constitutionality of a parallel provision of the FACE Act, held that

the threats outlawed by the statute were those threats that met the statutory definition of

"intimidation," meaning that they must place a person "in reasonable apprehension of bodily

harm." *Dinwiddie*, 76 F.3d at 922.

Offensive statements are not threats, and the fact that a purported victim subjectively

finds a statement threatening is not, by itself, enough to render it so, particularly in light of

§ 248's requirement that the government prove that a defendant made the threat to

---

[5] Because the government charged that bodily injury resulted, § 248 is a felony subject to up to ten years' imprisonment.  In the absence of this factor, which is charged in a conclusory manner without a factual description of the injury or how it occurred, the offense would be a petty misdemeanor subject to a maximum 6-month penalty.  *See* § 248(b)(2).

"*intentionally*" intimidate a person engaging in free exercise of religion.

Thus, § 248 requires that a defendant *both* (1) engage in one of three prohibited actions (the use of physical force, issuance of a threat intended to put someone in fear of bodily harm, or physical obstruction that renders impassable ingress to or egress from a building), *and* (2) act with an intent to injure, or place in apprehension of bodily harm, a person who is lawfully exercising their religious freedom. Patently, § 248 does not outlaw mere interference with, or disruption of, a prayer service—even if the disruption is rude, unseemly, and offensive. The FACE Act does not prohibit conduct that interrupts, bothers, disrupts, offends, or even frightens, unless that conduct also involves force, threat, or (total or near-total) obstruction carried out with intent to injure, intimidate and interfere with another person.

Another basic legal principle that is important in evaluating whether the grand jury was properly instructed on this count: in any multi-defendant case, Due Process demands that culpability be determined on an individualized, defendant-by-defendant and charge-by-charge basis. *See United States v. Whitfield*, 140 F.4th 978, 986 (8th Cir. 2025) (citing with approval instruction to petit juror that each count must be considered separately); *United States v. Benedict*, 855 F.3d 880, 885 (8th Cir. 2017) (citing with approval limiting instructions given during trial that each defendant "is entitled to have his case decided solely on the evidence which applies to him").

Accordingly, a properly instructed grand jury would need to be familiar with the elements and limitations of § 248, and particularly with the definitions of "intimidate," "threat," and "physical obstruction," and also be aware of the principle of individualized determination. In the absence of accurate legal guidance, grand jurors would almost certainly interpret this legally complicated statute based on the common usage of terms that are defined far more narrowly in the statute. The risk of a grand jury applying incorrect standards—and therefore the need for

15

accurate legal guidance—is particularly critical here, where the statute uses terms with special legal meaning; the conduct involves core First Amendment expression; the evidence is extraordinarily thin; and the subject matter (disruption of worship) is one about which passions run high.[6]

b.      *18 U.S.C. § 241 (The federal criminal civil rights conspiracy statute)*

Section 241 prohibits conspiracies to injure, oppress, threaten, or intimidate any person in the free exercise of a right secured by the Constitution or laws of the United States. 18 U.S.C. § 241. Section 241 does not expressly identify the federal rights encompassed by the statute, but rather incorporates rights defined elsewhere. *United States v. Lanier,* 520 U.S. 259, 265 (1997) ("in lieu of describing the specific conduct it forbids … [the] … statute's general terms incorporate constitutional law by reference."). This unusual cross-reference to a vast body of law exponentially increases the need for correct legal instruction, since the grand jury cannot simply read the words of the statute and thereby understand the law sufficiently to determine probable cause (as it can do in evaluating certain other statutes in the federal code).

The elements of a § 241 offense are (1) that an agreement (a meeting of the minds) existed; (2) that the purpose of the agreement was to injure, oppress, threaten, or intimidate another person in the exercise of a federally protected right; and (3) that each defendant willingly joined the conspiracy, intending its purpose. 18 U.S.C. § 241. *See also* Eighth Circuit Pattern Criminal Jury Instruction, § 6.18.241 Conspiracy to Deprive a Person of Civil Rights (setting forth elements). The terms "injure, oppress, threaten, and intimidate" require more than conduct

---

[6] In an apparent nod to the paucity of evidence here, the government—after a rush to indictment that included hounding multiple courts for immediate action and then dashing to the grand jury days later—immediately asked this Court for more time to investigate its case. *See* Doc. No. 131 at 4 (requesting complex case designation because "the investigation remains active"); Doc. No. 391 at 4 (requesting 90 day delay because "there were approximately 300-400 congregants and church staff at the church on January 18, 2026 during the time of the alleged offense conduct").

16

that is interruptive or unpleasant. *United States v. Magleby*, 420 F.3d 1136, 1143 (10th Cir. 2005) (holding that § 241 instructions to petit jury were flawed because the jury was allowed to consider the ordinary meaning of "oppress, threaten, and intimidate" rather than using a definition focused on true threats, and noting that "[m]any acts short of unlawful violence may constitute oppression or intimidation in the everyday sense of these words" ) (relying on *United States v. Lee*, 935 F.2d 952, 960 (8th Cir. 1991) (R. Arnold, J., dissenting), *rev'd en banc*, 6 F.3d 1297 (8th Cir.1993)).

In this case, the superseding indictment describes the right at issue as "the First Amendment right of religious freedom at a place of religious worship, as secured by Title 18, United States Code, Section 248(c)." The First Amendment itself cannot serve as the source of the right in this civil rights conspiracy, as the defendants are not state actors; as Justice Scalia explained, for a right to serve as the basis for a civil rights conspiracy where the defendants are not government actors, that right must be one "guaranteed against private impairment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274 (1993) (evaluating civil analogue of criminal conspiracy statute). Because the First Amendment proscribes only *governmental* interference with the practice of religion, *see* U.S. Constitution, Amdt. 1 ("Congress shall make no law ... prohibiting the free exercise" of religion), the "First Amendment right of religious freedom" cannot be violated by a private individual. *United Bd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 832 (1983).

Of course, under the plain language of § 241, a right may be conferred by federal statute as well as by the Constitution. 18 U.S.C. § 241. The superseding indictment cites to a federal statute, § 248(c), as the alleged source of the right; however, any right conferred by § 248(c) is far narrower than the broad right, asserted in the superseding indictment, to practice religion in a place of worship. If § 248(c) creates a right at all, it is by allowing a person aggrieved by the

conduct prohibited in § 248(a) (the provision charged in Count Two) to pursue civil damages. *See* § 248(c)(1)(A) ("Any person aggrieved by reason of the conduct prohibited by subsection (a) may commence a civil action…"). *See, generally, Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023) (explaining how to analyze whether civil laws create rights).

But the conduct prohibited by § 248(a)(2) is *not* mere interference with "the right of religious freedom at a place of religious worship," but rather interference with the right of religious freedom at a place of religious worship *through force, threat of force, or physical obstruction intended to injure, oppress or intimidate another person.* Accordingly, if § 248(c) secures a right that can form the basis of a § 241 charge, it cannot be the right cited in this superseding indictment. A proper indictment on a § 241 charge based on a right "secured by § 248" would require a finding of probable cause to believe that each defendant entered an agreement to injure, oppress, threaten, and intimidate another person in that person's right to worship free of force, threats, or physical obstruction intended to injure, oppress, or intimidate them. Moreover, unless the grand jury were provided a definition of "injure, oppress, threaten, or intimidate," it would almost certainly apply common-usage definitions of these terms—which the Tenth Circuit has expressly warned is error. *Magleby*, 420 F.3d at 1143.[7]

Other basic legal principles relating to conspiracy are also important in evaluating whether the grand jury was properly instructed on this count. As in any conspiracy, a § 241 agreement to violate civil rights requires proof of a meeting of the minds among all conspirators.

---

[7] The Eighth Circuit has noted that when the federal civil rights conspiracy statute is applied to allegations that implicate protected speech, as is the case here, the government must prove that the defendant acted "with the intent to advocate the use of force or violence" in a way that was "likely to produce such action;" or the defendant must have "intended to threaten" the targets of the conduct or "at least intended to cause [the targets] to reasonably fear the use of imminent force or violence." *United States v. Lee*, 6 F.3d 1297, 1304 (8th Cir. 1993) (Gibson, J. concurring). Thus, a properly indicted case would include a finding by the grand jury of probable cause to believe that each defendant acted with this *mens rea*.

18

*United States v. Rolon-Ramos*, 502 F.3d 750, 754 (8th Cir. 2007) ("For a conspiracy against rights, the Government must prove '*an actual agreement* between two or more persons to accomplish a prohibited object.'"); *see also Tinsley v. United State*s, 43 F.2d 890, 892 (8th Cir. 1930) ("In a conspiracy there must be some unity of purpose, some common design and understanding, some meeting of the minds in an unlawful arrangement. . . A person does not become a part of a conspiracy by knowledge that another is about to commit a crime, or necessarily by an acquiescence in the crime."). In the case of § 241, that meeting of the minds must specifically be to injure, oppress, threaten, or intimidate another person. *United States v. Mackey*, 143 F.4th 129, 140 (2d Cir. 2025) (Section 241 case holding that "the government must prove the defendant's knowing agreement as to the conspiracy's unlawful purpose. Here, that meant proving that [the defendant] knowingly agreed . . . to injure others in the free exercise or enjoyment of the right to vote.") (internal quotation and citation omitted).

Therefore, people who agree to take an action together (such as to engage in a protest) but who do *not* share the prohibited intent (an intent to injure, oppress, threaten or intimidate another person in their exercise of a federally protected right) do not violate § 241. *See* Eighth Circuit Pattern Criminal Jury Instruction, 6.18.241 Conspiracy to Deprive a Person of Civil Rights (explaining the second element to be that "at the time the defendant joined in the agreement or understanding, [he][she] *intended to* [interfere with][hinder][prevent] (name of person)'s free exercise or enjoyment [of a right].) (*emphasis added*). Absent such agreement, there is no crime, even if a joint action has the *effect* of interfering with a federally protected right. And, of course, it is axiomatic in any conspiracy that mere presence at a scene, even with knowledge of a crime being committed there, does not establish membership in a conspiracy. *See, e.g., United States v. Shavers*, 955 F.3d 685, 691 (8th Cir. 2020).

Thus, it is clear, as a legal matter, that § 241 does not criminalize an agreement to gather

19

together for a protest—even if those entering the agreement are aware that the protest may disrupt a prayer service in a church, and even if they know that congregants will find their actions deeply offensive. Rather, the statute outlaws only that subset of agreements that are specifically *aimed at* injuring, oppressing, threatening, or intimidating another person in the exercise of a federally protected right – in this case, the right to exercise religion in a place of worship free from force, threats, or obstruction intended to injure, intimidate, or interfere with the right. Any suggestion to the grand jury that a person violates § 241 simply by agreeing with others to engage in conduct that has the effect of disrupting a lawful prayer service would be so fundamentally inaccurate as to substantially affect the defendants' rights.

### 3. The Superseding Indictment Language Reflecting the Government's Legal Misconceptions

The government here chose to use a speaking indictment, setting forth detailed factual averments about the alleged crime. Thus, the superseding indictment reveals the specific conduct that the government claims violates the statutes. However, despite the detail, these allegations fail to establish many of the statutory elements of the offenses and appear to controvert many of the basic legal principles outlined above.[8] The superseding indictment details 41 "overt acts," which generally describe protestors organizing and promoting a demonstration to air grievances against the federal government. The allegations do not describe anyone discussing (let alone agreeing to) acts of violence or an intent to threaten anyone. They also do not describe any act of violence or any act intended to put another in fear of bodily harm. Nor do they include any act of rendering impassable ingress to or egress from the church. When those detailed factual allegations are compared to the statutory elements discussed above, it

---

[8] The defendants are not at this point moving to dismiss the indictment for failure to state an offense. That motion is likely forthcoming. In the meantime, the disconnect between the statutory elements and the factual allegations is relevant (and revelatory) for a different point: because it demonstrates a high likelihood that the grand jury was misled about the required legal standards.

becomes manifest that the government has profoundly misunderstood (or intentionally misrepresented) the law in numerous critical ways and therefore is likely to have significantly misguided the grand jury.  The error would have substantially influenced the decision to indict and would raise grave doubt that the grand jury's decision was free from improper influence. *See Bank of Nova Scotia,* 487 U.S. at 256.

> a.     *The government incorrectly interprets § 241 to outlaw, without more, an agreement to disrupt a service at a church.*

The superseding indictment accuses the defendants of "conspir[ing] and agree[ing] with one another to oppress, threaten, and intimidate multiple persons. . . in the free exercise and enjoyment of the[ir] rights and privileges." Doc. 144 ("SI") ¶ 6.  Yet, the facts set forth in the speaking indictment describe the agreement as an "operation" to "disrupt business as usual" (SI, Overt Act (OA) 16).  It then accuses the defendants of disruptive, but nonviolent, activity in multiple overt acts. (*Id.* at OAs 28, 29, 31, 33).  Indeed, it alleges, as proof that defendant Lemon understood the illegal nature of the conspiracy, that Lemon "*admit[ed]* his knowledge that "the whole point of [the operation] is to disrupt." (*Id.* at OA 33) (emphasis added). And it alleges that, at the end of the protest, demonstrators "engaged in a chant proclaiming 'Who shut this down? We shut this down!'" (*Id.* at OA 38).

But this type of non-violent disruption of "business as usual" is not a federal crime.  It has long been a hallmark of non-violent, First-Amendment-protected actions, such as the lunch counter sit-ins and other protests of the sixties.  In fact, in drafting § 248 (the impetus for which was to protect reproductive rights clinics from violence and physical obstruction that was occurring at that time), Congress expressly protected from prosecution the *non-violent* pro-life demonstrators.[9]  S*ee generally, e.g.,* H.R. REP. 103-306, H.R. Rep. No. 306, 103rd Cong., 1st

---

[9] The FACE Act was a response to violence at reproductive health clinics, including the murder of

Sess. 1993, 1993 WL 465093, 1994 U.S.C.C.A.N. 699.

In discussing the way the conspiracy unfolded, the superseding indictment describes protesters "enter[ing] the Church in a coordinated takeover-style attack and engag[ing] in acts of oppression, intimidation, threats, interference, and physical obstruction alleged herein." SI ¶ 3. The supporting facts, however, do not describe oppressive, intimidating, or threatening behavior, or physical obstruction, in the legal sense (rather than the common-usage sense) of those terms. Instead, the factual recitations discuss chanting, whistle-blowing, loud declarations, and gesturing. *E.g., id.* at OAs 18, 25, 26.

Thus, the facts alleged in the superseding indictment simply do not come close to describing an agreement to injure, intimidate or interfere with any person, much less that the object of any such agreement was to interfere with the free exercise of religion. Again, the chasm between the conduct described and the elements of the offense raises a nonspeculative concern that prosecutors who misconstrued the law (who, for example, equated "menacing" with "interrupting …[with]…loud declarations" or "yelling and blowing whistles," OA 24) shared incorrect legal instructions with the grand jury.

---

doctors, assault of patients, and acts of extreme physical obstruction. Recognizing that some protestors engaged in peaceful protests, Congress outlawed *violent* and *obstructive* actions, while expressly protecting protests (like the one at issue in this case) that were aimed at disrupting business-as-usual in a *non-violent, non-threatening, non-obstructive* way.

Congress ensured that the statute would not be misinterpreted to apply to nonviolent protests (even to upsetting or offensive ones, such as those where patients were called "baby killers," or where graphic pictures of fetuses were displayed). Congress did this by including a provision § 248(d)(1), which mandates that "Nothing in this [law] shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." A correctly instructed grand jury would have needed to be informed of this provision in order to apply the facts to the law and make a probable cause determination.

b.        The government incorrectly interprets § 248(a)(2) to outlaw the disruption of a prayer service at a church (at least if the disruption is upsetting to others and/or involves even minor hindrance of another person's movement).

Similarly, Count Two of the superseding indictment, tracking the statutory language, alleges that the defendants, "each aiding and abetting one another, by use of force, threat of force, and physical obstruction, intentionally injured, intimidated, and interfered with, and attempted to injure, intimidate, and interfere with multiple persons." SI at 18.[10] But the superseding indictment describes the protestors engaging in nonviolent, overtly political actions: "chanting" (*e.g.,* OAs 18, 25, 26, 28, 30, 31, 38); making "loud declarations" (OA 24); "berating … with questions" (OA 27); "occupying" or "standing" in or around the main aisle (*e.g.,* OAs 26, 28, 29); "holding up an anti-ICE sign and chanting "ICE Out!"; "yelling and blowing whistles" (OA 24); "st[anding] in close proximity to the pastor" (OA 35); "pepper[ing] [the pastor] with questions to promote the operation's message" (OA 35); and "challeng[ing congregants] with 'facts'" (OA 40).

The indictment then adds legally inaccurate conclusory characterizations, for example by referring to the described, nonviolent conduct as "menacing and threatening behavior" (OA 26).

The indictment thus reflects the government's basic misunderstanding of the legal requirements of § 248—an understanding that the government made even more explicit in a filing to the Eighth Circuit, where it took the legally unsupportable position that probable cause would exist based simply on allegations of "[a] large group 'entering a church' and 'yelling

---

[10] Although tracking the statutory language is usually sufficient to show that an indictment is facially valid, that is not the case for any § 241 charge, because, as noted *supra* pp. 17-19, the statutory language in § 241 does not contain all the elements of the offense. That general rule also does not apply where, as here, the government includes factual allegations that are inconsistent, as a matter of law, with the statutory language.

These issues and others will be fleshed out in one or more forthcoming Motions to Dismiss. For purposes of the instant motion, what matters is that, because the alleged conduct falls so far short of the alleged statutory allegations, the only way for the government to have bridged that gap in the grand jury was through incorrect legal instructions or improper argument, or both.

horrible things at the members of the church' during Sunday morning services." *In re United States of America,* No. 26-01135, Gov't Resp. at 2 (Jan. 23, 2026) (quoting First Letter).

Given the government's express misstatement of the law to the Eighth Circuit, there is not only a possibility, but an overwhelming likelihood, that this patently inaccurate legal standard was also relayed to the grand jury.

> c.   *The government incorrectly interprets "injure, oppress, threaten and intimidate" to encompass conduct that is disruptive and offensive, even absent an intent to advocate for force or violence, as required by Eighth Circuit law.*

As noted above, the superseding indictment, in entirely conclusory fashion, accuses the defendants of "acts of oppression, intimidation, threats, interference, and physical obstruction," P. 3; and of making unspecified "hostile and aggressive gestures," OA 25, and "engaging in menacing and threatening behavior" by chanting and yelling, OA 26.  The superseding indictment also claims, again without supporting factual allegations, that church staff "perceived [the protestors' actions] as threats of violence and a potential prelude to a mass shooting," OA 25.

These argumentative conclusions accompany factual allegations that describe *conduct*— chanting, singing, standing, making loud declarations, arguing, berating, blowing whistles, peppering with questions, etc.—that do not, as a legal matter, match any of those conclusory claims (let alone offer any hint as to how a reasonable person could fear "a mass shooting" from unarmed protestors holding signs and chanting for political reform).  Again, the gulf between the alleged conduct and the alleged legal conclusions suggest a great likelihood of improper instructions to the grand jury.

    *d.*  *The government incorrectly interprets "physical obstruction" to include crowding an aisle, standing close to another person, or engaging in other conduct that falls far short of the complete or near-complete obstruction required by the statute.*

Count Two of the superseding indictment includes a charge of physical obstruction, and the overt acts are rife with other references to "obstruction."[11]  But nowhere does the superseding indictment describe conduct that comes anywhere close to the kind of physical obstruction that would serve to render all doorways impassable or make entering or exiting the building unreasonably hazardous.

Perhaps the clearest indication that the government does not understand (or chooses to ignore) that "physical obstruction" under this statute means "rendering impassable ingress or egress" is the allegation—contained in the same indictment that alleges "physical obstruction"—that during this protest, congregants "fled the Church building." SI ¶ 4.  The government cannot have it both ways.

The government's contradictory claims, combined with the disconnect between the *conduct* alleged in the superseding indictment and the *legal conclusions* drawn therein, reveals that prosecutors misunderstood (or disregarded) the law, giving rise to a strong implication that they misguided the grand jury.

---

[11] *See, e.g.,* OA 26 (accusing defendants of chanting, yelling, "and/or physically obstructing [congregants] as they attempted to exit and/or move about within the Church"); OA 29 (alleging that protestors "contribut[ed] to the physical obstruction and intimidation of the congregants" by "standing in and around the main aisle with others" and "chanting"); OA 35 (accusing defendants of "largely surrounding", "st[anding] in close proximity to" and "physically obstruct[ing] the freedom of movement of" the pastor, while Don Lemon "peppered him with questions to promote the operation's message."); OA 36 (accusing Lemon of "st[anding] so close to the pastor" that the pastor's hand grazed Lemon); and OA 40 (alleging that Lemon "posted himself at the main door" and "physically obstructed [congregants] as they tried to exit" and as Lemon "challenge[d] them with 'facts'").

> e.       *The government misunderstands (or ignores) its duty to conduct an individualized assessment of each defendant's conduct with respect to each charge.*

The superseding indictment treats the vast majority of defendants as an undifferentiated mass; in the government's view, if they were present in the church as protesters, that alone makes them guilty. An observation Judge Schiltz made about the government's initial complaint affidavit is equally true of the superseding indictment: "The government lumps all [] protestors together and says things that are true of some but not all of them." Second Letter from Chief Judge Schiltz to Eighth Circuit at 1, No. 26-01135 (Jan. 23, 2026).

For a few defendants, individual actions linking them with the protest (though not to a crime) are set forth in overt acts of the conspiracy charge; for others, there is no act attributed to them individually. For many of the defendants, the only allegations against them are general charging averments that list all the defendants *en masse*; for others, the only allegations specific to them are generic claims that they "personally participated in the disruptive takeover operation with other defendants" by, for example, "contributing to the physical obstruction and intimidation of the congregants," holding signs, and chanting. *See*, e.g., OAs 28 (Lundy); 29 (Crews); 31 (Dunlap).

Certain allegations describe specific actions that are attributed to defendants "collectively," even though the described actions clearly were not undertaken by all 39 [now 38] defendants. In one particularly perplexing allegation, actions are attributed both to "defendants collectively" and to "some" defendants. OA 26 ("defendants collectively oppressed, threatened, and intimidated the Church's congregants and pastors by physically occupying most of the main aisle and rows of chairs near the front of the Church, engaging in menacing and threatening behavior, (for some) chanting and yelling loudly at the pastor and congregants, and/or physically obstructing them as they attempted to exit and/or move about within the Church").

26

The disconnect between the legal requirement of individual assessment and the convoluted factual allegations that fail to attribute acts to individual defendants again gives rise to a strong presumption that prosecutors provided inaccurate legal advice to the grand jury on this point. This concern is particularly acute because the speed with which the government obtained its indictment makes it unlikely that the grand jury was asked to take the time to consider each of the 39 defendants individually.

      *f.  The legal misinterpretations in the superseding indictment are shared by the highest officials in the Department of Justice.*

The improper, inflammatory public statements made by multiple high-ranking officials, including DOJ attorneys, underscore and amplify the potential harm from the government's multiple misinterpretations of (or utter disregard for) the law.  Those statements—which could "reasonably be expected to influence the outcome of a pending or future trial" and were therefore prohibited by federal regulations, the Justice Manual, and professional responsibility rules—reflect the very concerns expressed above: that the highest authorities in the DOJ at the time treated the law as if any disruptive demonstration within a house of worship constituted an "ATTACK" on a church (regardless of whether it involved force, a threat of bodily harm, or physical obstruction; regardless of whether there was an agreement to injure, oppress, or intimidate; regardless of what role each individual played) and that any such ATTACK must then constitute a federal crime.

In delivering this message, DOJ officials framed this prosecution essentially as a holy war against a group of infidels who have attacked Christianity itself. The government's emergency petition to the Eighth Circuit began:

> The right to worship in churches and other houses of worship free from terrorism and violence is fundamental to the American experience. That right was attacked this past week at a small church in Minnesota.

27

Pet. at 1. Similarly, in a recent pleading to this Court, the government described the offense conduct as "the agitators conspired to disrupt a liturgical worship service in 'a coordinated takeover-style attack.'" Doc. No. 479 at 2 (quoting SI).  Among the many inflammatory comments made by DOJ leadership:

- Then-Attorney General (AG) Pam Bondi: "We are coming after you if you participated in that.  I don't care if you're a failed CNN journalist, you have no right to do that in this country.  We don't live in a third world country."[12]

- AG Bondi: "YOU CANNOT ATTACK A HOUSE OF WORSHIP. If you do so, you cannot hide from us — we will find you, arrest you, and prosecute you … This Department of Justice STANDS for Christians and all Americans of faith."[13]

- Assistant Attorney General (AAG) for the Civil Rights Division, Harmeet Dhillon: "We [the DOJ] are going to pursue this to the ends of the earth."[14]

- AAG Dhillon: "[The DOJ is investigating] *these people* desecrating a house of worship and interfering with Christian worshippers."[15]

And in a comment suggesting, incorrectly, that a church, per se, is "a space protected" by federal law (and incorrectly suggesting that the First Amendment's protection of free speech does not apply in a church):

- AAG Dhillon: "A house of worship is not a public forum for your protest! It is a space protected from exactly such acts by federal criminal and civil laws! Nor

---

[12] Available at https://www.facebook.com/DonaldTrump4President/posts/ag-pam-bondi-announces-they-are-coming-after-don-lemon-for-storming-a-minnesota-/1323959043093455/

[13] *DOJ charges 30 more for Minnesota church protest*, Politico (Feb. 27, 2026) (available at https://www.politico.com/news/2026/02/27/doj-charges-30-more-for-minnesota-church-protest-00804774).

[14] *Harmeet Dhillon targets journalists as assistant attorney general,* U.S. Press Freedom Tracker (Jan. 18, 2026) (available at https://pressfreedomtracker.us/all-incidents/harmeet-dhillon-targets-journalists-as-assistant-attorney-general/?utm_source=chatgpt.com).

[15] *DOJ says it will investigate, press charges after activists disrupt church where Minnesota ICE official is a pastor*, PBS News (Jan. 19, 2026) (available at https://www.pbs.org/newshour/nation/doj-says-it-will-investigate-press-charges-after-activists-disrupt-church-where-minnesota-ice-official-is-a-pastor).

does the First Amendment protect your pseudo journalism of disrupting a prayer service. You are on notice!"[16]

Both then-Attorney General Bondi and AAG Dhillon's names are on the superseding indictment, and AAG Dhillon directly supervised the line prosecutor, Orlando Sonza, who signed the document. The fact that high-ranking officials directly supervising this prosecution either gravely misunderstand (or patently disregard) the relevant law greatly adds to the nonspeculative risk that prosecutors working directly under their supervision shared their misconceptions and relayed those misconceptions to the grand jury.

Moreover, the brazenness with which these public servants violate federal regulations, their own Justice Manual, and the Rules of Professional Conduct exponentially increases the likelihood that their direct subordinates felt similarly unrestrained when interacting (under a presumed cloak of secrecy) with the grand jury.

### B.    There is Reason to Believe that the Government Made Improper Inflammatory Arguments to the Grand Jury and/or Rushed It toTo Indict

A prosecutor who provides inflammatory argument or commentary to a grand jury, or who pressures it to indict, engages in misconduct that can serve as the basis for dismissal. *See* Sara Sun Beale, *et. al*, Grand Jury Law and Practice § 9:2 (2d ed.), § 9:2. ("Where inflammatory comments by the prosecutor bias the grand jury and destroy its independence, dismissal may be based on [denial of] the constitutional right to indictment by grand jury, due process, or supervisory power.").

---

[16] *Trump DOJ says fmr CNN host Don Lemon is 'on notice' following storming MN church*, ABC News4 (Jan. 19, 2026) (available at https://abcnews4.com/news/nation-world/trump-doj-says-don-lemon-is-on-notice-following-him-storming-mn-church-with-protesters-harmeet-dhillon-minnesota-immigration).
    The President also joined the fray, advocating "throw[ing] in jail" people who had not yet been charged, let alone convicted. President Trump described the protest as a "raid" conducted by "professionals" "They are troublemakers who should be thrown in jail, or thrown out of the Country," he said. *US officials probing Minnesota ICE protest that disrupted church service*, BBC (Jan. 20, 2026) (available at https://www.bbc.com/news/articles/c3wz93gwj8qo).

A prosecutor may not provide a personal opinion on the matter under investigation. *United States v. Breslin,* 916 F. Supp. 438, 442 (E.D. Pa. 1996) (finding misconduct by a prosecutor who, among other things, "often made characterizations of the evidence and inserted his own opinion"). Nor may a prosecutor "make statements or argue in a manner calculated to inflame the grand jury unfairly against the accused." *Hogan*, 712 F.2d at (dismissing an indictment where, among other things, the prosecutor referred to the target as a "hoodlum," suggesting that was a basis for prosecution). A prosecutor also may not pressure the grand jury to indict or suggest it must do so quickly, as doing so interferes with the independence of the grand jury. *Breslin,* 916 F. Supp. at 442 (E.D. Pa. 1996) (dismissing indictment because, among other things, prosecutor pressured the grand jury by repeatedly noting that his assigned time was short and that the statute of limitations was about to run).

Here, there is a nonspeculative risk that prosecutors—perhaps pressured by supervisors who were making inflammatory statements on social media disparaging the protest participants, and also attempting to bully federal courts to approve charges—not only mis-instructed on the law, but also used their supervisors' inflammatory language to characterize events; expressed personal opinions about the protesters or the charges; and/or rushed the grand jury to indict.

Specifically, there is a risk that prosecutors suggested that the targets of the grand jury were domestic terrorists or that the protestors were engaged in a war against Christianity. There is also reason to fear that prosecutors relayed to the grand jury, as they did to the Eighth Circuit, that failure to indict quickly might engender a "national-security emergency."[17] Rushing a grand jury interferes with the body's independence by, for example, discouraging the grand jury from

---

[17] Federal judges are, of course, well positioned to resist such pressure when it is unfounded. However, a grand jury of laypeople would be far more malleable. That the government attempted to rush the *courts'* decision-making with its claims of emergency give rise to a significant fear that prosecutors exerted similar pressure on the grand jury.

30

asking questions or thoroughly examining the record, or by causing it to indict based not on the evidence but on possible danger to the community if it fails to indict.

These concerns arise directly from the record in this case, which includes patently exaggerated claims in the superseding indictment; hyperbolic and frenzied claims the government made to the district judges and the Eighth Circuit (warning of a "national-security emergency" because of this nonviolent protest); and by government officials' [prohibited] out-of-court statements treating this prosecution as a crusade in defense of Christianity and suggesting that anyone who disrupted a Christian church service would be pursued "to the ends of the earth."[18]

### C.    The Defendants Are Entitled to the Limited Requested Grand Jury Material

The defendants are entitled to the grand jury information they seek.  They have met the requirements of Rule 6(e)(3)(E)(ii) and have demonstrated particularized need.

#### 1.    Defendants Have Met the Requirements Under Rule 6(e)(3)(E)(ii)

The defendants have more than demonstrated that multiple grounds may (and likely do) exist to dismiss the superseding indictment based on improper government conduct in the grand jury.  The record in this case suggests not only the *possibility* that such a ground may exist, as required by the rule, but the overwhelming *likelihood* that *many* such grounds exist.

The record here (including the superseding indictment itself; pleadings filed in the Eighth

---

[18] It seems likely that the government made a conscious decision that hyperbole would help it push its judicially-rejected charges past a grand jury; for example, where the initial complaint referred to the protestors "working together in a coordinated manner," Complaint, at 2, the superseding indictment refers to them engaging in "a coordinated takeover style attack," SI at ¶ 3.

Similarly, the superseding indictment hyperbolically describes Lemon's polite interviews with congregants like this: "At one point, defendant Lemon posted himself at the main door of the Church, where he confronted some congregants and physically obstructed them as they tried to exit the Church building to challenge them with 'facts' about U.S. immigration policy." ¶ 40. *But see* Ex. A at 23:40-27:40. These descriptions are so luridly hyperbolic as to raise serious concerns that the prosecutors infected the grand jury with inflammatory exaggerations.

Circuit; and inflammatory statements by Administration officials) leads to the nearly inescapable likelihood that the government gravely misrepresented the law to the grand jury in numerous ways, and may also have inflamed and rushed the grand jury, such that the errors would have substantially influenced the grand jury's decision to indict and cast grave doubt on the grand jury's independence.

These errors, separately or cumulatively, satisfy the exception in Rule 6(e) allowing for disclosure of grand jury material.  *See United States v. Chapman,* No. 2:20-CR-91 JCM (DJA), 2023 WL 6880414, at *4–5 (D. Nev. Oct. 18, 2023) (allowing disclosure where there was reason to believe that "the government provided incorrect instructions that affected the grand jury's assessment of probable cause"); *Stevens*, 771 F. Supp. 2d at 564) (explaining, in dismissing indictment, that court had previously ordered disclosure of grand jury material  "to allow for further briefing on whether the grand jury was properly instructed on the advice of counsel defense"); *United States v. Reid*, 477 F. Supp. 3d 1174, 1185–87 (W.D. Wash. 2020) (allowing disclosure where the defendant identified "a concrete example of misconduct" in the government's misinterpretation of an immunity order).

2. The Defendants Have Demonstrated Particularized Need

A defendant who has met an exception to Rule 6(e)'s secrecy requirement must then demonstrate a particularized need for the requested information. The key case explaining particularized need is *Douglas Oil Co. of California v. Petrol Stops NW.*, 441 U.S. 211, 222 (1979), which sets out a three-part test that essentially comes down to balancing:  the more manifest and fundamental the injustice that is at risk, the more important disclosure is; and the less critical continued secrecy is, the less objectionable disclosure is.

Under the three-part test, a defendant establishes particularized need by showing: (1) that disclosure of the materials will avoid a possible injustice; (2) that the need for disclosure is

greater than the need for continued secrecy; and (3) that the request is narrowly tailored to fit the need. *United States v. Kocher,* 978 F.2d 1264 (Table) (8th Cir. 1992) ("To compel disclosure of a grand jury transcript [the defendant] had to show the transcript was needed to avoid a possible injustice, the need for disclosure was greater than the need for continued secrecy, and his request was structured to cover only material needed.") (consolidating *Douglas* test as used in *In re Grand Jury Proc. Relative to Perl*, 838 F.2d at 307.); *United States v. Elmi*, No. 20-CR-262 (ADM/ECW), 2021 WL 2390247, at *2 (D. Minn. June 11, 2021) (*citing* same standard).

We address these factors in reverse order:

> a.        *The Request Is Narrowly Tailored*

The defendants' request for grand jury materials is narrowly drawn, seeking only those grand jury materials that are crucial to determining whether the misconduct strongly suggested by the record did, in fact, occur. The defendants have requested:

- *A transcript of direct interactions between the prosecution and the grand jury (such as introductory remarks, legal advice, responses to legal questions, instruction, or colloquy):* This information is of paramount importance to avoid a manifest injustice. For all of the reasons discussed herein, there is great risk that prosecutors provided fundamentally incorrect legal instructions to the grand jury on numerous points. The clearest way to determine if that likelihood is a reality is to disclose the direct interactions between the prosecutor and the grand jury.

- *Testimony of federal law enforcement witnesses.* Prosecutors in a grand jury generally guide case agents through the elements of a charged offense in order to establish probable cause. Thus, if (as the record suggests) the government fundamentally misunderstood the law and relayed that misunderstanding to the grand jury, that error will be exposed through federal-officer testimony.

- *Grand jury exhibits.* Because almost all the charged conduct was video-recorded, it is critical for a defendant pursuing a motion to dismiss to have access to the grand jury exhibits. In particular, it will be important for the defendants to know which portions of the video(s) were played for grand jurors. (For example, were grand jurors shown video of wide-open doors through which congregants and protestors were freely flowing?)

The defendants have not requested civilian-witness transcripts, or any colloquy with those witnesses.

### b. The Need for Disclosure Outweighs the Need for Continued Secrecy

Because of the narrowly tailored nature of the request, there is little weight militating towards continued grand jury secrecy for the materials requested. The Supreme Court has expressly identified five reasons underpinning the traditional expectation of grand jury secrecy incorporated into Rule 6(e): (1) prevention of flight by a defendant who is about to be indicted; (2) protection of the grand jurors from interference from those under investigation; (3) prevention of subornation of perjury and tampering with prospective witnesses at the trial to be held as a result of any indictment the grand jury returns; (4) protection of an innocent accused from unfounded accusations if in fact no indictment is returned; and (5) assurance to prospective witnesses that their testimony will be kept secret so that they will be willing to testify freely. *Douglas Oil*, 441 U.S. 211, 219 at n. 10 (1979); *United States v. Procter & Gamble Co.*, 356 U.S. at 681 n. 6; *see also In re Grand Jury Subpoena Duces Tecum*, 797 F.2d 676, 678–79 (8th Cir. 1986).

The defendants' narrowly tailored request does not implicate any of these enumerated harms. Neither the prosecutors' colloquy nor the exhibits would reveal anything at all about witness testimony, and because federal law enforcement officers regularly testify as part of their

jobs, release of their transcripts also would not chill any future testimony. Moreover, the defendants will eventually receive the transcript of any officer called upon to testify at trial, and the names of the officers who filed the probable cause affidavit are already public. None of the disclosures would risk flight of an unindicted defendant or encourage witness tampering.

The fourth consideration – protection of an innocent accused from unfounded accusations – cuts powerfully *in favor of* disclosure here: release of the requested information would not deter any future witness testimony, but it very well might deter future grand jury abuses by the government.[19]

On the other side of the ledger, the need for disclosure of each of the requested categories of evidence is crucial to avoid the injustice described below. The defendants must be permitted to assert a constitutional challenge to the indictment if there is a nonspeculative chance that the government engaged in misconduct sufficient to interfere with the independence of the grand jury. In this case, there is evidence suggesting that the government provided numerous radically incorrect legal instructions; failed to instruct the jury of the need for individualized assessments; made inflammatory argument or comment; and pressured the grand jury to indict. Any of this conduct would violate the defendants' Fifth Amendment rights and give rise to a motion to dismiss. Thus, the need for the material is exceptional.

### c.     The Material Is Needed to Avoid an Injustice

As detailed herein, the defendants have established a high likelihood of multiple acts of serious misconduct that, separately or together, raise the prospect that the defendant's Fifth Amendment rights have been abrogated. The defendants must have the opportunity to raise those

---

[19] In Doc. 478, the Government's Response to the Lemon Motion, the government argued that release of grand jury information could in some unspecified way interfere with an ongoing grand jury investigation. That justification cuts powerfully in *favor* of release in this case; if the outrageous government conduct that appears to have occurred in the grand jury is still occurring, it must be stopped.

defenses, which they can do properly only if they have access to the grand jury material. Where, as here, the injustices to be avoided by release of grand jury material are multiple and of constitutional magnitude, the defendants' need for that material is critically high. *See Comey*, 809 F.Supp.3d at 409, 413 ) (ordering release of grand jury material based, in part, on statements to the grand jury that appear to be "fundamental misstatements of the law" that "could reasonably form the basis for the defense to challenge whether the grand jury proceedings were infected with constitutional error.").

The government, in its response to the Lemon Motion, Doc. 479, invoked the presumption of regularity in asking this Court to deny defense access to grand jury material. Doc. 479, at 17-20. As should be patently clear by this point (and as was clear to Judge Schiltz), there is little about this case that is "regular." The government squandered any presumption of regularity when it attempted to bully federal judges into bending to its will; made prejudicial public statements, in brazen violation of federal law, to influence the outcome of this case; and presented an indictment without regard to the elements of the charged offenses or to a federal judge's finding of no probable cause.

Where, as here, a case is so infected with irregularities that raise the specter of possible constitutional violations, "traditional policies underlying grand jury secrecy are only moderately applicable." *Comey,* 809 F.Supp.3d 396, at 413. And where the harm at stake is of constitutional dimensions, release of grand jury material is "essential if [the defendant] is to fully and fairly defend himself in the face of irregularities that have characterized [the] investigation from its inception." *Id.,* at 414.

## IV.    CONCLUSION

For the reasons stated herein, the defendants respectfully ask this Court to direct the government to immediately disclose the requested grand jury material. Should this Court have

36

any lingering concern about release of these materials, those concerns can be addressed through

the use of a protective order.[20]

**LAW OFFICES OF ROBERT D. RICHMAN, LLC**

s/ Robert D. Richman
Robert D. Richman, Reg. No. 226142
P.O. Box 16643
St. Louis Park, MN 55416
(651) 278-4987
robert@rdrichmanlaw.com

Attorneys for Defendant Trahern Jeen Crews (7)

**LAW OFFICE OF JORDAN S. KUSHNER**

s/ Jordan S. Kushner
Jordan S. Kushner, Reg. No. 219307
431 South 7th Street, Suite 2446
Minneapolis, MN 55415
(612) 288-0545
jskushner@gmail.com

Attorneys for Defendant Nekima Levy Armstrong (1)

**THE JAB FIRM**

s/ Jill A. Brisbois
Jill A. Brisbois, Reg. No. 0345477
150 South 5th Street, Suite 1850
Minneapolis, MN 55402
(651) 209-7797
jill@thejabfirm.com

Attorneys for Defendant Chauntyll Louisa Allen (2)

**OFFICE OF THE FEDERAL DEFENDER**

---

[20] The government, in its response to defendant Lemon's request for release of grand jury material, Doc. 479, reluctantly suggested that the Court review the grand jury material *in camera* before making any disclosure to the defense. *Id.* at 20. The defendants do not believe that step is necessary, because the defense has conclusively met the legal standard for release. However, if the court is inclined to do an *in camera* review, the defendants respectfully request an opportunity for the parties to submit suggestions to the Court about what, specifically, to look for in the grand jury material.

s/ James S. Becker
James S. Becker, Reg. No. 388222
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858
James_becker@fd.org

Attorneys for Defendant William Scott Kelly (3)

**BIRRELL LAW FIRM, PLLC**

s/ Ian S. Birrell
Ian S. Birrell, Reg. No. 0396379
Andrew S. Birrell, Reg. No. 133760
333 South 7th Street, Suite 2350
Minneapolis, MN 55402
(952) 356-2393
ian@birrell.law
andy@birrell.law

Attorneys for Defendant Jerome Deangelo Richardson (5)

**CAPITOL CITY LAW GROUP, LLC**

s/ A.L. Brown
A. L. Brown (# 331909)
287 East Sixth Street, Suite 20
Saint Paul, Minnesota 55101
(651) 705-8580
a.l.brown@cclawg.com

Attorneys for Defendant Jamael Lydell Lundy (6)

**GAD & GAD LAW OFFICES LLP**

s/ Sarah R. Gad
Sarah R. Gad, Reg. No. 0403328
8 E 25th Street
Minneapolis, MN 55402
(612) 512-1870
sarah@gadlawoffice.com

Attorneys for Defendant Ian Davis Austin (9)

**KENNETH UBONG UDOIBOK, PA**

s/ Kenneth U. Udoibok
Kenneth U. Udoibok, Reg. No. 0262523
Flour Exchange Building, Suite 5010
310 Fourth Ave S.
Minneapolis, MN 55415
(612) 808-6031
k@kenulaw.com

Attorneys for Defendant Aziza M. Aboud (10)

---

**GLENN P. BRUDER**

s/ Glenn P. Bruder
Glenn P. Bruder, Reg. No. 148878
9531 West 78th Street
Suite 210
Eden Prairie, MN 55344
(952) 831-3174

Attorneys for Defendant Max Richard Adamson (11)

---

**DEVORE LAW OFFICE, P.A.**

s/ Kevin DeVore
Kevin W. DeVore, Reg. No. 0267302
724 Bielenberg Drive, Ste 110
Woodbury, MN 55125
(651) 435-6500
kevin@devorelawoffice.com

Attorneys for Defendant Ezra Chaim Pye Blumenfeld (13)

---

**LEACH LAW OFFICE**

s/ Patrick G. Leach

Patrick G. Leach, Reg. No. 0286825
8961 Aztec Drive
Eden Prairie, MN  55347
(763) 220-6164
pgl@leachlawoffice.com

Attorneys for Defendant Kelly Ann Carey (15)

39

**DE LEÓN & NESTOR, LLC**

s/ Bruce D. Nestor
Bruce D. Nestor, Reg. No. 0318024
3547 Cedar Avenue South
Minneapolis, MN 55407
(612) 659-9019
nestor@denestlaw.com

Attorneys for Defendant Monique Cullars-Doty (16)

**MELVIN R. WELCH**

s/ Melvin R. Welch
Melvin R. Welch, Reg. No. 0387750
Commerce at the Crossings Bldg
250 South Second Street, Suite 205
Minneapolis, MN 55401
(612) 741-3272
mel@melvinwelchlaw.com

Attorneys for Defendant Tiffany Lynn Dunlap (17)

**LAW OFFICE OF STEVEN J. WRIGHT, LLC**

s/ Steven J. Wright
Steven J. Wright, Reg. No. 387336
331 Second Ave S, Suite 705
Minneapolis, MN 55401
(612) 669-8280
stevejameswright@gmail.com

Attorneys for Defendant Andrew Edwards (18)

**CHARLES F. CLIPPERT**

s/ Charles F. Clippert
Charles F. Clippert, Reg. No. 248848
101 East Fifth Street, Suite 1500
St. Paul, MN 55101
(651) 300-4109
charlie@clippertlaw.com

Attorneys for Defendant Rachel Goligoski (19)

40

**FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP**

s/ Caitlinrose H. Fisher
Caitlinrose H. Fisher, Reg. No. 0398358
1500 Capella Tower
225 South 6th Street
Minneapolis, MN 55402
(612) 474-3300
cfisher@forsgrenfisher.com

Attorneys for Defendant Ariel Hauptman (21)

---

**LOTUS LEGAL PLLC**

s/ Caroline H. Brunkow
Caroline H. Brunkow, Reg. No. 0398936
331 Second Ave South, Ste 420
Minneapolis, MN 55401
(612) 293-6963
cari@lotuslegalpllc.com

Attorneys for Defendant Krista Erin Hogan (22)

---

**KOCH AND GARVIS, LLC**

s/ Andrew S. Garvis
Andrew S. Garvis, Reg. No. 257989
3109 Hennepin Avenue South
Minneapolis, MN 55408
(612) 827-8101
andrew@uptownlawyer.com

Attorneys for Defendant Danielle Andrea Matthias (24)

---

**F. CLAYTON TYLER, P.A.**

s/ Karen Mohrlant
Karen E. Mohrlant, Reg. No. 388093
331 Second Avenue South, Suite 230
Minneapolis, MN 55401
(612) 333-7309
kmohrlant@fctyler.com

Attorneys for Defendant Catie Anne Michaelson (25)

41

**JOHNSON & GREENBERG PLLP**

s/ Lee R. Johnson
Lee R. Johnson, Reg. No. 0189935
5775 Wayzata Boulevard, Suite 700
St. Louis Park, MN 55416
(952) 545-1621
lrjohnsonslp@gmail.com

Attorneys for Defendant Eric Ryan Michaelson (26)

---

**LAW OFFICE OF ROBERT A. LENGELING, PLLC**

s/ Robert A. Lengeling
Robert A. Lengeling, Reg. No. 304165
310 Fourth Avenue South, Suite 1050
Minneapolis, MN 55415
(612) 963-1555
robert@lengelinglaw.com

Attorneys for Defendant David Okar (27)

---

**LAW OFFICES OF THOMAS H. SHIAH, LTD.**

s/ Thomas H. Shiah
Thomas H. Shiah, Reg. No. 100365
331 Second Avenue South, Ste 705
Minneapolis, MN 55401
(612) 338-0066
ths@tomshiah.com

Attorneys for Defendant Jarmel Perry (28)

---

**BEST & FLANAGAN LLP**

s/ Amy S. Conners
Amy S. Conners, Reg. No. 0387375
60 South 6th Street, Suite 2700
Minneapolis, MN 55402
(612) 349-5665
aconners@bestlaw.com

Attorneys for Defendant Cheryl Ann Persigehl (29)

**GOETZ & ECKLAND P.A.**

s/ Frederick J. Goetz
FREDERICK J. GOETZ
Attorney Registration No. 185425
615 1st Avenue NE, Suite 425
Minneapolis, MN 55413
(612) 874-1552
FGoetz@goetzeckland.com

Attorneys for Defendant Emmar Monike Pineda-Moreno (30)

---

**RINGSTROM DEKREY PLLP**

s/ Dane DeKrey
Dane DeKrey, Reg. No. 0397334
814 Center Avenue, Suite 5
Moorhead, MN  56560
(218) 284-0484
dane@ringstromdekrey.com

Attorneys for Defendant Spencer Michael Rodriguez-Bocanegra (31)

---

**ARNESON LAW OFFICE PLLC**

s/ Wyatt Arneson
Wyatt Arneson, Reg. No. 0392071
1025 Grain Exchange Building
400 South 4th Street
Minneapolis, MN 55415
(612) 746-1188
wyatt@arnesonlawllc.com

Attorneys for Defendant Katherine Shaw (32)

---

**GERDTS LAW, PLLC**

s/ Daniel L. Gerdts
Daniel L. Gerdts, Reg. No. 207329
331 Second Avenue South, Suite 705
Minneapolis, MN 55401
(612) 800-5086
daniel@danielgerdtslaw.com

Attorneys for Defendant Satara Diann Strong-Allen (33)

**SIEBEN & COTTER, PLLC**

s/ Patrick L. Cotter
Patrick L. Cotter, Reg. No. 0319120
105 Hardman Court, Suite 110
South St. Paul, MN 55075
(651) 455-1555
patrick@siebencotterlaw.com

Attorneys for Defendant Charles Swenson (34)

---

**SAPIENTIA LAW GROUP, PLLC**

s/ Robin M. Wolpert
Robin M. Wolpert, Reg. No. 0310219
120 South Sixth Street, Suite 100
Minneapolis, MN 55402
(612) 756-7100
robinw@sapientialaw.com

Attorneys for Defendant Robyn Elise Swenson (35)

---

**DORSEY & WHITNEY LLP**

s/ Meredith LaVine
John Marti, Reg. No. 0388393
Meredith LaVine, Reg. No. 0506725
Ashley Repp, Reg. No. 0399661
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600
marti.john@dorsey.com
lavine.meredith@dorsey.com
repp.ashley@dorsey.com

Attorneys for Defendant Thomas Matthew Tier (36)

---

**JAMES M. VENTURA**

s/ James M. Ventura
James M. Ventura, Reg. No. 147217
1000 Twelve Oaks Center Drive, Suite 100
Wayzata, MN 55391
(952) 473-8064
jventura@jamesventuralaw.com

Attorneys for Defendant Lee Elizabeth Wiedeman Tuggle (37)

---

**LANGERT LAW, LLC**

s/ Maggie G. Langert
Maggie G. Langert, Reg. No. 0308316
724 Bielenberg Drive #54
Woodbury, MN 55125
(612) 470-4810
maggie@langertlaw.com

Attorneys for Defendant John Vergin (38)

---

**WOLD LAW**

s/ Peter B. Wold
Peter B. Wold, Reg. No. 0118382
331 2nd Avenue South, Suite 705
Minneapolis, MN 55401
(612) 341-2525
pwold@wold-law.com

Attorneys for Defendant Mark D. Weinfurter (39)

---