UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 26-cr-25 (LMP/DLM) |
| Plaintiff, | ) | |
| vs. | ) | St. Paul, Minnesota May 14, 2026 11:02 a.m. |
| Trahern Jeen Crews (7), Monique Cassandra Cullars-Doty (16), and Thomas Matthew Tier (36), | ) | |
| Defendants. | ) | |

---

BEFORE THE HONORABLE DOUGLAS L. MICKO
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(STATUS CONFERENCE)**

Proceedings recorded by digital recording; transcript produced by computer.

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | U.S. Department of Justice<br>Civil Rights Division<br>ROBERT J. KEENAN<br>312 North Spring Street<br>12th Floor<br>Los Angeles, California 90012 |
| | U.S. Department of Justice<br>Civil Rights Division<br>NEVILLE S. HEDLEY<br>150 M Street<br>Suite 700<br>Washington, D.C. 20002 |
| For Defendant Trahern Jeen Crews (7): | ROBERT D. RICHMAN<br>P.O. Box 16643<br>St. Louis Park, Minnesota 55416 |
| For Defendant Monique Cassandra Cullars-Doty (16): | De Leon & Nestor, LLC<br>BRUCE NESTOR<br>3547 Cedar Avenue South<br>Minneapolis, Minnesota 55407 |
| For Defendant Thomas Matthew Tier (36): | Dorsey & Whitney LLP<br>JOHN R. MARTI<br>50 South Sixth Street<br>Suite 1500<br>Minneapolis, Minnesota 55402 |
| Transcriber: | CAITLIN J. NAT, RPR-CRR<br>Suite 146<br>316 North Robert Street<br>St. Paul, Minnesota 55101 |

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendants present)

THE COURT: We are here in the matter of United States vs. Levy Armstrong and others. It's Court File Number 26-cr-25. And we're here for a status conference that I set based on some discovery issues.

Let me make sure I understand who-all is here before me today, so I'll get appearances, starting with the Government.

MR. KEENAN: Very good. Good morning. Rob Keenan for the United States.

THE COURT: Good morning, Mr. Keenan.

MR. HEDLEY: Good morning. Neville Hedley for the United States.

THE COURT: Good morning, Mr. Hedley.

How about on behalf of our defendants today?

MR. RICHMAN: Good morning, Your Honor. Robert Richman for Trahern Crews, Defendant Number 7, who's present beside me.

THE COURT: Good morning to both of you.

MR. NESTOR: Good morning, Your Honor. Bruce Nestor on behalf of Monique Cullars-Doty, who is present, Defendant Number 16.

THE COURT: And good morning to both of you as well.

MR. MARTI: And good morning, Your Honor. John Marti. I'm representing Mr. Tom Tier, Defendant Number 36, and he is present here as well.

THE COURT: And good morning to both of you as well.

I've read the submissions.

Just a couple of logistic matters, folks. As you might see, we don't have a court reporter with us today. These proceedings are being recorded and will be transcribed from that recording. But because of the potential difficulties with recording, I might ask you to speak up or speak a little bit clearer, and it's not intended to be any disrespect; it's just to make sure that you have a clear record, as I do, too.

I've read the submissions from the defendants who are present here today. And I'll say that I have also read the submissions about discovery from the other defendants that were filed at, I think, Dockets Number 514, 515, 516, and 517, although I denied the motions of those defendants to join this status conference. I think I'm aware generally of the issues.

Why don't I hear first from -- I don't know if I'm going to be hearing from one of the attorneys for the

defendants or more than one, but whoever wants to tell me the issues from defendants' perspective, I'm happy to hear from you.

MR. RICHMAN: Thank you, Your Honor. I've agreed to take the lead, but Mr. Nestor and Mr. Marti may weigh in as well.

THE COURT: Thank you, Mr. Richman.

MR. RICHMAN: Your Honor, Rule 16 requires disclosure of documents that are material to preparing the defense. It's our position that the Government, by restricting access to the names and contact information of the very witnesses who were present during the events that gave rise to these charges -- are material to preparing the defense, and, therefore, the Government's restricted production of discovery violates Rule 16.

Under Rule 16(d), this Court has broad discretion to regulate discovery, whether that be in restricting discovery in appropriate circumstances or in compelling it, which is what we are requesting here.

THE COURT: Well, I did that. Didn't I do that through the protective order?

MR. RICHMAN: That's what we think, Your Honor --

THE COURT: Okay.

MR. RICHMAN: -- but the Government disagrees.

Your Honor, first, just to explain to the Court

the nature of the discovery that we've received to date.

The discovery was produced in two tranches.

First, there are over 9,000 pages of PDFs, which have been significantly redacted. Some of the PDFs look like this (indicating), Your Honor, and for the record I'm holding up Bates Number 1558, which is entirely redacted and is completely blank or black. Although there are a number of documents that look like 1558, I admit that this is not typical.

Most of the documents look like this (indicating), and I'm holding up Bates 44, which looks like a Dalmatian because there are so many black spots.

THE COURT: So, Mr. Richman, I'm not -- just so that we're all on the same page, those two documents that you just showed me look similar to the documents that were included with the request of Ms. Fort to join this status conference at Docket Number 514. Is that kind of a fair exemplar, from your standpoint?

MR. RICHMAN: 1558 was included in those documents. Bates 44 is similar to but not the exact page that was appended to Ms. Fort's request. And if the Court would like, I could mark these as exhibits for this hearing. I don't know if that's necessary.

THE COURT: Let's see if we need to get there.

MR. RICHMAN: But the Government insists that the

discovery is usable in its current format.

So I just want to take a moment with respect to Bates 44. Bates 44 is a report that was written by "blank." It was approved by "blank." And just to give the Court some idea of what it is we're dealing with, here is an excerpt from Bates 44.

"'Blank' ran into 'blank' when looking for 'blank' kids and asked for assistance. 'Blank' has since spoken to 'blank' and was told she was unintelligible at that time. 'Blank' went downstairs and got the 'blank' kids. 'Blank' was outside of the church in an alleyway. 'Blank' took the children to a side door of the church to get them out."

And it goes on like that for 9,000 pages.

The second tranche of documents, Your Honor, is what the Government has designated as protected material, and it consists of hundreds of hours of audio and video; body-worn camera videos, recordings of interviews. And because those materials have not been redacted as far as I know at this point, that is not the subject of this request. We've learned that many of those recordings are in a format used by the St. Paul Police that even the U.S. Attorney's Office can't open, but we are working that out with the U.S. Attorney's Office, hopefully, so we're not bringing that issue to the Court.

THE COURT: Let me ask you a couple of questions

about the documents. You said there's something like 9,000 documents that you've received?

MR. RICHMAN: 9,000 pages.

THE COURT: 9,000 pages of documents. Thank you.

MR. RICHMAN: Yes. Yes, Your Honor.

THE COURT: Okay. And you received those electronically?

MR. RICHMAN: Yes, Your Honor.

THE COURT: If you were to try to search those through a text search function for names of witnesses, would you be able to do that?

MR. RICHMAN: No.

THE COURT: Would you be able to search it through a text search function for names of reporting officer?

MR. RICHMAN: No.

THE COURT: Okay. What about victims?

MR. RICHMAN: No.

THE COURT: Okay. Okay.

MR. RICHMAN: The -- it was our expectation, as the Court has already suggested, that the protective order was intended to deal with this issue, to -- by restricting access to protected material, to prevent the heavy redaction of material that we're dealing with here.

And while the Government has helpfully enumerated every time it used the word "redaction" in a filing,

beginning months before we were even negotiating a protective order, the clear import of the protective order was to prevent discovery that looks like Bates 44.

In fact, the Government, in its motion for a protective order, said -- this is Document Number 495 -- said at page 3, "While the government intends to redact a subset of sensitive information from the discovery, the redaction of all personal and sensitive information from the discovery would be impractical and unduly burdensome and would also be of limited value to the defense."

THE COURT: You know, I read that, too. I'll say that I -- tell me if I'm wrong, but I'm sure, from Mr. Keenan's perspective, that was in context with the preceding paragraph, which identified the number of electronic pieces of discovery that would be sent out, that is, the videos and whatnot. I think Mr. Keenan's argument is going to be that the protective order was meant to address videos and other electronic evidence but not documents.

I'm not sure that that matters, because arguments are fine, but it's the court order that is ultimately what binds the parties.

MR. RICHMAN: Correct, Your Honor. And I was the point person in -- for, I believe, 33 of the defendants who ultimately signed on in negotiating the protective order.

My point of contact for the Government was Orlando Sonza, and although he was the person who negotiated the protective order, he has had no role whatsoever in now interpreting the protective order that we negotiated.

But during those negotiations, the clear import of the negotiations, the premise of the negotiations was we were going to define what constituted protected material and then limit the dissemination of that material.

In the initial proposal from the Government, the Government included all discovery produced by the Government as protective material. I objected to that scope as being overbroad. And it was important to limit the scope of protective material because, under the terms of the order that this Court entered, protected -- the use of protected material, number one, is limited to what is necessary to prepare our defense for this case, and, number two, may only be produced to members of the defense team. Even if we have other people who are not a member of the defense team acknowledge the protective order and sign the certification under the terms of the protective order, they cannot have access to protective material.

One issue that came up during the negotiation was the Government wanted the names of law enforcement officers, not contact information, just their names, included in protected material, and I objected to that because I said

that means every single piece of paper is going to be protected material because it's going to have the name of some law enforcement officer. That would have been a perfect time for the Government to say, We intend to redact that information regardless of what the Court does. But it didn't. And, ultimately, this Court excluded from protected material the names of law enforcement officers. It included names of witness and -- witnesses and victims but not law enforcement officers.

THE COURT: Now, I think I -- I think that the order included personal identifying information of victims and witnesses but names of victims only.

MR. RICHMAN: Correct.

THE COURT: Okay.

MR. RICHMAN: That's what I'm saying, Your Honor, is that the names of law enforcement officers was not included.

THE COURT: No, I understood that. I just -- I -- witness names are not included within the protective order; witness personal identifying information is?

MR. RICHMAN: Yes.

THE COURT: Okay.

MR. RICHMAN: And yet, notwithstanding the way in which this Court has restricted what constitutes protected material, the Government has gone ahead and redacted that

information anyway. So the Government produced discovery in accordance with the protective order that it wanted rather than the protective order that was entered by this Court.

A second example, Your Honor, is -- and the Government has pointed out that the protective -- the protective order includes in protected material only the PII that is unredacted. I actually was the one that proposed that language, the use of "unredacted," because I wanted the defendants to be able -- if we wanted to give something that had PII to a witness, say, who was not part of the defense team, we could simply redact the PII and it would no longer be protected.

Again, that would have been a perfect opportunity for the Government to say, for Mr. Sonza to say, We're going to redact that information, in any event. That never came up.

And so it's our position that the Government, in redacting material completely without regard for the limitations of the protective order, has violated the protective order and has violated Rule 16.

THE COURT: Let me ask you a couple of questions about that.

I understood the Government's backup positions here to be that, number one, they'd be willing to give you the names of witnesses that would be called at trial

something like 28 days before the trial or, number two, they would be willing to serve as a gatekeeper for any of the potential witnesses that are -- or victims who are -- and, I guess, law enforcement officers who are currently redacted from the discovery.

It's hard for me to see how that's consistent with Rule 16(a)(1)(E)'s requirement to provide information that may be material to the defense since we have motion hearings coming up and you need to file motions, but maybe you have a different take on it.

MR. RICHMAN: No, Your Honor.

First of all, with respect to the 28 days before trial, that addresses only the issue of those witnesses or victims that the Government has determined are so favorable to the Government's case that they have designated them as potential trial witnesses.

Not surprisingly, Your Honor, we're interested in the ones who are not on that list. And as to those, the Government has said, as the Court mentioned, that they can act as a gatekeeper, reach out to them and say something to the effect of, That mob that invaded your church, they want to talk to you. Now, keep in mind, you're under no obligation to do so, but if you'd like, we can give them your name and phone number. Would you like us to do that? I think that we all know what the result of that gatekeeping

function is going to be.

We have a right to these disclosures without any mediation from the Government.

If we compare this case to *Roviaro*, Your Honor, if we were dealing with an informant, an informant who was involved in the criminal activity, who has provided information to the police, who has valid reason to fear for his safety if his identity is revealed -- and yet *Roviaro* has made clear that when that informant is a participant in the activities, is an actual witness to what went on, the defendant's right to a fair trial, to prepare his defense guaranteed by the due process clause of the Fifth Amendment, trumps the informer's privilege.

The language in *Roviaro*, I think, fits very well with our circumstances. The Court said, "A further limitation on the applicability of the privilege" -- referring to the informer's privilege -- "arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."

And then in the circumstances of that case, "The informer was the only witness in the position to amplify or contradict the testimony of government witnesses.... The

desirability of calling John Doe" -- the informer -- "as a witness, or at least interviewing him in preparation for trial, was a matter for the accused, rather than the Government, to decide." *(As read)*

There are no safety concerns in this case comparable to *Roviaro*. While the Government talks about doxing and ongoing protests at the church and harassment, during our meet-and-confer last week, when pressed, the Government conceded that they have no evidence that any of the 38 defendants have had anything to do with that activity since the protest in January, since the events that gave rise to these charges. And I would suggest that, if they did have any such evidence, they would be before the Court seeking revocation of release for violating their release conditions.

THE COURT: You know, I think that part of the Government's point, though, is that perhaps the difficulty in knowing who may leak information itself would support the idea that we should have further protection here because you're not going to know who of the 38 people may have disclosed information.

Do you have anything you can tell me about that?

MR. RICHMAN: Well, first of all, the suggestion that any of these 38 would violate the terms of the protective order is completely speculative. It's not enough

for the Government to say, We don't -- I mean, what the -- what they said during our meet-and-confer last week is, We don't trust your clients, so we don't care about the protective order.

You know, I've been doing this for 39 years, Your Honor, representing criminal defendants. I've represented people charged in major drug conspiracies with actual informants from those conspiracies; international sex trafficking where the witnesses were the women who were victims of the sex trafficking; major frauds where the PII was the information that allowed the defendants to actually perpetrate the fraud. I have never had a case in which the Government has said, We don't trust your client, and, therefore, notwithstanding a protection order, we are not going to give you information about any of the witnesses who were present at the time of the crime.

That is extraordinary, Your Honor, and I would suggest that it would make Rule 16 a nullity if the Government could simply take it upon itself to say, We're not going to comply in this case because we don't like your clients, which is essentially what the Government is saying here.

There's another point that I want to raise, Your Honor, which is the -- the Government's position, I would suggest, rings hollow, because in that tranche of

discovery which the Government has designated as protected, which are all those recordings, hundreds of hours of recordings, that material is unredacted. And with respect to recordings of interviews of these victims, in many cases -- I can't say all of them, but in the ones that I have reviewed -- the witnesses are -- the members of the congregation are identified by name. In many cases, their addresses are included. And the Government has said, It was too difficult for us to redact that.

If there was truly a concern about these witnesses' safety, if, for example, this was a situation with an informant, I would suggest that the Government would make absolutely clear that the information from which the defendant could identify the informant would be redacted, however difficult it is. But for the Government to say, You can't have the information in written form, but if you wade through hundreds of hours of material, you may be able to glean it from the audiotapes, that suggests to me not a concern for safety but an attempt to obstruct the defense function.

Our clients are presumed innocent. They have a due process right to prepare a defense, and we need the names of the witnesses to conduct an investigation. If we fail to do that fundamental task, we will be providing ineffective assistance of counsel.

And so, if the Government's view prevails, we will be forced to take other steps to fulfill our constitutional obligation to our clients. For example, we will be seeking the Court's authority for Rule 17(c) subpoenas to the church for the names and contact information for the congregants who were present on that day. I would suggest that that would be more intrusive to the interests of the church than what we are suggesting here, which is that these reports should be unredacted.

But it is simply a nonstarter for the Government to suggest that we will only get access to the names and -- well, at least the names of their witnesses 28 days before trial and, with respect to the others, they will act as gatekeeper.

There's another issue here, Your Honor, which is that, in its 12-page memorandum, the Government never once mentioned *Brady*. Every witness who does not claim that he was forcibly prevented from leaving the church is exculpatory because that is at odds with the elements of the FACE Act. Every witness who does not claim he was subject to physical force is exculpatory. Every witness who does not claim that he was threatened with physical violence is *Brady*.

And if I could give the Court a few examples.

Page 1287, an interview with "blank." "No, we

were" -- "we were able to exit with no problem and no one was hurt." *(As read)* That's indicated as a quote. That's exculpatory.

Page 1342, an interview with "blank." "Blank" stated no agitator blocked their departure nor physically harmed her or W.W. That's exculpatory.

Page 1345. "Blank" stated after a few minutes she realized it was just a protest, and she and some other friends started praying and comforting each other but remained in the church auditorium. "Blank" stated she was never blocked in the pew by the protestors but did feel her right to worship was violated. That's exculpatory.

And even with respect to the inculpatory statements, Your Honor, we have a right to pursue an investigation of those claims. For example, buried in the 9,000 pages of PDFs, there's one report from, I think, the only person who claims to have actually been assaulted by one of the defendants, who claimed that a defendant whacked him in the side of the head. Following further investigation, the Government concluded that that person was not even present in the church at the time of the protest and had made the whole thing up.

We are not required to accept the Government's allegations that its witnesses were actually present in the church. We are not required to accept the witnesses' claims

that they were threatened, if any of them -- or that they felt threatened. We have a right to investigate those claims. The Government has made that impossible for us to do.

Your Honor, what we are requesting, and, again, consistent with *Roviaro*, we are requesting the names, addresses, and telephone numbers of the people who actually witnessed the events giving rise to the crimes charged so that we may attempt to interview them, and if they decline to be interviewed, at our discretion, to subpoena them for trial.

We are not asking for dates of birth or Social Security numbers or any of the other PII that this Court carefully delineated in its protective order. We are not asking for the identity of any minors.

But this information we need in order to conduct our investigation, and if we cannot get it from the Government, we are going to seek it by subpoena from the church. But this is the bare minimum that we need in order to provide the effective assistance of counsel to which our clients are constitutionally entitled.

THE COURT: Well, let me ask you a question about what you just mentioned in terms of your request. The protective order already applies and provides, you know, a confidentiality designation to those other categories of

information that you said you're not seeking here: dates of birth, maybe Social Security numbers, identification of minors.

So I'm trying to just make sure that I understand your position here. Is it -- is it your position that the Government -- you're fine with the Government continuing to redact that material, even though the protective order already provides some confidentiality to those materials? Or are you looking for entirely unredacted materials that are -- nonetheless could be properly designated as confidential under the protective order?

MR. RICHMAN: Your Honor, we could certainly take a maximalist position and insist that, because it's protected by the protective order, that the discovery should be completely unredacted. But --

THE COURT: Because here's the problem: Let's go back to the page that was completely blank. Let's say that I agree with your position and I issue an order consistent with your position and that page remains completely blank. How in the world are you going to know what's in there and whether it's within the scope of this more narrowed permission to redact?

MR. RICHMAN: Well, clearly, this page has redacted more than a name and an address.

I have been looking for a compromised position

that will take into consideration the Government's concerns while at the same time allowing us to complete our investigation, and while it plainly does not address pages like this, I think that getting the limited additional discovery that I am requesting will allow us to conduct an investigation. And if at some point -- I mean, I guess we would turn to the Government with respect to these other pages that are not addressed by the remedy that I'm seeking.

With respect to pages like 1558, I would suggest that the Court order that the Government provide some sort of summary to explain why it is that -- what it is that has been redacted and why it has been redacted. And that may be a subject for a future date, but given what I have to work with, I can't fashion a remedy that will cover what's behind this redaction on page 1558.

THE COURT: Okay. Thank you, Mr. Richman.

MR. RICHMAN: Thank you, Your Honor.

THE COURT: Mr. Nestor, I'm happy to hear from you, but otherwise I'd be happy to turn to Mr. Keenan or whoever's going to speak to me from the Government for their position.

MR. NESTOR: Nothing at this time, Your Honor. Depending on the Government's presentation, I may have some comments.

THE COURT: All right. Is that true for you, too,

Mr. Marti?

MR. MARTI: Two quick points.

THE COURT: Okay.

MR. MARTI: I think Mr. Richman is correct that there are issues that are going to arise in the future related to this discovery, and if the Government feels strongly that this evidence should be protected or redacted, they can re-approach the Court and seek a modification of the protective order. They know how to do it. They've done it once before; they can do it again.

The second point I'd bring up is, as it relates to the Government's suggestion that they can mediate our access to witnesses and evidence, I feel very strongly that allowing them to become part of our investigative process impedes -- gives them access to privilege, both work product privilege, our strategy privilege. And the Court shouldn't countenance -- the fact that they made this offer and suggestion is alarming, and we'd ask you to reject it.

THE COURT: Thank you, Mr. Marti.

All right. Well, is it Mr. Keenan today or Mr. Hedley?

Hello again, Mr. Keenan. How are you?

MR. KEENAN: Excellent. Thank you very much. Nice to see you again.

The -- in the Government's papers, we tried to

explain -- address the primary allegation. At least, if it didn't make it into the letter to the Court, it made it into some of the e-mails to us.

THE COURT: I'd just ask you real quick to just bump up that podium a little bit. There's a button in front of you, and I want to make sure we get a good recording.

MR. KEENAN: All right.

THE COURT: Thank you.

MR. KEENAN: I'll try to lean in a little bit more.

THE COURT: Okay.

MR. KEENAN: The main point is that we started preparing the discovery in this case while the investigation, namely continuing efforts to interview witnesses, was still ongoing. I think that was reflected in some of our earlier court filings. So the -- and we explain what the preparation of discovery looked like, what it entailed. The Court is familiar with that process, but, nonetheless, we wanted it on the record in this case.

As part of that process, as we tried to explain -- we tried to highlight it that we were open and notorious about it. We weren't hiding it, weren't concealing it, weren't negotiating the protective order in bad faith. We made clear to everybody that redactions were occurring, and we were in the process of redacting documents.

THE COURT: That was before there was a protective order or even a motion for a protective order.

MR. KEENAN: The redactions were largely completed before the -- I say "largely" because I'm not positive of when the last one was made, but I think "largely" completed is certainly an accurate phrasing -- before the first protective order was issued and, a day or two later, the amended protective order.

THE COURT: Right.

MR. KEENAN: Those were all done.

THE COURT: So -- I know. I guess what -- my point in saying that is -- you know, and, ultimately, I'm not sure if I -- if I give that much attention to what brought us here; it's where we go from here that I particularly care about.

MR. KEENAN: I agree.

THE COURT: But, you know, when -- you spend a good deal of ink in your -- in your filing explaining how it was always, at least in the Government's view, that matters were going to be redacted, and you made that point to the Court a couple of times.

My question about that is -- was really, well, yeah, but wasn't that before there was a protective order? In other words, it's fine to say you're redacting something when there's no protective order, because apparently at that

point the Government's view was that -- I assume the Government's view was that they were protecting interests that otherwise weren't covered by a -- by a court order. But once there's a protective order, I'm not sure that -- I'm not sure that that whole, We were going to redact it anyways, makes any sense. So help me understand your position on that.

MR. KEENAN: We are taking an effort to be as protective as possible. I've had mandamus proceedings in the past involving allegations -- no findings -- of a failure to comply with the Crime Victims' Rights Act, you know, in those cases about plea negotiations, for example. But it's a serious act with serious consequences for violating it.

Part of the act, as the Court knows, we pointed out, it requires us to protect the privacy of the victims.

THE COURT: So who is covered by the act?

MR. KEENAN: Victims.

THE COURT: Exactly.

MR. KEENAN: Right.

THE COURT: I saw in your -- in your submission to me that there seemed to be kind of a lumping together of victims and witnesses and law enforcement officers, but I didn't see anything in the act that would speak to those latter two categories. So help me understand your position

on that.

MR. KEENAN: The CVRA does not apply to other third-party witnesses, it only applies to victims.

As to -- as to the others, there is still a privacy interest and a safety concern that we've tried to explain in our brief whether they're victims or not. They have -- they have concerns, and we have concerns for them, about the kinds of harassment -- and "doxing" is sort of the modern term for it -- that led the defendants in this case to Cities Church on January 18. That's what they were up to.

We have every concern that similar behavior, not necessarily from the defendants -- I would hope not. There are protective -- there are instruct- -- you know, release conditions that say, you know --

THE COURT: Well, there's also a protective order.

MR. KEENAN: Yes.

THE COURT: And the protective order itself has sanctions baked right into the order if there's any violation. So help me understand --

MR. KEENAN: Sure.

THE COURT: -- your position about that.

MR. KEENAN: The conc- --

THE COURT: Because it's -- because, you know, the protective order that I signed is very similar to the one

that you proposed, including the sanctions section.

MR. KEENAN: Yes. The concern about the -- the number one -- when we were preparing discovery, we said to ourselves, In addition to the redacting we're doing, do we need a protective order? We concluded that we needed a protective order not for the documents that we were redacting, because that's -- we were redacting the stuff that we were concerned about being disclosed and publicly disseminated; we were concerned about the stuff we couldn't redact just as a practical matter: audio recordings, video recordings, some of them, you know, body camera -- body-worn camera videos of the victims being interviewed in their -- in their homes, for example.

The -- and the -- Mr. Richman says he's responsible for the word "unredacted," but the word "unredacted" is the focus -- it's information -- '"Protected Material' is," per the protective order, "information produced by the government ... which contains the following unredacted personal identifiers." *(As read)* So the protective order is needed for stuff we couldn't redact.

THE COURT: Okay. Well, turn --

MR. KEENAN: But --

THE COURT: Since you have it in front of you --

MR. KEENAN: Mm-hmm.

THE COURT: -- turn to paragraph 7 of that

protective order.

MR. KEENAN: Yes.

THE COURT: Okay. Now, Section 7 is entitled, "Limitations on Use in Open Court," and it says, "The Legal Defense Team will redact any Protected Material sought for use in unsealed judicial proceedings."

That section would not be in there if it wasn't intended to address how matters should be used in court proceedings, that is, in filings or in open court.

So when we're talking here about how to use unredacted material --

MR. KEENAN: Right.

THE COURT: -- or protected material and that there's a requirement that protected material be redacted in open court, and that requirement, that onus, is put on the defense team, it would be intuitive to suggest that that matter is not already redacted by the Government coming in.

MR. KEENAN: There is no question that the protective -- the definition of "protected material" in that particular provision relates sort of definitionally to discovery materials produced by the Government that are not -- that are not redacted, and, therefore, for those, it's got to be redacted if it's publicly filed by the defense. But --

THE COURT: So your suggestion is that that only

applies to those matters you haven't taken the time to redact? In other words, just the electronic -- the videos and the audio recordings that are going to be used in a court filing? I'm not following that.

MR. KEENAN: That's, I think, the way that order is worded. That's -- it relates to protected material.

Paragraph 12 of the order, I was also going to note it -- you know, it notes that it's -- this order talks about what to do with materials that are produced that are unredacted. They're protected in the following way that the Court maps out in the amended order. But there's a limitation on the scope of the order, in the original as well, and it notes that it does not purport to "constitute a ruling on the question of whether any particular materials are discoverable ... and does not constitute a ruling on any potential objection to the ... discoverability of the material." *(As read)*

So, I mean, there are issues --

THE COURT: So you're saying that you didn't need to disclose the -- I'm not following your --

MR. KEENAN: Oh.

THE COURT: Help me understand what you're saying here.

MR. KEENAN: The point being that, you know, there's -- the defense, as I understood the argument today,

was suggesting that, Oh, this has already been ruled on. It hasn't. And the protective order is limited by its terms to what it says.

And so --

THE COURT: Well, every order is limited to its terms. The protective order deals --

MR. KEENAN: Right.

THE COURT: -- pretty comprehensively, in my view, with how we're going to handle the material that's included within its scope, that is, personal identifying information of victims and witnesses, additional information for minors, and some additional information for victims.

So help me understand why any limitations that are out on the margins have anything to do with what we're talking about here today.

MR. KEENAN: Well, I guess the point I was trying to make is that it -- the protective order, by its terms, does not say the Government may not redact anything else. Doesn't say that.

THE COURT: Why would it have to? It's a protective order.

MR. KEENAN: Well --

THE COURT: It addresses those materials.

MR. KEENAN: The question of whether or not -- it addresses those materials that are produced that are

unredacted and that we cannot protect ourselves by first --

THE COURT: No. No, no, no. I --

MR. KEENAN: -- first applying the redactions. That's --

THE COURT: I've just --

MR. KEENAN: That's our --

THE COURT: I've looked at -- come to -- I understand that's your argument. I'm trying to help you let me kind of get a little bit of a better flavor for that argument. Because I'm having a hard time with the notion that you moved for a protective order, I heard from the defendants on that, and, ultimately, in considering all the arguments, I fashioned a protective order that comprehensively covers discovery in this case and provides not just characterization of materials but also how those materials should be handled in court and out of court.

Help me understand how, when there's a comprehensive court order, that the Government then unilaterally determines that it's going to take steps separate and apart from that court order that affect a defendant's rights to a fair trial, to effective assistance of counsel, and under Rule 16.

MR. KEENAN: Two points.

Number one, we didn't unilaterally decide it --

THE COURT: Wait, wait, wait. Who did? Did you

ask them what to redact?

MR. KEENAN: If I can finish the one sentence.

We didn't unilaterally decide it after the protective order was issued. We made these -- my main point is we made these redactions over the course of a couple months. Okay? So -- and we make those decisions -- every prosecutor across the nation makes those decisions unilaterally, if you'd like, because we aren't consulting with people until there's a hearing and we need to figure out, okay, are the redactions okay?

THE COURT: And what about -- what about once there is a protective order? I know you have a second point. I'm going to let you --

MR. KEENAN: Yes.

THE COURT: -- get to your second point.

MR. KEENAN: This is it.

THE COURT: But help me understand the fact that you did a bunch of work leading up to the disclosures. How does -- how is that impacted by the fact that then there is a protective order that would provide Court-endorsed protections to the discovery that you've already redacted?

MR. KEENAN: Two things on that point.

The point I was going to make, I'll make now, is, is the protective order comprehensive? My reading of the protective order is it isn't as comprehensive as the Court

perceives. It's comprehensive regarding the treatment of discovery materials that are not redacted. That's my point. It doesn't mean that we cannot take other additional belt-and-suspenders, if you will, efforts to protect materials in accordance with the privacy act.

It's not just the -- it's not just the victims' rights act; there are privacy act issues, too. We've got records. Privacy act applies to government records. We've got to redact for that. It's under the PII -- privacy act. But -- so that's, essentially, it.

And the second point on that, as I've already said, is you spend months with redactions and you negotiate -- I think it was about three weeks of negotiation to get a stipulation on a protective -- well, some agreement regarding most of the protective order. And then we have to produce the discovery on the day of the amended discovery order.

And, again, just the point about -- to make clear, the Court may have a different understanding, but our understanding was clearly, frankly, openly, notoriously, and candidly expressed to the Court regarding the fact we're still planning on doing redactions. I pointed that out in our motion for reconsideration of the protective order and that's quoted in our brief.

In any event -- but that's still, as you point

out, sort of history. What are we going to do now? And is there a need that the defense -- anyway, all of that is designed to just explain the Government's view of the process and just a little bit of correcting the history about what we've done to date.

Everything's been open and notorious, what we were doing and how we were planning to do it. And the -- so the protective order was -- the amended protective order was issued, I think, two days before we disclosed. The amended protective order was issued on the day we needed to disclose and we weren't going to blow that deadline, so the discovery was produced as we had prepared it.

THE COURT: But you haven't --

MR. KEENAN: If --

THE COURT: -- you haven't subsequently reproduced in the manner that defense thinks is consistent with the protective order, have you?

MR. KEENAN: No, that's correct.

THE COURT: Okay.

MR. KEENAN: On that, because of the work that was done and the way it was done, it is my understanding that those redactions, for example, names, are coded in a way that I don't understand and won't pretend to be able to summarize accurately, but coded in a way so that redactions of names can be done with some speed, efficiency.

I asked prior to the hearing, Okay, what if we have to disclose the names? How long is that going to take? How many days do we need? I don't know that I have an exact thing, but in terms of my understanding of our Everlaw system, I think you can, you know, click a button, and I think, if it's coded in the way I understand it is, that the redactions of names can be removed somewhat quickly.

So I want to make that clear. So if we have to redact them, I think we can do it somewhat quickly.

THE COURT: Can you -- before you get to the logistics, can you help me understand how you think the privacy act supports the redactions here? Because I'm struggling with that, and I didn't see that addressed in your -- in your filing.

MR. KEENAN: Our filing -- it was a short time frame, but our focus was primarily on the victims, so I don't think I cite to the privacy act.

But the privacy act as a general proposition provides that records in the possession of the Government need to -- there's -- "personal identifying information," I think, is the standard term that's used in that act, as I recall. It puts obligations on us that we secure it and maintain, basically, the privacy interests of the people. So --

THE COURT: Vis-à-vis the public, right?

MR. KEENAN: -- the dates of birth, addresses, phone numbers, things like that.

THE COURT: But that's -- the way I always understood the privacy act is that those protections were vis-à-vis the public. Do you think I'm wrong on that?

MR. KEENAN: Like broad public dissemination? Certainly, it's included in that. I'd have to go back and study the text of the -- of the statute, but I --

THE COURT: Well, I'm asking you because you're the one who brought it up to me.

MR. KEENAN: Yeah. Well, my point remains that the privacy act reflects concerns about the privacy of personal identifying information, and we -- it's something we -- we -- as a general rule, I can just tell you -- I don't have Mr. Richman's 39 years, but I've been doing this a while. In victim reports -- or in police reports, countless different cases, you know, all the stuff he mentioned -- drug trafficking cases, bribery, bank robberies, all kinds of different things -- I redact victim -- it's not just me. I get trained on this stuff back in California, and I learned how to do it, and the way it's done by everybody is you redact the addresses, telephone numbers, dates of birth, Social Securities, that sort of thing.

So all of those are very standard redactions.

THE COURT: I understand. And I appreciate your experience; I appreciate Mr. Richman's experience. I can't make a decision based on that.

MR. KEENAN: Yeah.

THE COURT: I will tell you, for what it's worth, that I -- I tried to find any case law, because I didn't see any in your filing, that would support the type of what you're calling belt-and-suspenders approach here, and I didn't find anything in the district; I didn't find anything in the circuit.

I found a single case out of the District of New Jersey that supported the notion that even though there was a protective order similar to the one here, that certain redactions would be appropriate in that case, which was a sexual exploitation case and there was concerns about the victim being further victimized if their information was coming out.

MR. KEENAN: Mm-hmm.

THE COURT: Now, that was brought to the court by way of the Government seeking a protective order. So when I said "unilateral" earlier, it wasn't just throwing terms around. I'm telling you what I've seen happen in the one case that has endorsed the approach that was taken here.

This seems different to me in terms of the potential for abuse and also in terms of the posture in

which it comes to me. There's been no motion from the Government to amend the prior protective order. And, frankly, in a lot of ways, the conduct of the Government here would just render -- you know, it would obviate the need for any protective order. I don't understand how this has happened.

And you can sense I'm a little frustrated with it, I think --

MR. KEENAN: Yes, Your Honor.

THE COURT: -- because, as you know, I've tried to keep your case on track.

MR. KEENAN: Yes.

THE COURT: I think it's important for the public to have a quick trial in this case, if possible. The public has some right to a trial. I think it's important for disclosures to happen in due course and for the defense to be able to see what they can do and evaluate their case.

I think that's a very difficult thing to do given the type of disclosures that I've heard about. I don't know what the entirety of the disclosures look like, but it struck me as something that seemed inconsistent with what we were trying to do by ensuring through a protective order we would have a relatively full flow of information back and forth.

MR. KEENAN: In my introduction to the brief, I

said that we welcome the Court's guidance regarding these matters. You're the judge; I'm not. I'm comfortable with that. Been doing this a long time. That's the way it works. If the Court disagrees, we can do it however you want it done.

In terms of our concern, though, the -- when it comes to the disclosure of names, again, it's primarily, not exclusively, but primarily the victims of the offense who are worried about the disclosure. We've suggested maybe an attorneys'-eyes-only thing. They are members of the bar. I don't know hardly any of them except -- none of them except for my dealings with them in this case, but they are members of the bar and I trust them implicitly.

The -- their defendants might be fine people who had a bad day on January 18. But the bottom line is the conduct they engaged in on January 18 as alleged in the indictment is the kind of behavior that the victims in this case and that the Government is also concerned about, the kinds of harassment, intimidation, and doxing.

So -- and it's not just from the defendants. It's from anyone who might view themselves as allied in some way or another.

So here -- the big problem in a case like this, 38 defendants, is that we -- if it were one defendant and there were a disclosure, that enforcement provision would be

really handy. With 38 defendants, who did it? You know? It's like trying to find out who leaked a Supreme Court opinion in *Dobbs*, right? No one will know. Too many potential suspects.

So that's why the protective order doesn't give us a great deal of confidence that --

THE COURT: Well, why did you ask for it?

MR. KEENAN: -- it will have the --

THE COURT: Why did you ask me for it?

MR. KEENAN: Like I said, there are materials we cannot redact, like the videos. That's why.

THE COURT: I get that.

MR. KEENAN: That's why we asked.

THE COURT: But that's not clear from the order that you requested, because the -- as I mentioned, paragraph 7 of your order, your proposed order that I adopted, doesn't talk about videos that are hard to redact or anything like that. It speaks to the defendants' obligations to redact what are otherwise protected materials in judicial proceedings.

That suggests to me something other than just playing a video in court, suggests to me that what you're -- what you were contemplating was providing unredacted materials, not simply unredacted electronic materials because that was too hard to do, but unredacted materials

that, if the defense wanted to bring that up in a motion or whatnot, in a documentary motion, that then they would have some obligation to redact.

So what you're saying to me today, it's not consistent with what I -- and, you know, I say this with all due respect, it's not consistent with what I understood from your motion for a protective order, and it's not consistent, in my view, with the protective order in this case. So I'm trying to figure out where we go from here.

I appreciate the suggestion about maybe we could uncode a few things that are already in Everlaw coded a particular way. I have concerns about timing, so I don't know what to do with that.

You know, these disclosures -- it's hard for me not to say that these disclosures should have been made unredacted back on April 24th.

MR. KEENAN: The other couple -- well, primary point on redacting of the -- the core of the discovery is the, you know, the reports of interviews that they have and their point that they can't really make heads or tails out of them. They are actually able to see and have cited examples of, okay, a witness says that, you know, they're not -- they weren't in fear after a few minutes, I think was the phrase.

But the -- you know, I suppose the point is that

they -- they can look at the reports and see what that witness, which is usually going to be identified -- the DHS reports, you know, they -- ROI Number X, so there is an identifier. It's not the name, I get it's not the name, but there is an identifier. They can say, This witness says this, and they can see from the -- from the report what was said.

But, more importantly on that, it's -- the vast majority of the interviews, which are reflected in the interview reports, were conducted with -- they were recorded. Some, as I mentioned, the body-worn camera videos from St. Paul PD, video and audio; others, I think, were audio.

But they can -- there's -- it's not like, oh, blank, blank, blank. The audio -- if they really have concern about being able to perceive what's on the report, the audio recordings of the interviews will, you know, make clear what's being -- it will certainly aid. And I think it gets to the need or -- whether the discovery is worthless as is. I don't think it's -- "worthless" is an accurate word at all, but the -- my view is that the recordings of those interviews make clear what was said, how they were said, how the interview was conducted, you know, all sorts of different things that the reports, perhaps, won't.

THE COURT: But how do you link that up? So you

got a -- you got an audio -- you've got a video and audio interview of a victim --

MR. KEENAN: Mm-hmm.

THE COURT: -- and that identifies the victim's name --

MR. KEENAN: Mm-hmm.

THE COURT: -- address, contact information, whatever it might be, and then you've got separately hundreds of pages of ROIs that talk about interviews that were conducted with anonymous -- anonymized --

MR. KEENAN: Yes.

THE COURT: -- people. I don't know how -- even if you're right, how do you connect those two things up? I'm -- there might be an answer, I just don't know what it is.

MR. KEENAN: If it's not clear from the index or file names, we could -- we could link them up. This audio relates to this ROI, report of interview -- or investigation. We could do that if it's not already clear from the indexing.

And, lastly, just in terms of the point about the fully unredacted [sic] page, I don't know what that page is. I don't recall a significant number of pages like that. It's -- frankly, I didn't recall any pages that were completely blank. The -- so I don't know what that is.

I mean, if -- we can certainly provide a statement to all counsel saying, These things are blank because -- I know some of the documents, medical records, totally irrelevant. For the one victim that suffered an injury to her elbow, might be a page or two relating to that, but I can't say with certainty because I don't know that particular number.

And the mediation offer, we're not trying to invade the defense camp. And the suggestion -- the suggestion was not, Gee, defense lawyers, tell us who you want to interview. Okay, that would be a problem. Right? We get that. That wasn't the idea.

The idea that we suggested in our brief was we could just cover the waterfront, all of the victims, contact all of them, phone them or whatever, and say, Hey, there's been an interest expressed by some of the defense lawyers and they'd like to interview you. Would you like to -- are you willing to be interviewed? Some -- you know, vague, appropriately tailored, nothing suggestive. Do you want to talk to them or not? If so, we can provide your name and phone number for that purpose.

THE COURT: I understand. I mean, they're difficult issues --

MR. KEENAN: Anyway, it's not trying to get into -- yeah.

THE COURT: -- and I didn't think that the intention was to -- was anything kind of underhanded with that. I don't think I could do it, for whatever it's worth. I think that would be difficult to square with some of the issues that Mr. Marti and Mr. Richman raised. But I understood that, yeah.

MR. KEENAN: And that's all I have.

We've made a suggestion -- number one, I think the discovery as produced is adequate for the needs of the defense bar -- the defense lawyers in this case, and -- but if not, we're all ears, and we'll remove whatever redactions you think are excessive.

THE COURT: And let me get back to something, because in the event I do that, you know, I don't want to put you in an untenable position. Do you have a sense of timing for any reproduction?

MR. KEENAN: I think in terms of the reproduction, it would simply be removing the redactions within the Everlaw context and then letting the defense bar -- the defense lawyers here know that those documents, which are, as I understand it, just on a database available to be accessed, will -- are now available.

You know, I got the impression that the redaction -- the codes could be removed, you know, like a click of a button, but I don't want to overstate that, so

maybe Wednesday of next week. And if I'm wrong, I can deal with yet another mea culpa, but I believe it will be -- I believe it's a quick process.

THE COURT: Okay. All right. Thank you, Mr. Keenan.

MR. KEENAN: Thank you.

THE COURT: I appreciate it.

MR. HEDLEY: Your Honor, I also wanted to point out one thing. Get up to the microphone. I apologize, Your Honor.

THE COURT: All right. Go ahead, Mr. --

MR. HEDLEY: We still have less than half of the defendants having submitted the exhibit, or the attachment, to the protective order. So I think that's a relevant factor here in terms of the redactions already being in the pipeline, the discovery going out because of a discovery deadline, and not having the representations from defendants or their defense counsel that they're going to abide by the terms of the protective order. And we still only have approximately half of them.

So I think --

THE COURT: I saw that in your -- I saw that --

MR. HEDLEY: -- that context --

THE COURT: -- in your briefing.

MR. HEDLEY: -- I think, needs to be taken into

account about the whole flow of information, the whole flow of the process in terms of trying to meet a discovery -- the redactions being in the pipeline, trying to meet a discovery deadline, and then having the negotiation over the protective order, and then now we're three, four weeks from the protective order being entered and still have less than half the defendants having executed that. So I think that's a relevant factor to draw to the Court's attention.

THE COURT: Thank you, Mr. Hedley.

Any response from the defense on this?

MR. RICHMAN: First of all, with respect to that last point, Your Honor, it's completely appropriate that the protected material not be disclosed until the certifications have been provided to the Government.

Because of the two tranches that I spoke about at the beginning, one that was protected, the other not, the Government took the position that before receiving the protected material, they wanted a signed certification. So the defense counsel were able to get those, you know, 9,000 pages of PDFs because they were not protected, because they were all redacted, which I would suggest is the reason that there have been delays in producing those signed certifications.

But I certainly -- I've produced my signed certification as well as my client's, although I have not

provided him with any protected material to date. But I think that's completely appropriate that individual defense counsel not receive discovery until they've signed the certification.

But with respect to the protective order, Your Honor, the purpose of the protective order was to balance the privacy interests of the victims and witnesses against the due process rights of the defendants. It was negotiated at great length between the parties. This Court granted a protective order that it made its own tweaks to. The Government sought a specific amendment, which this Court granted in part. That protective order abides by the interests of the Crime Victims' Rights Act. That statute does not promise witnesses or victims anonymity. What it promises is that there -- that they will be treated fairly and their dignity and privacy interests will be respected. That's what the protective order does.

It is an untenable situation for only the Government to know who the people are who witnessed the events that gave rise to the charges in this case. Mr. Keenan seems to indicate that everything is fine because if we plow through a hundred hours -- hundreds of hours of audio, we can figure out who the witnesses are. If we can know through an enormous amount of work, we should be able to know by reading a PDF. The issue then becomes not

protecting any particular interest, but simply making our lives as difficult as possible.

We ask the Court to enforce the terms of the protective order by ordering the Government to produce the unredacted material that I outlined earlier.

Thank you, Your Honor.

THE COURT: And what you were asking for was names, addresses, phone numbers -- or I guess contact information. I don't know if you said e-mail addresses. I didn't hear that one way or another.

MR. RICHMAN: I didn't say e-mail addresses.

THE COURT: Okay. Names, address, and phone numbers of victims and witnesses, correct?

MR. RICHMAN: Correct.

THE COURT: Okay. Thank you.

MR. RICHMAN: Thank you.

THE COURT: All right.

MR. RICHMAN: And law enforcement officers.

THE COURT: Yes. Thank you.

Mr. Nestor?

MR. NESTOR: Your Honor, I just have a few brief comments. And it's not my intent to lose focus on the core issues as addressed by Mr. Richman, which really relate to the discovery, but today and in its moving papers responding to my letter, the Government has made accusations against my

client and the other defendants as to their behavior and motivation to dox or harass witnesses and victims as a reason for the Government's actions.

Today we had counsel saying that, We have concern for harassment and doxing. That is what they were up to, referring to the events that led to these charges.

In their Filing Number 520 responding to my letter, they talk about, quote, "Following well-known rules for radicals, the defendants identified the ICE agent and then tried to target, isolate, intimidate, and ostracize him." And that just calls for some response.

The events as publicly described that occurred at Cities Church on January 18th were holding a high public official accountable for his official actions, and that's Acting Field Office Director David Easterwood.

THE COURT: Mr. Nestor, I'm just going to cut you off on this, because I have a very limited amount of time and a limited scope of the hearing. Appreciate your comments. I appreciate that you want to respond to what feels to potentially you and your clients like attacks from the Government. You can deal with that in a different forum.

MR. NESTOR: I just -- I just -- I don't believe there's any evidence in the record to support that motivation or past behavior on the part of my client or any

of the other defendants.

THE COURT: Thank you, Mr. Nestor.

MR. MARTI: Judge, I understand you're running out of time. I'll use very little time.

One, the privacy act, it's a red herring. It's Title 5 U.S.C. § 552. No role in this, and you should just ignore that.

I think Mr. Keenan was referring to the administrative burden on the Government in redacting all this evidence. That suggests that quite easily they could unredact certain information and produce that.

And listening to your questions and commentary, I think you're focusing on a resolution of the issues that the three of us have brought before the Court, but we're not the only defendants in this case as a result of the Government's decision to charge this in the way it has done, and also to produce discovery in the manner which it has done. And I don't know how we work this out in the long run, because we are where we're at because of the Government's conscious decisions and the manner in which they've chosen to pursue this case.

If you look back in the gallery, you're going to see other counsel who represent other defendants in this case. They may have different positions as it relates to, I think, what Mr. Richman was suggesting in terms of

identifying data, and I don't want the Court to find itself in a position where it enters an order and then we're still in these arguments as we move forward.

And I don't --

THE COURT: You know, I --

MR. MARTI: -- I don't have an answer to that.

THE COURT: I appreciate that. But what I would say about that is simply that, you know, I don't expect unanimity among defense counsel on anything that I do, you know, but that doesn't really -- that can't really animate my decision.

MR. MARTI: Right.

THE COURT: So -- but I -- you know, that is what it is. But I appreciate you bringing that to my attention.

MR. MARTI: So there may be additional process as it relates to the protective order as we go forward.

THE COURT: Understood.

MR. MARTI: Okay. Thank you.

THE COURT: Thank you.

Mr. Keenan, it looked like you wanted to tell me something.

MR. KEENAN: Just one factoid. I'm informed that the reports of investigation, as I noted, they have a number, let's say "ROI 102." It's my understanding that the recordings relating to that interview are referenced as

"ROI 102" as well. But if the index is insufficient to make the -- to link those up, we are happy to do that.

THE COURT: Okay.

MR. KEENAN: And I don't yet -- I was checking to see exactly how quickly that can be done, the recoding. I don't yet have an answer, but I've told you what I know.

THE COURT: Thank you, Mr. Keenan.

Why don't we take just a five-minute recess and I'll be back out and tell you what we're going to do here today.

THE LAW CLERK: All rise.

*(Recess taken from 12:19 p.m. to 12:21 p.m.)*

THE LAW CLERK: All rise.

THE COURT: You all can be seated as you see fit. Thank you.

UNIDENTIFIED MALE ATTORNEY: Mr. Marti is just retrieving his client.

THE COURT: My five minutes was shorter than yours, which is fine.

MR. MARTI: I think my client probably went to the other end of the hallway.

THE COURT: Mr. Marti, do you want me to wait for your client, or do you want me to excuse your client for this part of the proceeding? We can give him a minute.

MR. MARTI: You can proceed.

THE COURT: Okay. Okay.

Thank you all for your presentation here today. It was helpful to my decision-making process.

I'll tell you what we're going to do: I'm going to follow this up with an order that summarizes what I'm going to do that I expect to issue today.

Let me tell you, first of all, how I see things. In my view, the amended protective order that was issued by the Court was intended to govern the characterization and use and dissemination of discovery materials, not simply discovery materials that may come to defense counsel in an unredacted form. That was the intention. It was intended to be more broadly used, and I don't think that the redactions that I've heard about today are consistent with that amended protective order.

I appreciated the Government's comments on the application of the privacy act and application of the Crime Victims' -- the CVRA. I considered privacy concerns when I issued the amended protective order, and that was part of my decisional process there, so that was already covered.

I also, in my research, noted that -- the Government confirmed today -- that the CVRA is designed to and does impose certain rights for victims, not for witnesses, not for law enforcement officers, unless they also qualify as victims.

I also will tell you that, to the extent that the CVRA has some application to this matter, as I said, I considered that in my protective order, and the rights that are conferred by the CVRA are general rights that are, you know, kind of probably included in and also -- they're, you know, perfected by a more specific protective order that identifies how those rights are going to be honored. That's what we did here with the protective order.

All of that to say, I don't find any basis for the Government's redactions in discovery that was produced, so I am going to order that the Government reproduce the discovery that is due and has been produced consistent with Rule 16.

I heard Mr. Richman, on behalf of the three defendants who are in front of me here today, indicate that he's -- that, at least from their perspective, the matters can be unredacted as to names, address, and telephone numbers of those victims and witnesses, that he's not asking for date of birth or other personal identifying information. I think that that is fine.

I'm going to issue this order broadly as it relates to all defendants. And I understand Mr. Marti's point that some other defendants might seek to challenge that order because they want additional personal identifying information. We can deal with that in due course.

I will say, for those who are here, you're free to go forward with whatever motion practice you feel like you need to to protect your clients' interests on that, but I think it's a tougher row to hoe to seek other personal identifying information beyond what -- the limitations that Mr. Richman had mentioned, that is, names, addresses, and phone numbers for witnesses and victims.

I'm also going to order that the discovery be reproduced entirely unredacted as it relates to law enforcement officers. I didn't hear anything today that would support the notion that redactions for law enforcement officers would be appropriate in this case. It's not contemplated by the protective order and they would not be included within the CVRA, and I know of no case that would support that type of redaction.

I'm going to order that that reproduction be completed no later than May 22nd, which is next Friday. Mr. Keenan indicated that this -- that unredacting in a manner that I've just identified would potentially be a matter of keystrokes. That's fine. Let's give it a little bit more time just in case it's not. And if there are difficulties between -- with making that deadline, you could always seek further relief from the Court.

I think that covers the matters that were before me.

MR. HEDLEY: Your Honor?

THE COURT: Yes.

MR. HEDLEY: Just wanted to clarify, if there hasn't been an executed attachment to 505 --

THE COURT: Thank you for bringing that to --

MR. HEDLEY: -- then we don't have to disclose unredacted --

THE COURT: So --

MR. HEDLEY: -- until -- until we have that.

THE COURT: Thank you, Mr. Hedley, for bringing that to my attention.

For -- just for the absence of doubt, if there are no executed attachments that the people receiving the information are -- understand that they are subject to the protective order, including the potential sanctions, yes, there does not need to be an unredacted disclosure to those members until there is such a certification that's executed.

Thank you for that.

Mr. Richman, did I capture -- is there any lack of clarity on this from the defense perspective?

MR. RICHMAN: No, Your Honor. The -- at least, on behalf of Mr. Crews, I'm satisfied, and I appreciate the Court's time.

THE COURT: Okay. Thank you.

Mr. Nestor, anything else that you wanted to raise

on behalf of Ms. Cullars-Doty?

MR. NESTOR: No, Your Honor.

THE COURT: All right. Mr. Marti, how about on behalf of Mr. Tier?

MR. MARTI: I agree with Mr. Richman. Thank you.

THE COURT: All right. Let me turn to the Government, then.

Mr. Keenan and Mr. Hedley, anything else other than the exhibit that you wanted to bring up to my attention? The exhibit being the certification. It's included as Exhibit A to the protective order.

MR. KEENAN: I have nothing further. I'll just say study the Court's order.

But in terms of victims, is it the Court's intent to disclose the addresses of victims as well as opposed to third-party witnesses?

THE COURT: Yes.

MR. KEENAN: Okay.

THE COURT: Okay. Okay. I mean --

MR. KEENAN: I should say, not -- that's not okay with the Government's view, but I understood what the Court said. Thank you.

THE COURT: No, no, I -- and, to be clear, Mr. Keenan, I think that that is already -- the identity of the victim is already included within the protective order

and that's what -- that's the basis for my decision.

Okay. With that, we are in recess.

*(Court adjourned at 12:30 p.m.)*

* * *

I, Caitlin J. Nat, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

Certified by: *s/ Caitlin J. Nat*

Caitlin J. Nat, RPR-CRR