UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

NEKIMA LEVY ARMSTRONG, et al.,

Defendants.

Case No. 0:26-cr-00025-LMP-DLM

**MOTION TO COMPEL**

## I.  INTRODUCTION AND RELIEF REQUESTED

Defendants Thomas Matthew Tier (36), Trahern Crews (7), and Ariel Hauptman (21) ("Defendants") move the Court to compel the Government to meet its discovery obligations under *Brady, Giglio, Agurs*, Federal Rule of Criminal Procedure 16, and prior orders of this Court.

Despite repeated, specific requests and multiple court orders, the Government has neither conducted nor certified a reasonable search for critical information, has not provided specific responses, and has not produced material responsive to Defendants' targeted requests. The Government's discovery failures are not isolated incidents but reflect a systematic refusal to comply with the law.

The Court should order (1) a detailed certification of searches conducted across all members of the prosecution team; (2) specific, written responses to each request; (3) production of all discoverable material on a firm schedule; (4) appropriate preclusion if the Government continues to disregard its obligations; and (5) a status conference to monitor compliance.

## II. BACKGROUND

### A.    The Government's Investigation.

This case arose in the context of "Operation Metro Surge," a coordinated federal law-enforcement initiative including personnel from the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), the Department of Justice ("DOJ"), and military personnel.

Public reporting described intense pressure on federal law enforcement agents and prosecutors to maximize arrests and prosecutions—featuring arrest quotas, incentives tied to enforcement outcomes, commemorative "challenge coins," and public Government statements promising aggressive prosecution of protesters while this matter was under investigation by the Grand Jury. (Doc. 493 at 8–11.) In addition, senior DOJ officials reportedly directed prosecutors to "go after the protesters with everything you have," and at least one prosecutor reportedly resigned rather than pursue charges under those circumstances. (*Id.* at 10.)

During the same period, public reporting further described accelerated ICE hiring and shortened training under former DHS Secretary Kristi Noem—reportedly deploying large numbers of inadequately trained agents before abandoning the initiative. *See, e.g.*, *Letter from Rep. Andrea Salinas et al. regarding ICE and CBP training practices* (Feb. 13, 2026), https://salinas.house.gov/sites/evo-subsites/salinas.house.gov/files/evo-media-document/salinas_ice-and-cbp-agents-training_february-2026.pdf.

Substantial evidence of institutional pressure and potential investigative overreach is directly material and relevant to credibility, motive, and the legality of investigative methods in this case. (Doc. 550 at 4–5; *see also* Doc. 492 at 8–13).

Moreover, after the Indictment was returned—and after Magistrate Judge Docherty denied the Government's applications for search warrants relating to several Defendants—the Government undertook alternative investigative measures that raise significant concerns. The Government unlawfully issued summonses under the authority granted in 19 U.S.C. § 1509 to obtain financial, employment, and communications evidence. LaVine ¶ 1, Ex. A; *see also* LaVine ¶ 2, Ex. B. The Government also caused the grand jury to issue post-indictment subpoenas seeking information potentially relating to funding for several defendants' legal defense.[1] Some of these subpoenas are subject to a non-disclosure order barring subpoena recipients from disclosing the subpoenas' existence until January 27, 2027. LaVine Decl. ¶ 3, Ex. C (DCN 00019840). Government prosecutors stated they are unaware whether this order was also attached to the § 1509 summonses.[2]

---

[1] The Government disclosed grand jury subpoenas issued April 9, 2026, seeking GoFundMe information related to Defendants William Kelly (Def. 3), LaVine Decl. ¶ 4, Ex. D ( DCN 00011958); Jerome Richardson (Def. 5), LaVine Decl. ¶ 5, Ex. E ( DCN 00011964); Satara Diann Strong Allen (Def. 2), LaVine Decl. ¶ 6, Ex. F ( DCN 00011952); and one other Defendant. The Government later withdrew those subpoenas on May 29, 2026, for reasons not disclosed to the defense. LaVine Decl. ¶ 7, Ex. G (DCN 00012656).

[2] (Doc. 565-2, at 3) ("The government did not know whether it had sought and obtained a nondisclosure order pursuant to 18 U.S.C. § 2705 in this case, including with respect to its customs-related administrative summonses. It stated that, if it had done so, it would have produced it (and any related materials) in discovery.")

### B.    Procedural History and Court Orders.

The Court has entered multiple discovery-related orders throughout this case in response to the Government's repeated failure to comply with its discovery obligations.

- On February 27, 2026, the Court entered a standing Brady Order, expressly warning that violations could result in sanctions. (Doc. 240).

- On March 20, 2026, the Court criticized Government delays, stating, "This is unacceptable," and imposed an April 24, 2026, disclosure deadline. (Doc. 411 at 3).

- On April 22, 2026, the Court entered a protective order governing discovery noting the possibility of sanctions for noncompliance (Doc. 503).

- On April 24, 2026, the Government produced heavily redacted discovery. At a hearing the Court found that the Government had violated the protective order and ordered production of unredacted materials. (Doc. 523 at 1).

### C.  Specific Defense Discovery Requests and the Government's Non-responses.

On April 8, 2026, Defendant Tier served a detailed written discovery request on the Government. (Doc. 493, Ex. A). The request was narrowly tailored, specific, relevant, and made in good faith to facilitate pretrial preparation and trial planning. Defendants requested a response by April 15, 2026. *Id.*

The Government replied after the requested response date with a three-sentence email promising generic compliance with Rule 16 and *Brady* and referencing the Court's standing order—without addressing a single request or committing to a timeline. (Doc.

4

493, Ex. B). More than three months later, the Government still has not substantively responded.

On April 14, 2026, Defendant Tier moved to compel targeted discovery. (Doc. 493). That motion to compel remains pending, and the Government has not responded.

On April 29, 2026, Defendant Tier served Specific Request No. 2 concerning government agent hiring/training and incentives. Defendant Tier sought information about ICE agents involved in this case, including whether any were hired following the roughly $75 billion allocation associated with reported shortcuts in training and vetting. LaVine ¶ 8, Ex. H (Specific Request #2).

On May 7, 2026, the Government responded that it cannot "reasonably respond to every defense attorney's separate request [for discovery]." LaVine Decl. ¶ 9, Ex. I. While the Government claimed the request was overbroad, it did not state whether it had conducted a search, whether responsive discovery exists, whether the material is discoverable, or when production would occur. On May 8, 2026, Defendant Tier explained that the Government's obligations run to each Defendant individually and cannot be conditioned on coordination. LaVine Decl. ¶ 10, Ex. J. Again, the Government never provided a substantive response.

On July 8, 2026, Defendant Tier served Specific Request No. 3 for materials regarding the Government's use of 19 U.S.C. § 1509 customs summonses (including after Magistrate Judge Docherty denied search-warrant applications) and post-indictment Grand Jury subpoenas apparently probing defense funding. LaVine Decl. ¶ 11, Ex. K. The Government did not acknowledge receipt, disclose any search, produce documents,

assert an objection, or otherwise respond. The Government completely ignored this request.[3]

On July 22, 2026, Defendants Crews and Hauptman joined Defendant Tier's specific discovery requests.

### D.  The Government Used Customs Summons Authority in a Non-Customs Criminal Investigation.

Beginning in January 2026 and continuing through at least March 2026, ICE agents issued administrative summonses purportedly under the authority of 19 U.S.C. § 1509. These summonses sought employment records, communications records, and other information unrelated to customs administration.

Congress authorized § 1509 summonses for limited and specific purposes. The statute permits the issuance of summonses only "for the purpose of ascertaining the correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States, for determining liability for fines and penalties, or for insuring compliance with the laws of the United States administered by the United States Customs Service." 19 U.S.C. § 1509(a)(1). The statute further identifies the categories of persons subject to such summonses, including importers, exporters, customs brokers, warehouse operators, carriers, and others involved

---

[3] The Government has admitted to other defendants that it will refuse to engage with or provide discovery in response to certain specific discovery requests. (Doc. 565-2, at 3) ("The government would not specify, when asked, whether it is continuing to issue customs-related administrative subpoenas as part of this case.").

in customs transactions or the movement of merchandise across United States borders. *Id.* at § 1509(a)(2).

The investigation at issue bears no relationship to customs enforcement. The Indictment alleges civil rights offenses and does not involve customs entries, imported merchandise, duties, tariffs, customs declarations, bonded merchandise, drawback claims, or any other matter within the scope of laws administered by U.S. Customs and Border Protection.

The Government also failed to comply with the statute's implementing regulations. A customs summons must describe the requested records "with reasonable specificity," identify the issuing officer, provide contact information, and comply with prescribed service requirements. 19 C.F.R. § 163.7. In addition, when records are sought from a third-party recordkeeper and another person possesses a proprietary interest in those records, the regulations require notice to that person and provide an opportunity to stay compliance with the summons. 19 C.F.R. § 163.8. The Government failed to provide the required notice and disregarded these mandatory procedural protections.

The regulations likewise limit the use of summonses to investigations, audits, or inquiries undertaken for specific customs-related purposes, including: "(i) Ascertaining the correctness of any entry, determining the liability of any person for duties, taxes and fees due or revenue due, or which may be due the United States; (ii) Determining liability for fines, penalties, and forfeitures; [or] (iii) Ensuring compliance with the laws of the United States administered by CBP." 19 C.F.R. § 163.6. None of those purposes is implicated by a domestic civil rights investigation.

The Government may not use § 1509 summonses to obtain communications and subscriber records in a civil rights case. The Stored Communications Act ("SCA"), 18 U.S.C. § 2701 et seq., prohibits electronic communication service providers from disclosing the contents of communications or customer records absent specific statutory authorization. Section 2703 establishes the procedures through which the Government may obtain such information, including search warrants, court orders, and grand jury subpoenas, depending upon the nature of the records sought. A customs summons issued under § 1509 is not among the mechanisms authorized for obtaining communications records in a domestic civil rights investigation.

The Government's conduct in this case is not an isolated incident. In 2017, the Department of Homeland Security Office of Inspector General found that CBP's Office of Professional Responsibility had used customs summons authority in matters unrelated to customs or immigration enforcement. The Inspector General reported:

> [T]hese summonses are being used to obtain records—including records from third parties—in a wide range of cases having no nexus to Title 8 or Title 19. Such uses violate CBP OPR's stated policy and potentially open up the agency to legal challenges.

Department of Homeland Security, *Office of Inspector General, OIG-18-18, CBP Office of Professional Responsibility Needs to Improve Oversight of Its Administrative Summons Authority* (Nov. 2017), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2017/oig-18-18-nov17.pdf.

The Inspector General's findings confirm that misuse of customs summons authority has been identified within DHS before. The conduct alleged here reflects

precisely the type of statutory overreach the Inspector General warned could expose the Government to legal challenge.

## III.   ARGUMENT

### A.  The Government Must Respond to Defendants' Specific Discovery Requests.

Defendant served specific discovery requests. The Government has neither produced the requested materials nor provided substantive responses as required by *United States v. Agurs*, 427 U.S. 97 (1976).

The duty to disclose extends beyond the prosecutor's personal knowledge and encompasses evidence known to the prosecution team, including information that could be discovered through the exercise of reasonable diligence. *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) ("A prosecutor has a duty to disclose evidence known by police officers, even if not known by the prosecutor, because a prosecutor has a duty to learn of such information."); *United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016) ("prosecutors have a duty to disclose to the defense all material evidence favorable to the accused"). Once placed on notice through specific defense requests, the Government must conduct a reasonable inquiry for responsive *Brady/Giglio* information. *Scurr v. Niccum*, 620 F.2d 186, 190 (8th Cir. 1980).

A specific discovery request places the Government on direct notice of the evidence the defense considers material. As *Agurs* recognized, when the prosecution receives a specific request, a complete failure to respond is "seldom, if ever, excusable." *Agurs*, 427 U.S. at 106. The Government may assert that responsive material does not

exist, is not discoverable, or does not constitute *Brady* material, provided it gives a legally sufficient explanation. *Id.* What it may not do is ignore the request and rely on an empty promise that it will comply with the law. *Id; see also generally Scurr*, 620 F.2d at 190.

That obligation is particularly significant here, where the prosecution team includes DOJ Civil Rights Division attorneys, ICE agents, Operation Metro Surge personnel, local law enforcement partners, and military personnel serving as Special Assistant United States Attorneys. A reasonable search requires identifying relevant custodians and reviewing potentially responsive records maintained across participating agencies.

The Government's responses indicate that no meaningful inquiry occurred. Its one-day response to Specific Request No. 1 suggests an effort to "paper the file" rather than conduct a reasonable search. Its response to Specific Request No. 2—that it need not address each Defendant's individual requests—misstates its constitutional obligations. And its failure to respond to Specific Request No. 3 demonstrates that meaningful compliance will not occur absent a court order. Therefore, the Government must respond to Defendants' specific requests.

**B.    The Evidence Sought in the Three Specific Discovery Requests Is Material to the Defense.**

"Where the defense has made a specific request for certain materials… 'material'…[is defined as] a reasonable probability that suppression of the evidence in question would undermine confidence in the outcome of the trial or, in other words, as

establishing a reasonable probability that without suppression of the evidence, the result of the proceeding would have been different." *United States v. Vue*, 13 F.3d 1206, 1208 (8th Cir. 1994); *see also* Fed. R. Crim P. 16(a)(1)(E)(i) ("Upon a defendant's request, the government permit the defendant to inspect and to copy" materials when "the item is material to preparing the defense[.]"). Here, the requested evidence goes directly to law enforcement bias, key witness credibility, government misconduct, and investigation reliability, making it essential to a fair trial and the presentation of a complete defense. Because this evidence is material, disclosure is required.

### 1.   Discovery regarding agent hiring and training is material.

Specific Request No. 2 seeks discovery concerning the hiring and training of the Government agents who participated in the investigation.[4] Training and qualification records are discoverable when they bear on the reliability of investigative methods or the credibility of the Government's witnesses. The Eighth Circuit has recognized that information relevant to assessing the reliability and credibility of law enforcement personnel is material to effective cross-examination and impeachment. *See e.g., United States v. Kiszewski,* 877 F.2d 210, 216 (2d Cir. 1989) (discussing Government's duty to disclose Giglio evidence for testifying agents, "[t]he law is clear that Brady and its progeny require that the government disclose material impeachment evidence"); *Helmig v. Fowler*, 828 F.3d 755, 760 (8th Cir. 2016) ("evidence includes both exculpatory and impeachment evidence").

---

[4] The materiality of Specific Request No. 1 is discussed in detail in Defendant's Motion to Compel Discovery. (Doc. 493).

Here, the requested records are material for three independent reasons. First, they may show whether the challenged summonses and subpoenas arose from systemic training deficiencies rather than isolated mistakes. Evidence that agents lacked training regarding subpoena authority, statutory limitations, or constitutional constraints would support the defense position that the alleged violations were foreseeable consequences of deficient agency practice. And because any evidence obtained through unlawful means may be subject to suppression, the lawfulness of the Government's evidence-gathering methods is central to pending and anticipated suppression issues.

Second, the records may provide impeachment material. Any agent who testifies that he or she lawfully exercised investigative authority may be impeached by evidence demonstrating inadequate training, lack of qualification, or training materials that expressly prohibited the conduct at issue. Such evidence falls squarely within the scope of *Giglio* and Rule 16 discovery.

Third, the records are relevant to the overall reliability of the investigation. Where agents are alleged to have employed unlawful investigative methods, evidence concerning their training and qualifications assists the defense in evaluating whether similar deficiencies affected other aspects of the investigation and the evidence ultimately presented to the grand jury and at trial.

Moreover, this request is neither speculative nor a fishing expedition. It is based on Government conduct already reflected in the public record and in discovery produced to date. And it is narrowly tailored, limited in scope, and directed to subjects that are

12

directly relevant to the legality and reliability of the investigation and the credibility of testifying agents.

Accordingly, Specific Request No. 2 seeks material, targeted discovery directly relevant to suppression issues, witness credibility, and the reliability of the Government's investigation. It therefore falls well within the scope of the Government's disclosure obligations.

### 2.      Discovery of 19 U.S.C. § 1509 policies and practices is material.

Specific Request No. 3, which seeks DHS policies, procedures, training materials, and guidance governing the use of 19 U.S.C. § 1509 summonses, is likewise material to the defense. To determine whether agents exceeded statutory authority or disregarded mandatory procedural safeguards (and therefore obtained evidence by unlawful means), Defendants must know what agency rules and/or supervisory guidance were in place at the time of the challenged conduct. For example, if DHS guidance prohibited the use of § 1509 summonses in investigations unrelated to Title 8 or Title 19, evidence that agents nonetheless employed those summonses would strongly support the conclusion that the violations were intentional and deliberate rather than reasonable mistakes and prevent the Government from invoking any good faith exception.

And like Specific Request No. 2, this request is not a fishing expedition. Defendants seek the very policies and directives that governed the conduct at issue and that agents were required to follow. Because the Government allegedly relied on § 1509 summonses and other administrative processes to obtain evidence in this case, the rules defining the scope and limits of those authorities are directly relevant to suppression

13

issues, witness credibility, and the overall integrity of the investigation. Thus, Specific Request No. 3 is plainly material to the preparation of the defense.

### 3. Discovery of the Government's possible investigation of defense funding is material.

In addition to the materials sought in Defendants' Specific Requests, the Government's possible investigation of the funding of Defendants' legal defense is also material to the preparation the defense. The Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might lawfully obtain and prohibits the government from impeding the supply of defense resources, absent justification. *United States v. Stein*, 541 F.3d 130, 135 (2d Cir. 2008). Here, evidence suggests that the Government used the grand jury to investigate Defendants' funding of its defense. This raises substantial concerns regarding the Sixth Amendment right to counsel and the integrity of the adversarial process, leading Defendants to now move the Court to compel the disclosure of materials related to this potential investigation.

The information is material for several reasons. First, disclosure is necessary to determine whether the Government has undertaken actions that could chill Defendants' right to effective assistance of counsel. Investigation of defense funding sources may deter witnesses, supporters, donors, or other third parties from assisting the defense out of concern that they themselves will become subjects of government scrutiny. Without disclosure, Defendants cannot assess the extent to which the Government's conduct may have interfered with the preparation of the defense.

Second, evidence concerning subpoenas directed at defense funding may constitute *Brady* or *Giglio* material. If the Government sought to identify, monitor, or investigate individuals or entities supporting Defendants' legal representation, that conduct may bear on prosecutorial motive, bias, or the good faith of the investigation. Such information may also provide a basis for impeaching Government witnesses or challenging the propriety of investigative decisions made during the prosecution.

Third, the existence and scope of any such investigation may support motions alleging prosecutorial misconduct or seeking remedies to protect Defendants' constitutional rights. Defendants cannot evaluate whether the Government crossed constitutional boundaries, improperly intruded upon the attorney-client relationship, or engaged in conduct warranting judicial intervention without disclosure of the relevant subpoenas and related communications.

Put simply, the Government's use of the grand jury to scrutinize the funding of Defendants' legal representation presents a direct threat to the Sixth Amendment right to counsel and the fairness of these proceedings. Accordingly, any investigation of defense funding is material and necessary to the preparation of the defense.

> **4.     Discovery of the Government improperly issuing grand jury subpoenas after the indictment and superseding indictment issued is material.**

Evidence relating to the Government's issuance of grand jury subpoenas after the Superseding Indictment is also because it points to an abuse of power. After a grand jury hands down an indictment, its investigation into those specific charges is officially over. The Government cannot use the grand jury's broad powers to gather evidence for an

upcoming trial—it must use standard pretrial discovery instead. *United States v. Sellaro*, 514 F.2d 114, 122 (8th Cir. 1973) ("Of course, a grand jury should not be used to prepare for a pending trial"); *United States v. Thompson*, 944 F.2d 1331, 1337 (7th Cir. 1991) ("Once a defendant has been indicted, the government is precluded from using the grand jury for the sole or dominant purpose of obtaining additional evidence against him.") (citation modified). And if the Government uses post-indictment subpoenas to extract documents or witness statements that directly bear on elements of the existing charges, such evidence may be subject to suppression or exclusion at trial.

In this case, a colorable basis exists to suspect the Government's improper use of the grand jury. The initial indictment was returned on January 29, 2026. A Superseding Indictment charging Defendants Tier, Hauptman, and others was returned February 26, 2026. Subsequent to that date, Defendants became aware that the grand jury issued at least 35 subpoenas to third parties.[5] Because these entities and individuals possess information directly relevant to the pending charges—and because the government has not filed a superseding indictment expanding the scope or adding new defendants in the five months since—there is a strong inference that the grand jury is being used as a

---

[5] Subpoena # 2026R00046-0008 (DCN  00009053) was issued on about March 10, 2026, to REI. LaVine Decl. ¶ 12, Ex. L. Subpoena # 2026R00046-0043 (DCN 00011868) was issued on about May 5, 2026, to Wings Financial Credit Union. LaVine Decl. ¶ 13, Ex. M.  The subpoena numbers establish that the government issued at least 35 subpoenas between March 10, 2026, and May 5, 2026.  It is unclear how many grand jury subpoenas were issued after the Superseding Indictment returned on February 26, 2026, but before March 10, 2026, and how many grand jury subpoenas have been issued since May 5, 2026.

substitute for trial discovery. For example, if the Government used the grand jury to lock in the testimony of trial witnesses after the indictment was issued, the timing and context of those statements are highly relevant to cross-examination, potential bias, and witness preparation under the Confrontation Clause. Thus, discovery relating to the Government's potential misuse of the grand jury and issuance of post-indictment subpoenas is likewise material and must be produced.

**C.    The Court Must Intervene to Correct the Government's Systematic Pattern of Discovery Violations.**

More than three months have passed since Defendant Tier served initial detailed requests; the Government has produced nothing responsive to those specific requests, filed no response to the April 14 motion to compel, largely ignored the April 29 supplemental letter, and completely ignored the July 8 supplemental letter. The delay not only prejudices the Defendants' ability to investigate, brief suppression and other motions, and prepare for trial; but, when viewed alongside the Government's (likely) unlawful investigation into Defendants' funding sources and (even more likely) misuse of the grand jury, reveals a disturbing pattern of prosecutorial overreach that jeopardizes the integrity of these proceedings and undermines confidence in the judicial system itself.

Pursuant to its broad discretion with respect to discovery motions and ability to impose sanctions for violations of discovery rules, *see United States v. Hintzman*, 806 F.2d 840, 846 (8th Cir. 1986), this Court has the ability to intervene. Therefore, the Court should exercise its discretion and order the Government to take specific actions that will ensure Defendants receive all discovery helpful to the defense.

## IV. RELIEF REQUESTED.

Defendants respectfully request that the Court:

1.     Grant this Renewed Motion to Compel Discovery;

2.     Order the Government to conduct a comprehensive, prosecution team–wide search for evidence responsive to the defense's three specific requests and file, within 14 days, a detailed certification describing the search, and confirmation that all material known to the team after reasonable inquiry has been produced;

3.     Order the Government to provide, within 14 days, specific written responses to each item in the April 8, April 29, and July 8, 2026 requests by either (a) producing the material; (b) stating, after a documented search, that it does not exist; or (c) stating a legal objection and the basis for it;

4.     Order the Government to produce all discoverable material within 21 days;

5.     Prohibit the Government from introducing at trial any evidence subject to timely discovery requests but not disclosed in accordance with this Court's order;

6.     Set a status conference to monitor compliance; and

7.     Grant such other and further relief as the Court deems just and proper.

Dated:  July 22, 2026                              **DORSEY & WHITNEY LLP**


                                                    By  s/ John Marti
                                                        John Marti (#0388393)
                                                        marti.john@dorsey.com
                                                        Meredith LaVine (#0506725)
                                                        lavine.meredith@dorsey.com
                                                        Ashley Repp (#0399661)
                                                        repp.ashley@dorsey.com
                                                    50 South Sixth Street, Suite 1500
                                                    Minneapolis, MN 55402
                                                    Telephone:  (612) 340-2600
                                                    Facsimile:  (612) 340-2868

                                                    *Attorneys for Defendant Thomas Matthew*
                                                    *Tier (36)*

**LAW OFFICES OF ROBERT D. RICHMAN, LLC**

s/ Robert D. Richman
Robert D. Richman, Reg. No. 226142
P.O. Box 16643
St. Louis Park, MN 55416
(651)278-4987
robert@rdrichmanlaw.com

*Attorney for Defendant Trahern Jeen Crews (7)*

**FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP**

s/ Caitlinrose H. Fisher
Caitlinrose H. Fisher, Reg. No. 0398358
1500 Capella Tower
225 South 6th Street
Minneapolis, MN 55402
(612) 474-3300
cfisher@forsgrenfisher.com

*Attorney for Defendant Ariel Hauptman (21)*

19