UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 0:26-cr-025-LMP-DLM |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S** |
| | ) | **OPPOSITION TO** |
| v. | ) | **DEFENDANTS TIER,** |
| | ) | **CREWS, & HAUPTMAN'S** |
| NEKIMA VALDEZ LEVY | ) | **MOTION TO COMPEL** |
| ARMSTRONG, et al., | ) | **DISCOVERY (Doc. 569)** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

The United States of America hereby submits this brief in response to the motion to compel discovery (ECF 569) filed by defendants Tier (39), Crews (7) and Hauptman (21) (collectively, "Defendants").

## INTRODUCTION

The Defendants' motion is an attempt to have the Court micro-manage the Government's prosecution. The motion is replete with accusations of "potential" investigative overreach or "likely" misuse of the grand jury. Contrary to the Defendants' assertions, the motion and their discovery requests amount to little more than a speculative fishing expedition. Moreover, the Defendants' motion ignores that the Government has delivered voluminous discovery to all of the defendants in this case. (*See* ECF 582, cataloging all of the discovery produced to date.)

The Defendants' motion to compel is focused on three specific requests for information. (ECF 569 at 10.) Although not entirely clear, the first request appears

to be a rehash of an extremely broad discovery request (ECF 493) that *predates* the Government's production of the significant volume of discovery in this case. Moreover, the request seeks various items that are wholly irrelevant to the case and beyond the scope of permissible discovery under Fed. R. Crim. P. 16(a), including internal government communications and policy decisions, information related to Operation Metro Surge, and immigration enforcement actions, and the involvement of any members of the U.S. Military. The second request seeks materials relating to the hiring and training of Government agents who participated in the investigation. (ECF 569 at 11.) The third request concerns the Government's use of administrative summonses under 19 U.S.C. § 1509(a). (ECF 569 at 13.) The motion to compel also makes two more related demands: (1) materials related to the Government's grand jury subpoenas of financial information (ECF 569 at 14); and (2) discovery regarding the Government's use of grand jury subpoenas after issuance of the superseding indictment. (ECF 569 at 15.) The Government addresses each of these requests in turn.

## ARGUMENT

### I.   General Rules & Principles Governing Discovery

"Criminal defendants do not have a general constitutional right to discovery." *United States v. Johnson*, 228 F.3d 920, 924 (8th Cir. 2000); *see also United States v. Tavlin*, 2023 WL 3477610, at *3 (D. Minn. 2023) (Docherty, J.) (summarizing law). A defendant must usually identify "a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government." *Id.* One such rule is Federal Rule of Criminal Procedure 16(a)(1), which requires the United States to disclose,

among other things, and upon the defendant's request, a defendant's oral, written, or recorded statement; and documents and objects within the United States' possession, custody, or control that are material to the defense, intended to be used in the government's case-in-chief, or from the defendant. Fed. R. Crim. P. 16(a)(1)(A), (B), (E).

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Government must also "disclose any evidence favorable to the defendant ... that is 'material either to guilt or to punishment.'" *United States v. Primm*, 63 F.4th 1186, 1192 (8th Cir. 2023) (quoting *Brady*, 373 U.S. at 87). The government's disclosure obligation includes evidence relevant to a witness's credibility. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972). A prosecutor also "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

## II.     The First Request is Overbroad, Seeks Irrelevant Policy Documents, and has Otherwise Been Satisfied By The Government's Prior Productions of Discovery

The Government is aware of its obligations under *Brady*, *Giglio*, and their progeny. The Government has complied—and will continue to comply—fully with those obligations. To date, the Government has produced over 40,000 pages of documents, hundreds of audio and video files, and hundreds of investigative process materials such as search warrant applications (both executed and unexecuted); grand jury subpoenas (several of which were withdrawn), and administrative summonses. To the extent evidence exists which is favorable to the moving Defendants (or to the

other defendants), exculpatory and material to either guilt or punishment, the Government either has produced it or will produce it in a "timely manner" upon discovery thereof, in accordance with the Court's standard Rule 5(f) order. (*See, e.g.*, ECF 187.)

*Brady* is not a general "discovery device," and it "does not require pretrial disclosure."[1] *United States v. Bowie*, 618 F.3d 802, 818 (8th Cir. 2010); *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005).  Indeed, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Madsen v. Dormire*, 137 F.3d 602, 605 (8th Cir. 1998) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)); *United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("the Constitution does not require the prosecutor to share all useful information with the defendant") (citing *Weatherford*, 429 U.S. at 559).

Rather, "due process is satisfied if the information is furnished before it is too late for the defendant to use *at trial*." *Almendares*, 397 F.3d at 664. (emphasis added).  Moreover, *Brady* only requires the disclosure of evidence material to guilt or

---

[1] Although it is clear that *Brady* is a "trial right," the Government cites to this rule advisedly; it is not to suggest that the Government plans to disclose *Brady* material (if any exists) on the eve of trial.  We cite to the applicable rules of law because it is a worthwhile starting point for most legal briefs.  To be clear, though, the Government's counsel recognize that the Court's form *Brady* order stresses the importance of "timely" disclosures, and counsel's standard practice is, in fact, to produce any *Brady* material promptly upon discovery.  As for *Giglio* impeachment material, most such material is typically included in the core discovery in any given case (*e.g.*, recordings, reports, and agent notes, etc.), and the final review for such material (*e.g.*, *Henthorn* checks, as they are known in the Ninth Circuit) are typically completed closer to trial after the Government has identified likely witnesses.

punishment. *See, e.g., United States v. Jeanpierre*, 636 F.3d 416 (8th Cir. 2011). Evidence is material only if there is a reasonably probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* Furthermore, "[m]ere speculation that materials may contain exculpatory evidence is not sufficient to sustain a *Brady* claim." *United States v. Crump*, 179 F.4th 1137 (8th Cir. 2026) (citing *United States v. Brown*, 360 F.3d 828 (8th Cir. 2004)).

In this case, Defendant's **Request No.1** (ECF 493-1) seeks information regarding a litany of items that are simply not material (*i.e.*, relevant) to guilt or punishment and thus fail the materiality requirement under *Brady* and its progeny. Simply stating the requested evidence is material or exculpatory does not make it so. *See United States v. Krauth*, 769 F.2d 473 (8th Cir. 1985) ( "A showing of materiality, however, is not satisfied by a mere conclusory allegation that the requested information is material to the preparation of the defense"); *United States v. Red Bird*, 2020 WL 6129634 at *5, 2020 U.S. Dist. LEXIS 193264 (D.S.D. Oct. 19, 2020) ("Neither *Brady* and its progeny nor Rule 16 require the government to produce personnel files when the defendant's assertions that the files contain impeachment evidence is speculative or conclusory."). Therefore, the Government objects to the Defendant's first request to the extent that it seeks materials that are not required to be disclosed under *Brady* or Fed. R. Crim. P. Rule 16(a).

As it relates to witness impeachment material and witness statements encompassed in Defendant's request, they will be timely produced in accordance with

5

*Giglio* and the Jencks Act, 18 U.S.C. § 3500.  The Jencks Act expressly provides in relevant part that statements or reports made by a prospective government witness are *not* subject to "subpoena, discovery, or inspection *until said witness has testified* on direct examination in the trial of the case."  18 U.S.C. § 3500(a) (emphasis added). To the extent Defendants seek an order compelling earlier Jencks Act disclosures, no such order would be proper. *See United States v. Sturdivant*, 513 F.3d 795, 803 (8th Cir. 2008) (recognizing that government cannot be compelled to produce Jencks Act materials until *after* a witness has testified at trial on direct examination.).

Generally, disclosure of impeachment material is timely if it is produced in compliance with the requirements of the Jencks Act.  *See, e.g., United States v. Miller*, 698 F.3d 699, 704 (8th Cir. 2012), *cert denied*, 568 U.S. 1182 (2013); *United States v. Eisenberg*, 469 F.2d 156, 160 (8th Cir. 1972); *United States v. Ayers*, 2020 WL 1444957, 2020 U.S. Dist. LEXIS 51699 (D. Minn. Mar. 25, 2020).  Thus, Defendant's assertion that the Government must disclose the requested evidence for "pretrial proceedings" otherwise it cannot comply with *Brady* misstates the law.  *See United States v. Jeanpierre*, 636 F.3d 416, 422 (8th Cir. 2011) ("We have previously held that '*Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant *to use at trial.*'") (quoting *Almendares*, 397 F.3d at 664)).

The Government cites to these rules regarding the timing of Jencks Act disclosures simply because that's what the law is.  Again, however, the Government notes that its standard practice is to produce such materials well before the deadline

established by the Act, and counsel fully expect to follow that practice in this case, assuming any such qualifying Jencks "statements" have not already been produced. "Statements" under the Jencks Act are narrowly defined.

As noted above, the Government understands its obligations under *Giglio* and its progeny and will comply with those obligations.  To the extent such material has not already been produced (*e.g.*, a material prior criminal conviction of any witness, an agent's relevant disciplinary record, promises made to a cooperating defendant or other witness, etc.), the Government will search for such material regarding any of its testifying witnesses and will produce it in due course — again, mindful of the Court's form Rule 5(f) order requiring such discovery to be produced in a "timely manner."

To be clear, however, *Giglio* material is impeachment material which becomes relevant and subject to disclosure for witnesses that the Government may call as witnesses.   The Government submits that it has no obligation to disclose impeachment materials at this point, before it has even selected witnesses.  That would be unduly burdensome here especially given that the number of victim-witnesses in the church at the time of the offense conduct exceeds 100 people, and the number of DHS and FBI agents who participated in the investigation is also quite large.  Moreover, the law is clear that any request that the Government conduct a Giglio check regarding all possible witnesses — before we've identified our likely witnesses — is beyond the scope of *Brady*, *Giglio*, and their progeny.  *See Eisenberg*, 469 F.2d at 160; *Miller*, 698 F.3d at 704 (addressing motion under Fed. R. Crim. P.

7

16(a)(1)(E)(i)). *See also United States v. Presser,* 884 F.2d 1275, 1283-85 (6th Cir. 1988) (discussing government's disclosure obligations under *Brady, Giglio*, the Jencks Act, and Rule 16); *United States v. Hamilton*, 452 F.2d 472 (8th Cir. 1971) ("The request for statements of witnesses not to be called at trial is merely another way of determining whether the co-conspirators named in the indictment would be witnesses at trial, … [and] the identity of witnesses is information the government is not normally required to supply to the criminal defendant.") (quotation omitted)).

Defendant's **Request No. 2** (ECF 493-2) is wholly irrelevant. Defendant Tier has not moved to dismiss based on mistaken identity nor has he provided the Government with notice of an alibi defense. The video evidence and photos already provided in discovery conclusively demonstrate Tier's presence at the pre-brief in the Cub Food parking lot and inside the church. Had there been a case of incorrect identification, Tier's counsel would obviously have brought that to the attention of the Government's counsel, and the Government would have promptly evaluated the claim and, if warranted, moved to dismiss the case as to Mr. Teir, as it did with the one individual who was incorrectly named in the Superseding Indictment. (ECF 412, 416.)

If he has an alibi defense, Tier must provide notice of that defense and any related discovery to the Government pursuant to Fed. R. Crim. P. 12.1. On April 24, 2026, the Government specifically asked for information regarding any alibi defense in the transmittal letter that was used to issue its first batch of discovery. It is telling that Tier has not yet provided any such notice or related discovery. Thus, Tier's

request for information regarding his mistaken identification appears to be more performative than serious.

Lastly, Defendant's **Request No. 3** (ECF 493-1), which seeks information regarding the involvement of U.S. Military attorneys in this case, is also properly denied. Criminal defendants do not have a general constitutional right to discovery. *See United States v. Johnson*, 228 F.3d 920 (8th Cir. 2000). Therefore, in most circumstances, a defendant must point to a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government. *Id.* This request falls squarely outside of *Giglio*, *Brady*, Jencks, and Rule 16, and Defendant's fail to identify any other proper legal basis for their request.

Moreover, the Court has already addressed and rejected similar defense arguments about this issue in other cases within this district. *See United States v. Redmond*, 2026 WL 1196702 (D. Minn. May 2, 2026); *United States v. Johnson*, 2026 WL 1194953 (D. Minn. May 1, 2026). In both cases, the Court held that the appointment of military attorneys as Special Assistant U.S. Attorneys to prosecute civilians was authorized by statute. Although such appointments deviated from U.S. Army regulations requiring a military nexus to such appointments, the regulations do not authorize the Court to grant the relief sought by the defendants, which was to strike the appearance of the military attorney. *Redman*, 2026 WL 1196702 at *6-8; *Johnson*, 2026 WL 1194953 at *5-6.

On a separate and independent ground, the Government further objects to providing discovery regarding the use of U.S. Military attorneys because Defendants

*lack standing* to even object to their appointment. The relevant statute authorizes the appointment of military attorneys as SAUSAs, and such SAUSAs act under the supervision of the Attorney General and intermediate supervisors within the Department of Justice. Thus, the use of military attorneys as SAUSAs does not involve the use of an "independent" counsel that is not answerable directly to the Chief Executive and his senior appointed officials. Accordingly, the Defendants can identify no cognizable harm or injury from the involvement of such SAUSAs.

III. **Materials Relating to the Hiring and Training of DHS Agents is Irrelevant and Beyond the Permissible Scope of Discovery**

Defendants' request for the identification of all Immigration and Customs Enforcement agents who participated in any way with the investigation, arrest, or prosecution of the defendants in this case — and who were hired following a $75 billion Congressional appropriation for the hiring of additional ICE agents — should also be denied. It is nothing more than an overbroad, speculative fishing expedition to second guess "the overall reliability of the investigation."

This case is not about Operation Metro Surge, and it is the Defendants who are on trial, not ICE. However interesting certain activists may find such information about ICE's hiring and training practices to be, those practices are not relevant here. As with every other criminal case, the Defendants will be free to ask the investigative agents — whether from ICE, FBI, or the St. Paul PD — *relevant* questions about how the investigation was conducted and to make the typical effort to "poke holes" in the Government's case. To conduct such cross-examinations, however, there is *no need* for defense counsel to ramble through the hiring and training practices of any of the

10

state and federal investigative agencies that participated in the investigation of this case. Such information is simply not "material" under Rule 16(a) or *Brady*.

The Government will comply with its discovery obligations under *Brady*, *Giglio*, and the Court's Rule 5(f) orders. Indeed, as noted above, the Government has already produced over 40,000 pages of documents, as well as numerous videos, audio files, and pictures. (ECF 582 at 2.) The Government has and will continue to meet its discovery obligations.

For purposes of *Giglio*, however, the Government does not know which agents it may call as witnesses at trial. Thus, it is premature to identify and disclose any potential *Giglio* material related to any agents. "Mere speculation that a government file may contain *Brady* material is not sufficient" for an *in camera* review, much less production in discovery. *United States v. Pau*, 953 F.2d 363, 366-67 (8th Cir. 1992) (citations omitted); *accord Red Bird*, 2020 WL 6129634 at *5 (declining to require disclosure of law enforcement personnel files "when the defendant's assertion that such files contain material evidence is merely speculative"). Accordingly, Defendants' request must be rejected.

## IV.    The Use of § 1509 Summonses was Authorized and Proper

The Defendants' third request relates to the Government's use of administrative summonses issued pursuant to 19 U.S.C. § 1509. In that regard, the Defendants argue that the investigators with Department of Homeland Security ("DHS" or alternatively "HSI") exceeded their authority in using § 1509 administrative summonses to investigate a civil rights case. (ECF 569 at 13.) As

11

explained below, however, the Government's use of § 1509 summonses was entirely proper, and the request for related discovery is invalid and should be rejected.

Section 1509 allows the issuance of administrative summonses "[i]n any investigation … for ensuring compliance with the laws of the United States administered by the United States Customs Service." 19 U.S.C. § 1509. As explained in *United States v. Smajlovic*, a recent district court case from the Eastern District of Missouri, the creation of the Department of Homeland Security abolished the Customs Service and transferred all its responsibilities to DHS. 2026 WL 785026 at *3, 2026 U.S. Dist. LEXIS 59147 (E.D. Mo. Mar. 20, 2026) (citing Homeland Security Act of 2002, 6 U.S.C. § 203). *Smajlovic* involved an investigation into cyber-crime and child pornography. A host of other courts have similarly found that DHS has broad investigative powers and approved the use of § 1509 summonses for non-traditional customs investigations. *See, e.g., United States v. Merrell*, 88 F.Supp.3d 1017 (D. Minn. 2015) (approving use of § 1509 summonses in child pornography investigation); *United States v. Cray*, 673 F.Supp.2d 1368 (S.D. Ga. 2009) (same).

Historically, the legacy DHS agencies like the Customs Service or the Immigration & Naturalization Service ("INS") had broad investigative authority that have now been assumed by DHS. Indeed, 8 U.S.C. § 1103(a) specifically states that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter [Immigration and Naturalization] and all other laws relating to the immigration and naturalization of aliens." Since its creation in 2002,

DHS has assumed a broad investigative portfolio beyond traditional customs and immigration enforcement.

Although some of the related statutory provisions have not been updated to reflect the merger of Customs into DHS, 19 U.S.C. § 1589a states that Customs officers may "execute and serve any order, warrant, subpoena, summons, or other process issued under the authority of the United States" and make lawful arrests without a warrant "for **any offense** against the United States … or for a felony, **cognizable under the laws of the United States**." *See, e.g., United States v. Jackson*, 2023 WL 7320614 at *11-12, 2023 U.S. Dist. LEXIS 199739 (D. Vt., Nov. 7, 2023) (noting traditionally broad investigative power of Customs Service now merged into DHS).

One historical responsibility that DHS inherited from the legacy Customs Service is the investigation of assaults on federal officers. DOJ's Justice Manual, which also has not been accurately updated to reflect the advent of DHS, notes that the Customs Service (now subsumed into ICE and HSI) typically maintains the authority to investigate assaults on its own federal officers. *See* Justice Manual § 9-65-600, Assaults on and Kidnappings of Federal Officers, (updated Jan. 2020). Although the Government has not yet charged violations of 18 U.S.C. §§ 111 and 372, the offense conduct that gave rise to this case surely fall within the potential ambit of those statutes, and the Government has previously noted that it is considering the filing of such charges.

The Defendants' characterization of the investigation as a civil rights case overlooks the fact that the Defendants invaded the church specifically to threaten or intimidate the acting Regional Director of Immigration and Customs Enforcement ("ICE"), an agency within DHS. This was an attempted assault on a federal officer, chargeable under 18 U.S.C. § 111, or 18 U.S.C. § 372 (more on that later). Because 6 U.S.C. § 203(1) transferred all "functions, personnel, assets, and liabilities of the United States Customs Service of the Department of Treasury" to DHS, it is DHS and its primary investigative and enforcement agency (HSI) that has the responsibility to investigate assaults or attempted assaults on ICE officials. The fact that — to date — the investigation has resulted only in the filing of civil rights charges is irrelevant. The use of § 1509 summonses was an appropriate tool employed by HSI.

If Defendants believe that the use of § 1509 summonses was improper, the solution is not to seek irrelevant discovery of internal agency policy, but rather to move to suppress the information obtained via the summonses. Yet, the Defendants must recognize that this is a dead end. The summonses were used to obtain subscriber information from mobile phone and email providers, as well as other information conveyed by defendants to third parties and held by those third parties. Defendants have not identified any specific § 1509 summons that sought content or material in which they have a reasonable expectation of privacy. Rather, they simply complain that the use of the summonses was improper.

Courts have repeatedly held that the information typically sought via a § 1509 summons is subject to the third-party doctrine and that defendants do not have

14

reasonable expectation of privacy for such data. *See United States v. Wellbeloved-Stone*, 777 Fed. Appx. 605, 607 (4th Cir. 2019) (internet and phone subscriber information); *Merrell*, 88 F.Supp.3d at 1032 (employment records from Minnesota Department of Economic and Employment Development); *United States v. Meyrand*, 2025 WL 1282638 at \*1-2, 2025 U.S. Dist. LEXIS 84060 (E.D. Mo., May 2, 2025) (internet subscriber information) (citing *United States v. Wheelock*, 772 F.3d 825, 828 (8th Cir. 2014)).  Even if the use of § 1509 summonses was improper—which it was not—there is generally no exclusionary rule applicable to statutory violations. *See Wellbeloved-Stone*, 777 Fed. Appx. at 607; *Smajlovic*, 2026 WL 785026 at \*4 (same).

Moreover, contrary to Defendants' assertion, courts have found that the use of § 1509 summonses comports with 18 U.S.C. § 2703(c)(2). *See, e.g., United States v. Jenkins*, 2019 WL 2482171 at \*2, 2019 U.S. Dist. LEXIS 63344 (N.D. Ga., Feb. 5, 2019); *United States v. Cray*, 673 F.Supp.2d 1368, 1378 (N.D. S.D. Ga. 2009). Regardless, even if the use of a § 1509 summons violated the Electronic Communications Storage Act, the remedy is not suppression, because the exclusive statutory remedies under the Act are civil. *See, e.g., Cray*, 673 F.Supp.2d at 1379; *United States v. Reed*, 2008 WL 11350272 at \*4, 2008 U.S. Dist. LEXIS 129651 (D.S.D., Nov. 17, 2008); *United States v. Sherr*, 400 F.Supp.2d 843, 848 (D. Md. 2005).

Accordingly, Defendants' assertions regarding the Government's use of § 1509 summonses lack merit, and their discovery request should be denied.

## V.    Use of Grand Jury Subpoenas Was Proper and Did Not Interfere with Defendants' Sixth Amendment Rights

Defendants also assert that the Government's use of grand jury subpoenas issued post-indictment was improper. The Defendants take particular issue with grand jury subpoenas that were issued to crowd-funding platforms and financial institutions. None of those subpoenas related to the three Defendants that have filed the subject motion to compel. Hence, it is doubtful that they have standing to challenge the subpoenas. *See, e.g., United States v. Montgomery*, 2025 WL 3033628 at *2, 2025 U.S. Dist. LEXIS 214172 (E.D. Mo., Oct. 30, 2025).

Nonetheless, Defendants complain that those subpoenas potentially interfered with their Sixth Amendment right to counsel. The claim is meritless because, based on the Government's information, all three of the moving Defendants have appointed, rather than retained counsel. There is no defense funding for the Government to investigate. Regardless, the subpoenas were not issued to investigate defense funding, but rather potential other crimes, including, *e.g.*, financial support for the conspiracy to commit the offense conduct charged in this case. There was nothing nefarious regarding such subpoenas. Moreover, the Government abandoned this line of inquiry. As Defendants acknowledge in their motion, the Government withdrew several of the subpoenas. (ECF 569 at 3 n.1.)

Likewise, subject to the strictures imposed by Rule 6, the Government notes *generally* that — in a wide range of cases or in a hypothetical case — the use of grand jury subpoenas after an indictment is obtained is entirely permissible if the

Government's grand jury investigation remains open and it is continuing to investigate and consider other potential charges.

Under applicable law, "[t]he government may not use the grand jury's investigative powers for the **sole or dominant** purpose of preparing a pending indictment for trial." *In re Grand Jury Proc.*, 492 F.3d 976, 986 (8th Cir. 2007) (emphasis added); *see also United States v. Puckett*, 147 F.3d 765, 770 (8th Cir. 1998) (holding same). In contrast, however, the use of the grand jury post-indictment is appropriate when the Government seeks to investigate additional wrongdoing or uncover additional defendants. "If the grand jury proceedings are directed toward other charges or persons, 'its scope cannot be narrowly circumscribed and any collateral fruits from bona fide inquiries may be utilized by the government.'" *In re Grand Jury*, 492 F.3d at 986 (quoting *United States v. Wadlington¸* 233 F.3d 1067, 1074 (8th Cir. 2000)).

In this case, without detailing any particular investigative efforts that may be subject to Rule 6, the Government notes that it has previously disclosed that the investigation remains ongoing. The Government acknowledged this in its recent status report regarding discovery, as well as in some other prior filings. The Government, for example, recently identified some protestors who were at the pre-operation briefing, but who are not observed on video from the church. Other potential charges are available (as noted above), and the previously misidentified suspect has since been identified. Thus, whatever grand jury subpoenas may have been issued in connection with this case since the filing of the superseding indictment,

17

no applicable rule or law prohibits the Government's use of any such process, and the

Defendants' request for related discovery should be rejected.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to compel.

DATED: July 31, 2026.

DANIEL N. ROSEN
United States Attorney

ABRAHAM KAPLAN
Assistant United States Attorney

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Dep. Asst. Attorney General

NEVILLE S. HEDLEY
Senior Trial Attorney

_/s/ Neville S. Hedley_
Neville S. Hedley
  Civil Rights Division
  U.S. Department of Justice
  950 Pennsylvania Ave. NW
  Washington, DC 20530
  Telephone: (202) 297-3424
  E-Mail: neville.hedley@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA