**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Criminal Case No. 26-25 (4) (LMP/DLM)**

| | |
|---|---|
| *United States of America* | |
| v. | **ORAL ARGUMENT REQUESTED** |
| *Don Renaldo Lemon (4)*, | |
| Defendant. | |

**DON LEMON'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT**
**FOR VINDICTIVE PROSECUTION**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 1

BACKGROUND ..................................................................................................... 2

ARGUMENT ......................................................................................................... 14

I. PUNISHMENT FOR EXERCISING RIGHTS SECURED BY THE FIRST AMENDMENT VIOLATES DUE PROCESS ................................... 15

II. PROSECUTORIAL VINDICTIVENESS CAN ARISE BASED ON AN INITIAL CHARGING DECISION ................................................................. 15

III. OBJECTIVE EVIDENCE PROVES THAT MR. LEMON IS BEING VINDICTIVELY PROSECUTED ................................................................. 17

IV. THE GOVERNMENT IS NOT ENTITLED TO THE PRESUMPTION OF REGULARITY ..................................................................................... 19

V. THE COURT SHOULD DISMISS THE CHARGES AGAINST MR. LEMON WITH PREJUDICE OR, AT A MINIMUM, ORDER DISCOVERY AND AN EVIDENTIARY HEARING ................................... 22

CONCLUSION ...................................................................................................... 23

**TABLE OF AUTHORITIES**

**Cases**

*Advoc. for Hum. Rights v. Dep't of Homeland Sec.,*
26-cv-749 (D. Minn. Feb. 2, 2026) ....................................................................20

*Bordenkircher v. Hayes,*
434 U.S. 357 (1978) ...................................................................................... 1, 15

*Bragan v. Poindexter,*
249 F.3d 476 (6th Cir. 2001) ...........................................................................15

*Harsono v. Trump,*
25-cv-1976 (D. Minn. May 14, 2025) ...............................................................21

*Hartman v. Moore,*
547 U.S. 250 (2006) ..........................................................................................15

*Hoque v. Trump,*
25-cv-1576 (D. Minn. May 5, 2025)..................................................................20

*Hoque v. Trump,*
25-cv-1576 (D. Minn. June 17, 2025)................................................................21

*In the Matter of the Search of the Real Property and Premises of Hannah Natanson,*
2026 WL 510727 (E.D. Va. Feb. 24, 2026)....................................................... 10

*In re Grand Jury Subpoenas,*
26-mc-43 (D. Minn. June 22, 2026)...................................................................21

*In re United States of America,*
No. 26-01135 (8th Cir. Jan. 22, 2026)................................................................ 7

*McDonald v. Smith,*
472 U.S. 479 (1985) ..........................................................................................15

*N.Y. State Rifle & Pistol Ass'n., Inc. v. Bruen,*
597 U.S. 1 (2022) ..............................................................................................15

*Tobay Robles v. Noem,*
26-cv-107 (D. Minn. Feb. 26, 2026) .................................................................20

*United States v. Abdi,*
2024 WL 323577 (D. Minn. Jan. 29, 2024) .......................................................22

*United States v. Abrego Garcia*,
2026 WL 1454303 (M.D. Tenn. May 22, 2026) ..........................................................22

*United States v. Armstrong*,
517 U.S. 456 (1996) ......................................................................................................20

*United States v. Chappell*,
779 F.3d 872 (8th Cir. 2015) ...................................................................................15, 16

*United States v. Dickerson*,
975 F.2d 1245 (7th Cir. 1992) .......................................................................................18

*United States v. Goodwin*,
457 U.S. 368 (1982) ..............................................................................................1, 14, 15

*United States v. Hirsch*,
360 F.3d 860 (8th Cir. 2004) .........................................................................................14

*United States v. Kelley*,
152 F.3d 881 (8th Cir. 1998) .........................................................................................22

*United States v. Myers*,
810 F.2d 1242 (D.C. Cir. 1987) .....................................................................................18

*United States v. Potts*,
2008 WL 2026132 (D. Minn. May 8, 2008) ..................................................................14

*United States v. Rodgers*,
18 F.3d 1425 (8th Cir. 1994) ....................................................................................14, 17

*United States v. Tripp*,
370 F. App'x 753 (8th Cir. 2010) ..................................................................................14

**Statutes**

18 U.S.C. § 111 ....................................................................................................................11

18 U.S.C. § 372 ...................................................................................................................11

19 U.S.C. § 1509 .................................................................................................................11

42 U.S.C. § 2000aa .............................................................................................................10

**Rules**

Federal Rule of Criminal Procedure 12(b) ...........................................................................2

**Regulations**

28 C.F.R. § 50.10(e).............................................................................................. 12, 13

**INTRODUCTION**

President Trump's animosity towards Don Lemon and his reporting is well-documented, stretching back over a decade. In recent months, the Trump administration has escalated its broader assault on the free press: seizing a reporter's devices, issuing grand jury subpoenas to journalists publishing stories the President dislikes, and pressuring news outlets to settle his baseless defamation suits. Now that campaign has produced its most brazen act yet. The Department of Justice has charged Don Lemon with multiple felony civil rights counts as punishment for his First Amendment protected reporting on protests related to Operation Metro Surge in Minnesota.

Charging Mr. Lemon with two specific intent felonies for merely engaging in constitutionally protected journalism is an affront to both the First and Fifth Amendments. "To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)).

The White House made a mockery of Mr. Lemon's arrest, posting "When life gives you lemons… 🧃"[1] accompanied by Mr. Lemon's picture. While the government may think it has made lemonade, all it has really made is a grave constitutional violation by arresting a journalist in the middle of the night for his coverage of a matter of public concern. To be clear, Mr. Lemon is not asking for special privileges to break the law, he is

---

[1] The White House (@WhiteHouse), X (Jan. 30, 2026, 9:50 AM), https://x.com/WhiteHouse/status/2017248964878143741.

simply playing the role the First Amendment to the Constitution provided him as a journalist covering newsworthy events.

Accordingly, Don Lemon moves this Court to dismiss the charges against him with prejudice pursuant to Federal Rule of Criminal Procedure 12(b). In the alternative, in the absence of a finding of actual or presumed vindictive prosecution, such flagrant and blatant efforts to punish a journalist for his protected conduct warrant further discovery into the government's motive and an evidentiary hearing.

**BACKGROUND**

President Trump has long expressed animosity towards Mr. Lemon based on years of critical reporting.



Donald J. Trump ✔
@realDonaldTrump

Another false story, this time in the Failing @nytimes, that I watch 4-8 hours of television a day - Wrong!  Also, I seldom, if ever, watch CNN or MSNBC, both of which I consider Fake News. I never watch Don Lemon, who I once called the "dumbest man on television!" Bad Reporting.

9:17 AM · Dec 11, 2017

[2]

---

[2] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 11, 2017, 9:17 AM), https://twitter.com/realDonaldTrump/status/940223974985871360.



**Donald J. Trump** ✔
@realDonaldTrump

CNN's Don Lemon, the dumbest man on television, insinuated last night while asking a debate "question" that I was a racist, when in fact I am "the least racist person in the world." Perhaps someone should explain to Don that he is supposed to be neutral, unbiased & fair,.....

11:31 AM · Jul 31, 2019



**Donald J. Trump** ✔ ➕
@realDonaldTrump

A small step for television, a giant step for mankind. Don Lemon, often called "the dumbest man on television" having made even Lebron James look smart during their interview two years ago, has been FIRED from his prime time evening spot on CNN - extremely low ratings - and will be thrown into their "Death Valley" morning show. I assume this means a BIG salary cut prior to his Complete & Total future firing from Ratings Challenged (to put it mildly!) CNN. Good luck Don, you'll need it! MAGA!!!

**8.79k** ReTruths **37.7k** Likes                    Sep 20, 2022, 2:39 AM



**Donald J. Trump** ✔ ➕
@realDonaldTrump

I just turned to CNN to see if Don Lemon, the dumbest man on television, was still on. Surprisingly, despite "deplorable" ratings, they have not yet yanked him from his chair. He had on with him another lonely and pathetic figure, con man Michael D'Antonio, who has been with CNN for years pretending he knows me, which he does not. I was probably the only one watching, but it was a sad sight seeing two losers,Trump Haters both, lamenting that I have come so far - Like President of the U.S.!

**4.86k** ReTruths **22.9k** Likes                    Sep 22, 2022, 11:31 PM

3 Donald J. Trump (@realDonaldTrump), Twitter (July 31, 2019, 11:31 AM), https://twitter.com/realDonaldTrump/status/1156588090456256512.

4 Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 20, 2022, 2:39 AM), https://truthsocial.com/@realDonaldTrump/posts/109029355974362892.

5 Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 22, 2022, 11:31 PM), https://truthsocial.com/@realDonaldTrump/posts/109045603804804007.



Donald J. Trump
@realDonaldTrump

Good News: "The dumbest man on television," Don Lemon, has finally been fired from Fake News CNN. My only question is, WHAT TOOK THEM SO LONG?

10.4k ReTruths   53.2k Likes                    Apr 24, 2023, 1:04 PM

[6]

Against this background of literally years of the President's direct attacks, Mr. Lemon landed in President Trump's crosshairs again for reporting on a story that the administration wanted to go away: the immigration surge in Minnesota. In December 2025, the Trump Administration launched "Operation Metro Surge," a federal immigration enforcement action that deployed over 3,000 federal agents in Minneapolis and St. Paul. Operation Metro Surge resulted in widespread protests and violent confrontations with law enforcement, including the killings of Renee Good and Alex Pretti by federal law enforcement officials.

On January 18, 2026, Mr. Lemon flew to Minneapolis to report live on Operation Metro Surge for the *Don Lemon Show*, a news broadcast on a YouTube channel. While there, he reported on a protest at Cities Church, where a local Immigration and Customs Enforcement official serves as a pastor.[7] It is abundantly clear that Mr. Lemon was present that day in his capacity as a journalist. Mr. Lemon's exercise of normal journalistic

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 24, 2023, 1:04 PM), https://truthsocial.com/@realDonaldTrump/posts/110254872471313661.

[7] *See* Giovanna Dell'orto, *Christian leaders urge worshippers' rights after protestors interrupt service*, Politico (Jan. 19, 2026), https://www.politico.com/news/2026/01/19/christian-leaders-urge-worshippers-rights-after-protesters-interrupt-service-00735905.

functions was on full display: he interviewed protestors beforehand, stood off to the side of the Church describing the events as they unfolded to his viewers, and interviewed churchgoers and the pastor. At no point did Mr. Lemon engage in any behavior characteristic of protesting. Mr. Lemon explicitly stated that he was there "chronicling and reporting. We're not a part of the activists, but we're here just reporting on them." ECF 23-1 at ¶ 28 (1/20/2026 Aff. of DHS-ICE Special Agent Timothy M. Gerber in support of criminal complaint).

In the hours after the Cities Church protest, Harmeet Dhillon, Assistant Attorney General for DOJ's Civil Rights Division—the division handling this prosecution—issued a direct warning to Mr. Lemon on X, writing, "A house of worship is not a public forum for your protest! It is a space protected from exactly such acts by federal criminal and civil laws! Nor does the First Amendment protect your pseudo journalism of disrupting a prayer service. You are on notice!"[8]

The next day, Dhillon sat for an extended interview with conservative internet personality Benny Johnson to attack Mr. Lemon's journalism: "The First Amendment includes the right to pray without interference. It includes the right of these people to not have *so-called journalists* and a mob of activists disrupt their sacred day of prayer."[9] Dhillon further stated that "Don Lemon himself has come out and said he knew exactly

---

[8] Harmeet Dhillon (@AAGDhillon), X (Jan. 18, 2026, 7:21 PM), https://x.com/AAGDhillon/status/2013044166062936417.

[9] Benny Johnson, *DOJ Confirms Don Lemon, BLM Will Be Charged With 'KKK Act' After ATTACKING Christians in Church*, YouTube, at 2:22–2:35 (Jan. 19, 2026), https://www.youtube.com/watch?v=H3s97v1qmXY.

what was going to happen inside that facility. He went into the facility and then he began

'committing journalism,' as if that's sort of a shield from being a part, an embedded part,

of a criminal conspiracy."[10]

On January 20, the government sought an arrest warrant for Mr. Lemon while

President Trump was simultaneously attacking him during at least two separate public

events. First, during a press conference at the White House, President Trump stated:

> And they have to be abused by guys like Don Lemon, who's a, you know, loser,
> lightweight. I saw him, the way he walked in that church. It was terrible. I have
> such respect for that pastor. He was so calm. He was so nice. He was just accosted.
> What they did in that church was horrible yesterday.[11]

Then, during an interview the same day with Katie Pavlich of NewsNation, he stated:

> And then you have the agitators, anarchists, you know, I watch sort of everything,
> I see it all. And I see people, screaming, "Shame, shame," you know. This is not
> people that are like living in Minnesota, these are professional paid people, they're
> like actors. I mean, I watched the guy last night in the church, he was, and not just
> Don Lemon, Don Lemon's a loser, but I watched a guy last night in the church.
> This guy's a professional guy and he, he actually admits to it, he gets paid a lot of
> money to go and cause trouble.[12]

At the same time, senior Justice Department officials expressed direct hostility to

Mr. Lemon's status as a journalist. Then-Attorney General Pamela Bondi publicly stated

that the Department of Justice is "coming after you if you participated in that. I don't care

if you're a failed CNN journalist, you have no right to do that in this country. We don't live

---

[10] *Id.* at 6:58–7:17.

[11] *Press Secretary Karoline Leavitt Briefs Members of the Media, Jan. 20, 2026*, The White House, at 55:33–55:51 (Jan. 20, 2026), https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-20-2026/.

[12] NewsNation, *President Trump reflects on first year of second term*, YouTube, at 0:45–1:17 (Jan. 21, 2026), https://www.youtube.com/watch?v=FgtogCctzbY.

in a third world country."[13] Bondi rejected the premise that Mr. Lemon is a journalist at all, instead calling him "an online agitator," while acknowledging that "if you are a journalist and you are covering a story" that may factor into the legal analysis.[14] Then-Deputy Attorney General Todd Blanche, when asked about Mr. Lemon on Fox News, stated that "freedom of the press extends to a lot of different areas, but it does not extend to somebody just trespassing and being embedded with a group of rioters."[15] Discussing Bondi's involvement, and illustrating the importance of this case to the administration, Dhillon said that "the Attorney General herself is there on the ground and managing this process."[16]

While these statements by the President and senior Justice Department leadership were being made publicly, prosecutors were privately pursuing charges against Mr. Lemon through extraordinary channels. After Judge Micko found that no probable cause existed to arrest Mr. Lemon, the government asked Chief Judge Schiltz to conduct an expedited review of that determination. *See In re United States of America*, No. 26-01135, Emergency Pet. for Writ of Mandamus at 4 (8th Cir. Jan. 22, 2026). The following day, after the Chief Judge indicated he could not meet the government's expedited timeline, the government filed an emergency petition for writ of mandamus with the Eighth Circuit Court of Appeals and requested a ruling by the next day. After the Eighth Circuit refused

---

[13] Derrick Evans (@DerrickEvans4WV), X (Jan. 24, 2026, 8:37 AM), https://x.com/DerrickEvans4WV/status/2015056472447897820.

[14] *Id.*

[15] *Deputy AG Todd Blanche says authorities are investigating MN church storming 'aggressively'*, Fox News, at 3:28–3:37 (Jan. 19, 2026), https://www.foxnews.com/video/6387960831112.

[16] *Id.* at 5:08–5:11.

to issue a writ of mandamus, the government rushed to the grand jury to obtain an indictment.

Upon hearing rumors of an indictment, counsel for Mr. Lemon contacted the Department of Justice to coordinate Mr. Lemon's self-surrender. Instead of arranging the normal self-surrender after a charge would be filed, in what can only be described as an effort to punish and humiliate Mr. Lemon, the government ignored the request to arrange an orderly surrender and chose to deputize agents to his Los Angeles hotel—where he was covering the music industry's annual awards show—to arrest him at midnight. Ironically, this is the exact practice that this Justice Department condemned the prior administration for engaging in against abortion facility protestors charged under the exact same statute as Mr. Lemon.[17] Mr. Lemon was held from midnight until 2:00 p.m., when he was finally presented before a magistrate judge for his initial appearance. *See* Ex. A (00008100, Lemon Arrest ROI). The White House celebrated its humiliation ritual, posting:

---

[17] *See Justice Department Reveals the Biden Administration's Weaponization of Federal Law Against Pro-Life Americans* (Apr. 14, 2026), https://www.justice.gov/opa/pr/justice-department-reveals-biden-administrations-weaponization-federal-law-against-pro-life ("Prosecutors . . . authorized aggressive arrest tactics instead of allowing pro-life defendants to self-surrender").



Perhaps recognizing that Mr. Lemon's presence as a journalist was protected by the First Amendment, the government's case agent falsely claimed in numerous sworn affidavits that Mr. Lemon affirmatively joined the protestors by "chanting with agitators and obstructing parishioners' path of travel." *See* Ex. B (2/2/2026 Aff. of T. Gerber in support of Lemon phone warrant); Ex. C (1/27/2026 Draft Complaint Aff. of T. Gerber). Agent Gerber claimed that "[b]roadcast video obtained from Cities [C]hurch shows" Mr. Lemon and others "chanting with agitators and obstructing parishioners' path of travel." *See id.* This lie was not harmless or immaterial in this context: multiple under-oath

---

[18] The White House (@WhiteHouse), X (Jan. 30, 2026, 9:50 AM), https://x.com/WhiteHouse/status/2017248964878143741.

attestations that Mr. Lemon was engaging in anti-ICE chants cut to the heart of Mr. Lemon's defense (and the truth) that he was there in his capacity as a journalist. Crucially, this false claim is part of the government's larger attempt to undermine Mr. Lemon's role as a journalist.

The post-arrest investigation continued in the same manner: a callous disregard for the rules, regulations, and laws that are intended to constrain the government. In February, the government sought a search warrant in Minnesota for information relating to Mr. Lemon's YouTube channel, including, among other things, "subscriber information in any form kept." *See* Ex. D at 4 (Case No. 26-mj-205, ECF 1). Magistrate Judge Docherty rejected the initial application because it lacked probable cause, "since subscriber information is not needed to prove or disprove the commission of a crime – indeed, it is hard to see how such information could be relevant evidence of the commission of a crime." *Id.* at 5. The government removed the request for subscriber information and resubmitted the application to Magistrate Judge Docherty. In refusing to sign the resubmitted search warrants, Judge Docherty explained that "[w]hen the government presented these warrants, both originally and for representment, it did not direct the Court's attention to the Privacy Protection Act, 42 U.S.C. § 2000aa. It should have. *In the Matter of the Search of the Real Property and Premises of Hannah Natanson*, No. 1:26-sw-0054 (WBP), 2026 WL 510727, at *5 (E.D. Va. Feb. 24, 2026) (expressing "significant concern" at the government's failure to address the Privacy Protection Act in a search warrant application within that Act's scope and pointing out that this omission "undermined the Court's confidence in the government's disclosures in this proceeding.")." Ex. E (Case No. 26-mj-205, ECF 4) at 4.

Judge Docherty further explained that the Privacy Protection Act and regulations promulgated by the Attorney General require the government (among other obligations) to provide Mr. Lemon "reasonable and timely notice" of the impending warrant so Mr. Lemon can intervene if necessary. *See id.* at 7.

Instead of taking the simple step of informing Mr. Lemon, as suggested by Judge Docherty, the government instead withdrew the warrant application entirely. *See* Ex. F (Case No. 26-mj-205, ECF 9) (3/23/26 email from HSI Special Agent to MND Duty Chambers). This sudden change of course makes sense in light of recently disclosed discovery. Rather than notifying Mr. Lemon and briefing the Privacy Protection Act issue in hopes of obtaining a court-authorized search warrant, the prosecutors and agents simply circumvented Judge Docherty's rulings (and any subsequent judicial check on their authority) by issuing a customs-related administrative summons under 19 U.S.C. § 1509. As the government well knows, summonses under § 1509 are statutorily limited to "ascertaining the correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States, for determining liability for fines and penalties, or for insuring compliance with the laws of the United States administered by the United States Customs Service."

Not only did the government misuse customs summonses for a civil rights investigation (with charges brought under Title 18 administered by the Justice Department, not the Customs Service),[19] the government requested *the exact subscriber information for*

---

[19] In response to another filing, the government ties itself in knots defending the use of customs summonses for this case by claiming that "[t]his was an attempted assault on a federal officer,

*which Judge Docherty denied a search warrant.* The customs summons requests "subscriber information, subscriber names, and IP address information" associated with ten YouTube accounts, including @TheDonLemonShow, @GeorgiaFort, @MegynKelly, and @DemocracyNow. *See* Ex. G (19242, Customs Summons). This deliberate end-run around a judicial ruling to obtain entirely irrelevant information shows how far this administration is willing to go to punish Mr. Lemon for his reporting protected by the First Amendment.[20]

At the same time as the post-arrest proceedings played out in Minnesota, President Trump ramped up his attacks against Mr. Lemon. Speaking to reporters aboard Air Force One on February 1, President Trump chastised Mr. Lemon, calling him a "washup," a "sleazebag," and a "failed host."[21] President Trump claimed he had no prior knowledge of

---

chargeable under 18 U.S.C. § 111, or 18 U.S.C. § 372," ECF 589 at 14, thus they were "ensuring compliance with the laws of the United States administered by the United States Customs Service." 19 U.S.C. § 1509. This argument is flawed for two reasons. First, the two statutes cited are general Title 18 crimes administered by the Department of Justice, not HSI, so even if these two crimes were charged, the use of § 1509 summonses would not be proper because these are not laws "administered by the United States Customs Service." More fundamentally, this hypothetical framing does not change the fact that the investigation's actual result is civil rights charges under Title 18 and the attempt to create a customs connection post-hoc is disingenuous (and entirely made up as there was no attempt by Mr. Lemon to engage, let alone assault a federal officer).

[20] DOJ's own media policy requires that members of the news media receive notice *before* DOJ seeks a third-party subpoena to obtain their records unless "such notice would pose a substantial threat to the integrity of the investigation, risk grave harm to the national security, or present an imminent risk of death or serious bodily harm." 28 C.F.R. § 50.10(e)(1)(i). No such risk existed here, and no notice was ever provided.

[21] *WATCH: Trump Publicly Attacks 'Sleazebag' Don Lemon After Ex-CNN Anchor's Arrest By Federal Agents*, YouTube, at 0:10–0:29 (Feb. 1, 2026), https://www.youtube.com/watch?v=xqlVENfX2Z8.

the arrest but asserted that the media attention in the aftermath of it was "the best thing that could happen to [Mr. Lemon]" due to his allegedly low viewership.[22]

Most recently, during a July 24, 2026 dinner intended to celebrate the First Amendment, President Trump used his remarks at the White House Correspondents' Association dinner to once again attack and mock Mr. Lemon, stating:

> We had a contest for who had the lowest ratings and the lowest IQ on television. And that was actually Don Lemon, I think. You know, when I said that he's the dumbest man on television, I said, "You know, when you say some things, you never make a comeback." It's not like, "Oh gee, hey, Don, let's have dinner some night." But I know what I'm saying.[23]

The President's blatant animus for Mr. Lemon was once again on display, as it has been for years. The record could not be more clear that Mr. Lemon has been a persistent target of President Trump's ire before the events in Minnesota, that the Justice Department acted on the President's animus by filing unprecedented charges against a journalist for doing his job, that DOJ was willing to take extraordinary measures to circumvent the rulings of judges calling into question its actions, that DOJ made sure to exact maximum punishment by ignoring Mr. Lemon's counsel's requests to arrange a proper surrender and by publicly bragging about the arrest as if it was some type of blood sport, and by the continued verbal attacks on Mr. Lemon as recently as a few weeks ago.

---

[22] *Id.*

[23] *Speech: Donald Trump Addresses the White House Correspondents Association Dinner - July 24, 2026*, Roll Call, https://rollcall.com/factbase/trump/transcript/donald-trump-speech-white-house-correspondents-dinner-july-24-2026/ (last accessed Aug. 4, 2026).

**ARGUMENT**

The Due Process Clause of the Fifth Amendment forbids prosecuting a defendant for the exercise of a protected right. *See Goodwin*, 457 U.S. at 372; *United States v. Tripp*, 370 F. App'x 753, 760 (8th Cir. 2010) ("A defendant cannot be punished for exercising a protected statutory or constitutional right."). While the defendant carries "the burden of establishing vindictiveness, in the sense of bad faith or maliciousness," *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004), a prosecutor's discretion is not limitless. Although prosecutors' charging decisions have traditionally been entitled to great deference under the presumption of regularity, "an indictment may be dismissed for violating a defendant's due process rights if the prosecution is vindictive." *United States v. Potts*, 2008 WL 2026132, at *4 (D. Minn. May 8, 2008).

Prosecutorial vindictiveness is proven "through objective evidence that the prosecutor's decision was intended to punish the defendant for the exercise of a legal right." *United States v. Rodgers*, 18 F.3d 1425, 1429 (8th Cir. 1994). Here, the objective evidence and timing of the charges against Mr. Lemon days after he reported on the protest events in Minnesota (against the backdrop of the President repeatedly singling out Mr. Lemon for criticism) readily establish that Mr. Lemon is being prosecuted as punishment for engaging in First Amendment protected journalism, specifically, his coverage of President Trump for over a decade and Operation Metro Surge.

## I. PUNISHMENT FOR EXERCISING RIGHTS SECURED BY THE FIRST AMENDMENT VIOLATES DUE PROCESS

A prosecution brought to punish the exercise of "a protected statutory or constitutional right" "is a due process violation 'of the most basic sort.'" *Goodwin*, 457 U.S. at 372 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). Because the Constitution does not create a hierarchy of rights, *see*, *e.g.*, *N.Y. State Rifle & Pistol Ass'n., Inc. v. Bruen*, 597 U.S. 1, 70 (2022), punishment for the exercise of First Amendment rights is as much of a due process violation as punishment for the exercise of any other constitutional right. Indeed, the Supreme Court has made clear that the government cannot use criminal prosecutions as punishment for the exercise of First Amendment rights. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out").[24] As such, a defendant may bring a vindictive prosecution claim when the purpose of the prosecution is to deter the exercise of First Amendment rights. *See*, *e.g.*, *Bragan v. Poindexter*, 249 F.3d 476, 483 (6th Cir. 2001).

## II. PROSECUTORIAL VINDICTIVENESS CAN ARISE BASED ON AN INITIAL CHARGING DECISION

While a typical vindictive prosecution case involves retaliation in the form of increasing the number or severity of charges after an initial case is brought, *see*, *e.g.*, *United*

---

[24] Similarly, the Constitution does not engage in ranking of rights guaranteed by the First Amendment. *See McDonald v. Smith*, 472 U.S. 479, 485 (1985) ("no sound basis for granting greater constitutional protection" to any one First Amendment right over another). Punishment for the exercise of press freedom is equally violative of due process as punishment for the exercise of freedom of speech.

*States v. Chappell*, 779 F.3d 872, 879 (8th Cir. 2015), the Eighth Circuit has never limited vindictive prosecution claims to such narrow grounds. The fact that few criminal defendants in the Eighth Circuit have successfully challenged their initial indictment on the basis of prosecutorial vindictiveness is of no moment: this case is unprecedented and should be treated as such.

When a prosecution is challenged as vindictive, courts consider the "prosecutor's actions within the context of the entire proceeding." *Id.* at 880 (internal citation and quotation omitted). Unlike other prosecutorial vindictiveness challenges to an initial indictment, here, "the entire context of the proceedings" offers far more than one or two government actions to consider. There are public statements by the President and the official White House social media account showing that punishment is the goal. There are statements by the Attorney General, Deputy Attorney General, and Assistant Attorney General explicitly tying this prosecution to Mr. Lemon's First Amendment protected journalism. There are attempts at unprecedented legal maneuvers, like the appeal of the denial of the arrest warrant to the Chief Judge and the application for a writ to the Eighth Circuit. And there is undeniable evidence of a callous disregard for rules and regulations governing government conduct, like making false statements about Mr. Lemon in multiple sworn affidavits, failing to bring the Privacy Protection Act to the Court's attention, and using customs summonses to obtain the same information that the Court expressly denied when sought through a search warrant.

While this case is technically in the initial charging decision phase, this robust record of vindictiveness simply has no comparator in Eighth Circuit precedent, on an initial

16

charging decision or otherwise.  The record as it exists now provides more than enough objective evidence to find prosecutorial vindictiveness—the fact that the number and severity of charges has not increased is not determinative.

### III.    OBJECTIVE EVIDENCE PROVES THAT MR. LEMON IS BEING VINDICTIVELY PROSECUTED

It is axiomatic that prosecutors, and the Department of Justice, are tasked with enforcing the law in a fair and neutral manner. Prosecutors may not charge someone in a vindictive manner designed to punish them for exercising a legal right.  To prove prosecutorial vindictiveness, a defendant must present "objective evidence that the prosecutor's decision was intended to punish the defendant for the exercise of a legal right." *Rodgers*, 18 F.3d at 1429.

Here, one need not look further than the statements and actions of the President and senior leadership in the Department of Justice to see that this case is an attempt to punish Mr. Lemon for exercising his First Amendment rights as a journalist to provide truthful coverage of actions by this administration.  The vindictive motivations of this prosecution were perfectly summed up by Dhillon's vow to "pursue this to the ends of the earth" [25] and the completely unprecedented nature of the Attorney General—fighting to maintain her job—flying out to a district to personally manage a prosecution. [26]

---

[25] The Megyn Kelly Show*, The DOJ WILL Continue Pushing for Criminal Charges Against Don Lemon, Reveals Harmeet Dhillon*, YouTube, at 1:54–2:06 (Jan. 23, 2026), https://www.youtube.com/watch?v=4i5xhWd2o2w.
[26] *Id.* at 5:08–5:11.

"The Supreme Court's decisions concerning vindictive prosecution have focused on the conduct of the government as a whole, rather than on the conduct or retributive sentiments of a single prosecutor." *United States v. Myers*, 810 F.2d 1242, 1248 (D.C. Cir. 1987). In this case, the analysis starts with the leader of the Executive Branch—the President—who has supervisory "control over federal prosecutors," including the prosecutors in this case.[27] *See United States v. Dickerson*, 975 F.2d 1245, 1251 (7th Cir. 1992). Mere hours after the protest at Cities Church, President Trump set this prosecution in motion with White House Press Secretary Karoline Leavitt posting on X that "President Trump will not tolerate the intimidation and harassment of Christians in their sacred places of worship."[28] Six minutes later, acknowledging her marching order, Dhillon responded "ON IT!"[29] President Trump then set the Justice Department's sights squarely on "Don Lemon, who's a [] loser, lightweight" that "abused" "that pastor."[30]

Senior Justice Department officials took direct aim at Mr. Lemon's journalism, directly tying this case to the exercise of his First Amendment rights. Dhillon called Mr.

---

[27] Unlike prior administrations, President Trump has routinely directed prosecutors and federal law enforcement to investigate and charge individuals. *See* Andrew Goudsward et al., *Powell probe highlights Trump DOJ role as White House enforcer*, Reuters (Jan. 14, 2026), https://www.reuters.com/legal/government/powell-probe-highlights-trump-doj-role-white-house-enforcer-2026-01-14/.

[28] Karoline Leavitt (@PressSec), X (Jan. 18, 2026, 9:28 PM), https://x.com/PressSec/status/2013075971348332554.

[29] Harmeet Dhillon (@AAGDhillon), X (Jan. 18, 2026, 9:34 PM), https://x.com/AAGDhillon/status/2013077529398071314.

[30] *Press Secretary Karoline Leavitt Briefs Members of the Media, Jan. 20, 2026*, The White House, at 55:33–55:51 (Jan. 20, 2026), https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-20-2026/.

Lemon a "so-called journalist"[31] and accused him of "quote, unquote 'committing journalism'" as if that is some kind of crime.[32] Bondi mocked Mr. Lemon's journalism bona fides, saying it doesn't matter "if you're a failed journalist with a camera in your hand."[33] The statements of these Main Justice officials are of heightened importance to the vindictive prosecution analysis because there is not a single line prosecutor from the Minnesota U.S. Attorney's Office on the original indictment. But the indictment does bear the names of Bondi and Dhillon—the Attorney General and Assistant Attorney General— the chief voices in the attempt to recast Mr. Lemon's protected press activity as illegitimate.

Bondi and Dhillon's statements, notably made before the grand jury indictment, describing Mr. Lemon as a "failed CNN journalist" engaged in "pseudo journalism" illustrate their motives of hostility to Mr. Lemon and his First Amendment activity rather than neutral law enforcement. The objective evidence of vindictiveness is overwhelming and warrants dismissal of the superseding indictment.

## IV. THE GOVERNMENT IS NOT ENTITLED TO THE PRESUMPTION OF REGULARITY

While prosecutorial decisions are generally afforded the presumption of regularity so courts presume that government officials have properly discharged their official duties,

---

[31] NewsMax, *I intend to find every single person in Minnesota church mob: Harmeet Dhillon*, YouTube, at 5:15–5:23 (Jan. 23, 2026), https://www.youtube.com/watch?v=FBnjsshemCQ.

[32] Benny Johnson, *DOJ Confirms Don Lemon, BLM Will Be Charged With 'KKK Act' After ATTACKING Christians in Church*, YouTube, at 6:58–7:17 (Jan. 19, 2026), https://www.youtube.com/watch?v=H3s97v1qmXY.

[33] *Pam Bondi Details New Arrests in Minnesota Church Storming While Taking Aim at 'Failed Journalist' Don Lemon*, Fox News, at 4:31–4:37 (Feb. 3, 2026), https://www.foxnews.com/media/pam-bondi-details-new-arrests-minnesota-church-storming-while-taking-aim-failed-journalist-don-lemon.

*see United States v. Armstrong*, 517 U.S. 456, 464 (1996), judges in this District and across the country have repeatedly found that this administration has acted in ways that undermined such a presumption. *See*, *e.g.*, Ex. H, *Tobay Robles v. Noem*, 26-cv-107, ECF 12 at 5 (D. Minn. Feb. 26, 2026) ("The Court is not aware of another occasion in the history of the United States in which a federal court has had to threaten contempt—again and again and again—to force the United States government to comply with court orders.") (Schiltz, C.J.); Ex. I, *Advoc. for Hum. Rights v. Dep't of Homeland Sec.*, 26-cv-749, ECF 95 at 2, 5 (D. Minn. Feb. 2, 2026) (finding that the government's account was "belied by the record" and supported by "threadbare declarations generally asserting, without examples or evidence," while "Plaintiffs' declarations provide specifics to the opposite.") (Brasel, J.). Continued deference to prosecutors in the face of repeated, serious examples of bad faith undermines trust in the justice system.

Even more telling, multiple judges in this District have found that the government is not entitled to the presumption of regularity specifically because of apparent attempts to punish the exercise of First Amendment rights. In one example, a lawfully present international student challenged ICE's detention and attempt to remove him, alleging (among other things) retaliation for pro-Palestinian speech. Judge Blackwell granted a temporary restraining order ordering his release pending the adjudication of his habeas petition, finding "credible allegations of retaliatory motive following protected speech; and shifting post hoc explanations to justify the arrest unsupported by any contemporaneous explanation demonstrating the reason for it." Ex. J, *Hoque v. Trump*, 25-cv-1576, ECF 29 at 15 (D. Minn. May 5, 2025). Judge Blackwell ultimately granted habeas relief, explaining

that "[t]he record reflects a coordinated series of executive actions—retaliatory in focus, opaque in their justification, and deficient in process—that collectively offend foundational constitutional protections." Ex. K, *Hoque v. Trump*, 25-cv-1576, ECF 36 at 2 (D. Minn. June 17, 2025).

In another example also involving allegations of punishment for speech disfavored by the administration, Judge Menendez found that "on this record, and with the showing made by Petitioner, it . . . likely indicates pretext, while the true reason for taking him into custody and detaining him during the ongoing removal proceedings is retaliation for his public expression of support for Palestinian human rights." Ex. L, *Harsono v. Trump*, 25-cv-1976, ECF 21 at 31–32 (D. Minn. May 14, 2025). Judge Menendez concluded that the petitioner had shown "that he is in custody in violation of the First Amendment[.]" *Id.* at 34. This administration's willingness to blatantly use the powers of the federal government to punish First Amendment activities that it does not like cannot be ignored.

In a recently unsealed order, Chief Judge Schiltz ordered six grand jury subpoenas to top Minnesota and Twin Cities officials quashed in their entirety, noting that "this campaign played out against the backdrop of the Trump administration's well-established history of using criminal investigations to retaliate against and pressure the President's political and personal adversaries." Ex. M, *In re Grand Jury Subpoenas*, 26-mc-43, ECF 1 at 17–18 (D. Minn. June 22, 2026). Judge Schiltz's conclusion that "the overwhelming evidence that these subpoenas were not issued to investigate, but to harass, coerce, and retaliate" (*id.* at 25) is of heightened importance because of the involvement of the same government attorney, Special Assistant U.S. Attorney Flavio de Abreu. In both cases, Mr.

21

Abreu was the only line prosecutor from the Minnesota U.S. Attorney's Office involved. In July 2026, the government withdrew Mr. Abreu from both cases. These other cases reflect actions similar to the ones challenged by Mr. Lemon in this case and reflect a loss of any presumption of regularity on conduct arguably less serious than the totality of events aimed at Mr. Lemon.

**V. THE COURT SHOULD DISMISS THE CHARGES AGAINST MR. LEMON WITH PREJUDICE OR, AT A MINIMUM, ORDER DISCOVERY AND AN EVIDENTIARY HEARING**

The record here supports dismissal of the charges against Mr. Lemon with prejudice. The administration's sustained campaign against journalists generally, and against Mr. Lemon specifically, is sufficient to demonstrate a flagrant violation of due process. However, should the Court conclude that Mr. Lemon has not yet met his burden to prove either prosecutorial vindictiveness, he has certainly met the burden to require further discovery, and the Court should order that and an evidentiary hearing into the government's motive and procedures in bringing these charges. That was the process used by the district court in *Abrego Garcia*. *United States v. Abrego Garcia*, 2026 WL 1454303, at *1 (M.D. Tenn. May 22, 2026).

A defendant may obtain discovery on the government's prosecutorial decisions by "'alleg[ing] specific facts sufficient to raise a significant doubt that the government's decision to prosecute was vindictive.'" *United States v. Abdi*, 2024 WL 323577, at *4 (D. Minn. Jan. 29, 2024) (citing *United States v. Kelley*, 152 F.3d 881, 886 (8th Cir. 1998)). At the very least, the record before the Court readily establishes such significant doubt. The President has a longstanding history of hostility to Mr. Lemon's journalism and

demonstrable pattern of using the full power of the federal government to attack the press. After the protest, the President issued marching orders to his Department of Justice, and Dhillon enthusiastically and publicly accepted. Prosecutors were undeterred by multiple judges' finding a lack of probable cause to arrest Mr. Lemon in January 2026, so they sought (and were denied) an emergency writ—with judges at every turn characterizing these efforts as unprecedented. While this was all occurring under seal, the Attorney General, Deputy Attorney General, and Assistant Attorney General went on any cable news program or podcast that would have them to disparage Mr. Lemon's journalism. And after receiving a grand jury indictment, the government refused Mr. Lemon's offers to self-surrender and instead tracked him to Los Angeles so they could ambush him in a hotel lobby in the middle of the night and keep him in custody until the following afternoon. This is more than sufficient to raise "significant doubt" that the government's motive for prosecution is punitive.

## CONCLUSION

The government should not be permitted to use criminal prosecutions to chill journalism disfavored by the President. The targeting of Mr. Lemon for criticism even before the Minnesota protests, and then the attacks starting on and continuing after, provide more than sufficient grounds to conclude the prosecution of Mr. Lemon is vindictive. Accordingly, Mr. Lemon respectfully requests that this Court dismiss all charges against him with prejudice, or in the alternative, order discovery and an evidentiary hearing to make even clearer the lack of evidentiary basis for this case.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Joseph H. Thompson*
Joseph H. Thompson (#0343031)
THOMPSON JACOBS PLLC
220 N. Second Street, Suite 220
Minneapolis, MN 55401
Tel: (612) 416-3322
joe@thompsonjacobs.com

By: */s/ Abbe David Lowell*
Abbe David Lowell (*admitted pro hac vice*)
David A. Kolansky (*admitted pro hac vice*)
Isabella M. Oishi (*admitted pro hac vice*)
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Tel: 202-964-6110
Fax: 202-964-6116
ALowellpublicoutreach@lowellandassociates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

*Counsel for Don R. Lemon*