# Exhibit B

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
## for the
### District of Minnesota

IN THE MATTER OF THE SEARCH OF THE
GOLD IPHONE DESCRIBED IN ATTACHMENT
A

**SEALED BY ORDER OF THE COURT**

Case No. 26-mj-106 DJF

## APPLICATION FOR A SEARCH WARRANT

I, Timothy Gerber, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, incorporated here**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B, incorporated here**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    X    evidence of a crime;

    X    contraband, fruits of crime, or other items illegally possessed;

    X    property designed for use, intended for use, or used in committing a crime;

        a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 241 & 248(a)(2) | Conspiracy Against Rights Secured by Federal Law, namely, the free exercise of religion at a place of religious worship secured by the FACE Act |

The application is based on these facts:

**See Affidavit, incorporated here**

    X    Continued on the attached sheet.

_____
*Applicant's Signature*

Timothy Gerber, Special Agent
Department of Homeland Security
_____
*Printed Name and Title*

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime and/or email) pursuant to Fed. R. Crim. P. 41(d)(3)

Date: _____February 2, 2026_____

_____
*Judge's Signature*

City and State: MINNEAPOLIS, MN

The Honorable Dulce J. Foster
United States Magistrate Judge
_____
*Printed Name and Title*

00010217

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

IN THE MATTER OF THE SEARCH OF
THE GOLD IPHONE DESCRIBED IN
ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

Case No. 26-mj-106 DJF

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, TIMOTHY GERBER, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property---one electronic device-which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent (SA) with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI), and have been employed since March of 2025. In my capacity as a Special Agent, I am responsible for conducting investigations into the federal laws enforced by HSI. Since March of 2025, I have investigated various criminal violations relating to child exploitation, assaults on federal officers, human rights violations, and immigration violations. Additionally, I have repeatedly reviewed and analyzed electronic devices.

3.      I am a graduate of the Federal Law Enforcement Training Center (FLETC), HSI Special Agent Training Program, having completed training in surveillance, search and arrest warrants, federal laws enforced by HSI, and federal criminal procedures. Prior to my tenure as a

1

00010218

HSI Special Agent, I was employed as a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI), where I investigated various criminal violations relating to the Internal Revenue Code, money laundering, digital currency, and elder exploitation.

4.    The facts in this affidavit come from my personal observations, my review of documents and other evidence, my conversations with other law enforcement personnel and other individuals, and my training and experience. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all my knowledge about this matter. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Additionally, the substance of conversations included herein may have been translated.

5.    For the reasons detailed below, there is probable cause to believe that the above-captioned SUBJECT DEVICE, which is described herein and in Attachment A, contains evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. §§ 241 (Conspiracy Against Rights Secured by Federal Law, namely, the free exercise of religion at a place of religious worship secured by the FACE Act, 18 U.S.C. § 248(a)(2)), and 248(a)(2) (FACE Act)(the "SUBJECT OFFENSES").

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.    The property to be searched is a rose gold iPhone, hereinafter, the "SUBJECT DEVICE."

7.    The SUBJECT DEVICE is currently located in the Central District of California.

2

00010219

8. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

00010220

## PROBABLE CAUSE

### Summary

9.    On January 29, 2026, in the U.S. District Court of Minnesota, an arrest warrant was issued for LEMON pursuant to an Indictment for violation of 18 USC §§ 241 and 248(a)(2).

10.    On January 30, 2026, HSI Los Angeles conducted surveillance of Don LEMON at The Beverly Hilton Hotel, located at 9876 Wilshire Blvd, Beverly Hills, California 90210, pursuant to a federal arrest warrant out of the District of Minnesota. At approximately 1142 p.m. PST, HSI Special Agents (SAs) observed LEMON walking through the hotel lobby towards the elevator. SAs approached LEMON wearing clearly marked HSI jackets and confirmed the identity of LEMON.

11.    LEMON was told by SAs they had a warrant for his arrest. Initially, LEMON was uncooperative and attempted to make phone calls using his iPhone and Apple watch.

12.     At the time of the encounter LEMON had possession of a rose gold apple iPhone (SUBJECT DEVICE).

13.    Agents placed LEMON under arrest and detained the SUBJECT DEVICE. LEMON was transported to the Los Angeles federal building for processing.

14.    On the morning of Sunday, January 18, 2026, at approximately 10:30 a.m., a group of approximately 30-40 agitators, working together in a coordinated manner, entered the Cities Church, located at 1524 Summit Avenue, St. Paul, MN 55105, during a religious service and engaged in conduct that, as detailed below, disrupted the religious service and intimidated, harassed, oppressed, and terrorized the parishioners, including young children, and caused the service to be cut short and forced parishioners to flee the church out of a side door, which

4

00010221

resulted in one female victim falling and suffering an injury. Statements made by agitators at the church indicated that they targeted the church based on their belief that one of the church's pastors is a federal immigration officer (Victim #1). Prior to their assault on the church, the agitators met together in the parking lot of a nearby shopping center and made plans for their actions inside the church. Some of the protestors also physically obstructed some parishioners as they attempted to leave the church and the adjacent parking areas. Some of the agitators, including defendant DON RENALDO LEMON ("LEMON"), livestreamed the agitators at the pre-assault meeting and the conduct of the agitators inside the church and after disrupting the church service.

15. Special Agents with DHS-HSI and the Federal Bureau of Investigation ("FBI") commenced an investigation. The following facts set forth information learned during the investigation.

**January 18, 2026: Livestreamed Video of Incident at Cities Church**

16. On Sunday morning, January 18, 2026, at approximately 10:00 a.m., LEMON began livestreaming on his internet-based livestream show, "TheDonLemonShow," in the parking lot of a shopping center located at 1440 University Avenue W, St Paul, MN 55104. I have reviewed pertinent portions of the livestream video. I used the YouTube closed-captioning option to assist with transcriptions.

**1. Pre-Operation Meeting**

17. At the start of the livestream, LEMON said he just got into Minneapolis, Minnesota and was there to speak with an organization that was gearing up for resistance and protest. Based on my training and experience, I am informed that persons identifying themselves as resistance protesters have recently sought to disrupt ICE operations in Minnesota. Due to the

5

presence of an American flag, LEMON noted, apparently in jest, that he initially thought the protesters looked "MAGA-coded," but he explained to his audience that the organization was, in fact, a group of resistance protesters.

18.    LEMON explained that the resistance protesters were planning an operation that LEMON intended to follow them on.  LEMON identified their operation as "Operation Pullup" and identified the apparent organizer as ARMSTRONG. When speaking with ARMSTRONG, LEMON assured her that, "We're not saying what it is, what's going on, but thank you.  Tell us why you're doing this."

19.    ARMSTRONG identified herself as a civil rights attorney and longtime activist in the community.  ARMSTRONG said she does activism and protests in various ways. ARMSTRONG identified this as "Operation Pullup," which she characterized as a "clandestine" operation.  ARMSTRONG explained that she and other agitators "show up somewhere that is a key location, [where the targets] don't expect us to come there, and we disrupt business as usual. That's what we're about to go do right now.  We've had a lot of success with the times we've done "Operation Pullup."  ARMSTRONG detailed prior protests and stated "this is our next action to call for justice for Renee Good and ICE out of Minnesota.  LEMON asked, "How long do you think before this operation would [inaudible] before it takes place?"  ARMSTRONG replied, "We got to go now and get there."  LEMON replied, "we'll see you there."  LEMON advised his audience that "we're going to head to the operation.  Again, we're not going to give any, any of the information away."

20.    LEMON introduced LUNDY, who said he was out there to support the community activists.  LUNDY identified himself as a current candidate for Minnesota State Senate, District 65.  LUNDY felt it's important if you're servicing people in office, you have to

6

00010223

be with the people as well.  (Based on my review of other video evidence of the agitators' activities inside the church, LUNDY later entered the church as part of the group's action.)

21.    LEMON walked away from LUNDY to focus his attention on the other agitators and a chant that ALLEN was leading.  ALLEN's initial chants were, "This is what community looks like" and "ICE out."  ALLEN then directed the agitators to respond with "of Minnesota" when she said, "ICE out."  ALLEN requested the favorite chants of the local agitators, one suggested "justice for Renee Good (Good)."  (Good was recently involved in an illegal protest to disrupt immigration enforcement activities, which led to an officer-involved shooting as a result of her assault on an immigration officer.)  ALLEN proceeded to lead the group in that chant, as well as "say her name," which the agitators responded with "Renee Good."

22.    ALLEN described their reasoning for being out at the staging location, stating they have a "duty to fight for our freedom," "we have a duty to win," "we must love and support one another," "we have nothing to lose but our chains."  ALLEN then stated to the agitators "you guys are sounding like Sunday morning."  ALLEN continued to address the crowd in a motivational manner.  ALLEN instructed the agitators to "stay bumper-to-bumper, make sure everybody gets through the light, and we all have the address, right?"

23.    ARMSTRONG addressed the agitators and encouraged everyone to make sure they had the address.  ARMSTRONG also provided the following instruction: Remember if you have anything that is activist identifying, do not wear it in if you're just going in to sit down and be a part of the situation.  In response to a question from an unidentified agitator, who asked if they should spread out once at the church, ARMSTRONG instructed that the agitators should not sit together.  ARMSTRONG further instructed the agitators that, if you have anything activism identifying, do not go in with the first wave, you wait until you come in with us people of color.

00010224

24. LEMON proceeded to move the camera away from the agitators and organizers because, as he explained, he did not want to divulge critical information about the operation that was being discussed at that time. LEMON went to the crowd of agitators and organizers and proceeded to thank them for allowing him to be there.

25. Based on my review of LEMON's livestream, I know that KELLY was present in the crowd of agitators at the pre-operation briefing led by ARMSTRONG and ALLEN.

26. Furthermore, the images below depicts Ian AUSTIN and LEMON at the pre-protest briefing in the St. Paul parking lot.



27. The image below depicts KELLY with AUSTIN, of note, KELLY and AUSTIN have a pre-existing relationship, dating back to their time serving in the United States military.

8

00010225



28.    Based on my review of the livestream video, ARMSTRONG and ALLEN appear to be the leaders of Operation Pullup and the meeting of agitators that was described in paragraphs above.  I believe this because ARMSTRONG and ALLEN provided instructions to the group, led chants, and conducted interviews as apparent leaders of the organization.

29.    During the livestream of the pre-operation briefing, LEMON's cameraman records many of the agitators in the crowd.  The following screenshots show ARMSTRONG,

9

00010226

ALLEN, LUNDY, CREWS, LEMON, FORT, AND RICHARDSON.





00010227



looks the for this reason
um it may look like MAGA

**Travel to Cities Church**

30.     LEMON and defendant JEROME DEANGELO RICHARDSON ("RICHARDSON"), along with a rear passenger, Michael LNU (Last Name Unknown), entered a vehicle to depart towards the location of the operation. LEMON asked RICHARDSON, the driver, "You know where we're going, right?" RICHARDSON replied, "yep."

31.     An individual who identified himself as "Mark" approached LEMON, thanked LEMON, and introduced himself. LEMON advised Mark, "You're on right now, just so you know. So don't give anything away." A short time later, RICHARDSON said, "alright, we're behind operation, we gotta catch up." LEMON replied, "Let's go catch up" and later, advised RICHARD and Michael, "Don't give anything away."

32.     On the drive to the operation location, LEMON advised his audience they are doing a clandestine secret operation. LEMON asked RICHARDSON, "They found out some inside information, right?" RICHARDSON responded, "yeah." LEMON identified who

11

00010228

RICHARDSON is, that he is a producer, and that they met at Essencefest a "couple years ago." RICHARDSON identified himself as an activist and social entrepreneur.

33.    While still on the drive, LEMON stated, "This is just the beginning of this uh clandestine operation that they're doing here because of some um inside information that they got. So, this is going to be very interesting. I don't think we can go ahead. I don't think we can go inside, right? No." Michael replied, "we can stand outside." LEMON later stated, "We can't say too much. We don't want to give it up." The occupants of the vehicle discussed going into a church service that is underway with parishioners. LEMON later stated "I'm just trying to figure out what's the best thing cuz we just found out about this this morning. I'm just trying to figure out if it's, um, if it's for me to go inside so I can tell what happened. That's what I'm gonna do." Michael responded, "I know I'm also not supposed to really like go in, right?" RICHARDSON responded, "but you can go in," Michael added, "because they're going to buy that."

34.    LEMON asked, "Will they let you in with a camera?" RICHARDSON replied, "Put it in your backpack." LEMON answered, "No, you can't do that. We can't do that. We can't do that." RICHARDSON asked, "Oh, we can't?" LEMON replied, "no," and later stated "let me produce this live as we're doing this." LEMON then instructed RICHARDSON "and if there's a place to turn, I want you to go where and park right where we can see the entrance." RICHARDSON replied, "I don't think that's the main entrance going on." LEMON replied, "yeah, it's right there." RICHARDSON replied, "Oh, where people are walking down those stairs."

**Conduct at Cities Church**

35.    As LEMON approached Cities Church, LEMON advised Michael to "stay on the sidewalk, you can probably come where the van is." Based on the video, it appears LEMON was

12

00010229

referring to a red vehicle parked in front of Cities Church. During LEMON's livestream, the camera focused on the outside of Cities Church, and LEMON entered only with audio equipment. The audio captures what appears to be the church's pastor ("Victim #7" or "pastor") in the midst of addressing his congregation during a religious service.

36.     Approximately one minute and forty-seven seconds after LEMON entered Cities Church, an unknown female voice, interrupted the pastor's sermon and shouted, "Excuse me, pastor…" LEMON is then heard saying, "Hey, Meta record." Based on my training and experience, Meta refers to smart glasses that integrate augmented reality features, allowing users to interact with digital content seamlessly. While the cameraman remained outside, the audio recording captures the voices of agitators yelling in the church.

37.     At one point, an unknown female refers to the Director of ICE. Agitators can also be heard yelling, "Justice for… Renee Good." Approximately thirty-five seconds later, RICHARDSON is observed on video entering Cities Church. Immediately after RICHARDSON enters Cities Church, the video shows multiple parishioners exiting Cities Church through multiple doors. Three unknown parishioners are observed falling to the ground while exiting Cities Church through the north side door. Approximately twenty seconds later, Michael is observed entering Cities Church.

38.     RICHARDSON entered Cities Church with his camera recording LEMON's live broadcast. Based on my review of the video, it appears that the parishioners are confused and shocked by the agitators' conduct. Again, based on the video, agitators can be heard yelling "ICE out" and blowing whistles. Based on my training and experience, anti-ICE agitators use whistles to disrupt ICE operations and notify others of their presence.

13

00010230

39.    The image below depicts ANDERSON, KELLY, and AUSTIN [seen wearing a multicam baseball cap] present when the protest was initiated.  AUSTIN can be observed blocking parishioners' freedom of movement.



40.    The images below depicts FORT, ALLEN, CREWS, and AUSTIN present. AUSTIN can be observed confronting a parishioner and obstructing the parishioner's freedom of movement.

14

00010231



41.     The image below depicts AUSTIN confronting parishioners after returning to the

aisle.  AUSTIN was previously seen leaving the protest.



15

00010232

42.     During the LEMON broadcast, ARMSTRONG and ALLEN are observed yelling "ICE out." KELLY can also be heard yelling, "This ain't God's house. This is the house of the devil." Based on my review of KELLY's numerous social media posts, I recognize that is KELLY's voice on the video saying those words. LEMON can be observed walking with a winter-style jacket and hood over his head, in what appears to be an attempt to conceal his identity. Several other agitators or parishioners are wearing winter-style jackets with their hoods down.

43.     During his livestream, LEMON explained that Operation Pullup learned that one of the pastors for Cities Church is a member of ICE. During his broadcast, LEMON tells his viewers that's he's there "chronicling and reporting. We're not a part of the activists, but we're here just reporting on them." RICHARDSON is observed engaged in agitator chants, yelling and raising his hands. LEMON stated, "I'm looking at a young man who's in the corner. He's frightened, he's scared, he's crying. People are leaving church. An unknown male parishioner was observed yelling to the agitators telling them to "get out." LEMON acknowledged that the unknown male parishioner is yelling this. LEMON stated, "I don't think they know what to do. I'm sure they probably called the local authorities right now. People are just really angry and upset and members of the church are trying to get them to calm down." LEMON followed with, "But this is the beginning of what's going to happen here. When you violate people's due process, when you pull people off the street and start dragging them and hurting them and, um, and not abiding by the constitution, when you start doing all of that, people get upset and angry." LEMON goes on to suggest that according to the Constitution, there are no limitations to protesters on where and when they can exercise their Constitutional rights. That's the whole point of it is to disrupt, and that's what they're doing and that's what I believe."

16

00010233

44.     While at the church, LEMON interviewed ARMSTRONG, who stated, "I told [inaudible] that Victim 1 is a pastor here and he also serves as a Director of the Field Office for ICE in St. Paul.  LEMON asked, "Are you sure that he's…?"  ARMSTRONG answered, "Yes, Cities Church, and that's why we're here.  We're demanding justice for Renee Good and letting them know that this will not stand.  They cannot pretend to be a house of God while harboring someone who is directing ICE agents to wreak havoc upon our community and who killed Renee Good, who almost killed a six-month-old baby.  Enough is enough.  I am a reverend, on top of being a lawyer and an activist."

45.     LEMON asked ARMSTRONG, "Who is the person that we should talk to?  Is our pastor or something?  ARMSTRONG replied, "He might have ran away."  LEMON replied, "All right, we'll see if we can find him."  LEMON informed his audience, "I'm going to talk to the pastor.  Let's see if I can talk to him."

46.     At one point in the livestream LEMON leaves Cities Church out of a side door.  This side door exit is the same exit where Victim 2 can be seen exiting and falling on the ice as the Cities Church protest begins.  As LEMON is walking he says to the viewers of his livestream "yeah that was interesting to watch, I imagine it's uncomfortable and traumatic for the people here, again careful it's slippery right here, it's uncomfortable and traumatic for the people here, (talks about how slippery the walk is), that's what protesting is about."

47.     During the livestream video LEMON interviewed a parishioner who was attempting to leave.  I believe from the facial expressions of this parishioner that the parishioner appears to be frustrated and frightened.  The parishioner told LEMON how he felt about the protest, the parishioner said, "I feel violated, I feel interrupted, I feel angry".  The parishioner attempted to leave, and LEMON used his body to block the parishioner from leaving the

17

00010234

church's front entrance.  It appeared in the video that LEMON placed his body in front of the parishioner at least four times.  The parishioner was eventually able to make his way out of the church.  The following screenshots are of LEMON blocking the parishioner.





00010235





### LEMON and Other Agitators Corner Pastor in Church

48.    LEMON then approached the pastor and began asking him questions.  In response

to a question from LEMON, the pastor said, "We were interrupted by this group of protesters.

We asked them to leave and they, um, obviously have not left.  This is unacceptable.  This is

19

00010236

shameful.  It's shameful to interrupt a public gathering of Christians in worship.  LEMON advised the pastor that, "We live in a, there's a constitution and the First Amendment to freedom of speech and freedom to assemble and protest."  The pastor replied, "We're here to worship Jesus because that's the hope of these cities.  That's the hope of the world is Jesus Christ." LEMON interrupted and then told the pastor, "I want to be very respectful, please don't push me, though."

49.    In the video, LEMON is standing very close to the pastor.  In the livestream, the pastor appears to be worried and distraught about his parishioners, whom he keeps looking at. LEMON continues to distract the pastor with questions.  The pastor then stated, "I have to take care of my church and my family.  So, I ask that you actually also leave this building.  LEMON asked, "You don't want us to worship?"  The pastor replied, "unless you're here to worship." LEMON replied, "I'm always worship[ing]; I'm a Christian."  Approximately thirteen minutes later, LEMON exited the Cities Church.

50.    Other video footage shows that, at this point during the incident, the pastor appears to be cornered by LEMON, RICHARDSON, GEORGIA ELLYSE FORT ("FORT"), and other unidentified agitators.

**Facts Obtained from Other Video Footage of Incident**

51.    I observed other livestream footage taken by another agitator who was inside the Cities Church, when the agitators began their protest.  In that video, I observed the pastor standing at the podium with both hands on each side of the lectern in what appears to be an observing stance.  During the recording, I am able to hear, "Hands up, don't shoot."  KELLY is shown standing in front of the lectern with his phone camera pointed at the pastor.  The pastor is

20

00010237

then shown pointing towards the exit of the church, in what appears to be a gesture to dismiss KELLY.

52.     In the video, I also observed a female parishioner in the corner of the church holding two toddlers in a protective way, with what appears to be a look of anxiety and fear on her face. KELLY is also shown in the video engaging with a parishioner in an aggressive, confrontational manner within the parishioner's personal space. KELLY was yelling at the parishioner, asking multiple questions along the lines of, Why aren't you involved in the protests? ALLEN is observed leading the agitators in various chants.

53.     I observed a video from a YouTube channel identified as iCkEdMeL, where a podcaster is talking about the agitators at Cities Church. At the beginning of the protest, I observed a female parishioner standing in the alcove of the church clutching two toddlers in her arms in a protective posture. I am able to see a look of fear and confusion on the female parishioner's face. The following is a screenshot of the female parishioner in the alcove protecting the two toddler children..



00010238

## Review of Cities Church Broadcast Footage & Related Videos

54.    Broadcast video obtained from Cities church shows ARMSTRONG, ALLEN, LEMON, RICHARDSON, KELLY, FORT, LUNDY, CREWS chanting with agitators and obstructing parishioners' path of travel.

55.    The image below depicts ARMSTRONG, FORT, ALLEN, and LUNDY obstructing parishioners' freedom of movement, in addition to LUNDY chanting and punching his fist in the air.  CREWS can also be observed chanting with agitators:



56.    The image below depicts CREWS and KELLY obstructing and confronting parishioners.  Additionally, ARMSTRONG, FORT, and RICHARDSON can be observed obstructing the aisle and the parishioner's freedom of movement:

22

00010239



57.     The image below depicts CREWS and KELLY confronting and obstructing the pastor, who appears to be overwhelmed and frightened. ARMSTRONG and FORT can also be observed obstructing the aisle and the parishioner's freedom of movement:



23

00010240

58.    The image below depicts ALLEN confronting parishioners, who appears to be comforting his wife during the protest:



59.    The image below depicts FORT, LEMON, RICHARDSON, and other agitators obstructing the pastor's freedom of movement. ALLEN can also be observed obstructing other

00010241

parishioners' freedom of movement. CREWS can be seen with his arm in the air chanting with other agitators and also obstructing other parishioner's freedom of movement.



60.    The zoomed-in image below further depicts LEMON, RICHARDSON, and FORT, obstructing the pastor's freedom of movement:



61.    Cities Church broadcast video confirmed FORT was present at the protest. A review of open-source social media videos showed FORT live-streaming the protest, in addition to interviewing ARMSTRONG and victim 7. FORT, LEMON, RICHARDSON, and other

25

00010242

agitators were later seen intimidating and obstructing the pastor's freedom of movement, as noted above.

62.     Cities Church broadcast also showed TRAHERN JEEN CREWS ("CREWS") present at the protest, recording with his phone, chanting with the agitators, and obstructing parishioners' freedom of movement.

**Complaints to and Related Information from St. Paul Police Department**

63.     I have reviewed an Incident Report from the St. Paul Police Department (SPPD) regarding the incident at Cities Church.  I learned the following information:

64.     According to Officer Jonathan Schroeder, on January 18, 2026, at approximately 10:40 a.m., St. Paul Police Department (SPPD) received multiple calls from parishioners at Cities Church reporting approximately 20-40 individuals disrupting their worship service by chanting and protesting.  Shortly after arriving on scene, SPPD Officers observed protesters leaving the building and moving to the driveway on the west side of the church.  The protesters continued to chant for approximately 30 minutes, then left the area.  Officers Schroeder learned this protest was happening because one of their pastors is allegedly a Director for ICE.  Members of the church's staff requested SPPD to document what happened and said they wanted to press charges if it's possible to identify anyone in the protest.

65.     According to SPPD Sergeant Ilya Tereshko, on January 18, 2026, at approximately 10:40 a.m., Officers were dispatched to Cities Church on a call of disorderly conduct where protesters were disrupting church services.  Church clergy advised Sergeant Tereshko that their parishioners were shaken up during the incident and many left early due to the protesters.  There was also concern that there would be more disruptions in the future as well

26

00010243

as vandalism to the building, because of the potential national attention that this incident could get due to the presence of LEMON, who is a former CNN news anchor.

66.      According to Sergeant Matthew St. Sauver, he was made aware of a possible protest in the parking lot of a shopping center at Cub Foods, 1440 W University, beginning at approximately 10:00 a.m.  At approximately 10:15 am., Sergeant St. Sauver directed a police unit to go to the area and see if the group was there and if they were protesting.  A police unit responded and observed the group getting into their vehicles and leaving in a caravan formation, heading southbound on Hamline Street in St. Paul, Minnesota.  Sergeant St. Sauver monitored Black Lives Matter MN live stream remotely at https://www.facebook.com/share/v/17mmiBpk1Y/ and identified the following individuals on livestream at the protest: CREWS (Head of BLM MN), ALLEN, (Member of St Paul School Board), ARMSTRONG, and FORT.

67.      According to SPPD Computer Aided Dispatch (CAD) form, Victim 2 broke her arm exiting through the Cities Church office door when proceeding towards Saratoga Street.  When Victim 2 came out the door and was running, she slipped and broke her arm.  I believe this is documented in LEMON's broadcast as described above.  Per the report, Victim 2 advised the SPPD that "they were terrorized, our children were weeping, college students and young women were sobbing, it was impactful and it will take time to work through."  (It should be noted the CAD report for this incident states it occurred January 19, 2026, I know the incident occurred on January 18, 2026.)[1]

---

[1]  On January 25, 2026, I contacted Victim 2 telephonically to follow-up on the status of her injury. During that call, Victim 2 provided the following information: On January 20, 2026, she saw a doctor about her arm, as she suspected it was broken. After an examination, which included an x-ray, the doctor said the x-ray came back negative for a fracture, but diagnosed her with deep bone bruising and recommended that she return for magnetic resonance imaging (MRI) if her arm has not healed in three weeks, as ligament damage is a possibility.

00010244

## Further Investigation

68.     During the course of the investigation, agents discovered a flyer posted on Instagram by "racialjusticemn" and "nekimal," advertising Operation Pullup, Sunday January 18, 10:00 a.m. sharp, at Cub Foods Parking Lot (Midway Area, St. Paul).  Nekimal is ARMSTRONG's personal Instagram account.  Instagram is a social media platform where users are able to post photos and videos.  The following photo is a screenshot of the Instagram post posted by "racialjusticemn" regarding Operation Pullup.



## Interviews of Victim-Witnesses

69.     On January 19, 2026, the Federal Bureau of Investigation (FBI) identified and interviewed Victims 4 and 5, both of whom have been members of Cities Church for at least four

00010245

years and present during the January 18, 2026 protest.  I have learned the following from a report of the interview.  Victim 5 noticed Cities Church was unusually full and noticed a group of unfamiliar individuals seated together towards the rear of the church.  Victim 4 noted after the protest began, approximately fifty members of the congregation were stuck towards the front of the church.  Victim 4 informed agents the aisles are already narrow to begin with, and the agitators who occupied the center of the sanctuary made it nearly impossible for parishioners to get out and leave.  Victim 5 later expressed fear that the agitators may have guns underneath their jackets.  Additionally, when the agitators began shouting, all the parishioner could hear was "shoot.", when the agitators began shouting, all the parishioner could hear was "shoot."

70.    Victim 4 informed agents that members of their parish attempted to retrieve their children from the childcare area located downstairs, but the agitators were blocking the stairs, and the parents were unable to get to their children.  Victim 4 recalled one agitator was threatening, aggressive, and intimidating towards parishioners.  Additionally, this agitator was screaming and getting in people's faces, to include women and young children.  This agitator continued to scream in the faces of young children while they were crying.

71.    On January 19, 2026, Homeland Security Investigations (HSI) and Federal Bureau of Investigations Special Agents interviewed Victim 6 regarding the incident that took place at Cities Church on January 18, 2026.  I've learned the following from a report of the interview.  Victim 6 was joined by his wife, Victim 2, and their children.  Victim 6 recalled an African-American woman yelling "EXCUSE ME PASTOR, EXCUSE ME PASTOR, do you know you're harboring ICE Agent [victim 1]?"  Victim 6 recalls protesters everywhere in the aisles chanting "[victim 1 out!]"  Victim 6 thought to himself that this is what it would feel like to be in a mass shooting.  Victim 6 described the events as surreal and could not believe what

29

00010246

was happening. Victim 6 recalled people shouting and running, children crying, as well as people singing and praying. Victim 6 recalled KELLY screaming "Nazi" in people's faces, in addition to confronting children saying, "do you know your parents are nazis, they're going to burn in hell."

72. Victim 6 was scared the agitators were not going to let people leave and that they were going to harm victim 1's family for harboring victim 1. Victim 6 later stated protesters followed and surrounded them in their car and would not let them leave. Victim 6 informed agents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and they are afraid people will try and come to their house at night. Victim 6 recalled his child stating to him "Daddy, I thought you were going to die." Victim 6 ended the interview and acknowledged that his children are traumatized.

## TECHNICAL TERMS

74. Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and

30

00010247

playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash mem01y cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unelated to photographs or videos.

c.    Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a p01iable media player may have the ability to store ve1y large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.    GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These

31

00010248

devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer com1ected to that antenna can mathematically calculate the ante1ma's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with

32

00010249

those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.      Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

i.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, coru1ections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

75.     Based on my training, experience, and research, I know that the SUBJECT DEVICE has capabilities that allow them to serve as "a wireless telephone, digital camera, portable media player, OPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

33

00010250

76.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

77.    Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECCT DEVICE because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information

34

00010251

stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.    I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

78.    Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

79.    Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

00010252

80.     Return of ESI. If law enforcement agents determine that the SUBJECT DEVICE is no longer necessary to retrieve and preserve the data, and the SUBJECT DEVICE is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the SUBJECT DEVICE will be returned, upon request.

## CONCLUSION

81.     Based on all of the foregoing facts, I submit that there is probable cause to believe that LEMON has committed the SUBJECT OFFENSES and that the items to be seized set forth in Attachment "B," are evidence, fruits, and instrumentalities of the following SUBJECT OFFENSES and will be found in the SUBJECT DEVICE described in Attachment "A."

Timothy M. Gerber
Special Agent
Homeland Security Investigations

SUBSCRIBED and SWORN before me by reliable
electronic means (FaceTime and/or email)
pursuant to Fed. R. Crim. P. 41(d)(3) on February 2, 2026.

DULCE J. FOSTER
UNITED STATES MAGISTRATE JUDGE

36

00010253

## ATTACHMENT "A"

## PROPERTY SUBJECT TO SEARCH

The following property is subject to search pursuant to this Search Warrant:

A rose gold iPhone (pictured below) that was found on defendant DON RENALDO LEMON's person on or about January 30, 2026, at the time of his arrest by Special Agents with Homeland Security Investigations and the Federal Bureau of Investigation (the "SUBJECT DEVICE").

The SUBJECT DEVICE is currently in the custody of Homeland Security Investigations and located in the Central District of California.



37

00010254

**ATTACHMENT "B"**

**ITEMS SUBJECT TO SEIZURE**

All of the following records and information on the SUBJECT DEVICE described in Attachment "A," are subject to seizure pursuant to this Search Warrant as evidence, fruits, and instrumentalities of the following SUBJECT OFFENSES, namely, (a) Conspiracy Against Rights Secured by Federal Law, namely, the Free Exercise of Religion at a Place of Religious Worship Secured by the FACE Act); and (b) Intimidation and Interference with Exercise of Religion at a Place of Religious Worship, in violation of 18 U.S.C. § 248(a)(2):

a. For the period of January 4, 2026 through January 30, 2026, inclusive, all of the following records and information:

1) Call log and related call data showing all incoming and outgoing calls to and from the SUBJECT DEVICE;

2) Any and all text messages, messages sent via telephone messenger applications, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, Instagram posts, FaceTime logs, Google Voice calls, and other electronic media evidencing or relating to (a) planning, organizing, scheduling, and commission of the SUBJECT OFFENSES and other organized protest activity; (b) subsequent communications regarding the SUBJECT OFFENSES and other organized protest activity; and (c) other communications, activities, and associations that LEMON had with any of his indicted co-defendants and/or other as yet unidentified persons who participated in the planning or commission of the SUBJECT OFFENSES.

00010255

3) Internet activity (including browser history, web page logs, downloads, postings on websites, search terms entered by the user, firewall logs, caches, cookies, and "bookmarked" or "favorite" web pages) evidencing or relating to (a) planning, organizing, scheduling, and commission of the SUBJECT OFFENSES and other organized protest activity; (b) subsequent communications regarding the SUBJECT OFFENSES and other organized protest activity; and (c) other communications, activities, and associations that LEMON had with any of his indicted co-defendants and/or other as yet unidentified persons who participated in the planning or commission of the SUBJECT OFFENSES.

4) Photographs or videos evidencing or relating to planning, organizing, scheduling, and commission of the SUBJECT OFFENSES and other organized protest activity; and

5) Any information regarding the schedule or travel of LEMON or his indicted co-defendants, including geolocation information and emails and text messages;

b. Financial records (e.g., bank or credit card records) evidencing his interstate travel to/from New York, New York and Minneapolis, Minnesota during the period from January 17, 2026 through January 18, 2026;

c. Contact lists, including names, telephone numbers, e-mail addresses, and other contact information of LEMON's associates;

d. Passwords, encryption keys and other access devices that may be necessary to access the SUBJECT DEVICE;

e. Records of Internet Protocol addresses used; and

39

00010256

f.      Contextual information necessary to understand the other items to be seized described in this attachment;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

00010257

## SEARCH WARRANT ADDENDUM

1.      In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2.      If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g., computer, hard drive, mobile device, smartphone, cell phone). The person from whom the electronic storage device was seized may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3.      Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or c01m11encing forfeiture proceedings against the electronic storage device and the data contained in the device. Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41 (g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4.      The government shall establish a search methodology governing the review of seized data to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team. In the event that data seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not

41

00010258

participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.

00010259

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Minnesota

IN THE MATTER OF THE SEARCH OF THE
GOLD IPHONE DESCRIBED IN ATTACHMENT
A

**SEALED BY ORDER OF THE COURT**

Case No. 26-mj-106  DJF

## SEARCH AND SEIZURE WARRANT

To:        Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the State and District of Minnesota:

**See Attachment A, incorporated here.**

The person or property to be searched, described above, is believed to conceal:

**See Attachment B, incorporated here.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before        February 13, 2026
                                                                                                            *(not to exceed 14 days)*

X        in the daytime 6:00 a.m. to 10 p.m.                    _ at any time in the day or night as I find reasonable
            cause has been established.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Magistrate Judge by email to usamn.cpss@usdoj.gov.

Date and Time issued:        February 2, 2026 11:46am

City and State:  MINNEAPOLIS, MN                            *Judge's Signature*

                                                                                    The Honorable Dulce J. Foster
                                                                                    United States Magistrate Judge
                                                                                    *Printed Name and Title*

00010260

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

### Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated clerk of courts.

Date:

_____
*Executing officer's signature*

_____
*Print name and title*

00010261

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 26-mj-106 DJF

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE GOLD IPHONE DESCRIBED IN ATTACHMENT A | **SEALED BY ORDER OF THE COURT** PETITION OF THE UNITED STATES FOR AN ORDER SEALING SEARCH WARRANT, AFFIDAVIT, RETURN, PETITION AND ORDER FOR SEALING |

COMES NOW the United States of America by its undersigned attorneys and in support of its Petition for an Order Sealing Search Warrant, Affidavit, Return, and Petition in the above-captioned matter, states as follows:

1.      On January 30, 2026, The Honorable Dulce J. Foster issued a warrant authorizing the search of the gold iPhone.

2.      The Affidavit of Special Agent, Timothy Gerber, submitted in support of the search warrant, sets forth facts regarding an ongoing investigation into violations Title 18 U.S.C. §§ 241 & 248(a)(2) (Conspiracy Against Rights Secured by Federal Law, namely, the free exercise of religion at a place of religious worship secured by the FACE Act).

3.      The search warrant documents presented to this Court for *in camera* review include detailed and highly sensitive investigative information. Disclosure of the information would jeopardize an ongoing investigation into alleged criminal offenses and the privacy of individuals unlikely to be, and/or who may ultimately not be indicted.

00010262

4.    Nondisclosure of the search warrant documents is necessary to prevent the ongoing investigation from being compromised. Immediate public filing of the search warrant documents would, *inter alia*, compromise details about the nature, extent, and scope of the investigation.

5.    The search warrant documents contain identifying information of and circumstances relating to an individual involved in criminal activity in some way who may not be indicted in this case.  Nondisclosure of the search warrant documents at this stage is necessary to protect the person's identity and/or to minimize the substantial risk that revelation of details set forth in the search warrant documents could cause to the person's reputation.

6.    The Court's power to prevent disclosure of its files, especially for a limited period of time, is well established.  This general power has been recognized by the United States Supreme Court.

> It is uncontested, however, that the right to inspect and copy judicial records is not absolute.  Every court has supervisory power over some records and files and access has been denied where court files might have become a vehicle for improper purposes.

> *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978).

7.    The Eighth Circuit has recognized the Court's specific power to restrict access to search warrant documents like those at issue here:

> We hold that the qualified first amendment right of public access extends to the documents filed in support of search warrants and that the documents may be sealed if the district court specifically finds that sealing is necessary to protect a compelling government interest and that less restrictive alternatives are impracticable.

00010263

*In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569, 574 (8th Cir. 1988).

8.    The Eighth Circuit and district courts within the Circuit have recognized that the circumstances surrounding ongoing investigations constitute compelling government interests warranting the sealing of search warrant documents.  For example, the Eighth Circuit has approved sealing search warrant documents that "describe[d] in detail the nature, scope and direction of the government's investigation and the individuals and specific projects involved," resulting in "substantial probability that the government's on-going investigation would be severely compromised if the sealed documents were released."  *Gunn* at 574.  Other compelling interests have similarly been recognized as justifying sealing.  *Certain Interested Individuals, John Does I-V, Who Are Employees of McDonnell Douglas Corporation v. Pulitzer Publishing Co.*, 895 F.2d 460, 466 (8th Cir. 1990) ("[w]here no indictments have issued against persons allegedly involved in criminal activity, there is a clear suggestion that whatever their truth, the Government cannot prove these allegations. . . .All citizens, whatever their real or imagined past history, are entitled to the protection of a grand jury proceeding.").

9.    Moreover, the Eighth Circuit has recognized that search warrant affidavits permeated with references to individuals other than the subjects of the search warrant and/or with information revealing the nature, scope and direction of the government's ongoing investigation may be sealed not only because they present compelling government interests justifying sealing, but also because less restrictive

alternatives to sealing are in such circumstances impracticable. *Gunn*, 855 F.2d at 574.

10.     Based upon the foregoing and all the files and proceedings to date, the United States respectfully requests that this Court issue an Order Sealing the Warrant, Application, Affidavit of Special Agent, Timothy Gerber, Return, this Petition, and the Sealing Order until the close of business on **January 30, 2027**, unless a compelling interest is shown by the United States for a continuation of the sealing.

Dated: January 30, 2026                          Respectfully submitted,

DANIEL N. ROSEN
United States Attorney

*s/ Orlando Sonza*
BY:    ORLANDO SONZA
Assistant United States Attorney

00010265

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 26-mj-106 DJF

IN THE MATTER OF THE SEARCH
OF THE GOLD IPHONE DESCRIBED
IN ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

ORDER FOR SEALING

This Court, having reviewed the Petition of the United States herein, finds that the United States has shown a compelling interest in the sealing of documents in the above-captioned matter because:

a.    Nondisclosure of the search warrant documents is necessary to prevent the ongoing investigation from being compromised.

b.    Nondisclosure of the search warrant documents is necessary to protect the privacy of an individual who may ultimately remain unindicted.

This Court also finds that less restrictive alternatives to sealing are impracticable or not appropriate.

It is therefore:

ORDERED that all documents filed in the above-captioned matter are hereby sealed until the close of business on **January 30, 2027**.

00010266

IT IS FURTHER ORDERED that these documents will be unsealed at the above time unless further compelling interest is shown by the United States for continuing this Order for an additional period of time.

February 2, 2026
Date

The Honorable Dulce J. Foster
United States Magistrate Judge

00010267