UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-25 (LMP/DLM)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NEKIMA LEVY ARMSTRONG, et al.,<br><br>Defendants. | JOINT MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR SELECTIVE OR VINDICTIVE PROSECUTION |

> *For a representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it. An unconditional right to say what one pleases about public affairs is what I consider to be the minimum guarantee of the First Amendment.*

*New York Times Co. v. Sullivan*, 376 U.S. 254, 297, 84 S. Ct. 710, 735, 11 L. Ed. 2d 686 (1964) (Black J., concurring).

## INTRODUCTION

On January 18, 2026, the undersigned Defendants gathered to peacefully protest the actions of agents of the Department of Homeland Security and the policies of the Trump administration which had caused terror, violence, and murder in Minnesota. Because United States government officials up to the highest level objected to the content of the Defendants' speech and the manner in which it was expressed, the Justice Department, at the direction and behest of President Donald J. Trump, prosecuted Defendants for violating 18 U.S.C. § 241, the federal civil rights conspiracy statute, and 18 U.S.C. § 248(a)(2), the

Freedom of Access to Clinic Entrances (FACE) Act. Yet, the Executive Branch, including the Justice Department, since January 2025 has dismissed prosecutions, overturned convictions, and made large monetary payments to others who engaged in actual violent conduct, violated the same federal laws, yet expressed views the Trump Administration agreed with and supported. By seeking to punish the Defendants on the basis of their views, the Justice Department initiated a prosecution in a manner that is unequal, oppressive, and has a clear and dangerous chilling effect on the Defendants and anyone else who wants to voice their opposition to U.S. Government policies. Such selective and vindictive prosecution against the Defendants violates the U.S. Constitution and cannot stand. Defendants therefore move pursuant to Fed. R. Crim. P. 12(b)(3)(A)(iv) that all Counts in the Superseding Indictment be dismissed.

## FACTS

### *I. Facts evidencing selective prosecution*

#### A. The Administration's Announced Intent to Use the FACE Act in a Discriminatory Manner.

The FACE Act has been a matter of special focus for this presidential administration. The law was enacted in 1994 to protect abortion providers against a growing national threat of violence aimed at eliminating women's access to abortion. *See*, *e.g.*, S. Rep. No. 103–117, at 3–11 (1993) (discussing the murder of Dr. David Gunn, who had performed abortions at several Florida clinics, as well as the wave of arson, bombing, chemical attacks, and other threats to clinics and staff that made the FACE Act necessary). According to one report, it was generally successful at reducing attacks and violence. *See*

Gov't Accountability Off., *Abortion Clinics: Information on the Effectiveness of the Freedom of Access to Clinic Entrances Act* (Nov. 1998).

FACE Act prosecutions are relatively uncommon. The Department of Justice issued a report on the FACE Act in April 2026, taking the unusual step of making internal DOJ emails public as exhibits. *See* U.S. Dep't of Just., Off. of Legal Pol'y, *The Biden Administration's Weaponization of the Freedom of Access to Clinic Entrances Act* (2026) [FACE Act Report], tinyurl.com/mp9vfvr8 (last visited Aug. 21, 2026). One of those internal emails included what "should be a complete list of all active/pending FACE cases" as of May 2023. (*See* FACE Act Report, at 622 (Ex. 87, Email from Sanjay Patel).) That list named eleven indictments across the country that were open at that time. (*See id.*) A later email cited in the report estimated that 45–50 individual defendants were charged with FACE Act offenses between January 2021 and May 2024, depending on how people charged with both FACE Act and non-FACE Act violations should be counted. (*See id.* at 707 (Ex. 111, Email from Angela Miller).

This prosecution marks what is generally understood to be the first time in the 30-year history of the FACE Act that anyone has been criminally charged under the provision relating to "place[s] of religious worship." Since the beginning, there have been concerns about constitutionality. According to reporting by CBS News, earlier drafts of the FACE Act Report had noted that career DOJ civil rights attorneys penned a memo during the first Trump administration warning prosecutors that this provision shouldn't be used because it is "unconstitutional and lacks a jurisdictional hook." (*See* Sarah Lynch & Jacob Rosen, *Justice Department Releases Report Accusing Biden-Era DOJ of Uneven Enforcement of*

*FACE Act Law*, CBS News (Apr. 14, 2026), perma.cc/Y3TW-Q6QX.) Reference to that memo was removed from the final draft of the report. (*See id*.)

To the current administration, the FACE Act was a tool of Biden-era oppression.[1] Within days of inauguration, the president pardoned 24 people for FACE Act violations, some of whom had been convicted of two or even three separate violations in different jurisdictions. (*See* Exec. Grant of Clemency (Jan. 23, 2025), perma.cc/3348-GTVJ.) Days later, the Department of Justice issued a policy statement on FACE Act charging policy. (*See* Memorandum from Chad Mizelle, Chief of Staff to the Att'y Gen. of the U.S., to Kathleen Wolfe, Supervisory Official of the C.R. Div. 1 (Jan. 24, 2025) [Charging Policy Memo], perma.cc/UY45-YQFB.) That policy statement claimed that many Americans considered FACE Act prosecutions to be the "prototypical example" of the "weaponization of the federal government" and "weaponization of law enforcement." (*See id*.) Going forward, the statement dedicated the DOJ to content-based enforcement of the FACE Act:

> To ensure that federal law enforcement and prosecutorial resources are devoted to the most serious violations of federal law, future abortion-related FACE Act prosecutions and civil actions will be permitted only in extraordinary circumstances, or in cases presenting significant aggravating factors, such as death, serious bodily harm, or serious property damage. Cases not presenting significant aggravating factors can adequately be addressed under state or local law. Additionally, until further notice, no new ***abortion-related*** FACE Act actions—criminal or civil—will be permitted without authorization from the Assistant Attorney General for the Civil Rights Division.

[1] An informative discussion of how the FACE Act became a target of conservative policymakers, and how the administration was prepared to address this law so immediately, is included in Complaint, *Doddamani v. Blanche*, 1:26-CV-2885, ECF Doc. 1 at 12–16 (D.D.C. Aug. 17, 2026).

(Charging Policy Memo (emphasis added).) The memo went on to order the dismissal with prejudice of three pending criminal and civil cases, including ongoing cases against Calvin Zastrow, who had just been pardoned for two prior FACE Act convictions. (*See id.*)

The administration has worked hard to ensure top-down compliance with its directives. Soon after the FACE Act charging policy memo, the Attorney General's Office issued a general policy regarding "zealous advocacy on behalf of the United States." (Memorandum from Att'y Gen. (Feb. 5, 2025), www.justice.gov/ag/media/1388521/dl?inline (last visited Aug. 21, 2026).) The memo effectively demanded loyalty by line attorneys to the administration's policies, threatening that they could be disciplined or even fired if their "personal political views or judgments" led them to decline to appear in court, sign briefs, or in any way delay or impede the "Department's mission." (*See id.*) The Department's mission and the president's mission must be parallel, with no room for "the personal political views or judgments" of line attorneys, because the president must not be deprived of the benefit of "his lawyers." (*See id.*)

### B. The Administration's Permissive Attitude Toward Church Invasions by ICE.

On the very first day of the new administration, the Department of Homeland Security issued a memorandum rescinding prior Guidelines for Enforcement Actions in or Near Protected Areas. (*See* Memorandum from Benjamine C. Huffman, Acting Sec., DHS (Jan. 20, 2025) [Enforcement Actions Memo], https://www.dhs.gov/sites/default/files/2025-03/25_0120_S1_enforcement-actions-in-near-protected-areas.pdf (last visited Aug. 21, 2026).) Prior policy stretching back to the 1990s had restricted ICE enforcement actions in

churches, and a 2021 policy said that, "[t]o the fullest extent possible, [DHS] should not take the enforcement action near protected areas," such as "place[s] of worship or religious study[.]"[2] Except in limited, defined circumstances, enforcement actions were not to take place in or near protected areas without prior approval. (*See id*. at 3–4.)

Rescinding these restrictions, the new guidance only required agents to rely on their own discretion and "common sense." (*See* Enforcement Actions Memo.) Courts have recognized that this new policy places significant burdens on religious exercise. Faith groups around the country have sought and obtained injunctions to prevent the new policy, arguing that it burdened their ability to worship communally and minister to immigrant communities, which they considered "fundamental to their religious exercise." *See Philadelphia Yearly Meeting of the Religious Soc'y of Friends v. DHS*, --- F.4th ---, No. 25-1512, 2026 WL 2409055 at *1, *13 (4th Cir. Aug. 18, 2026) (affirming partial grant of preliminary injunction to various Quaker, Sikh, and Baptist organizations); *see also New England Synod v. DHS*, 824 F.Supp.3d 118, 167 (D. Mass. 2026) (granting preliminary injunction to various religious groups prohibiting ICE activity "inside a church, at the entrance to a church, at a religious education facility (such as a Sunday school), at a religious social-service facility (such as a day-care center), or on adjacent church property (such as a parking lot)" unless authorized by a warrant).

---

[2] Memorandum from Alejandro Mayorkas, Sec., DHS (Oct. 27, 2021). The memorandum has been removed from the DHS website, but it is included as Exhibit 20 (R. Doc. 28-21) in the Joint Appendix filed in *Philadelphia Yearly Meeting of the Religious Soc'y of Friends v. DHS*, --- F.4th ---, No. 25-1512.

The *New England Synod* injunction has been openly violated in Minnesota. As shown in documents filed with a discovery motion in *United States v. Sant*, No. 26-CR-115 (KMM/DTS), ECF Doc. 212 and 212-19, an undercover ICE officer entered University Baptist Church in Minneapolis in the Twin Cities on May 29, 2026, staying for approximately two hours and recording conversations with people inside the church with a concealed microphone. That church was designated as a "Protected Location" on every list provided to DHS, the first of which was on February 27, 2026, and indeed although not required to do so the church had signs posted on all entrances at University Baptist stating, "These Premises are a Protected Area Pursuant to Federal Court Order in New England Synod v. Department of Homeland Security, Case No. 4:25-cv-40102-FDS." *See* Notice of Defendant's Non-Compliance and Motion for Order to Show Cause, *New England Synod v. DHS*, 4:25-CV-40102 (FDS), ECF Doc. 117 at 3–4 (D. Mass. Aug. 20, 2026) (discussing the *Sant* revelations).

C. Individuals with Beliefs the Administration Favors Have Been Pardoned or Rewarded.

i. The administration has pardoned numerous people convicted of more egregious FACE Act violations.

There were four indictments included in the Inauguration Week pardons. Despite the administration's claims that these involved mere "peaceful protesters," the facts of many of these cases show clear violations of the FACE Act. In the first, ten defendants had traveled from various states to blockade a clinic in Washington, D.C. *See* Indictment, *United States v. Handy et al.*, 22-CR-96 (CKK) ECF Doc. 1 (D.D.C. Mar. 24, 2022). In forcing their way into the clinic, the defendants pushed aside one medical specialist who

was trying to hold the door against them, they pushed the clinic's administrator until she fell backwards into a chair, and they pushed a nurse and caused her to sprain her ankle. (*See* Gov't's Sent. Memo., *United States v. Handy*, 22-CR-96 ECF Doc. 543 at 3–5 (citing the trial record).) The group made entrance into the clinic's treatment area inaccessible. One pregnant woman, experiencing labor pains and in need of immediate medical attention, could not access care and, while she lay on the ground, was accosted by one of the defendants, who pushed her down to keep her from accessing the facility. (*See id*. at 6.) While all this was happening, one of the conspirators announced the group's intent on Facebook ("No one dies today!") and livestreamed their actions. (*See id*. at 6–7.)

Two prosecutions listed in the pardon order involved overlapping groups of people who worked together to blockade a clinic in Tennessee and then two clinics in Michigan. (*See* Pardon Order (listing Caroline Davis, Eva Edl, Chester Gallagher, Heather Idoni, Calvin Zastrow, and Eva Zastrow as defendants in both *United States v. Chester Gallagher et al*., 3:22-CR-327 (M.D. Tenn.), and *United States v. Calvin Zastrow et al*., 2:23-CR-100 (E.D. Mich.).) The stated intent in both incidents was to blockade clinic entrances, which they accomplished for several hours.

In both Michigan and Tennessee, Chester Gallagher used his prior experience in law enforcement to waste law enforcement's time and extend the blockade to "prevent as many people as possible from getting into the facility." (*See* Sent. Tr., 3:22-CR-327 ECF Doc. 795 at 44, 47; Gov't's Trial Br., 2:23-CR-20100, ECF Doc. 335 at 5 (describing a livestreamed video explaining how to engage police in conversation to prolong the blockade, telling his viewers, "[T]hat's what obstructing the door of an abortion clinic is

about and why it's so successful. We are here blocking access so the doors can't open.").) Each event was publicized in advance and livestreamed via social media, and the sentencing judge in Tennessee noting that the intent was to inspire and educate other protesters seeking to blockade clinics.

Another defendant pardoned was found guilty of placing locks on the door of a Planned Parenthood location that had to be sawed off before staff or patients could access the building. (*See* Gov't Sent. Memo, *United States v. Moscinski*, No. 22-485 (SLT), ECF Doc. 28 at 1 (E.D.N.Y. Jun. 20, 2023).) Even after the locks were sawed off, he laid down in front of the gates. (*See id*.) He later went on a recorded interview and admitted that his motivation "was to try to keep that Planned Parenthood closed for as long as possible[.]" (*Id*. at 2.) He had a long history of similar conduct stretching back five years and was prosecuted by the state before his federal conviction. (*See id*. at 2–3.)

The most disturbing case involved a woman with a lengthy history of protesting outside a Manhattan health center who, one day after livestreaming her intent to "terrorize this place," went into the center and used her body to barricade the door and keep people from entering. (*See* Indictment, *United States v. Williams*, No. 1:22-CR-684 (JLR), ECF Doc. 2 at 3–4 (S.D.N.Y. Dec. 13, 2022).) She later bragged that, because of her actions, only one couple was able to come into the facility that day. (*See* Sent. Tr., *Williams*, ECF Doc. 151 at 50.)

In barricading the door, she crushed a worker's hand in the door with such force that it took three people to pry the door open. (*See id*. at 49.) Not only did she ignore the worker's cries of pain, she also sang, "We Shall Not Be Moved." (*See id*.) This was caught on video,

and the sentencing judge noted that after the assault she was smiling at the camera, without remorse. (*See id.*) The judge determined that, under the guidelines, this was an assault with a deadly weapon with intent to cause injury. (*See id.* at 14–15.)

All of these recidivist offenders, no matter the level of violence employed, received full and complete pardons.

ii. The administration paid out over $1 million in a suspicious settlement with an anti-abortion protester acquitted of FACE Act charges.

Mark Houck was charged with assaulting an elderly clinic escort, pushing him twice to the ground and causing him bodily harm while Houck tried to speak to a pregnant woman and convince her to go to his crisis pregnancy center rather than to Planned Parenthood. (*See* Order, *Houck v. United States*, 24-CV-2151, 2025 WL 725261 at *1 (E.D. Penn. Mar. 6, 2025) (citing the indictment and trial transcripts).) He was acquitted of these charges at trial. Then, Houck and his family sued under the Federal Tort Claims Act, alleging malicious prosecution, retaliatory prosecution, abuse of process, false arrest, assault, and (on behalf of his wife and children only) intentional infliction of emotional distress. (*See id.* at *3.)

The United States moved to dismiss the lawsuit, arguing lack of jurisdiction and failure to state a claim. (*See id.*) Even accepting the plaintiffs' factual allegations as true, the district court dismissed all the alleged claims, finding them "not plausible[.]" (*See id.* at *3 (discussing standard), *10 (finding that "none of Plaintiffs' claims is plausible").

Houck, though, had remarkable success on appeal, without even having to do anything. Houck and his family filed their notice of appeal on March 12, 2025. (*See* Notice of Appeal,

*Houck v. United States*, No. 25-1433, ECF Doc. 1 (3d Cir. 2025).) On May 5, 2025, Houck filed a motion to extend time for filing his opening brief, citing among other reasons the fact that "Appellants and Appellee United States are interested in resolving this matter through settlement and would like additional time for discussions." (*See* Joint Motion, No. 25-1433, ECF Doc. 13 at 2 (3d Cir. 2025).) About six weeks later, the parties moved to stay the briefing schedule, explaining that "Appellants and the United States are interested in exploring whether they can resolve this matter through settlement" and so a stay "would enable the parties to continue those negotiations[.]" (*See* Joint Motion, No. 25-1433, ECF Doc. 16 at 1–2 (3d Cir. June 18, 2025).)

Those negotiations quickly paid off for Houck. The parties informed the appellate court on January 5, 2026, that a settlement had been reached, subject to "final approval by the U.S. Attorney General's delegate with settlement authority." (*See* Joint Status Report, No. 25-1433, ECF Doc. 16 at 1–2 (3d Cir. June 18, 2025).) A month later, Houck moved to dismiss his appeal with the appellee's consent. (*See* Motion to Dismiss, No. 25-1433, ECF Doc. 27 (3d Cir. Feb. 10, 2026).)

Without the Department of Justice ever even attempting to defend the United States against FTCA claims deemed "not plausible" by the district court, the administration reportedly agreed to pay Houck over $1 million. (*See* Ryan Foley, *Pro-Life Activist Mark Houck Wins 7-Figure Settlement in Suit Against Biden DOJ: "A Huge Victory,"* CHRISTIAN POST (Apr. 13, 2026), https://www.christianpost.com/news/pro-life-activist-mark-houck-wins-7-figure-settlement.html (last visited Aug. 21, 2026).) One commentator

praised the outcome, expressing gratitude that, after "so much persecution from the DOJ under Biden," now "President Trump has corrected that." (*Id.*)

To be clear, this payout was not (officially) part of the planned $1.776-billion Anti-Weaponization Fund that was announced a month later, a fund later described by a district court judge as a "slush fund disguised as a settlement . . . doling the money out to whatever constituency the Executive wants bankrolled." (*See* Sanctions Order, *Trump v. IRS*, 1:26-CV-20609, ECF Doc. 106 at 35–36 (S.D. Fla. July 13, 2026) (quoting *Keepseagle v. Perdue*, 856 F.3d 1039, 1058 (D.D.C. 2017) (Rogers, J., dissenting).) Then-Acting Attorney General Todd Blanche testified to Congress that this fund would not be moving forward. (*See* Sanctions Order, *Trump v. IRS*, 1:26-CV-20609, ECF Doc. 106 at 35–36 (S.D. Fla. July 13, 2026) (citations omitted).)

But there are other means of handing money to favored constituencies. Asked to respond to claims that he was using Department of Justice funds to accomplish the same result as the anti-weaponization fund, the Attorney General recently said, "The fund is dead, or whatever word you want to use. It never started, so it's not as if the fund is coming back," and he accused those critics of not being honest. (*See* Fox News, *Blanche FIRES BACK at Schiff over Weaponization Claims* at 2:27–4:16 (Aug. 16, 2026), www.youtube.com/watch?v=kvZfzsxR61A (last visited Aug. 21, 2026).) Notably, though, he did allow that the Department really had been weaponized in the prior administration and so, "to the extent that anybody in this country feels that a tort has been committed against them by the government, they can sue[.]" (*Id.* at –4:16.) He was not asked to comment on the Houck settlement.

D. Individuals with the "Wrong" Beliefs Face Different Justice.

i. The administration has fired line prosecutors for bringing FACE Act prosecutions.

It was not enough to simply pardon the anti-abortion protesters. The administration has taken the unusual step of punishing those involved in bringing the prosecutions in the first place. Many Assistant U.S. Attorneys in the civil rights division left the department, but the administrator fired at least four who remained and had been involved in FACE Act prosecutions. (*See* Sarah Lynch & Jacob Rosen, *DOJ Fires at Least 4 Prosecutors Involved in FACE Act Cases During Biden Administration*, CBS News (Apr. 13, 2026), perma.cc/V32P-74LE.) The Justice Department acknowledged that they had "terminated the employment of personnel responsible for weaponizing the FACE Act who still remained at the department." (*Id.*; *see also* DOJ Rapid Response (@DOJRR47), Twitter (Apr. 13, 2026, at 17:09 ET), perma.cc/9NWR-42VV.) To drive home the point, the four attorneys were fired the day before the department issued its *FACE Act Report*. (*See* Complaint, *Doddamani v. Blanche*, 1:26-CV-2885, ECF Doc. 1 at 27–28 (D.D.C. Aug. 17, 2026) (lawsuit filed by a former Assistant U.S. Attorney who had participated in the prosecution of Calvin Zastrow and others in Michigan).)

ii. There were no pardons for people who vandalized crisis pregnancy centers.

The FACE Act Report attempts to portray a Biden administration unwilling to prosecute violations involving crisis pregnancy centers or churches. But, at the same time, the report is forced to acknowledge that the Biden administration did prosecute several defendants for their acts of vandalism against crisis pregnancy centers. The report describes four

defendants in Florida, one in Ohio, and one in Texas, who were all prosecuted and convicted by the Biden administration for vandalizing crisis pregnancy centers with spray paint. (*See* FACE Act Report at 31, 33–35.) Although some of the spray-painted messages were vaguely threatening (one message read "If abortion isn't safe neither r u!"), nobody was harmed or threatened or even present when the centers were vandalized, no one was prevented from accessing the centers, and only in the Florida case were any of the participants repeat offenders. Even though they involved federal prosecutions for relatively minor property damage, not one of these defendants received a pardon.

The report, as with many other statements about "weaponization," suggests that the Biden administration was ignoring attacks on churches. The report lists no examples of such incidents that were being ignored. Indeed, many cases were being prosecuted under provisions of 18 U.S.C. § 241, 247, and 249. (*See* Complaint, *Doddamani v. Blanche*, No. 1:26-CV-2885, ECF Doc. 1 at 23 n.12 (listing seven such prosecutions).)

iii. Church protests in Florida and Texas similar to this one were not subject to FACE Act prosecution.

About a year before the incident at issue in this case, a similar disruption occurred in a church in Orlando, Florida. (*See* Michael Cuglietta & Natalia Jaramillo, *"A New Level of Anger": Demonstrators Disrupt Worship, Protest at Orlando Churches*, Orlando Sentinel (Mar. 23, 2025), https://www.orlandosentinel.com/2025/03/23/a-new-level-of-anger-demonstrators-disrupt-worship-protest-at-orlando-churches/ (last visited Aug. 21, 2026).) Protesters had been asked by police to vacate the parking lot at Broadway United Methodist Church, where they had been "blasting Christian music, trying to cast out demons[.]" (*See*

*id.*) The protesters went from there to Joy Metropolitan Ministries (JMM) and acted as if they were there for the service. (*See id.*) JMM is an "unapologetically gay" church that served as a haven after a mass shooting left 49 people dead and another 58 wounded at Pulse, a gay nightclub in Orlando. (*See id.*) Knowing that this was a safe space for the LGBTQ community, the protesters rose up during the children's sermon and started shouting, "Synagogue of Sin!" at the congregants. (*See id.*; *see also* Heather Hahn, *Orlando Churches Face Anti-LGBTQ Protests*, United Methodist Church News (Apr. 11, 2025), https://www.nyac.com/newsdetail/orlando-churches-face-anti-lgbtq-protests-19044335 (last visited Aug. 21, 2026).) The service was interrupted, and the church had to start singing and playing music to drown out the protesters until eventually they left before the police came. (*See id.*) A video of the incident shows the protesters recording their disruption. (*See* WFTV Channel 9, *Christian Protesters Disrupt Church Worship Services* at 0:43–0:58, www.youtube.com/watch?v=HfdDqafk_R0 (last viewed Aug. 21, 2026).

The articles make plain that these are not isolated incidents, causing ongoing problems for LGBTQ churches in Orlando. As quoted in the Orlando Sentinel article, one of the protesters stated their goal plainly: "We want to clarify that we are not merely protesting outside LGBTQ-affirming churches—we are there to shut them down in the name of Jesus," before promising further attempts in the future. These incidents have led to no federal investigations and no FACE Act charges.

Nor was Orlando the only site of these kinds of church protests. In November 2025, a Republican Congressional candidate disrupted another LGBTQ-welcoming church, Faith United Church of Christ in New Braunfels, Texas, standing up during services to shout, "I

would say homosexuality is a sin and whoever supports that is worthy of death." (Valentina Gomez, @ValentinaforUSA, Twitter (Nov. 23, 2025), https://x.com/ValentinaForUSA/status/1992684596643962952 (last visited Aug. 25, 2026).) The candidate recorded the incident and posted it on her Twitter page for all her followers (currently over 672,000) to see, and the post remains up to this day. The church had been subject to protests in the past and, like JMM in Orlando, the protestors had a plan to drown out the speech with song. (*See* Faith UCC – New Braunfels, Facebook (Nov. 29, 2025), https://www.facebook.com/FaithUCCNewBraunfels/posts/pfbid02hoyEZb3W64BH4azHQC2rmrq5hRrhGrMttbtCQq2Zxg8TePkEKktSqaJjQLE79h9Sl (last visited Aug. 25, 2026).) As in Orlando, no federal charges and no federal indictment ensued.

iv. The Cities Church protest was investigated for FACE Act charges from the very beginning.

The day after the protest at Cities Church, legions of federal agents started interviewing witnesses, and it was clear from the questions agents asked in those first interviews on Monday, January 19th, that there was already a decision made to use the FACE Act. Numerous reports show that the agents were trying to set up a FACE Act prosecution, because the witnesses even on just that first day made "statements" that only make sense as responses to leading questions derived from the language of the statute. (*See*, *e.g.*, Ex. 1 (witness "noted that his freedom to exercise his religious rights were impeded"); Ex. 2 (different witness "stated he felt like he was unable to freely express his rights during the incident"); Ex. 3 (yet another witness said he and his family "did not feel that they could

freely practice their faith”); Ex. 4 (still another witness “stated he did not feel like he was able to freely exercise his religious rights”); *cf.* 18 U.S.C. § 248(a)(2) (referring to persons “lawfully exercising or seeking to exercise the First Amendment right of religious freedom”).

*II. Facts evidencing vindictive prosecution.*

A. Operation Metro Surge

In early December 2025, reports began to emerge about an immigration enforcement operation in Minnesota which, initially, was said to target the Somali community; people President Donald Trump said were "completely taking over the once great State of Minnesota" and who he described as "garbage." See "A timeline of Trump's immigration crackdown in Minnesota," PBS News, February 13, 2026 (hereafter "Timeline") (available at https://www.pbs.org/newshour/nation/a-timeline-of-trumps-immigration-crackdown-in-minnesota (last checked August 22, 2026).

Within days, protests against the federal government's actions in Minnesota began and soon became commonplace throughout the Twin Cities. Id. According to PBS, the protests quickly evolved into "a widespread network of residents working to help immigrants, warn people of approaching agents or film immigration officers' actions to share with the world." Id.

By late December 30, 2025, FBI Director Kash Patel and then Department of Homeland Security Secretary Kristi Noem announced there would be a surge of federal officers into Minnesota, purportedly to investigate alleged fraud in the Somali community. See "Surge in federal officers in Minnesota focuses on alleged fraud at day care centers," Associated

Press, December 30, 2025 (Available at https://apnews.com/article/minnesota-fraud-immigration-enforcement-somali-76e246b70d582f1dd42f1242cf7d7a66; last checked August 22, 2026). It soon became evident that the surge was much broader involving as many as 2,000 federal agents and officers deployed to the Minneapolis area for a sweeping crackdown on immigration. See "DHS deploys 2,000 federal agents to Minneapolis area to carry out 'largest immigration operation ever,'" Minn Post, January 6, 2026 (available at https://www.minnpost.com/metro/2026/01/dhs-deploys-2000-federal-agents-to-minneapolis-area-to-carry-out-largest-immigration-operation-ever/; last viewed August 22, 2026). The deployment represented "one of the largest single-city mobilizations of Department of Homeland Security personnel in years" and included agents from Homeland Security Investigations. Id.

On January 7, 2026, Renee Good, a 37-year-old U.S. citizen and mother of three, was shot and killed by an ICE agent in Minneapolis. Timeline. Then Secretary Noem attacked Ms. Good claiming the incident was "an act of domestic terrorism" while Vice President J.D. Vance echoed the allegations of assaultive behavior against the victim of the ICE shooting. Id.

On January 14, 2026, an ICE officer shot at two Venezuelan men, Alfredo Aljorna and Julio Sosa-Celis, who were in their home behind a closed door striking Sosa-Celis in the leg and claimed, falsely, that he fired at the men because they were attacking him with a shovel and a broom. Id. See also *United States v. Alfredo Aljorna* et al, 26-mj-23 (DJM). Then Secretary Noem falsely characterized the shooting as "an attempted murder of federal law enforcement" and that the officer "was ambushed and attacked by three individuals

who beat him with snow shovels and the handles of brooms." See "DHS Releases More Details About the Three Violent Criminal Illegal Aliens Who Violently Beat a Law Enforcement Officer with Weapons," Department of Homeland Security, January 15, 2026; (available at https://www.dhs.gov/news/2026/01/15/dhs-releases-more-details-about-three-violent-criminal-illegal-aliens-who-violently; last checked August 22, 2026).

On January 24, 2026, Alex Pretti, a 37-year-old intensive care nurse at the VA hospital was shot and killed by a U.S. Border Patrol officer when Pretti was engaged in peaceful protest in Minneapolis. Timeline. Secretary Noem soon thereafter falsely claimed that Pretti committed an "act of domestic terrorism" against immigration agents. "Noem says her response to Pretti shooting may have been wrong," Politico, January 29, 2026 (available at https://www.politico.com/news/2026/01/29/noem-pretti-shooting-00756830; last checked August 22, 2026). In a social media post the same day, Vice President Vance blamed Pretti's shooting on those who opposed Operation Metro Surge writing "This level of engineered chaos is unique to Minneapolis. It is the direct consequence of far left agitators, working with local authorities." (See https://x.com/JDVance/status/2015285455940399296?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E2015285455940399296%7Ctwgr%5E253fe54dea8104baf1f62d5321338a89ea44070e%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.foxnews.com%2Fpolitics%2Fvance-calls-minneapolis-unrest-engineered-chaos-after-deadly-federal-shooting-incident; last checked August 22, 2026)

B. The Protest at the Cities Church and Its Aftermath.

On January 18, 2026, the Defendants, in an act of peaceful protest, entered the Cities Church interrupting the services by chanting "ICE out," "Justice for Renee Good," "Hands Up, Don't Shoot!," and other statements. *See* Timeline; *see also* (ECF 144) Superseding Indictment at pp. 11-15, Overt Acts #s 23-31, 38.

On January 20, 2026, at 12:37 a.m., President Trump posted on Truth Social:

> Just watched footage of the Church Raid in Minnesota by the agitator and insurrectionists. These people are professionals! No person acts the way they act. They are highly trained to scream, rant, and rave like lunatics, in a certain manner, just like they are doing. They are troublemakers who should be thrown in jail, or thrown out of the Country. The first to go should be Walz, and Fake Sleazebag Ilhan Omar, who is supposedly worth over $30 Million Dollars, even though she's never had anything but a Government job. Investigate these Corrupt Politicians, and do it now!

https://truthsocial.com/@realDonaldTrump/posts/115926042315145030 (last visited August 22, 2026).

Within hours of President Trump's direction on social media, the first group of defendants in the instant case were charged by Complaint with violations of the FACE Act, 18 U.S.C. § 248(a)(2), and 18 U.S.C. § 241. (ECF 23, Criminal Complaint. *United States v. Armstrong et al*, 26-mj-40-DLM).

In a conference call in late January 2026, Associate Deputy Attorney General Aakash Singh ordered federal prosecutors to aggressively prosecute people protesting ICE's operations in Minnesota encouraging that prosecutors "Go big," "and go loud." *See* "Go Big and Go Loud": Inside the Justice Dept.'s Push to Prosecute Protesters, New York Times, March 19, 2026, https://www.nytimes.com/2026/03/19/us/politics/justice-dept-

prosecute-protesters.html?eafs_enabled=false (last visited August 24, 2026). The basis for prosecuting demonstrators was National Security Presidential Memorandum (NPSM) 7 which President Trump issued on September 25, 2025. *Id.* In NPSM 7, President Trump directs the Secretary of State, the Secretary of the Treasury, the Attorney General, and the Secretary of Homeland Security to develop a strategy to "investigate, prosecute, and disrupt entities and individuals engaged in acts of political violence and intimidation designed to suppress lawful political activity or obstruct the rule of law." *See* NPSM 7, Ex. 1 at 3. The Presidential directive included that all federal law enforcement agencies prioritize investigations of alleged violations of 18 U.S.C. § 241 amongst other offenses. *Id.* at 4.

Then Attorney General Pam Bondi soon thereafter issued a memorandum to all federal prosecutors and law enforcement agencies with directive on implementing NSPM-7 (the "Bondi Memorandum"). *See* Memorandum for All Federal Prosecutors Law Enforcement Agencies department of Justice Grant-Making Companents, from Attorney General Pam Bondi, date December 4, 2025; https://www.documentcloud.org/documents/26371599-bondi-memo-on-countering-domestic-terrorism-and-organized-political-violence-1/ (last viewed August 27, 2026). The Bondi Memorandum first defines "domestic terrorism" in relation to criminal conduct involving acts "dangerous to human life that *appear to be* intended to intimidate a civilian population" or influence the "policy" or "conduct of government" through intimidation, coercion, mass destruction, assassination, or kidnapping. Id. at pp. 1-2. Echoing NSPM-7, the Bondi Memorandum ties "domestic terrorism" to those with "extreme viewpoint on immigration, radical gender ideology, and

anti-American sentiment." Id. at p. 2. The Bondi Memorandum advises that "political and social agendas" common to "domestic terrorists" include "opposition to law and immigration enforcement; extreme views in favor of mass migration and open borders; adherence to radical gender ideology, anti-Americanism, anti-capitalism, or anti-Christianity;" and "hostility towards traditional views on family, religion, and morality." Id. The Bondi Memorandum then directs federal law enforcement agencies to investigate and federal prosecutors to prosecute all acts deemed crimes by "violent extremist groups" with potential charges including conspiracy against rights in violation of 18 U.S.C. §. 241. Id. at pp. 2-4.

Furthering the purpose of the Bondi Memorandum to fully execute NSPM-7, according to Deputy Attorney General Singh, President Trump is the "Chief Client" of the United States Department of Justice, and anyone within the Justice Department who is uncomfortable with advancing his personal directives must step aside. *See In-Your-Face DOJ Aide Rides Prosecutors for "Chief Client" Trump,* Bloomberg Law, February 19, 2026, https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump (last visited Aug. 22, 2026). These remarks, delivered in January 2026, were seen as directly referencing events in Minnesota. *Id.* In his role as deputy attorney general, every federal prosecutor and every federal agent in America reports to Singh. *Id.* Consequently, prosecuting individuals protesting against Trump administration policies has become a focus of the Justice Department. *See Donald Trump's Transformation of the Department of Justice Will Be Hard to Undo*, The Economist (July 16, 2026), https://www.economist.com/united-states/2026/07/16/donald-trumps-

transformation-of-the-department-of-justice-will-be-hard-to-undo (last visited Aug. 24, 2026).

That Defendants are being prosecuted for espousing views the Trump Justice Department disagrees with is demonstrated by what HSI deems "of interest" to this prosecution in a search of some of the protesters' cell phones. For example, in a search of Defendant Emmar Pineda Moreno's cell phone, HSI agents deemed the following to be "of interest" to this criminal prosecution:

- Google searches related to "ICE OUT" and Alex Pretti
- ChatGPT messages related to Department of Homeland Security Funding
- Safari history queries related to ICE, Trump, anti-ICE apparel, and constitutional observer training
- Email messages and calendar events relating to protests, fundraising, "anti-ICE," and "anti-Trump"
- A political contribution to ACTBLUE.

*See* HSI Report, Ex. 2 (Apr. 3, 2026) (beginning at document number 06716).

In contrast to the prosecution initiated against the Defendants by President Trump's Department of Justice, the City Attorney of the City of St. Paul, the jurisdiction in which the Cities Church protest occurred, has determined that nothing that occurred at the Cities Church on January 18, 2026, warrants criminal prosecution. In a statement sent to Minnesota Public Radio news on or about June 2, 2026, St. Paul City Attorney Irene Kao wrote:

> Our office has a legal and ethical obligation to file charges only when the available evidence establishes probable cause and supports a reasonable likelihood of conviction beyond a reasonable doubt. Following a careful evaluation of the video footage, investigative reports, and other available materials, prosecutors determined that the current evidence is insufficient to meet that standard for criminal charges under Minnesota state statutes.
>
> The right to peacefully protest is protected, as is the right to exercise one's religious beliefs. Balancing these equally important rights is paramount to our decision today.

*See St. Paul City Attorney Won't File Charges Against Cities Church Protesters*, MPR News (June 3, 2026), https://www.mprnews.org/story/2026/06/03/st-paul-city-attorney-wont-file-charges-against-cities-church-protesters (last visited Aug. 22, 2026).

## ARGUMENT

### *I. The Superseding Indictment should be dismissed as the Government has selectively prosecuted the defendants for exercising their right to freedom of expression, the content and manner of which the government opposes, whereas similarly situated individuals expressing views in a similar manner that the government supports are not prosecuted but in fact rewarded.*

#### A. Legal Standard: Selective Prosecution

"In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute," subject to certain constitutional constraints. *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). "A defendant may demonstrate that the administration of a criminal law is

'directed so exclusively against a particular class of persons . . . with a mind so unequal and oppressive' that the system of prosecution amounts to 'a practical denial' of equal protection of the law." *Id*. at 464–65 (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886)).

To prove selective prosecution, defendants must show, first, that they have been "singled out for prosecution while others similarly situated have not been prosecuted for similar conduct," and, second, that the government based its decision to prosecute "on an impermissible motive such as race, religion, or the exercise of constitutional rights." *United States v. Parham*, 16 F.3d 844, 846 (8th Cir. 1994); *see also Armstrong*, 517 U.S. at 465 (citations omitted). A selective-prosecution claim is not a defense, but rather "an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463.

For discriminatory effect, "some evidence" means "a credible showing" that "similarly situated individuals . . . were not prosecuted." *Armstrong*, 517 U.S. at 465, 470. For discriminatory intent, neither the Eighth Circuit nor the Supreme Court has addressed what "some evidence" means in the context of discriminatory intent for selective prosecution. But selective prosecution claims draw from the equal protection context. *See id*. at 465. Under those standards, courts look to the "impact," "pattern," "historical background," "sequence of events," "departure from normal procedural sequence," and "contemporary statements by the decision-maker" to determine whether an improper motive was at play. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266-68 (1977).

B. The Superseding Indictment Should Be Dismissed as It Results from a Selective Prosecution.

Defendants move under Fed. R. Crim. P. 12(b)(3)(A)(iv) for an order dismissing the Superseding Indictment with prejudice because it constitutes selective prosecution.

i. The administration has been explicit about its discriminatory motives for the FACE Act.

From its very first days, the administration has made no secret of its discriminatory use of the FACE Act. The administration's Charging Policy Memo is explicitly discriminatory. Rather than placing limits on ***all*** enforcement, it restricts only "***abortion-related*** FACE Act prosecutions and civil actions," saying that abortion-related cases not involving "significant aggravating factors" like "death, serious bodily harm, or serious property damage" should be left to be prosecuted under state and local law. (*See* Charging Policy Memo.)

That they meant what they said is clear in the present indictment. No death, no serious bodily harm, and no serious property damage, and yet the Defendants here face a federal felony indictment where the local authorities found no basis for even state misdemeanor charges. And, indeed, the St. Paul City Attorney explained her decision in terms evocative of the Charging Policy Memo, noting that "acts of violence, property destruction, or threats to public safety – none of which occurred here – remain serious concerns and will be prosecuted when supported by admissible evidence." Mara Gottfried, *St. Paul City Attorney Says Evidence Doesn't Support State Charges in Cities Church Protest*, Pioneer Press (June 2, 2026), www.twincities.com/2026/06/02/st-paul-city-attorney-no-charges-cities-church-protest/ (last visited Aug. 22, 2026).

The historical background shows that nothing about this prosecution has been part of a "normal procedural sequence," as is amply documented in "contemporary statements by the decision-maker." As is discussed in more detail below in the discussion of vindictive prosecution, the decision was quickly made at the highest levels of government to prosecute these protesters. As shown in the interview reports conducted the day after the incident, that decision specifically involved an intent to use the FACE Act.

This is the first prosecution for a nonviolent church protest in the more than 30 years of the FACE Act. It is the type of conduct that the administration specifically says would not be charged if it were "abortion-related." As is discussed in more detail below, the administration has acted consistently to favor anti-abortion and anti-LGBTQ protesters while using the FACE Act to punish viewpoints the administration opposes.

The administration's claims that this prosecution is based on a desire to protect the right to practice religion is disproved by the extraordinary freedom it has granted ICE to violate the sanctity of churches. Undoing years of practice, the administration has taken off any limitations on ICE enforcement activities in and around churches, despite recognized harms to congregations throughout the country. And ICE has gone even further, engaging in covert espionage within churches in the Twin Cities, even when forbidden from doing so by an injunction.

The administration's motive in prosecuting the Defendants under the FACE Act results from improper and unlawful discrimination.

ii. The administration has systematically employed the FACE Act to reward viewpoints the administration favors while punishing viewpoints it opposes, demonstrating discriminatory effect.

Generally, discriminatory effect can be shown when similarly situated individuals are not prosecuted. Here, the impact is born entirely by the Defendants, the sole group of persons ever charged under the FACE Act's provisions related to places of religious worship.

The administration's discriminatory approach to the FACE Act could not be plainer. In the seminal case of *Yick Wo*, a San Francisco ordinance was used to deny all 200 persons of Chinese descent a laundry license, while granting licenses to 80 persons not of Chinese descent. *See* 118 U.S. at 374. Although the law was nondiscriminatory on its face, the way it was used, based on these numbers, demonstrated that it was "applied by the public authorities . . . with a mind so unequal and oppressive as to amount to a practical denial by the state of . . . equal protection." *Id.* at 373. So too here.

Likewise, in *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F4th 1122, 1133–34 (D.C. Cir. 2023), an anti-abortion group filed suit when their members were arrested under a defacement statute for chalking the message "Pre-Born Black Lives Matter" on public sidewalks, and the group was then denied a permit to publicly proclaim the same message. As the group argued, many people throughout the city were being permitted to write "Black Lives Matter" messages on the street without arrest, and they were also granted permits for their protests. Analyzed under the First Amendment, rather than equal protection, the court determined that this showed a plausible case of viewpoint discrimination. *See id*. at 1142–43. The Foundation failed in its equal-protection argument

because it failed to establish sufficient evidence of the District's "'animus' against the Foundation's viewpoint." *Id.* at 1147–48 (quoting *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020)).

Here, though, animus is demonstrated through the administration's own statements and policies, and in their differential and discriminatory practices toward FACE Act prosecutions. Similarly situated individuals with different viewpoints who, like Defendants, disrupted church services with protests have not been prosecuted. The Orlando and New Braunfels church protests are on point with the present case in every way except for the beliefs of the protesters. In Orlando, numerous protesters went into a church, and then while the service was underway, they stood up and started chanting "Synagogue of Sin!" at the largely LGBTQ congregants. They also livestreamed their protest to their social media followers. Because of its experience with prior incidents and the expectation that more would be coming, the church had a plan, which was to stop its service and play music and sing so the protesters could not be heard. Eventually the protesters left, but they successfully disrupted the service in the middle of the children's sermon. Similarly, in New Braunfels, a Republican congressional candidate with more than half a million followers filmed herself standing up during services to shout at congregants that they were "worthy of death."

Unlike here, no federal charges resulted from those protests. The president and attorney general did not go on social media to demand arrests. As far as counsel is aware, there was never so much as a federal investigation of either incident.

But the discriminatory effect of the administration's policies goes beyond similarly situated individuals who were not prosecuted, because the administration has taken extraordinary viewpoint-discriminatory actions toward prior prosecutions.

To be clear, the Defendants here differ not just in viewpoint. Their protest was peaceful, while those engaged in violent and recidivist FACE Act violations have been pardoned or seen their cases dismissed because the administration supports their anti-abortion viewpoint. The administration has even rewarded one anti-abortion FACE Act defendant who twice shoved a Planned Parenthood volunteer to the ground with a more than $1 million settlement. Individuals who merely vandalized crisis pregnancy centers have not been rewarded with dismissals and settlements. And the administration doubled down on its viewpoint discrimination by firing the line attorneys responsible for bringing "abortion-related" FACE Act prosecutions, or at least firing those who hadn't already quit.

This administration has engaged in invidious and discriminatory practices in their use of the FACE Act. There is clear evidence of discriminatory effect.

iii. <u>The Superseding Indictment should be dismissed with prejudice.</u>

On Inauguration Day 2025, the new president offered what was presented as a rebuke of the prior president, ostensibly not a statement of purpose for the incoming administration.

> The American people have witnessed the . . . administration engage in a systematic campaign against its perceived political opponents, weaponizing the legal force of numerous Federal law enforcement agencies . . . against those perceived political opponents in the form of investigations, prosecutions, civil enforcement actions, and other related actions. These actions appear oriented more toward inflicting political pain than toward pursuing actual justice or legitimate governmental objectives. Many of these

> activities appear to be inconsistent with the Constitution and/or the laws of the United States, including those activities directed at . . . Americans who spoke out against the . . . administration's actions, and other Americans who were simply exercising constitutionally protected rights.

Exec. Order 14147 (Jan. 20, 2025).

But it is nonetheless an apt description of the present prosecution. This prosecution is "inconsistent with the Constitution" and "oriented more toward inflicting political pain than toward pursuing actual justice or legitimate governmental objectives." This prosecution flows directly from the administration's promise to use the FACE Act in a discriminatory manner.

The criminal provisions of the FACE Act have never before been applied to a nonviolent church protest, a protest that would not have been prosecuted under the administration's policy if it had been "abortion-related." Not only has the administration left similar church protests unprosecuted, but it has also pardoned and dismissed cases involving recidivist and even violent anti-abortion offenders. Nonviolent vandals with the wrong beliefs who spray-painted crisis pregnancy centers with no one around were left unpardoned for their FACE Act convictions. And the administration has gone so far as to reward one anti-abortion defendant acquitted of FACE Act offenses with over $1 million in taxpayer funds under extremely suspicious circumstances.

This selective prosecution is unjust and violates Defendants' constitutional rights. They respectfully ask the Court to order the Superseding Indictment dismissed with prejudice.

*II. The Superseding Indictment should be dismissed as resulting from a vindictive prosecution where the United States Department of Justice seeks to punish the Defendants for expressing opinions they disagree with.*

A. Legal Standard: Vindictive Prosecution

"To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)). The United States Supreme Court has repeatedly recognized this principle and made clear that while the government may certainly penalize an individual for violating the law, "he just as certainly may not be punished for exercising a protected statutory or constitutional right." *Goodwin,* 457 U.S. at 372. As the District Court for the District of Columbia recently observed, "(t)his rationale does not depend on whether the defendant is guilty; instead, it holds that when prosecutors have discretion over charging, they must exercise that discretion legitimately, not as a weapon to punish someone for exercising rights the Constitution protects." *United States v. Carey,* 816 F.Supp.3d 129, 139 (D.D.C. 2026).

"Vindictive prosecution occurs when a prosecutor seeks to punish a defendant solely for exercising a valid legal right." *United States v. Williams,* 793 F.3d 957, 963 (8th Cir. 2015). "A prosecution designed solely to punish a defendant for exercising a valid legal right violates due process." *United States v. Leathers,* 354 F.3d 955, 961 (8th Cir. 2004). Accordingly, a criminal defendant can seek to dismiss the indictment against him on the basis that his prosecution is vindictive. Fed. R. Crim. P. 12(b)(3)(A)(iv); *see United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983) ("Federal courts possess the power and

duty to dismiss federal indictments obtained in violation of the Constitution or laws of the United States."); *Bragan v. Poindexter,* 249 F.3d 476, 482 (6th Cir. 2001) (explaining that courts can dismiss an indictment resulting from a vindictive prosecution).

The vindictive prosecution doctrine applies not only to procedural rights but also to substantive rights, including the First Amendment right to engage in free speech. *United States v. Sanders,* 211 F.3d 711, 717-19 (2d Cir. 2000) (holding that reporter's claim he was subject to vindictive prosecution for an article he wrote failed on the merits but presuming it could support a claim of vindictive prosecution); *United States v. Bucci,* 582 F.3d 108, 114-15 (1st Cir. 2009) (finding that claim of defendant indicted for selling drugs that he was subject to vindictive prosecution for his speech failed on the merits but not questioning that such retaliation would be vindictive if it occurred); *Carey,* 816 F.Supp.3d at 139 (finding that individual prosecuted for acts related to flag burning could raise claim of vindictive prosecution based on evidence the government sought to punish him for exercising his First Amendment rights); *see also United States v. Southern Poverty Law Center, Inc.*, ___ F.Supp.3d ___, 2026 WL 2280675 at *8 (M.D. Ala. Aug. 7, 2026) (finding that defendant could raise vindictive prosecution doctrine based on claim of retaliatory action after having engaged in protected speech). Further, "[a] vindictive or improper motive may be proved either by direct of circumstantial evidence." *Leathers,* 354 F.3d at 961.

A defendant raising a claim of vindictive prosecution has the burden of demonstrating that the government initiated the prosecution in order to punish her for exercising a legal right. *Williams,* 793 F.3d at 963. Prosecutors generally have broad discretion to perform

their duties and a defendant's burden to show vindicative prosecution is a heavy one. *Id.*; *see also Leathers,* 354 F.3d at 961.

Prosecutorial vindictiveness can be established in either of two ways. *Williams,* 793 F.3d at 963. First, a defendant can show actual vindictiveness, "prov[ing] objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something that the law plainly allowed him to do." *Goodwin*, 457 U.S. at 384, 102 S.Ct. 2485; *accord Williams,* 793 F.3d at 963 (noting vindictiveness can be shown through "objective evidence of the prosecutor's vindictive or improper motive"). To meet this high bar, "a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001) (citing *Goodwin*, 457 U.S. at 380 n.12, 102 S.Ct. 2485); *see also Carey,* 816 F.Supp.3d at 142; *United States v. Koh,* 199 F.3d 632, 640 (2d Cir. 1999); *United States v. Adams,* 870 F.2d 1140, 1145 (6th Cir. 1989); *United States v. Monsoor,* 77F.3d 1031, 1034 (7th Cir. 1996); *United States v. P.H.E., Inc.,* 965 F.2d 848, 860 (10th Cir. 1992).

Alternatively, a defendant may rely on a presumption of vindictiveness, but "only in cases in which a reasonable likelihood of vindictiveness exists." *Goodwin*, 457 U.S. at 373, 102 S.Ct. 2485. A defendant must produce sufficient evidence to show a reasonable likelihood of vindictiveness exists. *Williams,* 739 F.3d at 963 (citing *United States v. Chappell,* 779 F.3d 872, 879 (8th Cir. 2015)). The prosecution's actions must be examined in the context of the entire proceedings in determining whether a presumption of vindictiveness applies. *Id.* "[I]f [a defendant] shows that his case fits a general fact pattern

in which there is a 'realistic likelihood' of vindictiveness, then he creates a presumption that his prosecution was vindictive." *Carey,* 816 F.Supp.3d at 141 (quoting *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017)). Once the presumption arises, the burden shifts to the prosecution to rebut it using "objective information in the record" that justifies its action. *Maddox v. Elzie,* 238 F.3d 437, 446 (D.C. Cir. 2001) (quoting *Goodwin,* 457 U.S. at 374). Any objective evidence justifying the prosecutor's actions is sufficient to meet this burden. *United States v. Safavian,* 649 F.3d 688, 694 (D.C. Cir. 2011). If the prosecution meets its burden, it then shifts back to the accused to show that the prosecution's justification is pretextual. *United States v. Meyer,* 810 F.2d 1242, 1245 (D.C. Cir. 1987).

B. The Defendants Have Demonstrated Actual Vindictiveness Where Objective Evidence Shows They Are Being Prosecuted for Expressing Views of a Nature and in a Manner Opposed by the Executive Branch, including the Department of Justice.

The Defendants have demonstrated actual vindictiveness. Objective evidence shows that the Justice Department officials who initiated this prosecution, at the behest and direction of President Donald Trump, harbored genuine animus to the Defendants: individuals who voiced their objections to and protested against the actions of ICE agents in Minnesota. Almost as soon as Operation Metro Surge began in Minnesota, Trump Administration officials sought to attack protesters as violent agitators. The victims of acts of violence and murder by ICE agents were falsely accused of being violent aggressors. Those Minnesotans who protested against Operation Metro Surge were branded violent left-wing agitators.

Against this backdrop, within little more than a day of the protests at the Cities Church, President Trump called for those involved to be "thrown in jail or thrown out of the country." The President's animus against those who disagreed with him politically and opposed his policies was plainly evident when, in the same social media post, he called for both Governor Tim Walz and Congresswoman Ilhan Omar to be investigated.

This prosecution was initiated within hours of President Trump's social media post. Directions from high-ranking Justice Department officials immediately after made clear that federal prosecutors and agents should aggressively investigate and prosecute protesters in Minnesota in general and, it may fairly be inferred, the Cities Church protesters in particular. Indeed, this prosecution is the direct result of the Justice Department's new mission to satisfy the personal animosities of its chief client, Donald Trump. Sadly, this is not at all hyperbole, but the cold hard facts behind this prosecution.

It is also evident that the Defendants would not have been prosecuted but for the Justice Department's animus against them. The record shows that individuals who engaged in the same or much more serious and violent conduct, whether at a progressive liberal church or an abortion clinic, were treated differently. Not only were such similarly situated individuals not prosecuted, they were in many instances rewarded with large monetary payouts from the Justice Department.

Though the bar for dismissal for actual vindictive prosecution is high, in this case the bar has been met. The Superseding Indictment should therefore be dismissed.

C. Alternatively, a Presumption of Vindictiveness Exists Where There Is a Reasonable Likelihood that Executive Branch Policies and Pronouncements Surrounding

Operation Metro Surge Effectively Directed the Department of Justice to Prosecute the Defendants.

Should the Court find that actual vindictiveness has not been shown, the evidence shows that at least a reasonable likelihood of vindictiveness exists. The general facts surrounding the Government's response to people protesting Operation Metro Surge, and the facts of the President's and the Justice Department's response to the Cities Church protest in particular, provide more than sufficient evidence of vindictiveness, and a presumption of vindictiveness is therefore warranted.

The directive from the President and top Justice Department officials could not be clearer: anyone who participated in the Cities Church protest should be prosecuted. The political nature of the prosecution was also clear: the Cities Church protesters should be prosecuted because of their expressions against the Trump Administrations unprecedented ICE operations in Minnesota. Tellingly, President Trump's social media post from January 20, 2026, makes no mention of protecting the right of Cities Church members to freely exercise their religion. Instead, the President tasks his Justice Department with prosecuting the Cities Church protesters for the views they expressed just as Governor Walz and Representative Omar should be investigated for their political views, though they were not present and had nothing to do with the Cities Church protest.

The evidence of vindictiveness is much more than this single Presidential social media post. This was merely the trigger for everything that followed, including the initial Complaint, the Indictment, and the Superseding Indictment. The commands from Deputy Attorney General Singh were clear: the Justice Department must carry out the President's

directives with respect to Minnesota anti-ICE protesters and anyone within the Justice Department, including the United States Attorney's Office for the District of Minnesota, who was not willing to do that must stand aside.

Examining the actions in bringing this prosecution in light of all of the surrounding circumstances, the entire context of Operation Metro Surge, and the demonstrated and long-standing dictates from the Executive Branch to prosecute those who protest against and criticize the President's policies; there is a reasonable likelihood that this prosecution is vindictive. The defendant Cities Church protesters are being vindictively prosecuted for dramatically and effectively exercising their legal right to criticize government policies. A presumption of vindictiveness therefore applies. Because the prosecution will not be able to present objective evidence justifying its actions, the Superseding Indictment should be dismissed.

*III. The Court should allow Defendants to conduct targeted discovery in support of their claims of selective and vindictive prosecution and hold an evidentiary hearing in the event the Court denies the motion to dismiss the Superseding Indictment at this stage.*

The standard for obtaining discovery on a claim of selective prosecution is not as onerous as the standard to establish the claim. To obtain discovery on a selective prosecution claim, a defendant must show only "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468-69 (internal quotation marks omitted)*; see also United States v. Bass*, 536 U.S. 862, 863 (2002) ("[A] defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and

discriminatory intent."). For example, in a claim of selective enforcement based on race, in order to obtain discovery a defendant must "produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not…." *Armstrong*, 517 U.S. at 469. "The showing necessary to obtain discovery is *somewhat less*" than the showing necessary to establish an equal protection violation. *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th Cir. 2003) (emphasis added)*; see also United States v. Jones*, 159 F.3d 969, 978 (6th Cir. 1998) ("Obviously, a defendant need not prove his case in order to justify discovery[.]").

Similarly, if a defendant cannot establish that an indictment should be dismissed for vindictive prosecution based on either actual or presumptive vindictiveness, she may nevertheless be entitled to obtain discovery to support such a claim if she makes "a preliminary threshold showing of the essential elements of" vindictive prosecution and "alleges sufficient facts to take the question past the frivolous state and raises a reasonable doubt as to the prosecutor's purpose." *United States v. Aanerud,* 893 F.2d 956, 961 (8th Cir. 1990). See also *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (defendant entitled to discovery on vindictive prosecution claim where she comes forward with "some evidence tending to show the existence of the essential elements of the defense"); *United States v. Abdi,* No. 23-CR-295 (ECT/DJF), 2024 WL 323577, at *4 (D. Minn. Jan. 29, 2024) (citing *United States v. Kelley*, 152 F.3d 881, 886 (8th Cir. 1998)), *report and recommendation adopted,* No. 23-CR-295 (ECT/DJF), 2024 WL 841312 (D. Minn. Feb. 28, 2024) ("To obtain discovery or an evidentiary hearing on this issue, a defendant cannot rest on vague or conclusory allegations, but must 'allege specific facts

sufficient to raise a significant doubt that the government's decision to prosecute was vindictive.' ").

In the First Amendment context, a defendant "must offer some evidence tending to show that he would not have been prosecuted but for his protected speech." *Carey*, 816 F. Supp. 3d at 144. "To obtain discovery, [a defendant] must do more than simply 'identify a potential motive for prosecutorial animus.'" *Bucci*, 582 F.3d at 114 (quoting *Sanders*, 211 F.3d at 718). "He must connect any vindictive animus to those making the challenged charging decisions in his case." *Id.* (citing *United States v. Goulding*, 26 F.3d 656, 662 (7th Cir. 1994)). And "to obtain an evidentiary hearing . . ., 'the defendant must present facts sufficient to create a reasonable doubt about the constitutionality of a prosecution.'" *Jordan*, 635 F.3d at 1188 (quoting *United States v. Silien*, 825 F.2d 320, 322 (11th Cir. 1987) (per curiam)).

Should the Court not dismiss the Superseding Indictment outright, the defendant Cities Church protesters request that they be allowed targeted discovery on their claims of selective and vindictive prosecution. Defendants have presented substantial evidence, well more than some evidence, showing that they may be entitled to relief on both or either of these claims.

Importantly, Defendants are not seeking to engage in a fishing expedition. Attached hereto as Appendix A is a list of the targeted discovery they seek that they believe will support their claims. The Defendants therefore request that the Court allow them to conduct this targeted discovery and allow them an evidentiary hearing to present evidence in support of both their claims of selective and vindictive prosecution.

## CONCLUSION

For the foregoing reasons, Defendants request that their motion to dismiss the Superseding Indictment on the grounds of selective or vindictive prosecution be granted. Alternatively, Defendants ask that the Court allow Defendants to conduct limited targeted discovery in support of these claims and, following the completion of such discovery, to hold an evidentiary hearing at which Defendants would produce evidence in support of their claims of selective and vindictive prosecution.

Dated: August 31, 2026

LAW OFFICE OF JORDAN S. KUSHNER

s/ *Jordan S. Kushner*
Jordan S. Kushner, Reg. No. 219307
431 South 7th Street, Suite 2446
Minneapolis, MN 55415
(612) 288-0545
jskushner@gmail.com

*Attorneys for Defendant Nekima Levy Armstrong (1)*

THE JAB FIRM

s/ *Jill A. Brisbois*
Jill A. Brisbois, Reg. No. 0345477
150 South 5th Street, Suite 1850
Minneapolis, MN 55402
(651) 209-7797
jill@thejabfirm.com

*Attorneys for Defendant Chauntyll Louisa Allen (2)*

OFFICE OF THE FEDERAL DEFENDER

*s/ Aaron J. Morrison*
Aaron J. Morrison, Reg. No. 341241
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858
aaron_morrison@fd.org

*Attorneys for Defendant William Scott Kelly (3)*

BIRRELL LAW FIRM, PLLC

*s/ Ian S. Birrell*
Ian S. Birrell, Reg. No. 0396379
Andrew S. Birrell, Reg. No. 133760
333 South 7th Street, Suite 2350
Minneapolis, MN 55402
(952) 356-2393
ian@birrell.law
andy@birrell.law

*Attorneys for Defendant Jerome Richardson (5)*

CAPITOL CITY LAW GROUP, LLC

*s/ A.L. Brown*
A.L. Brown, Reg. No. #0331909
Jennifer Rose Congdon, Reg. No. 0391048
Marcus Almon, Reg. No. # 0319387
287 East Sixth Street, Suite 20
St. Paul, MN 55101
(651)705-8580
a.l.brown@cclawg.com
jennifer@cclawg.com
marcusalmon@cclawg.com

*Attorney for Defendant Jamael Lydell Lundy (6)*

LAW OFFICES OF ROBERT D. RICHMAN LLC

s/ *Robert D. Richman*
Robert D. Richman, Reg. No. 226142
P.O. Box 16643
St. Louis Park, MN 55416
(651) 278-4987
robert@rdrichmanlaw.com

*Attorneys for Defendant Trahern Jeen Crews (7)*

GAD & GAD LAW OFFICES LLP

s/ *Sarah R. Gad*
Sarah R. Gad, Reg. No. 0403328
8 E 25th Street
Minneapolis, MN 55402
(612) 412-1720
sarah@gadlawoffice.com

*Attorneys for Defendant Ian Davis Austin (9)*

KENNETH UBONG UDOIBOK, PA

*s/ Kenneth U. Udoibok*
Kenneth U. Udoibok, Reg. No. 0262523
Flour Exchange Building, Suite 5010
310 Fourth Ave S.
Minneapolis, MN 55415
(612) 808-6031
k@kenulaw.com

*Attorneys for Defendant Aziza M. Aboud (10)*

MITCHELL, BRUDER & JOHNSON

*s/ Glenn P. Bruder*
Glenn P. Bruder, Reg. No. 0148878
9531 West 78th Street, Suite 210
Eden Prairie, MN 55344
(952) 831-3174
gbruder@bruderlaw.com

*Attorneys for Max Richard Adamson (11)*

DEVORE LAW OFFICE, P.A.

s/ *Kevin DeVore*
Kevin W. DeVore, Reg. No. 0267302
724 Bielenberg Drive, Ste 110
Woodbury, MN 55125
(651) 435-6500
kevin@devorelawoffice.com

*Attorneys for Defendant Ezra Chaim Pye Blumenfeld (13)*

LEACH LAW OFFICE

*s/ Patrick G. Leach*
Patrick G. Leach, Reg. No. 286825
8961 Aztec Drive
Eden Prairie, MN 55347
(763) 220-6164
pgl@leachlawoffice.com

*Attorneys for Defendant Kelly Ann Carey (15)*

DE LEÓN & NESTOR, LLC

s/ *Bruce D. Nestor*
Bruce D. Nestor, Reg. No. 0318024
3547 Cedar Avenue South
Minneapolis, MN 55407
(612) 659-9019
nestor@denestlaw.com

*Attorneys for Defendant Monique Cullars-Doty (16)*

MELVIN R. WELCH

s/ *Melvin R. Welch*
Melvin R. Welch, Reg. No. 0387750
Commerce at the Crossings Bldg.
250 South Second Street, Suite 205
Minneapolis, MN 55401
(612) 741-3272
mel@melvinwelchlaw.com

*Attorneys for Defendant Tiffany Lynn Dunlap (17)*

LAW OFFICE OF STEVEN J. WRIGHT, LLC

s/ Steven J. Wright
Steven J. Wright, Reg. No. 387336
331 Second Ave S, Suite 705
Minneapolis, MN 55401
(612) 669-8280
stevejameswright@gmail.com

*Attorneys for Defendant Andrew Edwards (18)*

CHARLES F. CLIPPERT

s/ *Charles F. Clippert*
Charles F. Clippert, Reg. No. 248848
101 East Fifth Street, Suite 1500
St. Paul, MN 55101
(651) 300-4109
charlie@clippertlaw.com

*Attorneys for Defendant Rachel Goligoski (19)*

FORSGREN FISHER McCALMONT
DeMAREA TYSVER LLP

s/ *Caitlinrose H. Fisher*
Caitlinrose H. Fisher, Reg. No. 0398358
1500 Capella Tower
225 South 6th Street
Minneapolis, MN 55402
(612) 474-3300
cfisher@forsgrenfisher.com

*Attorneys for Defendant Ariel Hauptman (21)*

LOTUS LEGAL PLLC

s/ *Caroline H. Brunkow*
Caroline H. Brunkow, Reg. No. 0398936
331 Second Ave South, Ste 420
Minneapolis, MN 55401
(612) 293-6963
cari@lotuslegalpllc.com

*Attorneys for Defendant Krista Erin Hogan (22)*

KOCH AND GARVIS, LLC

s/ *Andrew S. Garvis*
Andrew S. Garvis, Reg. No. 257989
3109 Hennepin Avenue South
Minneapolis, MN 55408
(612) 827-8101
andrew@uptownlawyer.com

*Attorneys for Defendant Danielle Andrea Matthias (24)*

F CLAYTON TYLER, P.A.

s/ *Karen E. Mohrlant*
Karen E. Mohrlant, Reg. No. 0388093
331 2nd Ave S, Ste 230
Minneapolis, MN 55401
(612) 333-7309
kmohrlant@fctyler.com

*Attorneys for Catie Anne Michaelson (25)*

JOHNSON & GREENBERG PLLP

s/ *Lee R. Johnson*
Lee R. Johnson, Reg. No. 0189935
5775 Wayzata Boulevard, Suite 700
St. Louis Park, MN 55416
(952) 545-1621
lrjohnsonslp@gmail.com

*Attorneys for Defendant Eric Ryan Michaelson (26)*

LAW OFFICE OF ROBERT A. LENGELING, PLLC

s/ *Robert A. Lengeling*
Robert A. Lengeling, Reg. No. 304165
310 Fourth Avenue South, Suite 1050
Minneapolis, MN 55415
(612) 963-1555
robert@lengelinglaw.com

*Attorneys for Defendant David Okar (27)*

LAW OFFICES OF THOMAS H. SHIAH, LTD.

s/ *Thomas H. Shiah*
Thomas H. Shiah, Reg. No. 100365
331 Second Avenue South, Ste 705
Minneapolis, MN 55401
(612) 338-0066
ths@tomshiah.com

*Attorneys for Defendant Jarmel Perry (28)*

BEST & FLANAGAN LLP

s/ *Amy S. Conners*
Amy S. Conners, Reg. No. 0387375
60 South 6th Street, Suite 2700
Minneapolis, MN 55402
(612) 349-5665
aconners@bestlaw.com

*Attorneys for Defendant Cheryl Ann Persigehl (29)*

GOETZ & ECKLAND P.A.

s/ *Frederick J. Goetz*
Frederick J. Goetz, Reg. No. 0185425
615 1st Avenue NE, Suite 425
Minneapolis, MN 55413
(612) 874-1552
fgoetz@goetzeckland.com

*Attorneys for Emmar Monike Pineada-Moreno (30)*

RINGSTROM DEKREY PLLP

s/ *Dane DeKrey*
Dane DeKrey, Reg. No. 0397334
814 Center Avenue, Suite 5
Moorhead, MN 56560-0853
(218) 284-0484
dane@ringstromdekrey.com

*Attorneys for Spencer Michael Rodriguez-Bocanegra (31)*

ARNESON LAW OFFICE PLLC

s/ *Wyatt Arneson*
Wyatt Arneson, Reg. No. 0392071
1025 Grain Exchange Building
400 South 4th Street
Minneapolis, MN 55415
(612) 746-1188
wyatt@arnesonlawllc.com

*Attorneys for Defendant Katherine Shaw (32)*

GERDTS LAW PLLC

s/ Daniel L. Gerdts
Daniel L. Gerdts, Reg. No. 0207329
331 Second Ave South, Suite 705
Minneapolis, MN 55401
(612) 800-5086
daniel@danielgerdtslaw.com

*Attorneys for Defendant Satara Diann Strong Allen (33)*

SIEBEN & COTTER, PLLC

s/ *Patrick L. Cotter*
Patrick L. Cotter, Reg. No. 0319120
105 Hardman Court, Suite 110
South St. Paul, MN 55075
(651) 455-1555
patrick@siebencotterlaw.com

*Attorneys for Defendant Charles Swenson (34)*

SAPIENTIA LAW GROUP, PLLC

s/ *Robin M. Wolpert*
Robin M. Wolpert, Reg. No. 0310219
120 South Sixth Street, Suite 100
Minneapolis, MN 55402
(612) 756-7100
robinw@sapientialaw.com

*Attorneys for Defendant Robyn Elise Swenson (35)*

DORSEY & WHITNEY LLP

s/ *Meredith LaVine*
John Marti, Reg. No. 0388393
Meredith LaVine, Reg. No. 0506725
Ashley Repp, Reg. No. 0399661
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600
marti.john@dorsey.com
lavine.meredith@dorsey.com
repp.ashley@dorsey.com

*Attorneys for Defendant Thomas Matthew Tier (36)*

JAMES M. VENTURA

s/ *James M. Ventura*
James M. Ventura, Reg. No. 0147217
1000 Twelve Oaks Center Dr. Ste 100
Wayzata, MN 55391
(952) 473-8064
jventura@jamesventuralaw.com

*Attorneys for Defendant Lee Elizabeth Wiedeman Tuggle (37)*

## Appendix A

1. All recordings or memorandum regarding a conference call in late January 2026 involving Justice Department Official Aakash Singh concerning efforts to prosecute individuals exercising their First Amendment right to freedom of expression, a/k/a "protestors," including but not limited to protestors in the State of Minnesota. A summary of the call is set forth at "'Go Big and Go Loud': Inside the Justice Dept's Push to Prosecute Protesters," New York Times, March 19, 2026 (the article may be found at https://www.nytimes.com/2026/03/19/us/politics/justice-dept-prosecute-protesters.html?smid=nytcore-ios-share).

2. All communications, in whatever form they exist, between the Justice Department or any official or employee thereof and any individual within the White House or other employee of the Executive Branch that at all concerns the decision to prosecute any defendant related to the Cities Church protest on January 18, 2026.

3. All communications, in whatever form they exist, between the Justice Department or any official or employee thereof and any individual within the White House or other employee of the Executive Branch that at all concerns the Cities Church protest on January 18, 2026.

4. All communications, in whatever form they exist, between the Justice Department or any official or employee thereof and any person affiliated with The Cities Church that at all concerns the decision to prosecute any defendant.

5. All communications, in whatever form they exist, between the Justice Department or any official or employee thereof and any person affiliated with The Cities Church that at all concerns the protest at the Cities Church on January 18, 2026.

6. All communications, in whatever form they exist, between any member of the Executive Branch, or any official or employee thereof and any person affiliated with The Cities Church that at all concerns the protest at the Cities Church on January 18, 2026.

7. All communications, in whatever form they exist, between the Justice Department or any official or employee thereof and any third party that at all concerns the decision to prosecute any defendant as a result of the Cities Church protest on January 18, 2026.

8. All communications, in whatever form they exist, between any member of the Executive Branch, or any official or employee thereof and any third party that at all concerns the decision to prosecute any defendant as a result of the Cities Church protest on January 18, 2026.

9. Any departmental legal memorandum on the constitutionality or legality of the FACE Act provision that is the subject of the current indictment, including but not limited to the 2018 DOJ memorandum reportedly discussed in an earlier version of the Face Act Report. (*See* Sarah Lynch & Jacob Rosen, *Justice Department Releases Report Accusing Biden-Era DOJ of Uneven Enforcement of FACE Act Law*, CBS News (Apr. 14, 2026), perma.cc/Y3TW-Q6QX.).

10. All communications, in whatever form they exist, between any member of the Executive Branch, or any official or employee thereof and any third party that at all concerns the investigation or non-prosecution of the protests at Joy Metropolitan Ministries and other Orlando, Florida, churches in March 2025.

11. All communications, in whatever form they exist, between the Justice Department or any official or employee thereof and any individual within the White House or other employee of the Executive Branch that at all concerns the Orlando, Florida, church protests in March 2025.