UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

*Plaintiff*,

v.

Nekima Levy Armstrong *et al.*,

*Defendants*.

Case No. 26-CR-25 (LMP-DLM)

**MOTION TO DISMISS COUNT TWO AS BEYOND CONGRESS'S POWER UNDER THE COMMERCE CLAUSE**

---

## INTRODUCTION

The Freedom of Access to Clinic Entrances Act ("FACE Act"), 18 U.S.C. § 248, primarily prohibits certain types of interference with patients' and medical providers' access to reproductive health services. One rarely used provision of the FACE Act—unrelated to access to health services—also prohibits certain types of interference with prayer at a house of worship ("the house-of-worship provision"). This house-of-worship provision, found at 18 U.S.C. § 248(a)(2), is the basis for the charge in Count Two of the Superseding Indictment.

The FACE Act's house-of-worship provision criminalizes purely noneconomic, intrastate conduct. As Judge Walker of the Second Circuit put it, the house-of-worship provision "has nothing to do with 'commerce' or any sort of economic enterprise." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 66 (2d Cir. 2021) (Walker, J., concurring) (quoting *United States v. Lopez*, 514 U.S. 549, 561 (1995)). Nor does the provision require the Government to prove the sort of nexus to interstate commerce

that potentially could save the statute from this fatal defect. Congress accordingly lacked constitutional authority under the Commerce Clause to enact the FACE Act's house-of-worship provision and Count Two should be dismissed.[1]

## BACKGROUND

### A. The offense conduct

Jonathan Ross, a Department of Homeland Security agent, shot Renee Good in the head and killed her in broad daylight, with Ms. Good's wife and members of the community as witnesses to her death. After the shooting, Ross expressed no remorse. His final words to the woman he had just shot: "fucking bitch."[2]

Anger—even outrage—is a reasonable response to a federal agent killing a mother of three with bullets purchased using taxpayer dollars because the mother dared to resist the Government's draconian and inhumane immigration crackdown. But the Defendants[3] didn't exhibit outrage or violence or even threats of violence; they instead engaged in a peaceful protest at a church. Armed with only their voices

---

[1] This motion is filed as a stand-alone motion to dismiss with permission from the Court. As explained in a separate filing, the Government's Superseding Indictment also reflects a profound misunderstanding of the elements of the charged offense and therefore fails to state an offense. *See generally* Motion to Dismiss for Failure to State An Offense [ECF 547] (June 24, 2026).

[2] Melissa Gira Grant, *Trump and ICE Want You to Think Renee Nicole Good Deserved It*, THE NEW REPUBLIC, Jan. 13, 2026, https://newrepublic.com/article/205199/renee-good-shooting-misogyny.

[3] References to "Defendants" herein should not be read to include the media defendants who were present solely in their capacity as journalists and reported on the events.

and their beliefs, Defendants sought to hold the federal government accountable for the death of Renee Good.

The Government now seeks to silence Defendants' voices and criminalize their political (and religious) beliefs solely because they raised their voices inside "a place of religious worship." (Superseding Indictment at 18 [ECF 144] (Feb. 26, 2026).)

**B. The charged offense**

Count Two of the Indictment arises under the FACE Act. Congress enacted the FACE Act in 1994 in response to violence, threats, and physical obstruction at clinics offering reproductive health services. Ex. 1, Pub. L. 103-259, §2 (May 26, 1994) (describing Act's "Purpose"); *see also* Ex. 3, H.R. REP. NO. 103-306, at 6 (1993).[4]

Unsurprisingly given the animating reason for enacting the legislation, key provisions of the FACE Act relate to reproductive health clinics. Section 248(a)(1) prohibits individuals from interfering by force, threats, or physical obstruction with a person obtaining or providing reproductive health services (the "reproductive-health provision"), and Section 248(a)(3) prohibits damaging or destroying a facility providing reproductive health services. Even the statute's name—the "Freedom of Access to Clinic Entrances Act"—reaffirms this animating purpose.

---

[4] For ease of the Court's review, key components of the legislative history are attached as exhibits to the accompanying declaration of Caitlinrose Fisher. The exhibits include the three congressional committee reports that accompanied the legislation: a Senate Report (S. REP. NO. 103-117 (1993)), a House Report (H.R. REP. NO. 103-306 (1993)), and a Conference Committee Report (H.R. REP. NO. 103-488 (1994) (Conf. Rep.), *as reprinted in* 1994 U.S.C.C.A.N. 724.

Congress identified two sources of constitutional authority for the FACE Act—the Commerce Clause and the Fourteenth Amendment. Ex. 1, Pub. L. 103-259, §2 (May 26, 1994). Congress supported its authority to enact the reproductive-health provision under the Commerce Clause with extensive findings on the vast economic network surrounding reproductive health clinics and the conduct the FACE Act sought to regulate. Those findings are primarily contained in the Senate Report, dated July 29, 1993. Ex. 2, S. REP. NO. 103-117, at 31–32 (1993).

The FACE Act's house-of-worship provision, § 248(a)(2), is a clause of a different color. This provision was not part of the bill when the Senate issued its July 1993 report with findings supporting its authority to enact the legislation under the Commerce Clause. *See* Ex. 2, S. REP. NO. 103-117, at 22–25, 31–32. Instead, it was added to the proposed act by an amendment offered by Senator Orrin Hatch—an initial opposer of the bill—on the Senate floor several months later. *See* Ex. 4, 139 CONG. REC. 29,360–61 (Nov. 16, 1993) (statement of Sen. Hatch); *see also* Ex. 2, S. REP. NO. 103-117, at 2 (noting Senator Hatch's vote in opposition at the committee level). Unlike the reproductive-health provision, the house-of-worship provision was not supported by *any* findings showing the substantial effect of houses of worship (and regulation thereof) on interstate commerce. Nonetheless, it became part of the final bill. *See* Ex. 5, H.R. REP. NO. 103-488, at 8–9 (1994) (Conf. Rep.), *as reprinted in* 1994 U.S.C.C.A.N. 724, 725–26. And it provides the basis for Count Two of the Indictment.

## ARGUMENT

The Constitution created a federal government of limited and enumerated powers, reserving all other powers for the states. This balance between state and federal power is a "paramount component" of a system designed to protect citizens from governmental tyranny. *Hoffman v. Hunt*, 126 F.3d 575, 583 (4th Cir. 1997); *see also id.* ("[T]his segregation of power between state and federal governments was designed to reduce the danger of oppression inherent in unchecked power." (discussing *Lopez*, 514 U.S. at 552)). To protect this separation of power, every law enacted by Congress must arise from one or more of Congress's enumerated powers. *United States v. Morrison*, 529 U.S. 598, 607 (2000); *see also id.* ("The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." (quoting *Marbury v. Madison*, 1 Cranch 137, 176 (1803) (Marshall, C.J.)).

In passing the FACE Act, Congress relied on two constitutional sources of authority—the Commerce Clause and the Fourteenth Amendment. Ex. 1, Pub. L. 103-259 § 2 (May 26, 1994). Congress's reliance on the Fourteenth Amendment is misplaced as a matter of settled law because "purely private conduct" is "beyond the scope of the [Fourteenth Amendment's] § 5 enforcement power." *Morrison*, 529 U.S. at 621. That leaves the Commerce Clause as the only potentially legitimate source of congressional authority for the FACE Act's house-of-worship provision. Because Congress acted far beyond its authority under the Commerce Clause when it enacted

the house-of-worship provision, Count Two must be dismissed. *See* Fed. R. Crim. P. 12(b)(2), (b)(3)(B)(v).

## I. Over the past thirty years, the Supreme Court has reaffirmed that there are meaningful limits to Congress's authority under the Commerce Clause.

The Commerce Clause grants Congress the power to "regulate Commerce . . . among the several States." U.S. CONST., art. I, § 8, cl. 3. The Supreme Court's "interpretation of the Commerce Clause has changed as [the] Nation has developed." *Morrison*, 529 U.S. at 607. Until 1995, Congress's authority to legislate pursuant to the Commerce Clause appeared "virtually limitless." *Jingrong v. Chinese Anti-Cult World All.,* 314 F. Supp. 3d 420, 424 (E.D.N.Y. 2018) (*Jingrong I*), *rev'd on other grounds*, 16 F.4th 47 (2d Cir. 2021). But in 1995, the Supreme Court struck down a law prohibiting the possession of a firearm in a school zone, noting that the regulated conduct was in no way economic and that any connection to interstate commerce was highly attenuated. *Lopez*, 514 U.S. at 567–68. In doing so, the Court reminded Congress that its power under the Commerce Clause "may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Id.* at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)).

Five years later, in *Morrison,* the Court struck down a civil provision of the Violence Against Women Act (VAWA), reaffirming the Court's insistence that Congress respect the distinction between national and local conduct. 529 U.S. at 613. Responding to (and rejecting) congressional findings that violence against women substantially affects interstate commerce, the Court noted that Congress's reasoning for those findings "would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id.* at 615. In other words, it would justify federalizing *any* crime. Allowing Congress to exercise Commerce Clause authority based on such an attenuated link to commerce would effectively eliminate any limitations on federal authority, destroying both the "distinction between what is truly national and what is truly local" and the related balance of power. *Id.* at 615–18.

*Lopez* and *Morrison* provide the framework for contemporary Commerce Clause analysis. In *Lopez*, the Court identified "three broad categories of activity" that support the exercise of Commerce Clause authority: the use of "channels of interstate commerce"; "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and "activities having a substantial relation to interstate commerce." 514 U.S. at 558–59.

With respect to the final category, four factors are relevant to whether regulated conduct has a substantial relation to interstate commerce. *See Morrison*, 529 U.S. at 610–13. First, whether the legislation regulates "economic activity" or

noneconomic activity. *Id.* at 610 (quotation omitted). Second, whether the legislation contains a jurisdictional element limiting its application to only those instances where there is “an explicit connection with or effect on interstate commerce.” *Id.* at 611–12 (quotation omitted). Third, whether Congress included “express congressional findings” explaining how the regulated activity affects interstate commerce. *Id.* at 612 (quotation omitted). And fourth, whether the link between the regulated activity and the substantial effect on interstate commerce is “attenuated.” *Id.* The Eighth Circuit follows this *Lopez/Morrison* framework for analyzing Commerce Clause questions. *See, e.g., United States v. Hari*, 67 F.4th 903, 909–10 (8th Cir. 2023); *United States v. Mugan*, 441 F.3d 622, 630 (8th Cir. 2006).

The lesson from *Lopez* and *Morrison* is clear: there are real limits on Congress’s Commerce Clause authority. Although Congress has the authority to regulate matters that are economic or closely related to an economic regulatory scheme, it *does not* have general police power or the authority to regulate noneconomic intrastate conduct. When Congress purports to use its Commerce Clause authority to regulate noneconomic conduct, its legislation must reflect some limiting principle that preserves the distinction between what is national and what is local. There is no such limiting principle inherent in the house-of-worship provision of the FACE Act.

## II. Congress exceeded its authority under the Commerce Clause by enacting the FACE Act’s house-of-worship provision.

The house-of-worship provision at Section 248(a)(2) is legally indistinguishable from the statutes the Supreme Court struck down in *Lopez* and

*Morrison.* Because the provision regulates criminal conduct that is not economic in nature and does not involve the channels, facilities, or instrumentalities of interstate commerce, it can stand only if it regulates conduct that has a "substantial relation to interstate commerce." *Morrison*, 529 U.S. at 609 (quoting *Lopez*, 514 U.S. at 558–59). Applying the four *Morrison* factors confirms what common sense dictates: interference with religious activity in a house of worship is "not, in any sense of the phrase, economic activity" and does not have a substantial effect on interstate commerce. *Id.* at 613; *see also Jingrong v. Chinese Anti-Cult World All., Inc.*, 16 F.4th 47, 66 (2d Cir. 2021) (Walker, J., concurring) (*Jingrong II*). As a result, Congress cannot regulate such activity under the Commerce Clause, and the house-of-worship provision must fall.

### A. The house-of-worship provision regulates noneconomic activity.

The first *Morrison* factor asks whether the provision regulates economic or noneconomic activity. This factor powerfully supports the conclusion that Congress exceeded its authority in enacting the house-of-worship provision, because there is nothing remotely economic about the conduct proscribed by this provision.

A concurring judge in the Second Circuit analyzed this issue in *Jingrong II.* In that case, a district court held that the FACE Act's house-of-worship provision *was* constitutional under the Commerce Clause. *Jingrong I*, 314 F.Supp.3d at 444. The Second Circuit reversed. *Jingrong II*, 16 F.4th at 63. Although the full panel did not reach defendants' constitutional challenge to the FACE Act, Judge Walker tackled the

issue head on in a concurring opinion. *Id.* (Walker, J., concurring). Applying the principles of *Lopez* and *Morrison* to the house-of-worship provision, Judge Walker concluded that "the regulated conduct in this case cannot be viewed as economic." *Id.* at 65 (Walker, J., concurring). Judge Walker went on to persuasively explain:

> Whether the relevant regulated activity . . . is either religious practice at a place of religious worship or violence against those worshippers and proselytizers at places of religious worship, neither activity is economic. Neither worship nor violence against worshippers affects the production, distribution, or consumption of a commodity in an interstate (or any) market.

*Id.* (cleaned up).

Consistent with Judge Walker's analysis, appellate courts have repeatedly recognized that churches are not inherently economic in nature. For example, in *United States v. Rea*, the Eighth Circuit reversed a conviction under § 844(i) (the federal arson statute) because the church building at issue did not have a connection to interstate commerce, as was an element of the offense. 300 F.3d 952, 962 (8th Cir. 2002). The Eighth Circuit held that the building's status as a church was not alone sufficient to make it a building used in activity affecting interstate commerce. *Id.* Although the court acknowledged that *some* churches engage in interstate commerce, it emphasized that this determination is fact specific. *Id.* The court further cautioned that assuming every church engages in interstate commerce would "blur the 'distinction between what is truly national and what is truly local.'" *Id.* at 962–63 (quoting *Lopez*, 514 U.S. at 567–68). Other courts have similarly recognized that, although churches are capable of engaging in commerce, they are not commercial in

nature. *See United States v. Lamont*, 330 F.3d 1249, 1254–55 (9th Cir. 2003) (explaining that "[a] church's primary function is essentially non-commercial and non-economic" because "the business of a church is to provide spiritual guidance, comfort, and charity to its members and to others who may wish to take advantage of its services"); *United States v. Odom*, 252 F.3d 1289, 1294 (11th Cir. 2001) ("Churches are not commonly considered a business enterprise[.]"). And that says nothing of the activity *within* churches, which is even more local than the churches themselves.

The Supreme Court's holding in *Gonzales v. Raich*—that regulation of certain non-economic local activity is constitutional because it sufficiently relates to a broader set of economic activity—does not change the equation. 545 U.S. 1, 32–33 (2005). In *Raich*, the Supreme Court concluded that Congress could regulate local cultivation and use of marijuana under the Commerce Clause. *Id*. The Court reasoned that, although the regulated activities were local in nature, the statute prohibiting the conduct was part of a comprehensive regulation (the Controlled Substances Act), which concerned a "quintessentially economic" nationwide class of activities (the "production, distribution, and consumption" of a commodity). *Id.* at 17, 25–26 (quotation omitted). Under *Raich*, "Congress may regulate economic *intrastate* activity when doing so is a necessary component of a comprehensive *interstate* regulation." *United States v. Anderson*, 771 F.3d 1064, 1069–70 (8th Cir. 2014) (emphasis added).

There is no similar broad economic regulatory scheme relating to prayer at houses of worship. *See Odom*, 252 F.3d at 1297 (noting, in a church arson case, that there was "[n]o regulatory scheme regulating an economic activity"). The activity at issue concerns conduct—not a "commodity." *See Raich*, 545 U.S. at 18. Like gun possession in a school zone (*Lopez*) or domestic abuse within the home (*Morrison*), and unlike a product that is regulated as part of a larger economic and regulatory scheme (*Raich*), religious activity in a house of worship is purely noneconomic, is not part of a larger regulatory scheme, and does not have a substantial effect on interstate commerce. The first *Morrison* factor therefore weighs in favor of striking down the FACE Act's house-of-worship provision.

### B. The house-of-worship provision lacks a jurisdictional hook.

The second *Morrison* factor also weighs in favor of unconstitutionality, because the FACE Act contains no jurisdictional hook that applies on a case-by-case basis.

The Supreme Court has suggested that a criminal statute that may otherwise exceed Congress's Commerce Clause authority may be saved from a facial attack if the statute includes a jurisdictional hook as an element of the offense. This requires proof beyond a reasonable doubt in each individual case that the criminal conduct affects interstate commerce. *See Scarborough v. United States*, 431 U.S. 563, 568 (1977). The requirement of proving a jurisdictional nexus on a case-by-case basis prevents federal law from unconstitutionally "intrud[ing] upon traditional state criminal jurisdiction." *United States v. Bass*, 404 U.S. 336, 350 (1971). And it arguably keeps federal

regulation within the bounds of Congress's Commerce Clause authority. *See Lopez,* 514 U.S. at 561.[5]

The house-of-worship provision contains no requirement that the prosecution prove beyond a reasonable doubt that the conduct at issue was in or affecting interstate commerce. *See* 18 U.S.C. § 248. Without such a jurisdictional element, there is no assurance that, "through case-by-case inquiry," the challenged conduct "affects interstate commerce." *Lopez*, 514 U.S. at 561; *see Morrison*, 529 U.S. at 613. The Government itself has described the lack of such a nexus as a "critical defect" in a case in which it declined to defend the constitutionality of a criminal statute. Letter from Solic. Gen. Noel Francisco to Comm. Chairman Jarrold Nadler (Apr. 10, 2019), *available at* https://www.law.georgetown.edu/icap/wp-content/uploads/sites/32/2019/04/530D-Letter-FGM-Statute.pdf; *see also United States v. Nagarwala*, No. 19-1015, 2019 WL 7425389, at *1 (6th Cir. Sept. 13, 2019). This second *Morrison* factor also weighs in favor of a finding of unconstitutionality.

[5] There are reasons to question the soundness of relying on jurisdictional hooks alone to defeat Commerce Clause challenges. *See United States v. Hemani*, 608 U.S. ----, 146 S. Ct. 1677, 1696–98 (2026) (Thomas, J., concurring) (questioning this rationale and concluding that issue was left open by prior Supreme Court precedent). But that issue is not presented here, given the FACE Act's lack of any jurisdictional element.

### C. No congressional findings support the regulation of activity in houses of worship.

The third *Morrison* factor, whether Congress made findings about the effects of the regulated conduct on interstate commerce, also weighs in favor of invalidating the house-of-worship provision.

The reproductive-healthcare provision of the FACE Act is amply supported by congressional findings. For instance, Congress found that women traveled across state lines for reproductive health care; facilities hired doctors and staff; clinics purchased medical equipment and supplies; and blockades and other violence had closed facilities and rendered them "unable to provide services." *Hoffman*, 126 F.3d at 583 (quotation omitted); *see also* Ex. 2, S. REP. NO. 103-117, at 31–32. These and other findings underscored the substantial effect that reproductive health clinics and the regulation surrounding them have on interstate commerce. *Id.* at 583–84. In view of these findings, the Eighth Circuit (and every other circuit to address the issue) has sustained the reproductive-healthcare provision of the FACE Act as an appropriate exercise of congressional authority under the Commerce Clause. *United States v. Dinwiddie,* 76 F.3d 913, 920 (8th Cir. 1996) (noting that Planned Parenthood is a business in interstate commerce).[6]

---

[6] *See also, e.g.*, *Norton v. Ashcroft*, 298 F.3d 547, 559 (6th Cir. 2002); *United States v. Gregg*, 226 F.3d 253, 267 (3d Cir. 2000); *United States v. Bird*, 124 F.3d 667, 682 (5th Cir. 1997); *Terry v. Reno*, 101 F.3d 1412, 1418 (D.C. Cir. 1996); *Cheffer v. Reno*, 55 F.3d 1517, 1521 (11th Cir. 1995); *United States v. Wilson*, 73 F.3d 675, 688 (7th Cir. 1995).

Unlike the reproductive-healthcare provision at the heart of the FACE Act, the tacked-on house-of-worship provision "contains no congressional pronouncement that would tie the proscribed conduct to activity affecting interstate commerce." *Jingrong II,* 16 F.4th at 66 (Walker, J., concurring). Congress's failure to make specific interstate-commerce findings about houses of worship is "telling" in light of Congress's very specific interstate-commerce findings about abortion clinics—findings that have "no bearing on whether violence against worshippers at places of religious worship substantially affects interstate commerce." *Id.* The stark absence of congressional findings justifying the FACE Act's house-of-worship provision supports the conclusion that this provision is beyond the scope of Congress's Commerce Clause authority. *See id.*

### D. The connection between religious activity in houses of worship and interstate commerce is highly attenuated and speculative.

Like the other three factors, the fourth *Morrison* factor favors finding that Congress exceeded its authority by enacting the house-of-worship provision of the

---

If the Court invalidates the house-of-worship provision, the remaining provisions of the FACE Act would remain unaffected. An unconstitutional provision is severable from the remainder of a statute where, as here, the remaining provisions can operate independently, with no disruption to the overarching regulatory scheme. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987); *see also, e.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 234 (2020) (noting that courts should "limit the solution to the problem" by severing the problematic portion even if the statute lacks a severability clause (quotation omitted)); *Dakota, Minn. & E. R.R. Corp. v. South Dakota*, 362 F.3d 512, 518 (8th Cir. 2004) (affirming a lower court's explanation that a court must "uphold the remaining sections of a statute if they can stand by themselves and if it appears that the legislature would have intended the remainder to take effect without the invalidated section" (quotation omitted)).

FACE Act. When it comes to reproductive clinics, there is a "real and substantial connection between [interference with reproductive clinics] and the interstate commercial market" such that courts "need not 'pile inference upon inference' to find a substantial effect on interstate commerce." *Hoffman*, 126 F.3d at 587 (quoting *Lopez*, 514 U.S. at 567). The same cannot be said of the house-of-worship provision. Even if some houses of worship "offer commercial services, such as childcare, education, and the purchase and distribution of goods," the FACE Act's worship provision "does not target violence interfering with social services provided at houses of worship, or damage or destruction to the property of a place of religious worship." *Jingrong II,* 16 F.4th at 67 (Walker, J., concurring). The provision targets "[t]he *act* of worship—separate from whatever commercial endeavors religious organizations may also engage in—[which] is in no sense a commercial or economic activity." *Id.* (emphasis added).

Nor is the fact that criminal activity allegedly occurs near or inside a church sufficient to lead to an aggregate effect on interstate commerce. The Supreme Court "has emphatically rejected 'the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce.'" *Hemani*, 608 U.S. ----, 146 S. Ct. at 1696 (2026) (Thomas, J., concurring) (quoting *Morrison*, 529 U.S. at 617). Finding that the conduct proscribed by the house-of-worship provision substantially affects interstate commerce would require the court "to layer 'inference upon inference,'" in a manner inconsistent with "*Lopez*,

*Morrison*, and the constitutional bounds on federal power." *Jingrong II,* 16 F.4th at 67 (Walker, J., concurring) (quoting *Lopez*, 514 U.S. at 567).

Indeed, interference with worship is even *less* related to interstate commerce than other conduct that the Supreme Court has deemed non-economic activity beyond the reach of the Commerce Clause. *Lopez* concerned firearms and gun violence, the former of which are commodities sold on a national market and the latter of which has an enormous effect on the economy. *Morrison* concerned an act supported by substantial findings on the impact domestic violence has on the economy. The Defendants moving here responded to violence by Jonathan Ross and other federal agents in their community by entering a church and using their voices. They did not enter a business or a health clinic. They did not purchase or sell a commodity. To allow Congress to regulate their conduct would completely erode the longstanding and essential limits on federal power, at great cost to Defendants and our democracy.

## CONCLUSION

Courts are duty-bound "to enforce the limits on federal power by striking down acts of Congress that transgress those limits." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (citing *Marbury*, 1 Cranch at 175–76). Because all four *Morrison* factors heavily favor a finding that the house-of-worship provision of the FACE Act is unconstitutional, Count Two of the Superseding Indictment cannot stand and should be dismissed with prejudice. Oral argument is requested for this motion.

Dated: August 31, 2026

LAW OFFICE OF JORDAN S. KUSHNER

*s/ Jordan S. Kushner*
Jordan S. Kushner, Reg. No. 219307
431 South 7th Street, Suite 2446
Minneapolis, MN 55415
(612) 288-0545
jskushner@gmail.com

*Attorneys for Defendant Nekima Levy Armstrong (1)*

THE JAB FIRM

*s/ Jill A. Brisbois*
Jill A. Brisbois, Reg. No. 0345477
150 South 5th Street, Suite 1850
Minneapolis, MN 55402
(651) 209-7797
jill@thejabfirm.com

*Attorneys for Defendant Chauntyll Louisa Allen (2)*

OFFICE OF THE FEDERAL DEFENDER

*s/ Aaron J. Morrison*
Aaron J. Morrison, Reg. No. 341241
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5858
aaron_morrison@fd.org

*Attorneys for Defendant William Scott Kelly (3)*

BIRRELL LAW FIRM, PLLC

*s/ Ian S. Birrell*
Ian S. Birrell, Reg. No. 0396379
Andrew S. Birrell, Reg. No. 133760
333 South 7th Street, Suite 2350
Minneapolis, MN 55402
(952) 356-2393
ian@birrell.law
andy@birrell.law

*Attorneys for Defendant Jerome Richardson (5)*

CAPITOL CITY LAW GROUP, LLC

*s/ A.L. Brown*
A.L. Brown, Reg. No. #0331909
Jennifer Rose Congdon, Reg. No. 0391048
Marcus Almon, Reg. No. # 0319387
287 East Sixth Street, Suite 20
St. Paul, MN 55101
(651)705-8580
a.l.brown@cclawg.com
jennifer@cclawg.com
marcusalmon@cclawg.com

*Attorney for Defendant Jamael Lydell Lundy (6)*

LAW OFFICES OF ROBERT D. RICHMAN LLC

s/ *Robert D. Richman*
Robert D. Richman, Reg. No. 226142
P.O. Box 16643
St. Louis Park, MN 55416
(651) 278-4987
robert@rdrichmanlaw.com

*Attorneys for Defendant Trahern Jeen Crews (7)*

GAD & GAD LAW OFFICES LLP

s/ *Sarah R. Gad*
Sarah R. Gad, Reg. No. 0403328
8 E 25th Street
Minneapolis, MN 55402
(612) 412-1720
sarah@gadlawoffice.com

*Attorneys for Defendant Ian Davis Austin (9)*

KENNETH UBONG UDOIBOK, PA

*s/ Kenneth U. Udoibok*
Kenneth U. Udoibok, Reg. No. 0262523
Flour Exchange Building, Suite 5010
310 Fourth Ave S.
Minneapolis, MN 55415
(612) 808-6031
k@kenulaw.com

*Attorneys for Defendant Aziza M. Aboud (10)*

MITCHELL, BRUDER & JOHNSON

*s/ Glenn P. Bruder*
Glenn P. Bruder, Reg. No. 0148878
9531 West 78th Street, Suite 210
Eden Prairie, MN 55344
(952) 831-3174
gbruder@bruderlaw.com

*Attorneys for Max Richard Adamson (11)*

DEVORE LAW OFFICE, P.A.

s/ *Kevin DeVore*
Kevin W. DeVore, Reg. No. 0267302
724 Bielenberg Drive, Ste 110
Woodbury, MN 55125
(651) 435-6500
kevin@devorelawoffice.com

*Attorneys for Defendant Ezra Chaim Pye Blumenfeld (13)*

LEACH LAW OFFICE

*s/ Patrick G. Leach*
Patrick G. Leach, Reg. No. 286825
8961 Aztec Drive
Eden Prairie, MN 55347
(763) 220-6164
pgl@leachlawoffice.com

*Attorneys for Defendant Kelly Ann Carey (15)*

DE LEÓN & NESTOR, LLC

s/ *Bruce D. Nestor*
Bruce D. Nestor, Reg. No. 0318024
3547 Cedar Avenue South
Minneapolis, MN 55407
(612) 659-9019
nestor@denestlaw.com

*Attorneys for Defendant Monique Cullars-Doty (16)*

MELVIN R. WELCH

s/ *Melvin R. Welch*
Melvin R. Welch, Reg. No. 0387750
Commerce at the Crossings Bldg
250 South Second Street, Suite 205
Minneapolis, MN 55401
(612) 741-3272
mel@melvinwelchlaw.com

*Attorneys for Defendant Tiffany Lynn Dunlap (17)*

LAW OFFICE OF STEVEN J. WRIGHT, LLC

s/ Steven J. Wright
Steven J. Wright, Reg. No. 387336
331 Second Ave S, Suite 705
Minneapolis, MN 55401
(612) 669-8280
stevejameswright@gmail.com

*Attorneys for Defendant Andrew Edwards (18)*

CHARLES F. CLIPPERT

s/ *Charles F. Clippert*
Charles F. Clippert, Reg. No. 248848
101 East Fifth Street, Suite 1500
St. Paul, MN 55101
(651) 300-4109
charlie@clippertlaw.com

*Attorneys for Defendant Rachel Goligoski (19)*

FORSGREN FISHER MCCALMONT DEMAREA TYSVER LLP

s/ *Caitlinrose H. Fisher*
Caitlinrose H. Fisher, Reg. No. 0398358
1500 Capella Tower
225 South 6th Street
Minneapolis, MN 55402
(612) 474-3300
cfisher@forsgrenfisher.com

*Attorneys for Defendant Ariel Hauptman (21)*

LOTUS LEGAL PLLC

s/ *Caroline H. Brunkow*
Caroline H. Brunkow, Reg. No. 0398936
331 Second Ave South, Ste 420
Minneapolis, MN 55401
(612) 293-6963
cari@lotuslegalpllc.com

*Attorneys for Defendant Krista Erin Hogan (22)*

KOCH AND GARVIS, LLC

s/ *Andrew S. Garvis*
Andrew S. Garvis, Reg. No. 257989
3109 Hennepin Avenue South
Minneapolis, MN 55408
(612) 827-8101
andrew@uptownlawyer.com

*Attorneys for Defendant Danielle Andrea Matthias (24)*

F CLAYTON TYLER, P.A.

s/ *Karen E. Mohrlant*
Karen E. Mohrlant, Reg. No. 0388093
331 2nd Ave S, Ste 230
Minneapolis, MN 55401
(612) 333-7309
kmohrlant@fctyler.com

*Attorneys for Catie Anne Michaelson (25)*

JOHNSON & GREENBERG PLLP

s/ *Lee R. Johnson*
Lee R. Johnson, Reg. No. 0189935
5775 Wayzata Boulevard, Suite 700
St. Louis Park, MN 55416
(952) 545-1621
lrjohnsonslp@gmail.com

*Attorneys for Defendant Eric Ryan Michaelson (26)*

LAW OFFICE OF ROBERT A. LENGELING, PLLC

s/ *Robert A. Lengeling*
Robert A. Lengeling, Reg. No. 304165
310 Fourth Avenue South, Suite 1050
Minneapolis, MN 55415
(612) 963-1555
robert@lengelinglaw.com

*Attorneys for Defendant David Okar (27)*

LAW OFFICES OF THOMAS H. SHIAH, LTD.

s/ *Thomas H. Shiah*
Thomas H. Shiah, Reg. No. 100365
331 Second Avenue South, Ste 705
Minneapolis, MN 55401
(612) 338-0066
ths@tomshiah.com

*Attorneys for Defendant Jarmel Perry (28)*

BEST & FLANAGAN LLP

s/ *Amy S. Conners*
Amy S. Conners, Reg. No. 0387375
60 South 6th Street, Suite 2700
Minneapolis, MN 55402
(612) 349-5665
aconners@bestlaw.com

*Attorneys for Defendant Cheryl Ann Persigehl (29)*

GOETZ & ECKLAND P.A.

s/ *Frederick J. Goetz*
Frederick J. Goetz, Reg. No. 0185425
615 1st Avenue NE, Suite 425
Minneapolis, MN 55413
(612) 874-1552
fgoetz@goetzeckland.com

*Attorneys for Emmar Monike Pineada-Moreno (30)*

RINGSTROM DEKREY PLLP

s/ *Dane DeKrey*
Dane DeKrey, Reg. No. 0397334
814 Center Avenue, Suite 5
Moorhead, MN 56560-0853
(218) 284-0484
dane@ringstromdekrey.com

*Attorneys for Spencer Michael Rodriguez-Bocanegra (31)*

ARNESON LAW OFFICE PLLC

s/ *Wyatt Arneson*
Wyatt Arneson, Reg. No. 0392071
1025 Grain Exchange Building
400 South 4th Street
Minneapolis, MN 55415
(612) 746-1188
wyatt@arnesonlawllc.com

*Attorneys for Defendant Katherine Shaw (32)*

GERDTS LAW PLLC

s/ Daniel L. Gerdts
Daniel L. Gerdts, Reg. No. 0207329
331 Second Ave South, Suite 705
Minneapolis, MN 55401
(612) 800-5086
daniel@danielgerdtslaw.com

*Attorneys for Defendant Satara Diann Strong Allen (33)*

SIEBEN & COTTER, PLLC

s/ *Patrick L. Cotter*
Patrick L. Cotter, Reg. No. 0319120
105 Hardman Court, Suite 110
South St. Paul, MN 55075
(651) 455-1555
patrick@siebencotterlaw.com

*Attorneys for Defendant Charles Swenson (34)*

SAPIENTIA LAW GROUP, PLLC

s/ *Robin M. Wolpert*
Robin M. Wolpert, Reg. No. 0310219
120 South Sixth Street, Suite 100
Minneapolis, MN 55402
(612) 756-7100
robinw@sapientialaw.com

*Attorneys for Defendant Robyn Elise Swenson (35)*

DORSEY & WHITNEY LLP

s/ *Ashley Repp*
John Marti, Reg. No. 0388393
Meredith LaVine, Reg. No. 0506725
Ashley Repp, Reg. No. 0399661
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-2600
marti.john@dorsey.com
lavine.meredith@dorsey.com
repp.ashley@dorsey.com

*Attorneys for Defendant Thomas Matthew Tier (36)*

JAMES M. VENTURA

s/ *James M. Ventura*
James M. Ventura, Reg. No. 0147217
1000 Twelve Oaks Center Dr. Ste 100
Wayzata, MN 55391
(952) 473-8064
jventura@jamesventuralaw.com

*Attorneys for Defendant Lee Elizabeth Wiedeman Tuggle (37)*

LANGERT LAW, LLC

s/ *Margaret G. Langert*
Margaret G. Langert, Reg. No. 0308316
724 Bielenberg Drive #54
Woodbury, MN 55125
(612) 470-4810
maggie@langertlaw.com

*Attorneys for Defendant John Vergin (38)*

WOLD LAW

s/ *Peter B. Wold*
Peter B. Wold, Reg. No. 0118382
331 2nd Avenue South, Suite 705
Minneapolis, MN 55401
(612) 341-2525
pwold@wold-law.com

*Attorneys for Defendant Mark D. Weinfurter (39)*