# EXHIBIT 1

KW

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF THE DEVICE DESCRIBED IN ATTACHMENT A

**SEALED BY ORDER OF THE COURT**

Case No. ~~26-mj-XXX (SGE)~~
26-mj-88 SGE

## APPLICATION FOR A SEARCH WARRANT

I, Timothy Gerber, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, incorporated here**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B, incorporated here**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- x  evidence of a crime;
- x  contraband, fruits of crime, or other items illegally possessed;
- x  property designed for use, intended for use, or used in committing a crime;
- ___  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| Title 18, United States Code, Section 241 | Conspiracy Against Rights Secured by Federal Law, namely, the free exercise of religion at a place of religious worship secured by the FACE Act |

The application is based on these facts:

**See Affidavit, incorporated here**

X  Continued on the attached sheet.

[signature]
*Applicant's Signature*

Timothy Gerber, Special Agent
Homeland Security Investigations
*Printed Name and Title*

SUBSCRIBED and SWORN before me by reliable electronic means (FaceTime and/or email) pursuant to Fed. R. Crim. P. 41(d)(3)

Date: 1/23/2026

[signature]
*Judge's Signature*

City and State: Minneapolis, MN

The Honorable Shannon G. Elkins
United States Magistrate Judge
*Printed Name and Title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, TIMOTHY GERBER, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent (SA) with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI), and have been so employed since March of 2025. In my capacity as a Special Agent, I am responsible for conducting investigations into the federal laws enforced by HSI. Since March of 2025, I have investigated various criminal violations relating to child exploitation, assaults on federal officers, human rights violations, and immigration violations. Additionally, I have repeatedly reviewed and analyzed electronic devices. I am a graduate of the Federal Law Enforcement Training Center (FLETC), HSI Special Agent Training Program, having completed training in surveillance, search and arrest warrants, federal laws enforced by HSI, and federal criminal procedures. Prior to my tenure as a HSI Special Agent, I was employed as a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI), where I investigated various criminal violations relating to the Internal Revenue Code, money laundering, digital currency, and elder exploitation.

3. The facts in this affidavit come from my personal observations, my review of documents and other evidence, my conversations with other law enforcement personnel and other individuals, and my training and experience. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Additionally, the substance of conversations included herein may have been translated.

4. For the reasons detailed below, there is probable cause to believe that the above-captioned SUBJECT DEVICE, which is described herein and in Attachment A, contains evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 241 (Conspiracy Against Rights Secured by Federal Law, namely, the free exercise of religion at a place of religious worship secured by the FACE Act, 18 U.S.C. § 248(a)(2)), and 248(a)(2) (FACE Act).

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

5. The property to be searched is a black Google phone in a clear plastic case, hereinafter, the "SUBJECT DEVICE."

6. The SUBJECT DEVICE is currently located in the District of Minnesota.

7. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

A. **Summary**

7. On the morning of Sunday, January 18, 2026, at approximately 10:30 a.m., a group of approximately 30-40 agitators, working together in a coordinated manner, entered the Cities Church, located at 1524 Summit Avenue, St. Paul, MN 55105, during a religious service and engaged in conduct that, *as detailed below*, disrupted the religious service and intimidated, harassed, oppressed, and terrorized the parishioners, including young children, and caused the service to be cut short and forced parishioners to flee the church out of a side door, which resulted in one female victim falling and suffering an injury. Statements made by agitators at the church indicated that they targeted the church based on their belief that one of the church's pastors is a federal immigration officer (Victim #1). Prior to their assault on the church, the agitators met together in the parking lot of a nearby shopping center and made plans for their actions inside the church. Some of the protestors also physically obstructed some parishioners as they attempted to leave the church and the adjacent parking areas. Some of the agitators, including defendant DON RENALDO LEMON ("LEMON"), livestreamed the agitators at the pre-assault meeting and the conduct of the agitators inside the church and after disrupting the church service.

8. Special Agents with DHS-HSI and the Federal Bureau of Investigation ("FBI") commenced an investigation. The following facts set forth information learned during the investigation.

B. **January 18, 2026: Livestreamed Video of Incident at Cities Church**

14. On Sunday morning, January 18, 2026, at approximately 10:00 a.m., LEMON began livestreaming on his internet-based livestream show, "TheDonLemonShow," in the parking

lot of a shopping center located at 1440 University Avenue W, St Paul, MN 55104. I have reviewed pertinent portions of the livestream video. I used the YouTube closed-captioning option to assist with transcriptions.

C. **Operation Meeting**

15. At the start of the livestream, LEMON said he just got into Minneapolis, Minnesota and was there to speak with an organization that was gearing up for resistance and protest. Based on my training and experience, I am informed that persons identifying themselves as resistance protesters have recently sought to disrupt ICE operations in Minnesota. Due to the presence of an American flag, LEMON noted, apparently in jest, that he initially thought the protesters looked "MAGA-coded," but he explained to his audience that the organization was, in fact, a group of resistance protesters.

16. LEMON explained that the resistance protestors were planning an operation that LEMON intended to follow them on. LEMON identified their operation as "Operation Pullup" and identified the apparent organizer as NEKIMA VALDEZ LEVY-ARMSTRONG ("ARMSTRONG"), a/k/a "Nekima Valdez Levy-Pounds." When speaking with ARMSTRONG, LEMON assured her that, "We're not saying what it is, what's going on, but thank you. Tell us why you're doing this."

17. ARMSTRONG identified herself as a civil rights attorney and longtime activist in the community. ARMSTRONG said she does activism and protests in various ways. ARMSTRONG identified this as "Operation Pullup," which she characterized as a "clandestine" operation. ARMSTRONG explained that she and other agitators "show up somewhere that is a key location, [where the targets] don't expect us to come there, and we disrupt business as usual. That's what we're about to go do right now. We've had a lot of

success with the times we've done "Operation Pullup." ARMSTRONG detailed prior protests and stated "this is our next action to call for justice for Renee Good and ICE out of Minnesota. LEMON asked, "How long do you think before this operation would [inaudible] before it takes place?" ARMSTRONG replied, "We got to go now and get there." LEMON replied, "we'll see you there." LEMON advised his audience that "we're going to head to the operation. Again, we're not going to give any, any of the information away."

18. LEMON introduced LUNDY, who said he was out there to support the community activists. LUNDY identified himself as a current candidate for Minnesota State Senate, District 65. LUNDY felt it's important if you're servicing people in office, you have to be with the people as well. (Based on my review of other video evidence of the agitators' activities inside the church, LUNDY later entered the church as part of the group's action.)

19. LEMON walked away from LUNDY to focus his attention on the other agitators and a chant that CHAUNTYLL LOUISA ALLEN ("ALLEN") was leading. ALLEN's initial chants were, "This is what community looks like" and "ICE out." ALLEN then directed the agitators to respond with "of Minnesota" when she said, "ICE out." ALLEN requested the favorite chants of the local agitators, one suggested "justice for Renee Good (Good)." (Good was recently involved in an illegal protest to disrupt immigration enforcement activities, which led to an officer-involved shooting as a result of her assault on an immigration officer.) ALLEN proceeded to lead the group in that chant, as well as "say her name," which the agitators responded with "Renee Good."

20. ALLEN described their reasoning for being out at the staging location, stating they have a "duty to fight for our freedom," "we have a duty to win," "we must love and support one

another," "we have nothing to lose but our chains." ALLEN then stated to the agitators "you guys are sounding like Sunday morning." ALLEN continued to address the crowd in a motivational manner. ALLEN instructed the agitators to "stay bumper-to-bumper, make sure everybody gets through the light, and we all have the address, right?"

21. ARMSTRONG addressed the agitators and encouraged everyone to make sure they had the address. ARMSTRONG also provided the following instruction: Remember if you have anything that is activist identifying, do not wear it in if you're just going in to sit down and be a part of the situation. In response to a question from an unidentified agitator, who asked if they should spread out once at the church, ARMSTRONG instructed that the agitators should not sit together. ARMSTRONG further instructed the agitators that, if you have anything activism identifying, do not go in with the first wave, you wait until you come in with us people of color.

22. LEMON proceeded to move the camera away from the agitators and organizers because, as he explained, he did not want to divulge critical information about the operation that was being discussed at that time. LEMON went to the crowd of agitators and organizers and proceeded to thank them for allowing him to be there.

23. Based on my review of LEMON's livestream, I know that defendant WILLIAM SCOTT KELLY ("KELLY") a/k/a "DaWokeFarmer" was present in the crowd of agitators at the pre-operation briefing led by ARMSTRONG and ALLEN.

24. Based on my review of the livestream video, ARMSTRONG and ALLEN appear to be the leaders of Operation Pullup and the meeting of agitators that was described in paragraphs above. I believe this because ARMSTRONG and ALLEN provided instructions to the group, led chants, and conducted interviews as apparent leaders of the organization.

**D. Travel to Cities Church**

25. LEMON and defendant JEROME DEANGELO RICHARDSON ("RICHARDSON"), along with a rear passenger, Michael LNU (Last Name Unknown), entered a vehicle to depart towards the location of the operation. LEMON asked RICHARDSON, the driver, "You know where we're going, right?" RICHARDSON replied, "yep."

26. An individual who identified himself as "Mark" approached LEMON, thanked LEMON, and introduced himself. LEMON advised Mark, "You're on right now, just so you know. So don't give anything away." A short time later, RICHARDSON said, "alright, we're behind operation, we gotta catch up." LEMON replied, "Let's go catch up" and later, advised RICHARD and Michael, "Don't give anything away."

27. On the drive to the operation location, LEMON advised his audience they are doing a clandestine secret operation. LEMON asked RICHARDSON, "They found out some inside information, right?" RICHARDSON responded, "yeah." LEMON identified who RICHARDSON is, that he is a producer, and that they met at Essencefest a "couple years ago." RICHARDSON identified himself as an activist and social entrepreneur.

28. While still on the drive, LEMON stated, "This is just the beginning of this uh clandestine operation that they're doing here because of some um inside information that they got. So, this is going to be very interesting. I don't think we can go ahead. I don't think we can go inside, right? No." Michael replied, "we can stand outside." LEMON later stated, "We can't say too much. We don't want to give it up." The occupants of the vehicle discussed going into a church service that is underway with parishioners. LEMON later stated "I'm just trying to figure out what's the best thing cuz we just found out about this this morning. I'm just trying to figure out if it's, um, if it's for me to

go inside so I can tell what happened. That's what I'm gonna do." Michael responded, "I know I'm also not supposed to really like go in, right?" RICHARDSON responded, "but you can go in," Michael added, "because they're going to buy that."

29. LEMON asked, "Will they let you in with a camera?" RICHARDSON replied, "Put it in your backpack." LEMON answered, "No, you can't do that. We can't do that. We can't do that." RICHARDSON asked, "Oh, we can't?" LEMON replied, "no," and later stated "let me produce this live as we're doing this." LEMON then instructed RICHARDSON "and if there's a place to turn, I want you to go where and park right where we can see the entrance." RICHARDSON replied, "I don't think that's the main entrance going on." LEMON replied, "yeah, it's right there." RICHARDSON replied, "Oh, where people are walking down those stairs."

**E. Conduct at Cities Church**

30. As LEMON approached Cities Church, LEMON advised Michael to "stay on the sidewalk, you can probably come where the van is." Based on the video, it appears LEMON was referring to a red vehicle parked in front of Cities Church. During LEMON's livestream, the camera focused on the outside of Cities Church, and LEMON entered only with audio equipment. The audio captures what appears to be the church's pastor in the midst of addressing his congregation during a religious service.

31. Approximately one minute and forty-seven seconds after LEMON entered Cities Church, an unknown female voice, interrupted the pastor sermon and shouted, "Excuse me, pastor…" LEMON is then heard saying, "Hey, Meta record." Based on my training and experience, Meta refers to smart glasses that integrate augmented reality features, allowing

users to interact with digital content seamlessly. While the cameraman remained outside, the audio recording captures the voices of agitators yelling in the church.

32. At one point, an unknown female refers to the Director of ICE. Agitators can also be heard yelling, "Justice for… Renee Good." Approximately thirty-five seconds later, RICHARDSON is observed on video entering Cities Church. Immediately after RICHARDSON enters Cities Church, the video shows multiple parishioners exiting Cities Church through multiple doors. Three unknown parishioners are observed falling to the ground while exiting Cities Church through the north side door. Approximately twenty seconds later, Michael is observed entering Cities Church.

33. RICHARDSON entered Cities Church with his camera recording LEMON's live broadcast. Based on my review of the video, it appears that the parishioners are confused and shocked by the agitators' conduct. Again, based on the video, agitators can be heard yelling "ICE out" and blowing whistles. Based on my training and experience, anti-ICE agitators use whistles to disrupt ICE operations and notify others of their presence.

34. During the LEMON broadcast, ARMSTRONG and ALLEN are observed yelling "ICE out." KELLY can also be heard yelling, "This ain't God's house. This is the house of the devil." Based on my review of KELLY's numerous social media posts, I recognize that is KELLY's voice on the video saying those words. LEMON can be observed walking with a winter-style jacket and hood over his head, in what appears to be an attempt to conceal his identity. Several other agitators or parishioners are wearing winter-style jackets with their hoods down.

35. During his livestream, LEMON explained that Operation Pullup learned that one of the pastors for Cities Church is a member of ICE. During his broadcast, LEMON tells his

viewers that's he's there "chronicling and reporting. We're not a part of the activists, but we're here just reporting on them." RICHARDSON is observed engaged in agitator chants, yelling and raising his hands. LEMON stated, "I'm looking at a young man who's in the corner. He's frightened, he's scared, he's crying. People are leaving church. An unknown male parishioner was observed yelling to the agitators telling them to "get out." LEMON acknowledged that the unknown male parishioner is yelling this. LEMON stated, "I don't think they know what to do. I'm sure they probably called the local authorities right now. People are just really angry and upset and members of the church are trying to get them to calm down." LEMON followed with, "But this is the beginning of what's going to happen here. When you violate people's due process, when you pull people off the street and start dragging them and hurting them and, um, and not abiding by the constitution, when you start doing all of that, people get upset and angry." LEMON goes on to suggest that according to the Constitution, there are no limitations to protesters on where and when they can exercise their Constitutional rights. That's the whole point of it is to disrupt, and that's what they're doing and that's what I believe."

36. While at the church, LEMON interviewed ARMSTRONG, who stated, "I told [inaudible] that Victim 1 is a pastor here and he also serves as a Director of the Field Office for ICE in St. Paul. LEMON asked, "Are you sure that he's…?" ARMSTRONG answered, "Yes, Cities Church, and that's why we're here. We're demanding justice for Renee Good and letting them know that this will not stand. They cannot pretend to be a house of God while harboring someone who is directing ICE agents to wreak havoc upon our community and who killed Renee Good, who almost killed a six-month-old baby. Enough is enough. I am a reverend, on top of being a lawyer and an activist."

37. LEMON asked ARMSTRONG, "Who is the person that we should talk to? Is our pastor or something? ARMSTRONG replied, "He might have ran away." LEMON replied, "All right, we'll see if we can find him." LEMON informed his audience, "I'm going to talk to the pastor. Let's see if I can talk to him."

**F. LEMON and Other Agitators Corner Pastor in Church**

38. LEMON then approached the pastor and began asking him questions. In response to a question from LEMON, the pastor (Victim #7) said, "We were interrupted by this group of protesters. We asked them to leave and they, um, obviously have not left. This is unacceptable. This is shameful. It's shameful to interrupt a public gathering of Christians in worship. LEMON advised the pastor that, "We live in a, there's a constitution and the First Amendment to freedom of speech and freedom to assemble and protest." The pastor replied, "We're here to worship Jesus because that's the hope of these cities. That's the hope of the world is Jesus Christ." LEMON interrupted and then told the pastor, "I want to be very respectful, please don't push me, though."

39. In the video, LEMON is standing very close to the pastor. In the livestream, the pastor appears to be worried and distraught about his parishioners, whom he keeps looking at. LEMON continues to distract the pastor with questions. The pastor then stated, "I have to take care of my church and my family. So, I ask that you actually also leave this building. LEMON asked, "You don't want us to worship?" The pastor replied, "unless you're here to worship." LEMON replied, "I'm always worship[ing]; I'm a Christian." Approximately thirteen minutes later, LEMON exited the Cities Church.

40. Other video footage shows that, at this point during the incident, the pastor appears to be cornered by LEMON, RICHARDSON, GEORGIA ELLYSE FORT ("FORT"), and other unidentified agitators.

**G. Facts Obtained From Other Video Footage of Incident**

41. I observed other livestream footage taken by another agitator who was inside the Cities Church, when the agitators began their protest. In that video, I observed the pastor standing at the podium with both hands on each side of the lectern in what appears to be an observing stance. During the recording, I am able to hear, "Hands up, don't shoot." KELLY is shown standing in front of the lectern with his phone camera pointed at the pastor. The pastor is then shown pointing towards the exit of the church, in what appears to be a gesture to dismiss KELLY.

42. In the video, I also observed a female parishioner in the corner of the church holding two toddlers in a protective way, with what appears to be a look of anxiety and fear on her face. KELLY is also shown in the video engaging with a parishioner in an aggressive, confrontational manner within the parishioner's personal space. KELLY was yelling at the parishioner, asking multiple questions along the lines of, Why aren't you involved in the protests? ALLEN is observed leading the agitators in various chants.

**H. Review of Cities Church Broadcast Footage & Related Videos**

43. Broadcast video obtained from Cities church shows ARMSTRONG, ALLEN, LEMON, RICHARDSON, KELLY, FORT, LUNDY, CREWS chanting with agitators and obstructing parishioners' path of travel.

44. The image below depicts ARMSTRONG, FORT, ALLEN, and LUNDY obstructing parishioners' freedom of movement, in addition to LUNDY chanting and punching his fist in the air. CREWS can also be observed chanting with agitators:



45. The image below depicts CREWS and KELLY obstructing and confronting parishioners. Additionally, ARMSTRONG, FORT, and RICHARDSON can be observed obstructing the aisle and the parishioner's freedom of movement:



46. The image below depicts CREWS and KELLY confronting and obstructing victim 7, who appears to be overwhelmed and frightened. ARMSTRONG and FORT can also be observed obstructing the aisle and the parishioner's freedom of movement:



47. The image below depicts ALLEN confronting parishioners, who appears to be comforting his wife during the protest:



48. The image below depicts FORT, LEMON, and RICHARDSON obstructing victim 7, who can be seen surrounded by agitators. ALLEN can also be observed obstructing the parishioner's freedom of movement. CREWS can be seen with his arm the air chanting with other agitators.



49. The image below FORT, LEMON, and RICHARDSON obstructing victim 7 and an unidentified parishioner, who can be seen surrounded by agitators:




Cities Church broadcast video confirmed FORT was present at the protest. A review of open-source social media videos showed FORT live-streaming the protest, in addition to interviewing ARMSTRONG and victim 7. FORT, LEMON, RICHARDSON, and other agitators were later seen intimidating and obstructing the pastor's freedom of movement, as noted above.

50. Cities Church broadcast also showed TRAHERN JEEN CREWS ("CREWS") present at the protest, recording with his phone, chanting with the agitators, and obstructing parishioners' freedom of movement.

**I. <u>Complaints to and Related Information from St. Paul Police Department</u>**

51. I have reviewed an Incident Report from the St. Paul Police Department (SPPD) regarding the incident at Cities Church. I learned the following information:

52. According to Officer Jonathan Schroeder, on January 18, 2026, at approximately 10:40 a.m., St. Paul Police Department (SPPD) received multiple calls from parishioners at Cities Church reporting approximately 20-40 individuals disrupting their worship service by chanting and protesting. Shortly after arriving on scene, SPPD Officers observed

protesters leaving the building and moving to the driveway on the west side of the church. The protesters continued to chant for approximately 30 minutes, then left the area. Officers Schroeder learned this protest was happening because one of their pastors is allegedly a Director for ICE. Members of the church's staff requested SPPD to document what happened and said they wanted to press charges if it's possible to identify anyone in the protest.

53. According to SPPD Sergeant Ilya Tereshko, on January 18, 2026, at approximately 10:40 a.m., Officers were dispatched to Cities Church on a call of disorderly conduct where protesters were disrupting church services. Church clergy advised Sergeant Tereshko that their parishioners were shaken up during the incident and many left early due to the protesters. There was also concern that there would be more disruptions in the future as well as vandalism to the building, because of the potential national attention that this incident could get due to the presence of LEMON, who is a former CNN news anchor.

54. According to Sergeant Matthew St. Sauver, he was made aware of a possible protest in the parking lot of a shopping center at Cub Foods, 1440 W University, beginning at approximately 10:00 a.m. At approximately 10:15 am., Sergeant St. Sauver directed a police unit to go to the area and see if the group was there and if they were protesting. A police unit responded and observed the group getting into their vehicles and leaving in a caravan formation, heading southbound on Hamline Street in St. Paul, Minnesota. Sergeant St. Sauver monitored Black Lives Matter MN live stream remotely at https://www.facebook.com/share/v/17mmiBpk1Y/ and identified the following individuals on livestream at the protest: CREWS (Head of BLM MN), ALLEN, (Member of St Paul School Board), ARMSTRONG, and FORT.

55. According to SPPD Computer Aided Dispatch (CAD) form, Victim 2 broke her arm exiting through the Cities Church office door when proceeding towards Saratoga Street. When Victim 2 came out the door and was running, she slipped and broke her arm. I believe this is documented in LEMON's broadcast as described above. Per the report, Victim 2 advised the SPPD that "they were terrorized, our children were weeping, college students and young women were sobbing, it was impactful and it will take time to work through." (It should be noted the CAD report for this incident states it occurred January 19, 2026, I know the incident occurred on January 18, 2026.)

**J. <u>Further Investigation</u>**

56. During the course of the investigation, agents discovered a flyer posted on Instagram by "racialjusticemn" and "nekimal," advertising Operation Pullup, Sunday January 18, 10:00 a.m. sharp, at Cub Foods Parking Lot (Midway Area, St. Paul). Nekimal is ARMSTRONG's personal Instagram account. Instagram is a social media platform where users are able to post photos and videos. The following photo is a screenshot of the Instagram post posted by "racialjusticemn" regarding Operation Pullup.




K. <u>Interviews of Victim-Witnesses</u>

57. On January 19, 2026, the Federal Bureau of Investigation (FBI) identified and interviewed Victims 4 and 5, both of whom have been members of Cities Church for at least four years and present during the January 18, 2026 protest. I have learned the following from a report of the interview. Victim 5 noticed Cities Church was unusually full and noticed a group of unfamiliar individuals seated together towards the rear of the church. Victim 4 noted after the protest began, approximately fifty members of the congregation were stuck towards the front of the church. Victim 4 informed agents the aisles are already narrow to begin with, and the agitators who occupied the center of the sanctuary made it nearly

impossible for parishioners to get out and leave. Victim 5 later expressed fear that the agitators may have guns underneath their jackets. Additionally, when the agitators began shouting, all the parishioner could hear was "shoot."

58. Victim 4 informed agents that members of their parish attempted to retrieve their children from the childcare area located downstairs, but the agitators were blocking the stairs, and the parents were unable to get to their children. Victim 4 recalled one agitator was threatening, aggressive, and intimidating towards parishioners. Additionally, this agitator was screaming and getting in people's faces, to include women and young children. This agitator continued to scream in the faces of young children while they were crying.

59. On January 19, 2026, Homeland Security Investigations (HSI) and Federal Bureau of Investigations Special Agents interviewed Victim 6 regarding the incident that took place at Cities Church on January 18, 2026. I've learned the following from a report of the interview. Victim 6 was joined by his wife, Victim 2, and their children. Victim 6 recalled an African-American woman yelling "EXCUSE ME PASTOR, EXCUSE ME PASTOR, do you know you're harboring ICE Agent [victim 1]?" Victim 6 recalls protesters everywhere in the aisles chanting "[victim 1 out!]" Victim 6 thought to himself that this is what it would feel like to be in a mass shooting. Victim 6 described the events as surreal and could not believe what was happening. Victim 6 recalled people shouting and running, children crying, as well as people singing and praying. Victim 6 recalled KELLY screaming "Nazi" in people's faces, in addition to confronting children saying, "do you know your parents are nazis, they're going to burn in hell."

60. Victim 6 was scared the agitators were not going to let people leave and that they were going to harm victim 1's family for harboring victim 1. Victim 6 later stated protesters followed

and surrounded them in their car and would not let them leave. Victim 6 informed agents that their face is on the Cities Church website, and they are afraid people will try and come to their house at night. Victim 6 recalled his child stating to him "Daddy, I thought you were going to die." Victim 6 ended the interview and acknowledged that his children are traumatized.

**L. Arrest**

61. On January 22, 2026, at approximately 8:15am agents observed an individual they believed to be Chauntyll ALLEN in the hallway of the Aloft Hotel in Minneapolis, MN. Agents were aware that ALLEN was the subject of an outstanding federal criminal arrest warrant. Agents approached this individual and asked her if she was Chauntyll ALLEN. ALLEN confirmed that she was Chauntyll ALLEN. At this time, ALLEN was taken into custody. Agents escorted ALLEN downstairs to transport her to the Warren E. Burger Federal Building.

62. ALLEN was then transported to the Warren E. Burger Federal Building in St. Paul, MN. An Agent conducted a search of ALLEN and found a phone, which she identified as hers, in the front pocket of her sweatpants. This phone was then placed in airplane mode and put into a Faraday bag.

## CONCLUSION

63. Based on all of the foregoing facts, I submit that there is probable cause to believe that defendant ALLEN has committed a violation of 18 U.S.C. §§ 241 (Conspiracy Against Rights Secured by Federal Law, namely, the free exercise of religion at a place of religious worship secured by the FACE Act, 18 U.S.C. § 248(a)(2)), and 248(a)(2) (FACE Act).

## TECHNICAL TERMS

64. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or

miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to

the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

65. Based on my training, experience, and research, I know that the SUBJECT DEVICES have capabilities that allow them to serve as "a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA." In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

66. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

67. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the SUBJECT DEVICE were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECCT DEVICE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

68. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

69. Manner of execution. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

70. Return of ESI. If law enforcement agents determine that the SUBJECT DEVICE is no longer necessary to retrieve and preserve the data, and the SUBJECT DEVICE is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the SUBJECT DEVICE will be returned, upon request.

**CONCLUSION**

71. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICE described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Timothy Gerber
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me telephonically on January 23, 2026:

HONORABLE SHANNON G. ELKINS
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MINNESTOA

# ATTACHMENT A

The property to be searched is a black Google phone in a clear plastic case (the "SUBJECT DEVICE"). The SUBJECT DEVICES are currently located in the District of Minnesota.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

All records on the SUBJECT DEVICE described in Attachment A that relate to violations of 18 U.S.C. §§ 241 (Conspiracy Against Rights Secured by Federal Law, namely, the free exercise of religion at a place of religious worship secured by the FACE Act, 18 U.S.C. § 248(a)(2)), and 248(a)(2) (FACE Act), including:

a. Names and telephone numbers, as well as the contents of all call logs, text messages, messages sent via telephone messenger applications, emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, Facebook posts, Instagram posts, FaceTime logs, Google Voice calls, Internet activity (including browser history, web page logs, and search terms entered by the user), and other electronic media;

b. Photographs or videos relating to the Subject Offenses;

c. Contact lists;

d. Passwords, encryption keys and other access devices that may be necessary to access the SUBJECT DEVICE;

e. Contextual information necessary to understand the evidence described in this attachment;

i. Any information recording the DEFENDANTS' schedule or travel, including geolocation information;

j. All bank records, checks, credit card bills, account information, and other financial records;

k. Records of Internet Protocol addresses used; and

l. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigative agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

SEARCH WARRANT ADDENDUM

1. In conducting the search authorized by this warrant, the government shall make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant.

2. If electronically stored data, information, documents or other records have been identified and seized by the government pursuant to this warrant, the government may retain the electronic storage device (e.g., computer, hard drive, mobile device, smartphone, cell phone). The person from whom the electronic storage device was seized may request that the government provide him or her with electronic copies of the data, information, documents or other records by making a written request to the United States Attorney's Office, identifying with specificity the data, information, documents or other records sought to be copied. The government must respond to all such requests within a reasonable amount of time, and must provide a copy of the electronically stored data, information, documents or other records requested unless the copies requested constitute contraband, instrumentalities, or property subject to forfeiture.

3. Nothing in this warrant shall limit or prevent the government from seizing the electronic storage device as contraband or an instrumentality of a crime or commencing forfeiture proceedings against the electronic storage device and the data contained in the device. Nothing in this warrant shall limit or prevent the owner of the electronic storage device, files, software, hardware, data, information, documents or other records from (a) filing a motion with the Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the Return of Property, or (b) making a request of the government to return certain specified electronic storage devices, files, software, hardware, data, information, documents or other records.

4. The government shall establish a search methodology governing the review of seized data to ensure that no attorney-client privileged communications will be inadvertently reviewed by the prosecution team. In the event that data seized pursuant to this warrant are identified by the government as possibly containing attorney-client privileged communications, an Assistant United States Attorney, who is not a member of the prosecution team and who is not participating in the search, shall act as a "taint team" to set up an ethical wall between the evidence and the prosecution team that will prevent any privileged material from getting through to the prosecution team.