AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
District of Minnesota

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (612) 598-0559 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE

**SEALED BY ORDER OF THE COURT**

Case No. 26-mj-32 (DLM)

## APPLICATION FOR A SEARCH WARRANT

I, Timothy Gerber, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A, incorporated here.**

located in the State and District of Minnesota, there is now concealed:

**See Attachment B, incorporated here.**

The basis for the search under Fed. R. Crim. P. 41(c) and 18 U.S.C. 2703(c)(1)(A) is *(check one or more)*:

X evidence of a crime;
X contraband, fruits of crime, or other items illegally possessed;
X property designed for use, intended for use, or used in committing a crime;
___ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, United States Code, Section 241 | Freedom of access to clinic entrances, Interference with rights |

The application is based on these facts:

**See attached Affidavit**

X Continued on the attached sheet.

X Delayed notice of 30 days (give exact ending date if more than 30 days) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's Signature*

SUBSCRIBED and SWORN before me by reliable electronic means (Facetime and/or email) pursuant to Fed. R. Crim. P. 41(d)(3)

Special Agent Timothy Gerber
HSI
*Printed Name and Title*

Date: 1/21/26

*Judge's Signature*

City and State: St. Paul, MN

The Honorable Douglas L. Mikco
United States Magistrate Judge
*Printed Name and Title*

**Exhiibt 1**

**Exhiibt 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (612) 598-0559 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE | TO BE FILED UNDER SEAL<br><br>No. 26-mj-32 (DLM) |

AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT

I, Timothy Gerber, being first duly sworn, hereby depose and state as follows:

INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (612) 598-0559, with listed subscriber Nekima Valdez LEVY ARMSTRONG (the "TARGET CELL PHONE"), whose service provider is T-Mobile (the "Provider"), a wireless telephone service provider located in Parsippany, New Jersey. The TARGET CELL PHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. See 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. See 18 U.S.C. § 3123(b)(1).

**Exhiibt 1**

3. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Special Agent (SA) with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI), and have so employed since March of 2025. In my capacity as a Special Agent, I am responsible for conducting investigations into the numerous federal laws enforced by HSI. Since March of 2025, I have investigated various criminal violations relating to child exploitation, assaults on federal officers, human rights violations, and immigration violations. I am a graduate of the Federal Law Enforcement Training Center (FLETC), HSI Special Agent Training Program, having completed training in surveillance, search and arrest warrants, federal laws enforced by HSI, and federal criminal procedures. Prior to my tenure as a HSI Special Agent, I was employed as a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI), where I investigated various criminal violations relating to the Internal Revenue Code, money laundering, digital currency, and elder exploitation.

4. This affidavit is based on my personal knowledge, as well as information I have learned from other law enforcement officers and the review of reports, written materials, and recordings at the time of this affidavit. This affidavit does not include all of the details I have learned regarding this investigation. Rather, it only includes information believed to be sufficient to establish probable cause.

5. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a



**Exhiibt 1**

district court of the United States that has jurisdiction over the offense being investigated. See 18 U.S.C. § 2711(3)(A)(i).

6. Based on the facts set forth in this affidavit and the attached exhibit, there is probable cause to believe that ARMSTRONG has violated 18 U.S. Code § 241 - Conspiracy against rights and 18 U.S. Code § 248 - Freedom of access to clinic entrances (the "SUBJECT OFFENSES"). There is probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting ARMSTRONG, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

## PROBABLE CAUSE

7. On January 18, 2026, at approximately 1000 hours, Don Renaldo LEMON (LEMON) aka "TheDonLemonShow" began live streaming in the parking lot of Cub Foods, 1440 University Ave W, St Paul, MN 55104. LEMON initiated the broadcast by stating he just got into Minneapolis, Minnesota and he is speaking to an organization who is gearing up for resistance and protest. Based on my training and experience, someone who identifies as a resistance protester in Minnesota has recently sought to disrupt ICE operations. LEMON identified the protesters as "MAGA-coated", due to the presence of the American Flag, but later determined they are resistance protesters. Your affiant advises that I used the YouTube closed-captioning option to assist with transcriptions. These are resistance protesters that are planning an operation which LEMON intends to follow them on. LEMON identified their operation as "Operation Pullup" and identified ARMSTRONG who has been doing this since George Floyd (Floyd), Daunte Wright (Wright), and others. Floyd and Wright were both victims of police brutality in Minnesota, subsequently losing their lives. According to LEMON, ARMSTRONG's

organization surprises people, catch them off-guard, and holds them to account. LEMON identified these as surprise operations but couldn't say where they were going.

8. LEMON introduced LUNDY, who is out there to support his community activists. LUNDY identified himself as a current candidate for Minnesota State Senate, District 65. LUNDY felt it's important if you're servicing people in office, you have to be with the people as well.

9. LEMON walked away from LUNDY to focus his attention on the agitators and a chant directed by ALLEN. The initial chants led by ALLEN were "this is what community looks like", and "ICE out". ALLEN then directed the agitators to respond with "of Minnesota" when she says, "ICE out". ALLEN requested the favorite chants of the local agitators, one suggested "justice for Renee Good (Good)". Good was recently involved in an interaction with ICE law enforcement, resulting in her death. ALLEN proceeded to lead the group in that chant, as well as "say her name", which the agitators responded with "Renee Good".

10. ALLEN described their reasoning for being out at the staging location, stating they have a "duty to fight for our freedom", "we have a duty to win", "we must love and support one another", "we have nothing to lose but our chains". ALLEN then stated to the agitators "you guys are sounding like Sunday morning." ALLEN continued to address the crowd in a motivational manner. ALLEN instructed the agitators to "stay bumper-to-bumper, make sure everybody gets through the light, and we all have the address, right?"

11. ARMSTRONG addressed the agitators, requesting that they had the address. ARMSTRONG followed with "remember if you have anything that is activist identifying, do not wear it in if you're just going in to sit down and be a part of the situation. A question from an unidentified agitator directed to ARMSTRONG asked if they should spread out, ARMSTRONG directed the agitators to not sit together. ARMSTRONG reaffirmed if you have anything activism identifying, do not go in with the first wave, you wait until you come in with us people of color.

12. LEMON proceeded to move the camera away from the agitators and organizers because he did not walk to divulge critical information about the operation. LEMON went to the crowd of agitators and organizers and proceeded to thank them for allowing him to be there. LEMON spoke with ARMSTRONG and stated "we're not saying what it is, what's going on, but thank you. Tell us why you're doing this." ARMSTRONG identified herself as a civil rights attorney, and longtime activist in the community. ARMSTRONG does activism and protests in all kinds of ways. ARMSTRONG identified this as "Operation Pullup", more of a "clandestine" operation. ARMSTRONG and agitators "show up somewhere that is a key location, they don't expect us to come there, and we disrupt business as usual. That's what we're about to go do right now. We've had a lot of success with the times we've done "Operation Pullup." ARMSTRONG detailed prior protests and stated "this is our next action to call for justice for Renee Good and ICE out of Minnesota. LEMON asked, "how long do you think before this operation would [inaudible] before it takes place?" ARMSTRONG replied, "we got to go now and get there." LEMON replied, "we'll see you there." LEMON advised the

audience "we're going to head to the operation, again, we're not going to give any, any of the information away."

13. Your affiant advises that after reviewing LEMON's broadcast, KELLY is present in the crowd that was briefed on instructions by ARMSTRONG and ALLEN about the operation.

14. Your affiant advises that ARMSTRONG and ALLEN appear to be the leaders of Operation Pullup and the meeting of agitators that was described in paragraphs four through nine. Your affiant believes this because of the led chants, instructions, and interviews conducted by ARMSTRONG and ALLEN viewed during the LEMON broadcast.

15. LEMON and RICHARDSON, along with a rear passenger, Michael LNU, enter their vehicle to depart towards the location of the operation. LEMON asked RICHARDSON, the driver, "you know where we're going, right?" RICHARDSON replied, "yep."

16. An individual that identified himself as "Mark" approached LEMON, thanked LEMON, and introduced himself. LEMON advised Mark, "you're on right now, just so you know. So don't give anything away." A short time later, RICHARDSON said "alright, we're behind operation, we gotta catch up." LEMON replied, "let's go catch up" and later, advised RICHARD and Michael, "don't give anything away."

17. On the drive to the operation location, LEMON advised his audience they are doing a clandestine secret operation. LEMON asked RICHARDSON, "they found out some inside information, right?" RICHARDSON responded, "yeah." LEMON identified who

RICHARDSON is, that he is a producer, and that they met at Essencefest a "couple years ago." RICHARDSON identified himself as an activist and social entrepreneur. While still on the drive, LEMON stated "this is just the beginning of this uh clandestine operation that they're doing here because of some um inside information that they got. So, this is going to be very interesting. I don't think we can go ahead. I don't think we can go inside, right? No." Michael replied, "we can stand outside." LEMON later stated "we can't say too much. We don't want to give it up." The occupants of the vehicle discussed going into a church service that is underway with parishioners. LEMON later stated "I'm just trying to figure out what's the best thing cuz we just found out about this this morning. I'm just trying to figure out if it's, um, if it's for me to go inside so I can tell what happened. That's what I'm gonna do." Michael responded, "I know I'm also not supposed to really like go in, right?" RICHARDSON responded, "but you can go in," Michael added, "because they're going to buy that." LEMON asked, "will they let you in with a camera?" RICHARDSON replied, "put it in your backpack." LEMON answered, "no, you can't do that. We can't do that. We can't do that." RICHARDSON asked, "Oh, we can't?" LEMON replied, "no," and later stated "let me produce this live as we're doing this." LEMON then instructed RICHARDSON "and if there's a place to turn, I want you to go where and park right where we can see the entrance." RICHARDSON replied, "I don't think that's the main entrance going on." LEMON replied, "yeah, it's right there". RICHARDSON replied, "Oh, where people are walking down those stairs."

18. As LEMON approached Cities Church at 1524 Summit Ave, St. Paul, MN 55105, LEMON advised Michael to "stay on the sidewalk, you can probably come where the van is." Your affiant advises there is a red vehicle parked in front of Cities Church that LEMON

is referring to. During the LEMON broadcast, the camera focused on the outside of Cities Church, and LEMON entered only with audio equipment. You are able to hear what is presumed to be the pastor engaged in active sermon preaching to his congregation.

19. Approximately one minute and forty-seven seconds after LEMON entered Cities Church, a unknown female voice, interrupted the pastor sermon and shouted "excuse me, pastor…" LEMON is then heard saying "Hey, Meta record". Based on my training and experience, your affiant advises that Meta are smart glasses that integrate augmented reality features, allowing users to interact with digital content seamlessly. While the cameraman remained outside, you can hear the agitators yelling in the church. At one point, an unknown female refers to the Director of ICE. Agitators can also be heard yelling "justice for… Renee Good." Approximately thirty-five seconds later, RICHARDSON is observed entering Cities Church. Immediately after RICHARDSON enters Cities Church, parishioners are observed exiting Cities Church through multiple doors. Three unknown parishioners are observed falling to the ground while exiting Cities Church through the north door. Approximately twenty seconds later, Michael is observed entering Cities Church.

20. RICHARDSON entered Cities Church with his camera recording LEMON's live broadcast. It appears to your affiant there is confusion between parishioners and agitators. Agitators can be heard yelling "ICE out" and blowing whistles. Based on my training and experience, anti-ICE agitators use whistles to disrupt ICE operations and notify others of their presence. During the LEMON broadcast, ARMSTRONG and ALLEN are observed yelling "ICE out." Your affiant advises KELLY can be heard yelling "this ain't God's house. This is the house of the devil." Your affiant knows this to be KELLY's voice from numerous social media

posts that your affiant has observed and listened to. LEMON can be observed walking with a winter-style jacket and hood over his head, in what appears to be an attempt to conceal his identity. Several other agitators or parishioners are wearing winter-style jackets with their hoods down. LEMON stated in his broadcast Operation Pullup learned that one of the pastors for Cities Church is a member of ICE. During his broadcast, LEMON tells his viewers that's there "chronicling and reporting. We're not a part of the activists, but we're here just reporting on them." RICHARDSON is observed engaged in agitator chants, yelling and raising his hands. LEMON stated "I'm looking at a young man who's in the corner, he's frightened, he's scared, he's crying. People are leaving church. An unknown male parishioner was observed yelling to the agitators telling them to "get out." LEMON acknowledged that the unknown male parishioner is yelling this. LEMON stated "I don't think they know what to do. I'm sure they probably called the local authorities right now. People are just really angry and upset and members of the church are trying to get them to calm down." LEMON followed with "but this is the beginning of what's going to happen here. When you violate people's due process, when you pull people off the street and start dragging them and hurting them and um, and not abiding by the constitution, when you start doing all of that, people get upset and angry." LEMON goes on to suggest that according to the Constitution, there are no limitations to protesters on where and when they can exercise their Constitutional rights. That's the whole point of it is to disrupt, and that's what they're doing and that's what I believe…

21. LEMON interviewed ARMSTRONG who stated "I told [inaudible] that Victim 1 is a pastor here and he also serves as a Director of the Field Office for ICE in St. Paul. Victim 1. LEMON asked, "are you sure that he's…?" ARMSTRONG answered, "yes, Cities

Church, and that's why we're here. We're demanding justice for Renee Good and letting them know that this will not stand. They cannot pretend to be a house of God while harboring someone who is directing ICE agents to wreak havoc upon our community and who killed Renee Good, who almost killed a six-month-old baby. Enough is enough. I am a reverend, on top of being a lawyer and an activist." LEMON asked ARMSTRONG "who is the person that we should talk to? Is our pastor or something? ARMSTRONG replied, "he might have ran away." LEMON replied, "all right, we'll see if we can find him." LEMON informed his audience "I'm going to talk to the pastor. Let's see if I can talk to him."

22. LEMON interviewed the pastor who stated "we were interrupted by this group of protesters. We asked them to leave and they um, obviously have not left. This is unacceptable, this is shameful. It's shameful to interrupt a public gathering of Christians in worship. LEMON advised the pastor that "we live in a, there's a constitution and the first amendment to freedom of speech and freedom to assemble and protest." The pastor replied, "we're here to worship Jesus because that's the hope of these cities, that's the hope of the world is Jesus Christ." LEMON interrupted and stated, "I want to be very respectful, please don't push me though." In the video, LEMON is standing close to the pastor. In the broadcast, the pastor appears to be worried and distraught about his parishioners, whom he keeps looking at. LEMON continues to distract the pastor with questions. The pastor then stated, "I have to take care of my church and my family. So I ask that you actually also leave this building. LEMON asked, "you don't want us to worship?" The pastor replied, "unless you're here to worship." LEMON replied, "I'm always worship, I'm a Christian." Approximately thirteen minutes later, LEMON exited Cities Church.

23. Your affiant advises I observed other social media footage from the inside of Cities Church when the agitators began their protest. I am able to observe the pastor standing at the podium with both hands on each side of the lectern in what appears to be an observing stance. During the recording, I am able to hear "hands up, don't shoot." KELLY is then observe standing in front of the lectern with his phone camera point at the pastor. The pastor is observe aggressively pointing towards the exit of the church, in what appears to be a gesture to dismiss KELLY. I am able to observe a woman in the corner of the church holding two toddlers in a protective way in what appears to be a look of fear on her face. KELLY is observed engaging with a parishioner in a confrontational manner within the parishioner's personal space. KELLY is yelling at the parishioner asking multiple questions along the line of, why aren't you involved in the protests? ALLEN is observed leading the agitators in chant.

24. Broadcast video obtained from Cities Church shows LUNDY chanting with the agitators and punching his fist in the air. I also observed LUNDY give ARMSTRONG what appears to be a hug, then engaging in a brief conversation with her. LUNDY is later observed greeting and shaking hands with the pastor before departing

25. According to Officer Jonathan Schroeder, on January 18th, 2026, at approximately 1040 hours, St. Paul Police Department (SPPD) received multiple calls from parishioners at Cities Church reporting approximately 20-40 individuals disrupting their worship service by chanting and protesting. Shortly after arriving on scene, SPPD Officers observed protesters leaving the building and moving to the driveway on the west side of the church. The protesters continued to chant for approximately 30 minutes, then left the area. Officers Schroeder learned this protest was happening because one of their pastors is allegedly a director



Exhiibt 1

00008219

for ICE. Council of elders requested SPPD document what happened and press charge if it's possible to identify anyone in the protest.

26. According to SPPD Sergeant Ilya Tereshko, on January 18th, 2026, at approximately 1040 hours, Officers were dispatched to 1524 Summit Ave (Cities Church) on a call of disorderly conduct where protesters were disrupting church services. Church clergy advised Sergeant Tereshko that their parishioners were shaken up during the incident and many left early due to the protesters. There was also concern that there would be more disruptions in the future as well as vandalism to the building, because of the potential national attention that this incident could get due to the presence of LEMON, who is a former CNN news anchor.

27. According to Sergeant Matthew St. Sauver, he was made aware of a possible protest in the parking lot of Cub Foods, 1440 W University, beginning at approximately 1000 hours. At approximately 1015 hours, Sergeant St. Sauver requested a police unit to go to the area and see if the group was there and if they were protesting. A police unit responded and observed the group getting into their vehicles and leaving in a caravan formation, heading southbound on Hamline Street in St. Paul, Minnesota. Sergeant St. Sauver monitored Black Lives Matter MN live stream remotely at https://www.facebook.com/share/v/17mmiBpk1Y/ and identified the following individuals on live stream at the protest: Trahern Cruz (Head of BLM MN), Chantel Alan (Member of St Paul School Board), Nekima Levy Armstrong, and Georgia Fort (Protest Journalist).

28. According to SPPD Computer Aided Dispatch (CAD) form, Victim 2 broke her arm exiting through the Cities Church office door when proceeding towards Saratoga Street. When Victim 2 came out the door and was running, she slipped and broke her arm. I



**Exhiibt 1**

00008220

believe this is documented in LEMON's broadcast as described in paragraph sixteen. Victim 2 stated "they were terrorized, our children were weeping, college students and young women were sobbing, it was impactful and it will take time to work through." It should be noted the CAD report for this incident states it occurred January 19th, 2026, I know the incident occurred on January 18th, 2026. It is my belief that this could be due to a computer or clerical error.

29. During the course of the investigation, Agents discovered a flyer posted on Instagram by "racialjusticemn" and "nekimal", advertising Operation Pullup, Sunday January 18th, 10:00am sharp, at Cub Foods Parking Lot (Midway Area, St. Paul). Nekimal is ARMSTRONG's personal Instagram account. Instagram is a social media platform where users are able to post photos and videos. The following photo is a screenshot of the Instagram post posted by "racialjusticemn" regarding Operation Pullup.

30. 


31. Additionally, public data searches reveled that ARMSTRONG associates the TARGET CELL PHONE with ARMSTRONG and her Civil Rights group. In February 2022, a Facebook post by ARMSTRONG lists her phone number as the TARGET CELL PHONE (612-598-0559) for contact related to use of force incident.

32. On January 19, 2026, this affiant served a summons (HSI-MS-2026-023737) on the TARGET CELL PHONE, and received the following information: Customer Name: Nekima Levy Pounds Service; Address: 1101 50th Ave N Minneapolis, MN 55430.

33. Accordingly, I respectfully submit that there is probable cause to collect location information on the TARGET CELL PHONE for the next 15 days to locate and effectuate the arrest of ARMSTRONG. This warrant seeks prospective cell site information for



Exhiibt 1

15 days so that law enforcement can continue to track ARMSTRONG if the arrest does not occur as planned. If law enforcement locates and arrests ARMSTRONG prior to the expiration of the warrant, law enforcement will cease reviewing the location information for ARMSTRONG, as this warrant is sought solely to locate and arrest ARMSTRONG.

TECHNICAL INFORMATION

34. In my training and experience, I have learned that the T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

35. Based on my training and experience, I know that the Provider can collect E-911 Phase II data about the location of the TARGET CELL PHONE, including by initiating a

signal to determine the location of the TARGET CELL PHONE on the Provider's network or with such other reference points as may be reasonably available.

36. Based on my training and experience, I know that the Provider can collect cell-site data about the TARGET CELL PHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## AUTHORIZATION REQUEST

37. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the TARGET CELL PHONE, without geographic limit, for a period of fifteen days (15) days (or until ARMSTRONG is arrested) pursuant to 18 U.S.C. § 3123(c)(1).

38. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay

notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET CELL PHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

39. I further request that the Court direct the Provider to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the Provider. I also request that the Court direct the Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the TARGET CELL PHONE on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

40. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET CELL PHONE outside of daytime hours.

41. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss pending charges that are currently under seal and the upcoming arrest of a charged defendant. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including allowing the defendant to flee from prosecution and endangering the safety of the law enforcement officers who will be executing these arrests.

Respectfully submitted,

Timothy Gerber
Special Agent
United States Department of Homeland Security
Homeland Security Investigations

Sworn to before me by telephone this
21 day of January, 2026

THE HONORABLE DOUGLAS L. MICKO
UNITED STATES MAGISTRATE JUDGE
U.S. DISTRICT OF MINNESOTA

Attorney Certification Under 18 U.S.C. §§ 3121-3127

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant applied for herein will also function as a pen register order. I, an attorney for the Government, certify that the prospective information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation. See 18 U.S.C. §§ 3122(b), 3123(b).

S/ Kristian Weir

Kristian Weir

Assistant United States Attorney

District of Minnesota



Exhiibt 1

# ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number (612) 598-0559, with listed subscriber Nekima Valdez LEVY ARMSTRONG (the "TARGET CELL PHONE"), whose wireless service provider is T-Mobile (the "Provider"), a company located at 180 Washington Valley Road, Parsippany, New Jersey.

2. Records and information associated with the TARGET CELL PHONE that is within the possession, custody, or control of the Provider.

**Exhiibt 1**

# ATTACHMENT B

Particular Things to be Seized

I. Information to be Disclosed by the Provider

All information about the location of the TARGET CELL PHONE described in Attachment A for a period of 15 days, during all times of day and night. "Information about the location of the TARGET CELL PHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the TARGET CELL PHONE on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

**Exhiibt 1**

If ARMSTRONG is arrested prior to the expiration of this warrant, law enforcement will stop reviewing the cell site data as this warrant is sought only to locate ARMSTRONG for purposes of arresting them.

II. Information to Be Seized by the Government

All information described above in Section I that will assist in locating Nekima Valdez LEVY ARMSTRONG, for whom there is probable cause to believe has violated Title 18 U.S. Code § 241 - Conspiracy against rights - Freedom of access to clinic entrances and who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.



**Exhiibt 1**