**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>NEKIMA VALDEZ LEVY ARMSTRONG, *et al.*,<br>Defendants. | No. 0:26-cr-025-LMP-DLM<br>**OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS SUPERSEDING INDICTMENT DUE TO GOVERNMENT MISCONDUCT (Dkt. 756) AND JOINT MOTION TO COMPEL DISCOVERY (Dkt. 758)** |

The United States of America submits this response in opposition to certain defendants' motion to dismiss the Superseding Indictment due to alleged government misconduct and an accompanying motion to compel discovery. (Dkt. 756, 757 & 758.)[1]

## INTRODUCTION

Defendants contend that certain social media posts featuring photos of the arrest of a few, but not all, defendants — including one with an altered photo of defendant Armstrong — amounts to government misconduct that

---

1 The motion was a joint motion by defendants Armstrong, Richardson, Cullars-Doty, Dunlap, Edwards, Goligoski, Hauptman, Hogan, both Michaelsons, Perry, Persigehl, Pineda-Moreno, Elise Swenson, Tier, Vergin, and Weinfurter. Related exhibits were filed separately as ECF 757.

warrants dismissal of the Superseding Indictment. They also seek discovery and an evidentiary hearing relating to the social media posts.

The motion should be denied in its entirety. It establishes no basis for dismissal or their related requests for discovery and an evidentiary hearing. First, the posting of arrest and booking photos on the official websites of law enforcement agencies and elected or appointed officials is commonplace throughout the United States, including Minnesota, and it does not constitute misconduct. Such postings enable officials to communicate directly to the public at large that they are taking prompt action to enforce the law and protect the public and — equally important — to convey a deterrent message to other potential lawbreakers. Second, none of the moving defendants have established that they suffered prejudice because of the posting of their photos or related pre-indictment publicity, some of which defendants amplified to portray themselves as victims of the system. The public is well aware that the criminal justice system begins with an arrest or booking process. Third, any risk of prejudice due to publication of the arrest photos — as distinct from the video evidence of defendants' crimes — can be addressed through far less extreme remedies, including voir dire, a jury questionnaire, and the standard jury instruction that the indictment and arrest of a defendant may not be considered as evidence of guilt. Finally, the identity of persons involved in posting such photos (*i.e.*, the "source" of the alleged prejudice) is

irrelevant and beyond the scope of Rule 16, and there is, therefore, no basis for defendants' requests for discovery or an evidentiary hearing.

## STATEMENT OF FACTS

### A. The Offense Conduct

On Sunday, January 18, 2026, defendants — acting collectively as a mob of approximately 40 agitators — descended upon Cities Church in St. Paul, Minnesota. (Superseding Indictment, Dkt. 144 at 2.) The defendants conspired to obstruct and disrupt a liturgical worship service at the church in "a coordinated takeover-style attack." (*Id*. at 3.)

Because of this attack, the pastor and congregants were forced to end their worship service. (*Id*.) Several congregants fled the Church, fearing a mass shooting. (*Id.* at 12.) In the rush to escape, one congregant suffered an injury to an elbow when she slipped on an icy, unused sidewalk. (Dkt. 23-1 at ¶ 43.)

The defendants did not fear or eschew publicity during their invasion and assault upon the church and its members. Some amplified the intimidating effect of their offense conduct with livestream coverage and later internet posts. (Dkt. 144 at 9-11, 14.) They were proud of their conduct, as some expressed with the chant, "Who shut this down? We shut this down!" (*Id*. at 15.) In the following days, prior to her arrest, defendant Armstrong openly admitted her involvement in the offense and portrayed it as virtuous.

*See, e.g.*, https://www.youtube.com/watch?v=e8_8c4qYkAs (during an interview on January 21, 2026 with the internet-based newscast "Democracy Now!," Ms. Armstrong said she was "unapologetic" about her conduct and admitted, *inter alia*, that she was one of the four main organizers of the illegal protest).

### B. General Procedural History

On or about January 20, 2026, the Government obtained a complaint and arrest warrant against defendants Armstrong, Allen, and Kelly for a violation of 18 U.S.C. § 241 (Conspiracy Against Rights). (Dkt. 23-1.) On January 22, 2026, federal agents arrested Armstrong, Allen, and Kelly based on the complaint. On January 29, 2026, a federal grand jury issued an indictment against nine defendants. (Dkt. 39.)

On February 26, 2026, the grand jury issued a superseding indictment charging an additional 30 defendants. (Dkt. 144.) All Defendants are charged with the same two charges: (1) Conspiracy Against Federally Secured Rights, in violation of 18 U.S.C. § 241; and (2) Interference with the Free Exercise of Religion at a Place of Religious Worship, in violation of 18 U.S.C. § 248(a)(2).

### C. <u>The Government's Arrest of Defendants and Related Social Media Posts</u>

After the complaint was filed, the Government executed arrest warrants on defendants Armstrong, Allen, and Kelly. All three were arrested on January 22, 2026.

On or about the same day (January 22, 2026), a photo of Armstrong's arrest was posted on the official X account of then-Secretary of Homeland Security Kristi Noem. (Dkt. 757-1.) Consistent with Armstrong's own admission during her televised interview of January 21, 2026, the DHS website said that Armstong orchestrated the church takeover and noted that she had been charged with violating 18 U.S.C. § 241. (*Id.*)

Shortly after the DHS post, the White House posted on its X account a digitally-altered version of Armstrong's arrest photo, which depicted Armstrong as crying and distraught over her arrest. (Dkt. 757-2.) The White House also reposted on X a post by then-Attorney General Bondi stating that Armstrong had been arrested at her direction, that the administration was committed to protecting houses of worship, and that there was "more to come." (Dkt. 757-3.) The White House X account also posted a photo of defendant Allen in custody, with a note that there was "more to come." (Dkt. 757-4.) Continuing on January 22, 2026, a similar photo documenting

defendant Kelly's arrest was posted on the X accounts of Noem, Bondi, and the White House. (*See* Dkt. 718 at 3 n.6.)

### D. Defendants' Own Efforts to Generate Publicity

One week lapsed between the allegedly prejudicial social media posts and the initial indictment, handed down January 29, 2026. At no time did Armstrong, Allen, or Kelly — the objects of the challenged social media posts — attempt to petition the Court to address the postings. Instead, defendant Armstrong, as well as her counsel, leaned into the media spotlight and the controversy over the altered arrest photo, thereby further fueling any pre-indictment publicity. For example, defendant Armstrong appeared on CBS News to criticize the altered photo posted on the White House X account. *See* https://www.cbsnews.com/minnesota/news/nekima-levy-armstrong-white-house-altered-photo-talking-points/. Likewise, Kelly touted his arrest on his social media accounts in the week leading up to the initial indictment.

Indeed, the defendants' media campaign started shortly after their mob action assault on the church, before the complaint and arrests. For example, a Tik Tok video from January 18, 2026, shows Armstrong with defendant Lemon condemning ICE, the pastor who was targeted for his role as an ICE official, and the church itself.[2] Kelly posted videos on social media in a

---

[2] https://www.tiktok.com/@4b.forever0/video/7596856811282566413

vulgar tirade daring General Bondi to arrest him.[3] Armstrong appeared in a NewsNation interview on January 19, 2026, proudly claiming credit for the church takeover and criticizing ICE and the Trump administration.[4] She also was quoted in a January 19, 2026, Minnesota Public Radio News item claiming credit for the church takeover and critiquing Cities Church because the targeted ICE officer was a pastor there.[5] On that same day, in an article published by FORTUNE regarding the defendants' church takeover and DOJ's consideration of federal charges, defendants Armstrong and Cullars-Doty were quoted being critical of the church and also of any Justice Department investigation.[6]

On January 21, 2026, as noted above, defendant Armstrong appeared on a televised interview with DemocracyNow! and touted defendants' offense conduct as virtuous and took credit for organizing it.[7] On January 22, 2026, the day Armstrong and Allen were arrested, their supporters — including

---

[3] https://www.foxnews.com/media/anti-ice-protester-william-kelly-dares-pam-bondi-come-arrest-him-after-minnesota-church-disruption ("Come and get me Pam Bondi, you f---in' traitorous b----.")

[4] https://www.youtube.com/watch?v=drLoaK3GEV4

[5] https://www.mprnews.org/story/2026/01/19/protesters-interrupt-service-at-cities-church-in-st-paul-claiming-pastor-works-for-ice

[6] https://fortune.com/2026/01/19/the-curious-case-of-the-ice-pastor-as-minnesota-protesters-disrupt-church-services-and-doj-launches-investigation/

[7] https://www.youtube.com/watch?v=e8_8c4qYkAs

some of the subsequently indicted defendants and Armstrong's defense counsel — appeared at a press conference and rally to decry the arrests and demanding their release from custody.[8]

On January 23, 2026, defendant Fort posted a video showing Armstrong and Allen being released from custody, both of them raising their fists in triumph.[9] The next day, Armstrong appeared for an interview during a 10-minute segment on CNN, during which she again claimed credit for the church takeover and criticized ICE and the case against her, and highlighted the altered photo of her arrest.[10]

On January 26, 2026, Armstrong herself was interviewed on DemocracyNow! during which she criticized ICE, her arrest, and the case against her, including the altered arrest photo which was displayed during the interview.[11] On January 29, 2026, Armstrong and her counsel, along with Allen, Kelly, and Cullars-Doty, participated in a press conference and rally condemning the arrests and charges.[12]

---

8 https://www.youtube.com/watch?v=bfUSxHM-ybc

9 https://www.youtube.com/shorts/72d4GOqD9oY

10 https://www.youtube.com/watch?v=FRbPG7FNeeo

11 https://www.youtube.com/watch?v=0m3QE3kqxPY

12 https://www.youtube.com/watch?v=w7aEgXSktDA

The media campaign by Armstrong and many of her co-defendants — not all of them, to be clear — continued unabated even after the initial and superseding indictments were filed. For instance, on January 31, 2026, Armstrong again appeared on NewsNation for another interview.[13] On February 3, 2026, the New York Times published a positive profile article on Armstrong that, among other things, highlighted the altered photo posted by the White House.[14] On February 6, 2026, Armstrong appeared in a video interview on her own Instagram account and that of an outlet called BTNewsroom during which she again claimed credit for the church takeover and condemned the altered White House photo, which was prominently displayed during the interview.[15] On February 14, 2026, Armstrong, flanked by defendants Allen, Kelly, Austin, and others, appeared at a press conference and rally to criticize the Attorney General and other high-ranking federal officials.[16]

The defendants regularly host press conference rallies after court hearings related to this case, as well as other cases tangentially related to

---

13 https://www.youtube.com/watch?v=Q60Hb3Fwxv4

14 https://www.nytimes.com/2026/02/03/us/politics/nekima-levy-armstrong-minnesota-protest.html

15 https://www.instagram.com/reel/DUa7dT9iDlk/?stkn=NDBib2xseHZmcnlw

16 https://www.youtube.com/watch?v=NrI91xAYSOM

this prosecution. For instance, in April 2026, several of the defendants, led by Armstrong, participated in a press conference following the arrest and subsequent release from custody of an allied protestor arrested outside Cities Church on Easter Sunday.[17] Defendant Armstrong and at least two of the defense attorneys in this case were key speakers at a televised rally on June 16, 2026, condemning federal charges brought against fifteen individuals for violently obstructing and impeding federal law enforcement officers in the Twin Cities, and the alleged "injustices" of this case played a prominent role in their remarks.[18] Consequently, it is defendants, particularly Armstrong, rather than the Government, that have generated the bulk of pre-indictment and pre-trial publicity in this case.[19]

---

[17] https://tinyurl.com/wvewnm6x

[18] https://www.youtube.com/watch?v=ElIjn3deEcY

[19] To be clear, the Government is not hereby criticizing defendants' public statements. The Government's counsel have not asked for a gag order and have no plans to do so. In counsel's view, a pre-trial "gag order" against any defendant is rarely, if ever, appropriate under the First Amendment. The individual is the most beleaguered minority of all (as the columnist Mark Steyn once observed), and the need to speak freely and publicly is most acute when an individual is charged with a crime.

## ARGUMENT

### I. Legal Standard

"Where the defendant has alleged prosecutorial misconduct, dismissal of [the] indictment is proper only when the defendant demonstrates flagrant misconduct and substantial prejudice." *United States v. Wadlington*, 233 F.3d 1067, 1073 (8th Cir. 2000). "Absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *United States v. Morrison*, 449 U.S. 361, 365 (1981).

The burden to prevail on a motion to dismiss based on prejudicial pre-indictment publicity is a "heavy one" in which "'the defendant must show specifically that such publicity caused prejudice and bias in the grand jurors and that the indictment returned was the result of essential unfairness.'" *United States v. Civella*, 648 F.2d 1167, 1173 (8th Cir. 1981) (quoting *United States v. Anzelmo*, 319 F. Supp. 1106, 1113 (E.D. La 1970)). This is true even with respect to "government-engendered" prejudicial publicity resulting from alleged "'intentional misconduct'" *Id.* at 1173-74 (quoting *United States v. Stanford*, 589 F.2d 285, 299 (7th Cir. 1978) *cert. denied* 440 U.S. 983 (1979)). Here, there has been no Government misconduct, nor can any of the defendants point to specific prejudice that was the result of Government publicity of certain defendants' arrests such that it tainted either the original

indictment or the superseding indictment.[20] Defendants' motion must be denied because there is no evidence that Government's alleged misconduct "substantially influenced the grand jury's decision to indict." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255-56 (1988).

## II. **The Government has Not Engaged in Misconduct, and the Defendants Have Suffered No Prejudice**

The challenged social media postings by the press offices of elected and high-level appointed officials regarding the arrests of the first three defendants (*i.e.*, Armstrong, Allen, and Kelly) are not properly regarded as government "misconduct." Moreover, the defendants have not shown that they suffered any prejudice from the challenged postings.

### A. **No Misconduct**

In a republican form of government, public officials need to communicate with the public. With respect to crime, the public has a right to know what law enforcement officials (from the Chief Executive on down) are doing to enforce the law and protect the public. Good public officials keep the public apprised of such things, and, in so doing, they let the public know that

---

[20] Here, the Court has the benefit of having the performed an *in camera* review of the relevant grand jury material. Thus, the Court can easily assess whether "preindictment publicity did, in fact, influence or prejudice the grand jury." *Civella*, 648 F.2d at 1173.

their concerns matter and are being addressed promptly. Good public officials are also mindful of the importance of deterring some people from engaging in similar criminal conduct, and they use public statements to communicate messages of deterrence.

In this case, those legitimate public purposes appears to be what motivated all of the challenged social media posts regarding the arrests of defendants Armstrong, Allen, and Kelly. The defendants' offense conduct was way out of line — indeed, criminal. It terrorized the church members and put them at risk of harm. As noted in one or more prior filings or perhaps at a hearing in this case, the Government candidly admitted that it was concerned defendants' crimes might lead to "copycat" crimes across the country, which would potentially put many people at risk of harm and allow further trampling of the right of religious worship. Thus, when charges were filed and the first three defendants were arrested, it was entirely proper for the Government — *i.e.*, the press offices for the Chief Executive and two Executive Branch Departments — to announce that fact.

The inclusion of arrest photos was not improper. It made clear — with the power of pictures — what words alone could not fully convey. It affirmed what Attorney General Bondi declared the day after the defendants' crimes: that such conduct would not be tolerated. The photos showed that there

would, in fact, be consequences for engaging in threatening, intimidating, and obstructive conduct inside a house of worship.

None of the text accompanying the arrest photos appears to be inaccurate in any respect. As to the one digitally-modified photo, two points bear noting. First, no other digitally-modified arrest photos were published, and that suggests the influence of an internal, self-correcting mechanism — *i.e.*, not a continuing problem that the Court needs to fix or punish. Second, for the benefit of the public, officials need to express themselves bluntly and economically, and that speech is not properly restricted simply because some might regard it as coarse, unrefined, or even unfair to some degree. As the Supreme Court held in *Cohen v. California*, 403 U.S. 15 (1970), the First Amendment protects not only the cognitive content of speech, but also the emotive content of speech — how individuals (including public officials) choose to express themselves to maximize the power of their message.

Finally, the posting of arrest and booking photos on the official websites of law enforcement agencies and the offices of elected or appointed officials is commonplace. It does not constitute a form of government misconduct. Some recent examples out of Minnesota make the point clearly enough. For example, the county sheriff published the booking photo of the 18-year old man — dressed in the orange garb of a jailhouse inmate — who shot and wounded two other teenagers at the homecoming game in Eden

Prairie.[21] The state booking photo of a recently-charged, and similarly-attired Customs and Border Protection officer was also published and is prominently displayed in many news articles and broadcasts.[22] These are just two of countless examples throughout the country, and the photos don't require dismissal of those cases. Thus, this case is not an outlier; the publication of the three arrest photos is not unusual.

**B. <u>No Showing of Prejudice</u>**

Because it is so commonplace, the publication of a defendants' arrest photos is also not inherently prejudicial. It is hard to imagine any member of the public who is unaware of the fact that the initiation of a criminal case often starts with either an arrest or booking, both of which typically generate video and/or photographic evidence that is often made publicly available under FOIA laws and the First Amendment. Thus, the defendants' complaint about the taking and posting of the three arrest photos in this case fails to establish any form of cognizable prejudice.

To successfully challenge an indictment based on a pre-indictment publicity, a defendant must show that the publicity "caused actual prejudice

---

[21] https://kstp.com/kstp-news/top-news/charges-cellphone-data-led-to-arrest-of-teen-in-eden-prairie-homecoming-football-game-shooting/

[22] https://www.youtube.com/watch?v=TwkuqBlRBhU&t=13s

and that the indictment returned was the result of that prejudice." *United States v. Lewis*, 738 F.2d 916, 922 (8th Cir. 1984). The determining factor is the "prejudicial effect of preindictment publicity, rather than its source[.]" *Civella*, 648 F.2d at 1174. Thus, even if the Government generates pre-indictment publicity, the defendants must still demonstrate, with specificity, that the publicity unfairly prejudiced the grand jury against the defendants.

In contrast to this case, *Civella* involved "massive prejudicial publicity" spanning "more than a decade prior the indictment." *Id.* This was exacerbated by government officials participating in interviews with a major news outlets and FBI press releases, all of which the defendants alleged were intended to influence the public in favoring prosecution of defendants while painting "a highly prejudicial image" of the defendants. *Id.* The defendants in *Civella* (and *Stanford*) argued that the Government violated 28 C.F.R. § 50.2 regarding the release of prejudicial information, which amounted to a due process violation requiring dismissal. In both cases, however, the courts rejected those arguments, holding that in the absence of any showing of actual prejudice, dismissal was not warranted, regardless of whether the Government was the source of the alleged prejudicial pre-indictment publicity. *See Civella*, 648 at 1174; *Stanford*, 589 F.2d at 300; *see also United States v. Nunan*, 236 F.2d 576, 593 (2d Cir. 1956) (denying motion to dismiss indictment due to pre-indictment publicity).

Any unfair prejudice harbored by the grand jury because of social media posts or arrest photos is purely speculative. Non-specific allegations of adverse pre-indictment publicity are insufficient to warrant dismissal of the indictment. *See United States v. Burke*, 700 F.2d 70, 82 (2d Cir. 1983). Even if defendants could "establish that the grand jurors were aware of the publicity, that would not in itself establish grounds for dismissal." *United States v. Finley*, 705 F. Supp. 1297, 1308 (N.D. Ill. 1988); see also *United States v. Silver*, 103 F. Supp. 3d 370, 373-74 (S.D.N.Y. 2015), *rev'd & remanded on other grounds,* 860 F.3d 102 (2d Cir. 2017).

The facts in *United States v. Silver* are instructive. There the government filed a complaint against a high-profile politician. Significant media coverage of the criminal investigation had preceded the filing of the complaint, and even before the complaint was unsealed, the press reported that the defendant would be arrested. 103 F. Supp. 3d 370, 373-74 (S.D.N.Y. 2015), *rev'd & remanded on other grounds,* 860 F.3d 102 (2d Cir. 2017). Following the defendant's arrest, the U.S. Attorney engaged in a media blitz, which included explicit public comments that "could reasonably have been interpreted to reflect the U.S. Attorney's personal views as to [defendant's] character or guilt." *Id.* at 374. The defendant also complained of an orchestrated arrest and "photo op" designed to prejudice him. Over the next several weeks, and before a grand jury returned an indictment, the U.S.

Attorney made speeches and media appearances, during which he commented about the pending charges against the defendant. A grand jury indicted the defendant approximately one month after the initial complaint had been filed. *Id.* at 375. The defendant then filed a motion to dismiss the indictment for alleged "government misconduct" relating to the pre-indictment publicity or, in the alternative, for a poll of the grand jury to disclose whether grand jurors had been improperly influenced by the publicity blitz, citing 28 C.F.R. § 50.2. *Id.* at 375-76. Although it found some of the challenged pretrial statements to be troubling, the court concluded that "dismissal of the indictment is not appropriate." *Id.* at 379.

Other courts have reached similar conclusions and refused to dismiss indictments, even with acknowledged prosecutorial misconduct that may have prejudiced the grand jury. In *United States v. Jackson*, 22 F. Supp. 636, 646 (E.D. La. 2014), for example, the district court refused to dismiss the indictment even though there had been documented instances of social media posts and commentary by the line prosecutors who handled the case. The court emphasized that the defendant must show actual prejudice, which she failed to do. *Id.* at 646.[23] In *United States v. Biden*, the district court

---

[23] The documented misconduct involved the same prosecutors whose anonymous online posts in *Bowen* (cited by defendants) resulted in a new trial and sanctions. The key differences were that the prosecutors were

declined to dismiss the indictment based on the pre-indictment disclosures by two IRS agents who allegedly disclosed confidential taxpayer data and grand jury information related to the defendant in media appearances and as whistleblowers testifying before Congress. *See United States v. Biden*, 728 F. Supp. 3d 1054, 1097-1101 (C.D. Cal. 2024).

The cases cited by defendants are distinguishable. *Fredin v. Middlecamp*, 2020 WL 6867424 at *3-*6 (D. Minn., Nov. 23, 2020), involved a relentless online public relations campaign by a litigant consisting of multiple websites and posted videos geared towards harassing the opposing litigants, their counsel, and the Court and Court staff. The case of *United States v. Bowen*, 799 F.3d 336 (5th Cir. 2015), similarly involved repeated clandestine, anonymous social media and online posts by federal prosecutors who were actually involved in the prosecution of the defendants. *Id.* at 355. Accordingly, there was demonstrable evidence of prosecutorial misconduct that "commenced even before indictments were handed down and continued throughout the trial and into post-trial proceedings." *Id.* This rampant misconduct was compounded by the Justice Department's mishandling of the internal investigation into the misconduct. *Id.*

---

posting during the trial and were directly involved in the prosecution. *Jackson*, 22 F.Supp.3d at 644.

The conduct here consists of the publication of a handful of arrest photos — which are commonplace — and social media posts, none of which, contrary to Defendants' assertion, "inappropriately announced Defendants' guilt [or] intimidated witnesses." (Dkt. 756 at 6.) The X post from Secretary Noem was purely factual, announcing Armstrong's arrest along with a picture of her in custody. (Dkt. 757-1.) A similar post from the White House X account references an X post from then Attorney General Bondi, which also announced the arrest of Armstrong and signaled "more to come." (Dkt. 757-3.) The White House's earlier re-post of Secretary Noem's X post contained an altered photo of Armstrong's arrest photo to depict her as crying (Dkt. 757-2). However, that post was quickly accompanied by a "community note" indicating that the photo was altered, and the White House press office acknowledged that fact. The last two challenged X posts show defendants Allen and Kelly in custody following their arrest (Dkt. 757-4; Dkt. 718 at 3 n.6), and both posts appear unremarkable and innocuous.

A handful of social media posts with arrest photos (only one of which was modified), accompanied by factually accurate statements, do not constitute "misconduct." Moreover, defendants fail to show that the posts caused any of the defendants to suffer actual prejudice. Nor can they, especially when the posts are considered in context with the voluminous pre-

indictment and pre-trial publicity generated by Armstrong and other defendants.

Contrary to the subject motion, those defendants who were not "specifically singled out by the Government" were not prejudiced by the alleged misconduct directed at Armstrong, Allen, or Kelly. The majority of them were arrested after being named in the superseding indictment. Thus, any arrest photos of those defendants — if they were even published — could not have possibly prejudiced the grand jury, since *any such photos were taken post-indictment*. Moreover, the Government is not aware of any social media posts by any arm of the Executive Branch that include arrest photos of any defendants other than Armstrong, Allen, and Kelly, and the other defendants do not even claim that their arrest photos were published.

The defendants' claim of prejudice by the pre-indictment social media posts also ignores the defendants' ample use of media tactics to garner sympathy for themselves and their shared cause. As noted above, the defendants, led by Armstrong, have engaged in a constant media campaign to justify their mob takeover at Cities Church on January 18, 2026. The media campaign started even before the Government obtained a complaint against Armstrong, Allen, and Kelly on January 20, 2026, and continued after their arrests and in the week prior to the initial indictment. The media campaign has continued unabated, including many of the defendants, who have taken

to calling themselves the "Righteous 39." Accordingly, most of the pre-indictment and pre-trial publicity is the result of the Defendants' own media campaign, not the result of publicity prompted by the Government.

## III. **<u>There Is No Basis for Granting Discovery or an Evidentiary Hearing Regarding the Social Media Posts</u>**

Defendants' request for discovery (Dkt. 758) regarding the social media posts and the taking of arrest "trophy" photos, should also be denied. As noted above, "*the source*" of the alleged prejudice is irrelevant. *See Civella*, 648 F.2d at 1174 (holding that it was "prejudicial effect of preindictment publicity, rather than its source," that was the determining factor as to whether dismissal is warranted); *see also Silver*, 103 F. Supp. 3d at 380 (rejecting claim that dismissal for pretrial publicity was especially needed because the publicity was "initiated by the prosecutor"); *United States v. Myers*, 510 F. Supp. 323, 324 (E.D.N.Y.1980) (rejecting claim that lower standard for dismissal was appropriate because the pretrial publicity was caused by DOJ officials).

Accordingly, any discovery requested by defendants would be irrelevant because it is aimed at the "*source*" of the alleged pre-indictment prejudicial misconduct, rather than its effect. Even if the Court allowed for it, discovery and an evidentiary hearing are also not needed here to determine who modified the arrest photo of defendant Armstrong. Multiple news reports

confirm that the White House press office posted it as a "meme," reflecting "enforcement of the law." *See* https://www.nbcnews.com/politics/white-house/white-house-shares-altered-photo-arrested-minnesota-protester-nekima-l-rcna255595.

Moreover, courts have consistently denied evidentiary hearings to allow defendants to explore whether the alleged Government misconduct unfairly tainted the grand jury and influenced the decision to indict. In *Finley*, for example, the court denied an evidentiary hearing because the defendant failed to demonstrate the "particularized need for a hearing" reasoning that the defendant was "unable to show prejudice resulting from pre-indictment publicity." *Finley*, 705 F. Supp. at 1308 (citing *Burke*, 700 F.2d at 82).

Likewise, in *Silver*, the court noted that, unlike a petit jury, grand juries do not operate in a vacuum and "need not deliberate in a sterile chamber, completely immunized from reports of those events transpiring about it." *Silver*, 103 F. Supp. 3d at 381; *see also Nunan*, 236 F.2d at 593. Accordingly, the court in *Silver* declined to allow defense counsel to question the grand jurors regarding the pre-indictment publicity.

In *United States v. Hubbard*, the court, in the interest of justice, reviewed the grand jury transcripts *in camera* and noted that if any improprieties were discovered, the Court would consult with counsel to determine appropriate action short of dismissal. 474 F. Supp. 64, 78 (D.D.C.

1979). Although the social media posts at issue here would not justify *in camera* review of the grand jury transcripts, it bears noting that the Court has already had the opportunity to perform an *in camera* review of the transcripts in this case. The Government submits — as the Court can confirm — that the transcripts do not reveal prejudice from pretrial publicity.

## IV. Alternative Means Exist To Address Any Pre-Trial Prejudice

Finally, any *legitimate* concerns about pre-trial publicity can be addressed by a number of alternative means. The drastic sanction of dismissal is, therefore, wholly unwarranted even in a case (*unlike this one*) that involves actual misconduct and actual prejudice.

*First*, defendants could seek a change in venue under Rule 21 of the Federal Rules of Criminal Procedure, or in the alternative seek to move the case to a different division within the district. In *United States v. Blom*, 242 F.3d 799, 803-04 (8th Cir. 2001), for example, the district court moved the trial from Duluth to the Twin Cities in light of significant pre-trial publicity, and the Eighth Circuit approved that solution. Indeed, the Government is considering such a motion in light of defendants' significant pretrial publicity, especially due to reports of leftwing activists encouraging people to attend

seminars about "jury nullification" and then falsely testifying they have not done so in order to get on the jury in politically-sensitive cases.[24]

*Second*, the Court could also make use of the procedural devices also used and approved in *Blom — e.g.*, expand the size of the jury pool, exclude prospective jurors from certain parts of the district where pre-trial publicity was most intense, utilize a juror questionnaire for voir dire, and increase the number of preemptory strikes available to the parties. *Blom*, 242 F.3d at 804; *see also United States v. Rodriguez*, 581 F.3d 775, 789 (8th Cir. 2009) (approving of similar mechanisms to alleviate impact of pretrial publicity); *United States v. Petters*, 2009 WL 3430133 at *2 (D. Minn., Oct. 16, 2009) ("use of a jury questionnaire" during voir dire helps "root out possible prejudice"), *aff'd*, 663 F.3d 375 (8th Cir. 2011).

The availability of these alternative remedies to address prejudicial pretrial publicity is itself a basis for denying defendants' request for the drastic remedy of dismissal.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied.[25]

---

[24] https://www.youtube.com/watch?v=_a87ZAb9YA4

[25] This brief includes a total of 5131 words, excluding the caption and signature block.

DATED: October 12, 2026.

DANIEL N. ROSEN
United States Attorney

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Dep. Asst. Attorney General

NEVILLE S. HEDLEY
Acting Senior Litigation Counsel

*/s/ Neville S. Hedley*

Neville S. Hedley
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 297-3424
E-Mail: neville.hedley@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA