UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br>v.<br><br>**CHARLES LEE SWENSON (34),**<br>Defendant. | Case No. 26-cr-25 (LMP/DLM)<br><br>**UNITED STATES' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE (Docs. 724, 725, 778)** |

Defendant Charles Lee Swenson ("Swenson") moves to suppress the silver iPhone seized at his February 27, 2026 arrest and all evidence obtained from the subsequent court-authorized forensic search of that phone. Docs. 724, 725, 778. Swenson first contends that the warrantless seizure of the phone was unlawful because the phone was not seized incident to his arrest and the plain-view exception does not apply. Doc. 724. He next contends that the March 16, 2026 search warrant was not supported by probable cause, lacked a nexus to the phone, and was overbroad and insufficiently particular. Doc. 725 at 3–8; Doc. 778 at 1–3. Each argument fails.

Agents secured the phone from Swenson at the moment of his arrest and, rather than look at its contents, did exactly what the Fourth Amendment demands: they got a warrant. *Riley v. California*, 573 U.S. 373, 403 (2014) ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.") A neutral magistrate judge found probable cause on a detailed, 18-page affidavit,

and the warrant confined the search to a defined window (January 1, 2026 through March 16, 2026) and to evidence of two specified offenses: (a) Conspiracy Against Rights Secured by Federal Law, namely, the Free Exercise of Religion at a Place of Religious Worship Secured by the FACE Act); and (b) Intimidation and Interference with Exercise of Religion at a Place of Religious Worship, in violation of 18 U.S.C. §§ 241 and 248(a)(2). Doc. 726. Even if the Court were to find some defect, the good-faith exception would foreclose suppression. For the reasons below, the Court should deny the motions

## BACKGROUND.

On January 17, 2026, several of Swenson's co-defendants organized "Operation Pullup," a self-described "clandestine" operation targeting Cities Church in St. Paul and promoted it with a flyer on Instagram and Facebook. Doc. 726 at 6–8, ¶¶ 14, 18–21. The next morning the group, including Swenson, met in a nearby parking lot, made plans for their actions inside the church, practiced chants, and drove to the church together. *Id.* at 6, 8, ¶¶ 15, 22–24. Roughly forty (40) disruptors entered in a coordinated clandestine manner during a religious service, interrupted the liturgical reading to bring "judgment" to the house of God, chanted, blew whistles, and yelled "This ain't God's house. This is the house of the devil." *Id.* at 5, 8–9, ¶¶ 13, 25–27. Swenson physically obstructed congregants as they attempted to leave the church and was observed on video blocking congregants' freedom of movement throughout

the church. *Id.* at 6, 9, ¶¶ 16, 28. Congregants fled, children wept, one woman was injured, and the service ended prematurely. *Id.* at 5–6, 9–10, ¶¶ 13, 29, 31–32. Several disruptors recorded and livestreamed the events on electronic devices. *Id.* at 6–7, 9, ¶¶ 16, 19, 30.

On February 26, 2026, a federal grand jury indicted Swenson and 38 co-defendants under 18 U.S.C. §§ 241 and 248(a)(2). *Id.* at 5, ¶ 9. At 6:05 a.m. the next day, Homeland Security Investigations agents executing arrest warrants at the Swenson's Minneapolis residence took Swenson into custody as he got into his Subaru, and "[a] cellphone was secured from Charles SWENSON at the vehicle." Report of Investigation, MS05F226MS0003-288 (approved May 4, 2026).[1] *See generally,* Body Worn Camera Footage, *Walker, Andree* 0288. Minutes later, agents entered the house with a key Swenson provided and arrested his wife and co-defendant, Robyn Swenson. Report of Investigation, MS05F226MS0003-288 (approved May 4, 2026).[2]

Swenson's motion offers an unsworn, contrary account: that agents took the phone from a table inside the house over his objection. Doc. 724 at 1. Nothing in the record, including body worn footage, suggests that agents viewed the phone's contents before obtaining a warrant.

---

[1] Given the volume of responses and because the report is under a protective order we will not be attaching the report but will present it at the evidentiary hearing.
[2] *See* n.1.

Seventeen days later, on March 16, 2026, Special Agent Timothy Gerber applied for a warrant to search the phone. Doc. 726 at 1–19. His affidavit recounted the facts above; stated that "[a]t the time of the arrest, SWENSON had possession of" the phone, *id.* at 5, ¶ 12; explained that "disruptors and co-conspirators … communicate, organize, and work together with other individuals by utilizing cellular telephones," *id.* at 4, ¶ 5; and reported that similar flyers had been found on co-defendants' phones pursuant to search warrants. *Id.* at 6, ¶ 14. Attachment B to the warrant limited seizure to records constituting "evidence, fruits, and instrumentalities of the … SUBJECT OFFENSES," §§ 241 and 248(a)(2), for January 1, 2026 through the present, in enumerated categories tied to the planning, commission, and subsequent discussion of those offenses. *Id.* at 21–23. An addendum required search methodology that "avoids searching" information "not identified in the warrant" and a taint team for any privileged material. *Id.* at 25–26. Magistrate Judge Shannon G. Elkins found probable cause and issued the warrant that afternoon. *Id.* at 27.

## <u>ARGUMENT.</u>

### I. Agents Lawfully Seized Swenson's Phone Without A Warrant [Doc. 724].

The Fourth Amendment prohibits "unreasonable seizures," and "[t]he warrantless seizure of property is per se unreasonable unless it falls within a

well-defined exception to the warrant requirement." *United States v. Mays*, 993 F.3d 607, 614 (8th Cir. 2021). Two such exceptions independently justify the seizure here. And even if neither applied, the exclusionary rule would not reach the evidence Swenson seeks to suppress.

**A. The phone was seized incident to Swenson's lawful arrest.**

The Supreme Court has long recognized a "search-incident-to-arrest exception to the Fourth Amendment's warrant requirement." *Arizona v. Gant*, 556 U.S. 332, 335 (2009). Incident to an arrest, officers may search "the space within an arrestee's immediate control, meaning the area from within which he might gain possession of … destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969). Items on the arrestee's person fall squarely within the exception. *See United States v. Robinson*, 414 U.S. 218 (1973) (approving seizure of heroin from an arrestee's pocket). And "[b]ecause a seizure is generally less intrusive than a search, the Supreme Court 'has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search … would have been impermissible.'" *United States v. Bragg*, 44 F.4th 1067, 1071 (8th Cir. 2022) (quoting *Segura v. United States*, 468 U.S. 796, 806 (1984)).

Swenson was arrested pursuant to a valid warrant at 6:05 a.m. as he was exciting his Subaru, and "[a] cellphone was secured from Charles SWENSON at the vehicle" at that moment—two minutes before any agent

entered the residence. Report of Investigation, MS05F226MS0003-288 (approved May 4, 2026).[3] The sworn affidavit and Attachment A say the same thing: "[a]t the time of the arrest, SWENSON had possession of" the phone, which was "found on SWENSON's person." Doc. 726 at 5, ¶ 12; *id.* at 20. The Body Worn footage also supports this narrative. A phone on an arrestee's person, or within the vehicle he occupies at the moment of arrest, is within his "immediate control." *Bragg*, 44 F.4th at 1071 (phone taken from a car's seat pocket was seized incident to the arrest of the defendant in his car); It makes no difference whether Swenson had already been handcuffed or otherwise restrained when the phone was secured. *United States v. Perdoma*, 621 F.3d 745, 750 (8th Cir. 2010).

Swenson's motion asserts a different sequence—that agents found the phone on a table inside the house. Doc. 724 at 1. That assertion is unsworn and unsupported by any citation to the record. Rather, the contemporaneous investigative reports, prepared within days of the arrest and months before any motion was filed as well as the officer's Body Worn footage place the phone with Swenson at the vehicle. Report of Investigation, MS05F226MS0003 (approved May 4, 2026)-288;[4] Report of Investigation, MS05F226MS0003

---

[3] *See* n.1.
[4] *See* n.1.

(approved May 2, 2026).[5] The United States will present the arresting agents' testimony at the hearing, play their body worn camera, and that testimony and evidence will establish that the phone was seized from Swenson incident to his lawful arrest.

**B. Alternatively, even on Swenson's account, the seizure was lawful.**

Even accepting Swenson's version of events, the seizure was lawful. Under the framework he invokes, Swenson concedes that the agents were lawfully inside the residence executing the arrest warrant for his co-defendant wife and that they had a lawful right of access to the phone. Doc. 724 at 2. His sole contention is that the phone's evidentiary significance was not "immediately apparent" because agents lacked "probable cause to associate the property with criminal activity." *Id.* (quotation omitted).

Probable cause is not a demanding standard. It requires only "a fair probability that contraband or evidence of a crime will be found in a particular place," assessed through "a practical, common-sense decision." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (cleaned up). "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard for probable cause." *Id.* at 235.

[5] Given the volume of responses and because the report is under a protective order we will not be attaching the report but will present it at the evidentiary hearing.

When the agents saw the phone, they knew: (1) a federal grand jury had, the day before, indicted Swenson for conspiring with 38 others to interfere with religious worship, Doc. 726 at 5, ¶ 9; (2) the conspiracy had been organized and promoted electronically, through a flyer circulated on Instagram and Facebook, *id.* at 6–7, ¶¶ 14, 18; (3) the co-conspirators had assembled for a pre-operation briefing and traveled together to the church, where several of them recorded and livestreamed the events on electronic devices, *id.* at 6–9, ¶¶ 15–16, 19, 25–26, 30; and (4) warrants had already been obtained for co-defendants' phones, and the flyers promoting the operation had been found on them, *id.* at 6, ¶ 14; *see* Doc. 739-1 at 2 (January 23, 2026 warrant for co-defendant Allen's phone). Agents trained in these investigations know that "disruptors and co-conspirators … communicate, organize, and work together with other individuals by utilizing cellular telephones." Doc. 726 at 4, ¶ 5. On those facts there was at least *a fair probability* that an indicted conspirator had used his phone to contact co-conspirators during or after [or before] committing a crime *which is probable cause* to associate the phone with the charged conspiracy.

Swenson's remaining points do not change the analysis. That the agents "had never seen the phone before," Doc. 724 at 2, is beside the point; the question is whether the facts known to the agents made it probable that the phone of a just-indicted conspirator contained evidence of an electronically organized conspiracy, not whether they had previously observed that

particular device. Nor does the six-week interval between the offense and the seizure matter. A phone is "a storage medium for evidence of the crime" that "can store information for long periods of time," Doc. 726 at 15, 17, ¶¶ 35, 36(f), and communications among co-conspirators about the offenses—and about the arrests of co-defendants that had been under way since January, *see* Doc. 3—would be expected to continue well after January 18. Having probable cause, the agents were entitled to secure the phone for the time necessary to secure a warrant rather than leave it where its contents could be deleted.

**C. In any event, the exclusionary rule does not reach the evidence Swenson seeks to suppress.**

Swenson asks the Court to suppress "any evidence discovered pursuant to HSI's seizure" of the phone. Doc. 724 at 1. But agents discovered nothing from the seizure itself. They did not view the phone's contents; they held the device and obtained a warrant 17 days later. Doc. 726 at 4–5, 27, ¶¶ 7, 12. "[T]he question of what police must do before searching a cell phone seized incident to an arrest is … simple—get a warrant," *Riley*, 573 U.S. at 403, and that is what the agents did.

The "fruit of the poisonous tree" doctrine does not apply here. Every piece of evidence from Agent Gerber's affidavit—the flyers, the livestream, the videos, the police report, the indictment—came from sources wholly independent of the seizure; the only fact the seizure contributed is that

Swenson possessed the phone. Doc. 726 at 5, ¶ 12. Agents who had just arrested an indicted conspirator, in an investigation in which they had already obtained warrants for co-defendants' phones, inevitably would have sought a warrant for Swensons'. Because the warrant was not the product of anything learned from the seizure, suppression of the search results would be unwarranted even if the seizure were somehow defective.

As such, Defendant's Motion to Supress Evidence Obtained from the Seizure Of The Silver Iphone With White Back In Clear Case, Doc. 724, should be denied.

## II. The Search Warrant Was Supported By Probable Cause And Was Sufficiently Particular [Docs. 725, 778].

Courts may issue a warrant only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The issuing judge's task "is simply to make a practical, common-sense decision whether … there is a fair probability that contraband or evidence of a crime will be found in a particular place," and "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238–39 (cleaned up). Reviewing courts therefore "accord great deference to the issuing judge's determination that [the] affidavit

established probable cause." *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009) (quotation marks omitted).

Here, the agents obtained a warrant to search digital information on a cell phone seized from an individual who had been arrested, precisely what the Fourth Amendment requires, and Magistrate Judge Elkins found probable cause. Doc. 726 at 27.

**A. The warrant affidavit established probable cause.**

Swenson first argues that the affidavit's description of the Cities Church invasion is "conclusory" and fails to show that he acted with the specific intent that 18 U.S.C. §§ 241 and 248(a)(2) require, because the disruptors were motivated by a pastor's employment with ICE. Doc. 725 at 5–6. The argument misapprehends the standard. "[O]nly a probability of criminal conduct need be shown" in an affidavit, *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) (cleaned up); "only the probability, and not a prima facie showing, of criminal activity is the standard for probable cause." *Gates*, 462 U.S. at 235. Affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation," and "[t]echnical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *Id.* As such, an affidavit need not prove each element of an offense; it need only make criminal conduct probable.

Here, the affidavit did far more. First, it recited that a federal grand jury had already returned a Superseding Indictment charging Swenson and 38 co-defendants with these very offenses. Doc. 726 at 5, ¶ 9. A grand jury's finding of probable cause as to the SUBJECT OFFENSES is, by itself, a "substantial basis" for the magistrate judge to conclude that those offenses were probably committed. *Gates*, 462 U.S. at 238–39. Second, the affidavit laid out specific facts. *See supra* Background A. It described the organizing and online promotion of "Operation Pullup" the day before; the organizer's livestreamed description of a "clandestine" operation to "disrupt business as usual"; the pre-operation briefing, attended by Swenson, at which the group "made plans for their actions inside the church" and practiced chants; the coordinated entry of roughly 40 disruptors during a religious service; the chants, whistles, and statements inside ("This ain't God's house. This is the house of the devil"); Swenson "physically obstruct[ing] congregants as they attempted to leave the church" and "blocking congregants' freedom of movement throughout the church"; the pastor directing the disruptors to leave; and the frightened congregants, weeping children, injured victim, and prematurely ended service. Doc. 726 at 5–10, ¶¶ 13–32.

Those facts establish a fair probability of each offense. Section 248(a)(2) reaches anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure,

intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." Swenson's own conduct—physically blocking worshippers' movement inside a church during a service—is physical obstruction of persons exercising religious freedom at a place of worship, and the planning, the "coordinated clandestine" entry, and the statements made inside support the inference that the interference was intentional. Section 241 requires an agreement to injure, oppress, threaten, or intimidate persons in the free exercise of a federally secured right; the flyers, the pre-operation briefing where plans were made, and the coordinated execution of those plans make such an agreement, and Swenson's knowing participation in it, probable. That the disruptors selected this church because of a pastor's employment, Doc. 725 at 5–6, does not negate the probability that they intentionally interfered with the congregation's worship. The affidavit shows that they chose a religious service as their venue, invoked "judgment" on "the house of God," and obstructed worshippers as they tried to leave. Whether the government can prove intent beyond a reasonable doubt is a question for trial. For a warrant, "a probability of criminal conduct" suffices, *Summage*, 481 F.3d at 1078, and the affidavit established one.

Lastly, Swenson's observation that Agent Gerber joined HSI in March 2025, Doc. 725 at 1, adds nothing. The affidavit disclosed that Gerber

previously served as a special agent with IRS Criminal Investigation, graduated from FLETC's HSI Special Agent Training Program, and "ha[s] repeatedly reviewed and analyzed electronic devices." Doc. 726 at 2–3, ¶¶ 2–3. More to the point, probable cause rests on the facts the affidavit recites—videos, a livestream, flyers, a police report, and a grand jury indictment—not on the affiant's tenure.

### B. The affidavit established a nexus between the phone and the offenses.

Swenson next argues that there is "no evidentiary nexus between any criminal activity, Mr. Swenson, and the cell phone." Doc. 725 at 6. The Government disagrees. "In order to support an application for a search warrant, there must be evidence of a nexus between the contraband and the place to be searched." *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017) (cleaned up). A nexus exists where "information in the affidavit establishe[s]" that a search "would likely result in the discovery of evidence" of a crime, *id.*, and "[f]actors to consider in determining if a nexus exists include the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *Id.* (cleaned up).

The affidavit first tied the phone to Swenson: "[a]t the time of the arrest, SWENSON had possession of" the device, which HSI "retrieved" and has held since. Doc. 726 at 5, ¶ 12; *see id.* at 20 (Attachment A: phone "found on

SWENSON's person … at the time of his arrest"). Swenson's complaint that the affidavit does not explain "how HSI determined that the cell phone belonged to Mr. Swenson," Doc. 725 at 6, overlooks this paragraph. Possession of a phone at the time of arrest is a reasonable basis to believe it is the arrestee's phone—the same basis on which the warrants for co-defendants' phones in this case rested. *See* Doc. 744-1 at 4, ¶ 13 (co-defendant Robyn Swenson "had possession of a Black Apple iPhone" at arrest). And the affidavit sought "user attribution" evidence precisely so that the forensic examination would confirm "who used [the device], and when." Doc. 726 at 15–16, ¶¶ 34, 36(b)–(c).

The affidavit then tied the phone to the crime. The nature of the crime is a 39-person conspiracy that was organized and promoted on the Internet through a flyer circulated on Instagram and Facebook, Doc. 726 at 6–7, ¶¶ 14, 18; publicized through a YouTube livestream, *id.* at 7, ¶ 19; coordinated at an in-person pre-briefing that Swenson attended, *id.* at 6, 8, ¶¶ 15, 23; and recorded by "[s]everal disruptors … on electronic devices," with footage posted to co-defendants' social-media accounts, *id.* at 6, 9, ¶¶ 16, 30. The affiant explained, from training and experience, that "disruptors and co-conspirators … communicate, organize, and work together with other individuals by utilizing cellular telephones," using "phone calls, messaging applications, photos, emails, and other forms of communication," *id.* at 4, ¶ 5, and that such

a device "will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime." *Id.* at 17, ¶ 36(f). That expectation was corroborated, not hypothesized: "[s]imilar flyers have been found on the cell phones of other co-defendants, namely [Armstrong and Allen], pursuant to search warrants." *Id.* at 6, ¶ 14. Given Swenson's attendance at the planning session and his participation in the coordinated entry, there was at least a fair probability that he used his phone to contact co-conspirators during or after [or before] committing a crime.

Swenson's demand for more—observed phone use, intercepted communications, or proof that he was one of the disruptors filming, asks for a prima facie case rather than a probability.

**C. The warrant was not an impermissible general warrant.**

Swenson argues that the warrant was "overbroad and insufficiently particular." Doc. 725 at 6–8; Doc. 778 at 2–3. The Government disagrees.

The particularity requirement "is a standard of practical accuracy rather than a hypertechnical one." *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007) (quotation marks omitted). “The degree of specificity required will depend on the circumstances of the case and the type of items involved." *Id.*

Although the warrant used some "broad language," it "did not authorize a blanket search of documents for no particular purpose, but rather for the

purpose of discovering evidence" of two specified crimes. *United States v. Fiorito*, 640 F.3d 338, 346–47 (8th Cir. 2011) (upholding as "sufficiently particularized" a warrant seeking "[e]ntire files involving [a mail-fraud defendant], including but not limited to … any other document for any other residential real property transaction"). That limitation answers Swenson's complaints about "associates" and "all incoming and outgoing calls." Doc. 725 at 8. In a 39-defendant conspiracy, the identities of the people Swenson was communicating with as the operation was planned, executed, and discussed afterward are core evidence of the conspiracy's membership and coordination; call logs and contact lists are how that evidence is found. The warrant does not authorize the United States to use information about contacts who played no role in the charged offenses, and the United States may not do so.

Second, this warrant carried an express temporal limit: January 1, 2026 through the date of issuance, March 16, 2026. Doc. 726 at 21. That window begins roughly two and a half weeks before the invasion—a reasonable period in which to find the planning, recruitment, and promotion of an operation that was publicly announced on January 17 and described by its organizer as one the group had run before, *id.* at 7–8, ¶¶ 18, 21—and runs forward to capture the "subsequent communications regarding the SUBJECT OFFENSES" that co-conspirators would be expected to exchange as the investigation and arrests

unfolded. *Id.* at 21–22. A 75-day window anchored to the offense is the opposite of a "wide-ranging exploratory search." Doc. 778 at 2.

Third, it was limited by methodology. The addendum obligated the government to "make reasonable efforts to utilize search methodology that avoids searching files, documents or other electronically stored information which is not identified in the warrant" and required a taint team for any potentially privileged material. Doc. 726 at 25–26. The United States has also established a filter team in accordance with Department of Justice procedures, which this Court has already recognized as "appropriate" in this case. *See* Doc. 85 at 4–5; Doc. 86 at 2. HSI's forensic analysts produce filtered extractions before any material is reviewed or produced. Report of Investigation, MS05F226MS0003-540 (approved May 12, 2026).[6] The provision permitting attorneys, support staff, and technical experts to assist in that review, Doc. 778 at 3, defines who may conduct the review "in order to locate evidence, fruits, and instrumentalities described in this warrant"; it does not expand what may be seized. Doc. 726 at 23–24.

The categories Swenson singles out are each tethered to the offenses. Geolocation and travel information was limited to "the schedule or travel of

---

[6] Given the volume of responses and because the report is under a protective order we will not be attaching the report but will present it at the evidentiary hearing.

SWENSON or the indicted co-defendants," Doc. 726 at 23—information that would show the group's movement from the shopping-center staging area to the church and corroborate Swenson's attendance at the pre-briefing. Financial records were limited to those "evidencing interstate travel to/from St. Paul, Minnesota on or about January 18, 2026." *Id.* Passwords and encryption keys were limited to those "necessary to access the SUBJECT DEVICE." *Id.* And "[c]ontextual information necessary to understand the other items to be seized," *id.*, reflects the affiant's explanation that whether a given piece of electronic data is evidence often "depend[s] on other information stored on the [device]." *Id.* at 17, ¶ 36(d). Swenson's reliance on general observations about the sensitivity of location data, Doc. 725 at 8, is misplaced: the data here were sought under a warrant, for a defined period, as evidence of specified offenses—the very protections the Fourth Amendment prescribes. *See Riley*, 573 U.S. at 403.

Swenson's First Amendment objection to the phrase "other organized protest activity" fails for the same reasons. Doc. 725 at 7–8; Doc. 778 at 3. That phrase appears only within clauses that are themselves limited to records "evidencing or relating to" the planning and commission of the SUBJECT OFFENSES and subsequent communications about them. Doc. 726 at 21–22. The limitation is not academic. The organizer described “Operation Pullup” as

a tactic the group had used before, *id.* at 7–8, ¶ 21, so evidence of how this group organizes its other operations, and with whom, is evidence of the conspiratorial agreement and of who joined it.

Lastly, even if this Court were to conclude that the warrant was so obviously overbroad as to render official belief in its validity objectively unreasonable, this Court should suppress only that information obtained pursuant to the potentially overbroad portion of the warrant. *See United States v. Fitzgerald*, 724 F.2d 633, 636 (8th Cir. 1983) (en banc).

**D. The good-faith exception justifies the search.**

Even if the application and warrant violate the Fourth Amendment, the good-faith exception requires this Court to deny Swenson's request to suppress all evidence obtained under the search warrants, together with any and all derivative evidence obtained. Pursuant to the good-faith exception, suppression is not "an appropriate remedy" where officers "obtained [evidence] in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). "[A]n officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* at 921. Thus, "suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926; *see also United*

*States v. Dickerman*, 954 F.3d 1060, 1065 (8th Cir. 2020) (same). Swenson does not argue that any law-enforcement officer was dishonest, reckless, or lacked an objectively reasonable belief that there was probable cause to obtain Swenson's cell phone location records. The good-faith exception therefore applies.

Accordingly, this Court should deny the motions.

DATED: October 15, 2026.

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney

HARMEET K. DHILLON
Assistant Attorney General

ROBERT J. KEENAN
Acting Dep. Asst. Attorney General

NEVILLE S. HEDLEY
Acting Senior Litigation Counsel

MANPREET K. UPPAL-GUPTA
Trial Attorney

*/s/ Manpreet K. Uppal-Gupta*
Manpreet K. Uppal-Gupta
Trial Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 304-8928
E-Mail: Manpreet.Uppal@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA